UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:14-cv-24517-KMM/McAliley

EDGE SYSTEMS, *et al.,*
                    Plaintiffs,
        v.

Rafael Newton Aguila,
                    Defendant.
_____/

FILED by _____ D.C.

DEC 1 5 2014

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

DEFENDANTS' MEMORANDUM OPPOSING

THE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

TABLE OF CONTENTS .................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 1

    A.   Plaintiffs' argument that the Defendant's device is dangerous to the public because it is not approved by the FDA, while Plaintiffs' Hydrafacial device is FDA approved ........................................ 1

    B.   Plaintiffs' argument that the trade dress between their Hydrafacial device and the Defendant's Hydraderm MD is identical. ......................................................................................................... 3

    C.   Plaintiffs' argument that the Defendant has copied both its logo and the name "Edge Systems". ... 5

    D.   Plaintiffs' argument that on January 2010, they sent the Defendant a cease & desist letter. Furthermore, the Defendant subsequently removed the supposedly infringing products from the offending websites ................................................................................................................................ 6

    E.   Plaintiffs' argument that their trademarks are being infringed upon by the Defendant. ................. 8

ARGUMENT ...................................................................................................................... 8

    A.   The Plaintiffs have not developed an iconic brand ........................................................................ 8

        1.   The trademarked term "Hydrafacial" is generic in nature ........................................................ 8

        2.   The trademarked term "The Edge System" has been abandoned ............................................. 11

        3.   The trademarked term "Hydropeel" is generic .......................................................................... 11

        4.   The trademarked term "Vortex-Fusion" is descriptive ............................................................. 12

        5.   The Plaintiffs' "common law" trademarks should not be protected .......................................... 13

    B.   The Plaintiff do not have a substantial likelihood of prevailing on the merits of their Patent Infringement Claims ....................................................................................................................... 13

        1.   Statute of Limitation on Patents (laches) .................................................................................. 13

        2.   Plaintiffs' US Patent No. 6,299,620 ("the '620 patent") is invalid due to anticipation from prior art. 14

    C.   Fraud is not sufficiently alleged ..................................................................................................... 16

    D.   The Balance of Hardships Favors the Defendant ........................................................................... 16

    E.   LACHES AND EQUITABLE ESTOPPEL PRECLUDES THE PLAINTIFFS FROM CLAIMING TRADEMARK INFRINGEMENT, COPYRIGHT INFRINGEMENT, UNFAIR COMPETITION, DILUTION, AND CYBERSQUATTING ................................................................. 17

    F.   UNCLEAN HANDS PRECLUDES THE PLAINTIFFS' FROM RECEIVE INJUNCTIVE RELIEF ............................................................................................................................................. 18

        1.   Click-fraud on Defendant's Google Adwords account ............................................................. 18

2.   Declaration of LEALANI IRBY ....................................................................18

3.   Declarations from the other Declarants....................................................19

CONCLUSION ..............................................................................................20

## TABLE OF AUTHORITIES

*Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC.*, S.D. Florida.  October 5, 2010. 745 F.Supp.2d 1359.                                                                                        9

*Creative Gifts, Inc. v. UFO, 235 F.3d 540, 544 (10th Cir.2000).*                                 10

*Park 'N Fly, Inc., 469 U.S. at 194, 105 S.Ct. 658.*                                              11

*Sally Beauty Co., 304 F.3d at 976*                                                               11

*Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1513, 224 U.S.P.Q. 552, 555 (11th Cir. 1984)  18     11, 18

*St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1208-09 (11th Cir. 2009)  11

*Cumulus Media,, Inc v. Clear Channel Communications, Inc.,* 304 F.3d 1167 (11th Cir. 2002).      11

*Baron Philippe de Rothschild v. Paramount Distillers, Inc.,* 923 F. Supp. 433, 438 (S.D.N.Y. 1996)  13

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1029–1031, 1039–1041 (1992) (*en banc*).  14

*Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1370–71 (11th Cir.1997)  16

*Durham v. Business Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir.1988)                           16

*Hughes v. Design Look Inc.*, 693 F. Supp. 1500, 8 U.S.P.Q.2d (BNA) 1587, 1593 (S.D. N.Y. 1988).  17

*Reed Publ'g (USA), Inc. v. Who's Who Worldwide Registry*, 27 U.S.P.Q.2d 1702, 1704 (E.D. N.Y. 1992), aff'd 9 F.3d 1537, 30 U.S.P.Q.2d 1229 (2d Cir. 1993).  17

*Reins of Life, Inc. v. Vanity Fair Corp.,* 5 F. Supp. 2d 629 (N.D. Ind. 1997)                    17

*Kason Indus. v. Component Hardware Group, Inc.,* 120 F.3d 1199, 1203 (11th Cir. 1997)            17

See *Citibank, N.A. v. Citibanc Group, Inc.,* 724 F.2d 1540, 1545 (11th Cir. 1984).               18

*Davidoff & Cie, S.A. v. PLD International Corp.,* 263 F.3d 1297 (11th Cir. 2001)                 20

## OTHER AUTHORITIES

35 U.S.C. 286                                                                                     17

21 CFR 878.4820                                                                                    5

## PRELIMINARY STATEMENT

The Defendant, Rafael Newton Aguila, asks the Court to deny the Plaintiff's motion for preliminary injunction because (1) the balance of harm is disproportionally directed at the Defendant since the Preliminary Injunction would force him to close down his business of manufacturing  and selling microdermabrasion machines, thereby rendering him without means of supporting himself and without the ability to legally defend himself in this lawsuit; (2) many of the claims made by the Plaintiffs are time-barred under laches and equitable estoppel; (3) the Plaintiffs actually copied the Defendant's trade dress and several of his trade names; (4) the Plaintiffs claim that their HydraFacial device is FDA approved when it is not; (5) the Plaintiffs claim that the Defendant's devices are neither listed nor registered with the FDA, when they are in fact both listed and registered; (6) Plaintiff's patents were anticipated by several other previous patents and prior art; (7) many of the Plaintiffs' trademarked names are generic.[1]

## STATEMENT OF FACTS

### A. Plaintiffs' argument that the Defendant's device is dangerous to the public because it is not approved by the FDA, while Plaintiffs' Hydrafacial device is FDA approved.

On page 17 of Plaintiffs' *ex parte* motion, they write that "*The Edge Machine is an FDA-registered medical device. (Cohen Decl., '118, Exs. J&K.)*". Supposedly, the Plaintiffs are referring to their Hydrafacial device as "The Edge Machine". Furthermore, Mr. William Cohen (the President for Plaintiff Edge Systems LLC) writes in his declaration[2] that a "*true and correct copy of a February 25, 1999 FDA 501(k) notification from Edge*" is attached as Plaintiffs' Exhibit "I".[3] Unfortunately, the 510(k) notification that Mr. Cohen alludes to is for a "Sterile Tubing" that is "for use in removing smoke from laser and/or electrosurgical procedures" with a 510(k) number of K990748. This device has **nothing** to do with the Plaintiff's Hydrafacial microdermabrasion device. Yet, Mr. Cohen gives the impression that the 510(k) that he is referencing is for the Plaintiff's Hydrafacial device. In fact, the Plaintiff's Hydrafacial device had **no** 510(k) number and was **never** approved by the FDA because microdermabrasion machines are exempt from the FDA's 510(k) approval procedures.

---

[1] See Defendant's Exhibit 1 for Aguila's declaration.
[2] See Plaintiffs' Exhibit B for Mr. Cohen's declaration.
[3] See Cohen Decl. ¶33.

Although Edge Systems LLC is registered with the FDA as a medical device manufacturer, it is important to note that it does not list neither the Hydrafacial nor "The Edge System" as one of the devices in their registration information.[4] Mr. Cohen goes on to claim that a *"true and correct copy a screenshot (November 24, 2014) listing Edge's **HydraFacial MD** in the FDA's Establishment Registration & Device Listing is attached hereto"* as Plaintiffs' Exhibit J.[5] Unfortunately for the Plaintiffs, the name HydraFacial MD does **not** appear in the Plaintiffs' FDA listing.

By going to the FDA's online database on 510(k) Premarket Notifications (http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPMN/pmn.cfm), one can discover if a device has a 510(k) from the FDA. A 510(K) is a premarket submission made to the FDA to demonstrate that the device to be marketed is at least as safe and effective – that is, substantially equivalent – to a legally marketed device (21 CFR §807.92(a)(3)). When one writes the name of Edge Systems in the database field for "Applicant name", the results show that Edge Systems has a 510(k) approvals for three devices: (a) Del Sol Red Light Therapy System (K072399), (b) Del Sol Blue Light Therapy System (K061470), and (c) Edge Systems Sterile Tubing (K990748).

However, Plaintiffs never received a 510(k) approval for their Hydrafacial device. This is allowed by the FDA because microdermabrasion machine are 510(k) exempt. The FDA classifies microdermabrasion devices under 21 CFR 878.4820 (Surgical instrument motors and accessories/attachments). Furthermore, microdermabrasion devices are classified as "Class 1" medical devices (the lowest of the 3 different classes that the FDA assigns to medical devices), exempt from the 510(k) premarket notification procedures mentioned in subpart E of 21 CFR 807. Therefore, Defendant's HydraDerm MD and Hydradermabrasion MD devices are also 510(k) exempt by the FDA. Wherefore, Plaintiffs' argument that Defendant's products are **potentially dangerous** to the public because they have not been approved by the FDA is clearly false because Plaintiffs' Hydrafacial MD device is also not approved by the FDA.

On Page 18 of the Plaintiffs' *ex parte* motion, they claim that a Preliminary Injunction will serve the public interest because it is *"necessary to protect consumers from Defendant's potentially harmful knock-off products. The Edge Machine is registered with the FDA as a medical device. (Cohen Decl., ¶8, Exs. J&K.) Although Defendant makes claims that its products are registered with the FDA, Edge has not found any such registration and believes that Defendant's claims are false. (Razai, ¶¶10, 11) Allowing Defendant to continue selling its knock-off product poses a risk to the safety of consumers"*. In fact, the

---

[4] See Plaintiffs' Exhibit K.
[5] See Cohen Decl. ¶34.

Defendant is registered with the FDA, and he has listed all of his devices with the FDA, including both the HydraDerm MD and Hydradermabrasion MD. While the Plaintiff has failed to list the Hydrafacial in their FDA device listing.

Plaintiffs' have offered this argument in bad faith to this Court in order to show an immediate need for the *ex parte* TRO and a Preliminary Injunction. Plaintiffs' false argument on the lack of FDA approval, for the HydraDerm MD, has prejudiced the Defendant since the Court accepted Plaintiffs' argument that Defendant's devices were potentially harmful to the public in its *ex parte* Temporary Restraining Order. The Plaintiffs made it appear that their Hydrafacial MD device has a 510(k) approval, by including a 510(k) number of a completely different device.

In addition, the FDA maintains a database on all medical device-related complaints in the United States called MAUDE (Manufacturer and User Facility Device Experience). This database can be found at www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm. If one types the brand name of one of the Defendant's current or former devices into the MAUDE database (e.g. HydraDerm MD, Hydradermabrasion MD, DiamondSkin, DiamondPeel, HydraPeel, or DermisPeel), one would find no results. Even if one selects 1996 as the beginning of "date range". However, there is one MAUDE report against the Plaintiffs' Hydrafacial device.[6] This MAUDE report was submitted by Edge Systems itself, and is, therefore, written in a manner that diminishes the Plaintiff's potential responsibility in this medical accident. Nevertheless, this evidence does show that the Plaintiffs' Hydrafacial device has more FDA / MAUDE complaints than the Defendant's products. Further demonstrating that the Defendant's products do not present a danger to the public.

**B. Plaintiffs' argument that the trade dress between their Hydrafacial device and the Defendant's Hydraderm MD is identical.**

This argument appears to be valid because of the side-by-side comparison found on the second page of the Plaintiffs' *ex parte* motion. However, in fact, the real facts are the exact reverse. The Plaintiffs' Hydrafacial device has copied the Defendant's Hydraderm MD trade dress. Originally, in 2005, the Plaintiffs' Hydrafacial device looked like the images below:

---

[6] See Defendant's Exhibit 2.

 

However, the Defendant's HydraDerm MD trade dress was already present since 2004. As can be seen in a screenshot of Defendant's www.diamondskin.com website from August 2004, using the Wayback Machine[7], the writing on the website includes the fact that the "*DiamondSkin machine uses advanced Oxygen infusion technology to assist skin cell recuperation at the moment of dermabrasion*".[8] Furthermore, the website makes the claim about the device's "*Transdermal Oxygen delivery system*". The DiamondSkin was a family of various microdermabrasion machines, which ranged from the low-end to expensive. The HydraDerm MD was considered to be the high-end in the DiamondsSkin family of devices because it had a touchscreen monitor and wheels on its base.

As can be seen in the Wayback Machine's retrieval of the Plaintiffs' website from 2004, www.edgesystem.net, it shows that the Plaintiffs were only selling the Delphia microdermabrasion device and some other products.[9] Only in 2005 did the Plaintiffs start selling the Hydrafacial on their website.[10,11] As can be shown with the evidence presented, the Defendant was selling a serum-based, transdermal

---

[7] The Wayback Machine is a service that enables users to see archived versions of web pages across time. It is maintained by the Internet Archive, a non-profit organization. www.archive.org
[8] See Defendant's Exhibit 3.
[9] See Defendant's Exhibit 4.
[10] Mr. Cohen writes that "*Edge has been selling product bearing this unique and distinctive design as early as 2010 and has been selling a product bearing a nearly identical design since 2005*". See Cohen Decl. ¶9 in Plaintiffs' Exhibit B.
[11] See Defendant's Exhibit 5.

microdermabrasion device before the Plaintiffs. In addition, the Plaintiffs' original Hydrafacial device in 2005 looked nothing like the current iteration.

Notwithstanding the evidence presented, thus far, on how the Plaintiffs have imitated the Defendant's Hydraderm MD trade dress. On page 2 of the Plaintiffs' *ex parte* motion, it is clear that the image on their Hydrafacial computer screen is strikingly **dissimilar** to the HydraDerm MD's computer screen. Not only do they display the word "Hydrafacial", but their background is a dark color. The HydraDerm MD's computer screen, in contrast, shows a light gray background with a wave-like streak, right below the word "HydraDerm MD".

### C. Plaintiffs' argument that the Defendant has copied both its logo and the name "Edge Systems".

The Defendant is well-known in the microdermabrasion industry as an innovator. Since 1996, he has created numerous microdermabrasion machines and invented terms like "hydradermabrasion" to describe the simultaneous action of hydrating the skin while at the same time exfoliating the skin with a microdermabrasion device. In fact, the Defendant was selling a transdermally infusing, serum-based microdermabrasion in 2004, one year before the Plaintiffs placed their Hydrafacial on sale in 2005. However, this was not the first time the Plaintiffs copied some of the Defendant's ideas. In 1996, the Defendant began to manufacture a microdermabrasion machine called the DermisPeel. The Defendant chose the term "Edge Systems" to be the name of his company. In addition, the Defendant created the logo for Edge Systems, which was shown on his website until the *ex parte* Temporary Restraining Order from Judge Moore on December 2nd, 2014.

On or about 2000, it came to the Defendant's attention that Roger Ignon had started selling microdermabrasion machine in California under name of Edge Systems, and using a modified version of my logo. After calling Mr. Ignon, I asked that he stop using my trade name and logo. Mr. Ignon refused to do so. Since microdermabrasion machines were not very popular at that time, I decided not to pursue any legal challenges against Mr. Ignon. Nevertheless, since the web domains of edgesystem.com and edgesystem.net were already taken, I decided to use a different name for my main company.

In order to avoid confusion with Mr. Ignon's company, I avoided using the term Edge Systems to describe my main company. I chose a different company that I had created, DiamondSkin, as my main company. Furthermore, nine year ago on October 14, 2005, the Defendant applied for a US Trademark on the term "DiamondSkin". Although the application was not ultimately successful, it does show that the first time that the Defendant used the term "DiamondSkin" in commerce was in January 1997.

However, once the web domain of www.edge-systems.com became recently available on October 29th, 2014, the Defendant decided to purchase it. Since the Defendant was the first to use Edge Systems for a microdermabrasion manufacturer, he assumed that there would be no legal issues in using the web domain on www.edge-systems.com. Apparently, this action was the real reason that the Plaintiffs decided to file this lawsuit. It should also be noted that Mr. Ignon's Edge Systems only started using a version of the Defendant's logo on or about 2000. Even though Mr. Ignon had started his company in 1997. From 1997 to approximately 2000, Mr. Ignon's company used a completely different logo to the one that he uses now.

**D. Plaintiffs' argument that on January 2010, they sent the Defendant a cease & desist letter. Furthermore, the Defendant subsequently removed the supposedly infringing products from the offending websites.**

The Defendant does not dispute the fact that a Cease & Desist letter was sent by the Plaintiffs on January 2010 as mentioned on page 8 of their *ex parte* motion.[12] However, the Defendant does vehemently dispute the Plaintiffs' allegation that he removed all of the supposedly infringing products from the offending websites. In fact, this makes no sense since the Defendant had no alternative means of producing income in 2010, other than selling his products on his websites. Furthermore, if the Defendant had removed all of the supposedly infringing products from his websites, then he would have had to declare bankruptcy and left in penury because he no other way of supporting himself. In addition, the Plaintiffs provide no evidence to back up their claims that the Defendant removed the supposedly infringing products from his websites after the Cease & Desist letter. The fact that the Defendant ignored the Cease & Desist letter, as admitted by the Plaintiffs, shows that he also ignored **all** of the demands made in the Plaintiffs' Cease & Desist letter. Furthermore, the Plaintiffs belie their own argument by writing in the very next paragraph that in October 2011 *"Edge learned that Defendant's website had copied portions of text from Edge's website and was also infringing Edge's HYDROPEEL mark"*.

If the Defendant had indeed removed the supposedly infringing products from his websites after the 2010 Cease & Desist letter from fear of the Plaintiffs' legal actions, why is the Defendant again performing the same infringement activities only one-year afterwards? Although it is possible to think of such a scenario, the common-sense reality is that this never happened. The Defendant had been selling since 2004, products that the Plaintiffs claim infringe on their trademarks and patents. Why would the Defendant stop for one year, after the Cease & Desist letter in 2010, and then begin selling again until the present Temporary Restraining Order put a stop to his sales.

---

[12] See Plaintiffs' Exhibit U and also Defendant's Exhibit 6.

6

In addition, the Plaintiffs had asked for much more than the stoppage of all commerce by the Defendant on his websites. In fact, the Plaintiffs had demanded that the Defendant **(1)** immediately cease and desist any and all use of the marks HYDRAPEEL, HYDRAFACIAL, GLYSAL, ACTIV-4, DERMABUILDER, and ANTIOX-6, or any other mark confusingly similar to our client's marks; **(2)** immediately take down all text and other copyrighted material belonging to Edge Systems from the <hydradermabrasian.com> domain and any other domains you control; **(3)** immediately take down all material from the domains <hydrapeel.com> and <hydropeel.com> and transfer the domains <hydrapeel.com> and <hydropeel.com> to Edge Systems; **(4)** immediately cease doing business as HydraPeel Systems and agree not to do business under a trade name confusingly similar to Edge Systems' marks; **(5)** immediately cease all manufacturing, sales, offers for sale, and importation of your hydradermabrasion products, and any other products covered by Edge Systems patents; **(6)** immediately destroy all products covered by Edge System's patents and provide us with documentation of such destruction; and **(7)** pay Edge Systems' damages, attorneys' fees, and costs incurred in connection with this matter.

Within a week of receiving the Cease & Desist letter, the Defendant spoke with the Plaintiffs and mentioned that he could sue them for common law trademark infringement because he was the first to use the Edge Systems name and logo, in addition to being first to offer a serum-based microdermabrasion device in 2004. Soon thereafter, both sides agreed not to sue each. However, no agreement was signed.

However, once the Plaintiff was able to purchase the domain name www.edge-systems.com on October 2014, he then registered the business name of "Edge Systems" with the state of Florida as a sole proprietorship. The Defendant subsequently applied for a trademark[13] for both the term and logo for "Edge Systems" with the USPTO on November 1st, 2014.[14] These actions led directly to the current lawsuit.

Importantly, the Plaintiffs have a strong incentive to make the false argument that the Defendant stopped selling after the Plaintiffs' Cease & Desist letter in January 2010. The reason has to do with Florida's four-year statute of limitations. Because the Defendant did not stop selling any of the items that the Plaintiffs identified in their letter, therefore under Florida's four-year statute of limitation for such claims, many are now time-barred because of laches. A discussion of the legal arguments will be made later on in this document.

---

[13] Serial Number: 86442086
[14] See Defendant's Exhibit 7.

### E.  Plaintiffs' argument that their trademarks are being infringed upon by the Defendant.

On first page of the Plaintiffs' *ex parte* motion, they claim that "*Edge's path-breaking product, the HydraFacial MD® System (the "Edge Machine"), is covered by the six patents asserted in this lawsuit, and accounts for over half of Edge's total sales*". Plaintiffs make reference to their HydraFacial MD device as being synonymous to their trademarked term of "The Edge Machine". However, the Plaintiffs offer for sale a number of machines[15], not just the HydraFacial. In fact, in all of their advertisement, they never refer to the HydraFacial device as being "The Edge Machine".

In fact, the Plaintiffs' trademark for "The Edge System"[16] was first filed with the USPTO on August 17th, 2000, five year before they would introduce the Hydrafacial into the marketplace. Moreover, the term "The Edge System" was used by the Plaintiffs during that time to refer to a microdermabrasion machine that they manufactured during that period. In fact, the description for this trademark specifically mentions that the trademark for "The Edge System" is limited to a "*medical apparatus, namely, systems comprised primarily of a vacuum source and hand piece used for medical body care treatments, microdermabrasion, and massage therapy*". Furthermore, the Plaintiffs' had abandoned this trademark, until this lawsuit because they had been using the term to describe any "medical apparatus" in their current inventory. In any case, the Defendant has made it clear that he was the first to use the term and logo for "Edge Systems" in 1996. Nevertheless, it would be misleading on the part of the Plaintiffs to continue labeling the HydraFacial device as "The Edge Machine".


### ARGUMENT

## A.  THE PLAINTIFFS HAVE NOT DEVELOPED AN ICONIC BRAND

Although it is clearly erroneous for the Plaintiffs to call themselves an "iconic" brand[17], on par with Microsoft or Coca-Cola, it is important to notice that most of their trademarks are generic in nature.

### 1.  The trademarked term "Hydrafacial" is generic in nature.

---

[15] For example, the Plaintiffs still sell three different iterations of the Hydrafacial. In addition, they sell a different microdermabrasion machine called the Delphia.
[16] USPTO Registration Number: 2992734
[17] See page 3 of the Plaintiffs' *ex parte* motion

On February 9, 2005, the Plaintiffs applied for a trademark for the term "Hydrafacial MD". The trademark was subsequently registered on November 20, 2007.[18] However, on September 12, 2005, the examining attorney for the USPTO sent the Plaintiffs a letter asking them to place a disclaimer for the term "Hydrafacial" since "it describes a feature of the goods, namely, that they are used to provide hydra facials".[19] *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC.*, S.D. Florida. October 5, 2010. 745 F.Supp.2d 1359.

On March 13, 2006, the Plaintiffs responded to the USPTO's office action by arguing the following points[20]:

> "The term HYDRAFACIAL cannot immediately convey any knowledge of Applicant's medical apparatus and instruments because a multi-step reasoning process must be employed by a consumers and potential consumers to arrive at any conclusion about the goods.  That is, a consumer must make a substantial mental leap if he is to make any connection between the term HYDRAFACIAL and Applicant's medical goods".

> "On the other hand, the terms "Hydra," "hydra," and "facial" do have recognized definitions.  The definition of "Hydra" is:

> 1. Greek Mythology - The many-headed monster that was slain by Hercules.
> 2. A constellation in the equatorial region of the southern sky near Cancer, Libra, and Centaurus. Also called Snake.
> 3. A persistent or multifaceted problem that cannot be eradicated by a single effort.

> The definition of "hydra" is "[a]ny of several small freshwater polyps of the genus Hydra and related genera, having a naked cylindrical body and an oral opening surrounded by tentacles."  The definition of "facial" is "[a] treatment for the face, usually consisting of a massage and the application of cosmetic creams."  See the attached dictionary definitions from The American Heritage® Dictionary of the English Language (4th ed. 2000).

> Thus, the term HYDRAFACIAL has numerous literal meanings – e.g., **a facial for a many-headed monster from Greek mythology, a facial for a constellation**, etc. – but none of these literal definitions has any relevance to Applicant's medical apparatus and instruments, and the Board has made it clear that the literal meaning of a mark must be considered in determining mere descriptiveness".

Notwithstanding the Plaintiffs' claim that the term "HydraFacial" is not a generic term used to describe a "hydra facial" treatment, but instead means "a facial for a many-headed monster from Greek

---

[18] The Registration Number for the "HydraFacial MD" is 3341027. For the term "HydraFacial" (without the MD), it is 4317059.

[19] See Defendant's Exhibit 8.

[20] See Defendant's Exhibit 9.

mythology". On the Plaintiffs' website, www.hydrafacial.com/faq.htm, they drop all pretence that the term "Hydrafacial" is merely suggestive by stating the following[21]:

> "What is HydraFacial™?
> The HydraFacial™ treatment is a new breakthrough in aesthetic technology. **It takes its name from the root word Hydrate; "to cause to take up moisture".** This ability to moisturize the skin separates the HydraFacial™ from all other skin resurfacing procedures. The HydraFacial™ treatment removes dead skin cells and extracts impurities while simultaneously bathing the new skin with cleansing, hydrating and moisturizing serums.
>
> Why is HydraFacial™ good for my skin?
> Hydration is the foundation of healthy, radiant skin. Irritation of the skin has been proven to increase signs of aging. **The HydraFacial™ is a hydrating and non-irritating treatment**.
>
> Am I a candidate for this treatment?
> **The HydraFacial™ treatment is designed for all skin types.** Even the most sensitive skin easily tolerates the HydraFacial™ treatment. Your physician or skincare professional may choose specific treatment serums and/or customize the treatment for your unique skin conditions and needs. Consult your physician or skincare professional for a skin evaluation and sensitivity test.

"When the relevant public ceases to identify a trademark with a particular source of a product or service but instead identifies the mark with a class of products or services regardless of source, that mark has become generic and is lost as an enforceable trademark." *Creative Gifts, Inc. v. UFO, 235 F.3d 540, 544 (10th Cir.2000)*. It is only common sense to see that the term "HydraFacial" refers to a facial that includes water or liquids for the purposes of performing a hydrating facial.[22] Just like there are other types of facials such as "mud facials", "caviar facials", "chocolate facials", or "European facials". No reasonable person would think of allowing a term such as "mud facial" to be trademarked by a company. This does not mean that term "facial", when combined with another word, can never be properly trademarked. For example, the "Geisha Facial®" is a registered trademark.[23] The reason that it is not generic is because the meaning behind the term "Geisha Facial®" is not immediately clear to a reasonable person.[24] However, the meaning of the term "Hydrafacial" is clearly generic in that it is synonymous with a "wet facial" treatment, which is exactly what the HydraFacial device is intended to perform. This Court should, therefore, declare

---

[21] See Defendant's Exhibit 10
[22] A "facial" is commonly understood to be a procedure involving a variety of skin treatments that might include: steam, exfoliation, extraction, creams, lotions, facial masks, peels, and/or massage.
[23] USPTO Registration Number: 3572103
[24] *Uguisu no fun* (Japanese: 鶯の糞) which literally means "nightingale feces" in Japanese, refers to the excrement produced by a nightingale. The droppings have been used in facials since ancient Japanese times.

this trademarked term to be generic. Generic terms cannot be registered, and a registered mark may be canceled if it becomes generic. *Park 'N Fly, Inc., 469 U.S. at 194, 105 S.Ct. 658.* "A generic term is one that refers to the genus of which the particular product is a species," in other words; it constitutes a common descriptive name. *Id. See also Sally Beauty Co., 304 F.3d at 976* (giving "cola" as an example of a general class of goods). "Absent consumer survey evidence, four factors can be considered in determining whether a particular mark has acquired a secondary meaning: (1) The length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the name and the plaintiffs ... business; and (4) the extent to which the public identifies the name with the plaintiffs [service]." *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1513, 224 U.S.P.Q. 552, 555 (11th Cir. 1984); *St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1208-09 (11th Cir. 2009).

**2.   The trademarked term "The Edge System" has been abandoned.**

As was previously discussed, the Plaintiffs have not used the trademarked term "The Edge System" to describe any of their products for several years.[25] Although for the purposes of this lawsuit, they have begun referring to the HydraFacial device as "The Edge Machine", even this is misleading because the Plaintiffs have never referred to the Hydrafacial device as "The Edge Machine" in any of their advertisements or manuals. Nevertheless, the fact remains that the Plaintiffs do not sell any device called "The Edge System". This Court should, therefore, declare this trademarked term to be abandoned. *Cumulus Media,, Inc v. Clear Channel Communications, Inc.,* 304 F.3d 1167 (11th Cir. 2002). In addition, Under Section 7(c) of the Trademark Act, the date of filing an application, whether based on actual use or intent to use, establishes a registrant's date of "constructive use," establishing nationwide priority. Since the Defendant sensed that the Plaintiff was close to filing a lawsuit, the Defendant decided to protect its intellectual property by applying for a trademark on both the logo and trade name of "Edge Systems" on November 1st, 2014.[26]

**3.   The trademarked term "Hydropeel" is generic**

The trademarked term "Hydropeel" clearly refers to a hydrating peeling, and should be considered to be generic in nature.[27] The term "Hydropeel" is described by the Plaintiffs as referring to a "medical

---

[25] Registration number: 2,992,734
[26] Serial Number: 86442086. See Defendant's Exhibit 7.
[27] Registration number: 3,500,086

11

apparatus and instruments for resurfacing and nourishing tissue".[28] On September 07, 2005, the examining attorney wrote that the Hydropeel "*mark is merely descriptive as applied to the goods because it refers to a process carried out using the applicant's goods and/or the function of the applicant's goods*".[29] On March 2006, the Plaintiffs responded with the following argument:

> "The applied-for mark HYDROPEEL cannot immediately convey any knowledge of Applicant's medical apparatus and instruments because a multi-step reasoning process must be employed by a would-be consumer to arrive at any conclusion about the goods.  That is; a consumer must make a mental leap if he is to make a connection between the mark HYDROPEEL and Applicant's goods.  That Applicant's mark HYDROPEEL is suggestive is buttressed by the fact that "hydropeel" has no definition according to Outlook.com, a website that searches numerous online dictionaries at once.  See the attached website printout from Outlook.com.
>
> The literal meaning of Applicant's mark HYDROPEEL **would be the peeling of either hydrogen or water**, and Applicant's medical apparatus and instruments do not perform this apparently-impossible task.

Regardless of the Plaintiffs' argument that the term "Hydropeel" merely refers to "*the peeling of either hydrogen or water*", any reasonable person can surmise that term "Hydropeel" refers to a "hydrating peel", which is what the Hydrafacial device is designed to perform. This Court should, therefore, declare this trademarked term to be generic.

## 4.  The trademarked term "Vortex-Fusion" is descriptive

The trademarked term "Vortex-Fusion" clearly refers to a vortex, and should be considered to be generic in nature, or at least descriptive in nature.[30] The Plaintiffs describe the term "Vortex-Fusion" as referring to a "microdermabrasion apparatus".[31] It was only recently registered on March 20th, 2012 so it is not considered "incontestable". On November 3rd, 2011, the examining attorney wrote that the "*The applicant asserts the mark has no meaning or significance in relation to the goods other than trademark significance*".[32] Notwithstanding the examining attorney's amendment, this Court should declare that this trademark is merely descriptive since it literally describes the action performed by the Hydrafacial or creating a "vortex" in their handpiece to increase their ability to "penetrate" into the epidermis.

---

[28] See Plaintiffs' Exhibit R.
[29] See Defendant's Exhibit 11
[30] Registration number: 4,114,466
[31] See Plaintiffs' Exhibit S.
[32] See Defendant's Exhibit 12

**5.    The Plaintiffs' "common law" trademarks should not be protected**

The terms "Activ-4", "Antiox+", "Antiox-6", "Beta-HD", "DermaBuilder", "GlySal" – that the Plaintiffs mention on page 3 of their *ex parte* motion – were all used by the Defendant before the Plaintiffs began using them.  The Defendant is the senior user, not the Plaintiffs. Similar to how the Defendant had been selling a "transdermally infusing" microdermabrasion machine in 2004 on his www.diamondskin.com website, one year **before** the HydraFacial device was introduced by the Plaintiffs in 2005. Under Section 7(c) of the Trademark Act, the date of filing an application, whether based on actual use or intent to use, establishes a registrant's date of "constructive use," establishing nationwide priority. Since the Defendant sensed that the Plaintiff was close to filing a lawsuit against, the Defendant filed an application for a trademark for Activ-4[33], Antiox-6[34], Beta-HD[35], and DermaBuilder[36] on December 1st, 2014 in order to protect his intellectual property. However, the Defendant did not apply for the terms "Antiox-Plus" or "GlySal" since this is not an important product and did not merit the expense of a trademark application. Nevertheless, these products were all used by the original HydraDerm MD device in 2004, and the Plaintiffs have slowly copied every term, until today.[37] The Court should take note that the term "HydraDerm" is a simply a shortening of the longer word "HydraDermabrasion", which is why the Defendant selected them "HydraDerm MD" in 2003, when he was first developing the device and its accessories. Therefore, like so many other aspects in the case, the truth is the exact reverse of what the Plaintiffs have claimed in both their *ex parte* motion and Complaint.

**B.    THE PLAINTIFF DO NOT HAVE A SUBSTANTIAL LIKELIHOOD OF PREVAILING ON THE MERITS OF THEIR PATENT INFRINGEMENT CLAIMS**

**1.    Statute of Limitation on Patents (laches)**

The statute of limitations for Patents of six years has passed (laches) since the Plaintiffs first purchased one of the Defendant's devices on 2006 for suspecting that it was potentially violating their patents.[38] The Plaintiffs admit on page-seven of their *ex parte* motion, which they have been aware of the

---

[33] Serial Number: 86467532. See Defendant's Exhibit 13
[34] Serial Number: 86467584. See Defendant's Exhibit 14
[35] Serial Number: 86467563. See Defendant's Exhibit 15
[36] Serial Number: 86467627. See Defendant's Exhibit 16
[37] Baron Philippe de Rothschild v. Paramount Distillers, Inc., 923 F. Supp. 433, 438 (S.D.N.Y. 1996) states that "even assuming that the...defendants' mark is incontestable...it would not be incontestable against a senior user".
[38] Although the six-year statute of limitations for Patents only affects any potential monetary awards, and not injunctive relief.

Defendant's supposedly infringing products since at least 2006.[39] Although the Plaintiffs claim that the Defendant's technology was antiquated, it is clear that they had copied at least the trade dress of the Defendant's HydraDerm MD because early 2006 was when the Plaintiffs altered the trade dress of their original HydraFacial device from the pictures shown on page five of this document, to their current trade dress. 35 U.S.C. 286 on the Time limitation on damages ("except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action). *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1029–1031, 1039–1041 (1992) *(en banc).*

**2. Plaintiffs' US Patent No. 6,299,620 ("the '620 patent") is invalid due to anticipation from prior art.**

On page 19 of the Plaintiffs' *ex parte* motion, they claim that their '620 patent is being infringed by the Defendant's HydraDerm MD device. However, US Patent 6,241,739 ("the '739 patent) was filed with the USPTO on November 12, 1999, more than one month before the '620 patent was filed on December 30th, 1999.[40] The '739 patent clearly anticipates the '620 patent by mentioning the following:

*"FIG. 11 shows a second tube 54 mounted on the treatment tip 22. The tube could be used to allow the metered use of chemicals to enhance the abrasion or supply or other liquids to reduce friction".*



| Plaintiffs' '620 Patent | Disclosure of U.S. Patent No. 6,241,739 |
|---|---|
| Preamble: A system for treating surface layers of a patient's skin, comprising: | The device for microdermabrasion comprises a hollow tube with and abrasive material permanent attached to a **skin contacting end**. The abrasive coated tip is moved over the skin surface While a vacuum is applied through the tube to the skin surface to remove cells abraded from the skin |

---

[39] As quoted on page seven of the Plaintiffs' *ex parte* motion: "Although unrelated to its current actions, this isn't the first time that Defendant has attacked Edge's business. Edge first became aware of Defendant in early 2006, when Defendant-doing business as DiamondSkin Systems-was selling a microdermabrasion machine on eBay that appeared to infringe some of Edge's licensed patents. Edge learned that, contrary to the description on eBay, the products used antiquated technology".
[40] See Defendant's Exhibit 17 for a copy of the '739 patent.

| Plaintiffs' '620 Patent | Disclosure of U.S. Patent No. 6,241,739 |
|---|---|
| | surface. The vacuum also causes the skin to be held in intimate contact With the abrasive tip during the treatment procedure. |
| (a) an instrument body with a distal working end for engaging a skin surface; | This is generally accomplished by the use of a tube **having a treatment tip with an abrasive material** permanently attached thereto. The term "tube" or "tubular" used herein refers to **an elongated hollow structure** of any cross section, which includes, but is not limited to, a round, oval, square or rectangle cross section. |
| (b) a skin interface portion of the working end comprising an abrasive fragment composition secured thereto; | The abrasive tip is **rubbed over the skin surface** being treated. The tube and related instrumentation also provides a vacuum collection and an optional filter system for collection of the skin cells removed by the procedure, the skin cells being aspirated through a hole or holes in the central portion of the abrasive tip. |
| (c) at least one inflow aperture in said skin interface in fluid communication with a fluid reservoir; and | FIG. 11 shows a second tube mounted on the treatment tip. The tube could be used to allow the metered use of **chemicals** to enhance the abrasion or supply or other **liquids** to reduce friction. |
| (d) at least one outflow aperture in said skin interface in communication with a negative pressurization source. | A tubular device for performing micro-abrasion of a skin surface comprising a tubular device with a lumen there through, the tubular device having a first end with an abrasive surface and means on a second end thereof for attachment to a source of a vacuum to apply a **negative pressure** to a skin surface to be treated, said vacuum causing increased contact between the skin surface and the abrasive surface. |

Additionally, US. Patent No. 4,378,804 ("the '804 patent") anticipates the Plaintiffs' patent by first claiming that liquid "is directed to a skin abrasion device which uses flowing water to rotate an abrasive brush and create a vacuum to remove loosened skin particles. The rotating brush is usually used in conjunction with a liquid detergent or medicinal compound applied to the skin surface being scrubbed".[41]

Also, US. Patent No. 5,037,431 ("the '431 patent") describes the use of a pressurized jet of a liquid, such as water or sterile saline, to fragment and remove diseased tissue without harming surrounding healthy tissue. This device operates in conjunction with vacuum aspiration to remove the liquid and fragmented tissue.[42]

---

[41] See Defendant's Exhibit 18 for a copy of the '804 patent.
[42] See Defendant's Exhibit 19 for a copy of the '431 patent.

A similar analysis can be made on the Plaintiffs' other patents, but space does not allow for that level of analysis in this document. Including an analysis on Plaintiffs' Inequitable Conduct in receiving their patents. The Court should take note that Plaintiffs' analysis of the Defendant's device is wholly inadequate.[43] It should be noted that the Defendant (doing business as Newcell-Technologies) had previously won a patent infringement case by Altair Instruments in 2006 by participating in an *ex parte* reexamination of Altair's patent with the USPTO. Altair had to substantially alter its claims in that patent to avoid complete invalidation of its patent. Altair subsequently dismissed its case against the Defendant.[44,45]

## C.  FRAUD IS NOT SUFFICIENTLY ALLEGED

Plaintiffs allege that Defendants' marks should be canceled due to fraud in the trademark registration process. Rule 9(b) of the Federal Rules of Civil Procedure provides, in pertinent part, that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). Further, "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id*. This Rule is satisfied if the complaint sets forth (1) the exact statements or omissions made; (2) the time and place of each such statement and who made the statement or omission; (3) the substance of the statement and how it misled the plaintiff and (4) the defendants' gain due to the alleged fraud. *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1370–71 (11th Cir.1997) (quoting *Durham v. Business Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir.1988)). On page 6 of the Plaintiff's *ex parte* motion, they claim that the "*Defendant has gone to great lengths to attempt to assume Edge's identity, including filing its own trademark application for the mark EDGE SYSTEMS with a fraudulent declaration as to the purported date of Defendant's first use*". The Plaintiffs provide no evidence to back up their claims of fraud against the Defendant. In fact, the Defendant had been selling microdermabrasion machine since 1996. For example, in the Defendant's trademark application for the term "DiamondSkin" in 2005, he stated that the first use of this term was on January 1st, 1997.[46] Therefore, the Plaintiffs did not sufficiently allege Fraud ad required in Fed.R.Civ.P. 9(b).

## D.  THE BALANCE OF HARDSHIPS FAVORS THE DEFENDANT

---

[43] See Plaintiff's Declaration of Rabinder N. Narula, who never touched the HydraDerm MD
[44] 1:06-cv-21135-WMH Altair Instruments v. Newcell-Technologies, et al
[45] 2:04-cv-09766-R-PJW Altair Instruments Inc v. Newcell-Technologies et al
[46] See Defendant's Exhibit 20

The balance of harm is disproportionally directed at the Defendant since the Preliminary Injunction would force him to close down his business of manufacturing and selling microdermabrasion machines, thereby rendering him without means of supporting himself and without the ability to legally defend himself in this lawsuit by being able to afford a competent attorney. "Balance of hardships tips in defendant's favor where it has expended substantial sums of money to produce its product and has taken a considerable number of orders, and plaintiffs have not shown any economic injury", *Hughes v. Design Look Inc*., 693 F. Supp. 1500, 8 U.S.P.Q.2d (BNA) 1587, 1593 (S.D. N.Y. 1988). In this case, a Preliminary Injunction would be the equivalent of a Permanent Injunction. See Exhibit 1 for Aguila's Declaration. "If the defendant has made a substantial investment and will be put out of business by the preliminary injunction, then the balance of harms tilts decidedly in its favor", *Reed Publ'g (USA), Inc. v. Who's Who Worldwide Registry*, 27 U.S.P.Q.2d 1702, 1704 (E.D. N.Y. 1992), aff'd 9 F.3d 1537, 30 U.S.P.Q.2d 1229 (2d Cir. 1993). The Defendant has spent more than $200,000 over the past several years in marketing and other business costs. The investment would be lost by a Preliminary Injunction. *Reins of Life, Inc. v. Vanity Fair Corp.*, 5 F. Supp. 2d 629 (N.D. Ind. 1997) ("balance of harms tips toward defendant where the cost to defendant greatly outweighs the threat to plaintiff").

## E.  LACHES AND EQUITABLE ESTOPPEL PRECLUDES THE PLAINTIFFS FROM CLAIMING TRADEMARK INFRINGEMENT, COPYRIGHT INFRINGEMENT, UNFAIR COMPETITION, DILUTION, AND CYBERSQUATTING

The Plaintiffs sent the Defendant a Cease & Desist letter on January 2010. Plaintiffs claimed in their letter that the Defendant had engaged in Trademark Infringement, Copyright Infringement, Unfair Competition, Dilution, and Cybersquatting on the trademarks. The Plaintiffs mention in their letter that *"[I]t has recently come to our attention that DiamondSkin Systems, Inc. ("DiamondSkin") is using the marks HYDRAPEEL and HYDRAFACIAL in connection with skin resurfacing equipment and treatments and using GLYSAL, ACTIV-4, DERMABUILDER, and ANTIOX-6 in connection with treatment topicals"*.

Importantly, in opposition to the Plaintiffs argument on page 8 of its *ex parte* motion, the Defendant never stopped selling of the supposedly infringing products. Only with the recent *ex parte* Temporary Restraining Order, has the Defendant stop selling the supposedly infringing products.[47] The federal trademark and cybersquatting statutes do not contain a limitations period; rather laches principles apply. See *Kason Indus. v. Component Hardware Group, Inc*., 120 F.3d 1199, 1203 (11th Cir. 1997)("The Lanham

---

[47] See Aguila's Declaration.

Act does not contain a statute of limitations. However, in trademark cases, this circuit has followed the Sixth Circuit, which applies the period for analogous state law claims as the touchstone for laches"). "The equitable defense of estoppel by laches may be applied to bar claims for trade dress or trademark infringement brought under the Lanham Act". *Conagra, Inc. v. Singleton,* 7 43 F 2d 15 08, 1517 (11th Cir.1984). "The test for laches or estoppel is flexible, requiring a careful examination of both the delay and the prejudice caused by that delay. See *Citibank, N.A. v. Citibanc Group, Inc.,* 724 F.2d 1540, 1545 (11th Cir. 1984). Under Florida Statute 95.11, the statute of limitation is 4 years for (1) false designation of origin; (2) unfair competition; (3) the Florida Deceptive and Unfair Trade Practices Act; (4) and trademark infringement.

## F.   UNCLEAN HANDS PRECLUDES THE PLAINTIFFS' FROM RECEIVE INJUNCTIVE RELIEF

### 1.   Click-fraud on Defendant's Google Adwords account

The Defendant has evidence that dozens of IP Addresses engaged in action that involved clicking on the Defendant's Google Adwords advertisements, in some cases, hundreds of times. There is a strong possibility that the Plaintiffs, their employees, or their agents directly participated in these click-fraud attacks on the Defendant's websites of www.hydradermabrasion.com and www.edge-systems.com. Only through the Discovery process and filing subpoenas on the respective Web Hosting companies which hosted the suspected IP addresses, will the Defendant be able to know for sure if these individuals had a relationship with the Plaintiffs or not.  The suspected IP addresses include: 173.227.19.10; 173.227.19.26; 173.227.19.30; 50.162.77.199; 173.198.54.82; 72.198.179.27; 173.227.19.31; 68.225.254.203; and 71.84.51.149.

### 2.   Declaration of LEALANI IRBY

Apparently, the Defendant sold a Hydradermabrasion MD device to Ms. Irby from Atlanta, Georgia on August 15th, 2014. It is not clear what her associations are with the Plaintiffs or if she gains in some way from her association with them. Nevertheless, it is clear that Ms. Irby filed a complaint on eBay against the Defendant on September 7th, 2014, claiming "the machine does not work". Although it was suspicious that Ms. Irby only complained about the device that was sent to her not working, after three weeks, the Defendant tried to resolve the situation. The Court should note that even though Ms. Irby claims to have been shocked to not have received a Hydrafacial device, she still wrote a positive review on my eBay profile. Nevertheless, Ms. Irby's complaint on eBay has negatively affected my relationship with eBay and might cause eBay to shut down my account with them.

### 3. Declarations from the other Declarants

The claims made in the Declaration of STEVE HAIK are diminished in weight by the fact that he is an employee of the Plaintiffs and his employment might be terminated if he does not do what his bosses ask from him.

The claims made by CINDY CANTAVESPRI are suspicious because she has previously had a relationship with the Plaintiffs, and she might receive economic benefits from helping the Plaintiffs. In addition, she clearly mentions that Defendant's device is clearly labeled as the HydraDerm MD, and not the HydraFacial.

The claims made WILLIAM COHEN (the President of the Plaintiff Edge Systems LLC) should be looked at askance due to the fact that he purposely misled this Court into believing that their HydraFacial was approved by the FDA with a 510(k). In addition, Mr. Cohen even included the supposed 510(k) number of the HydraFacial, as well as a copy of the 510(k) as Plaintiffs' Exhibit I. The Court should that the Plaintiffs' combined motion and exhibits run for more than 600 pages, so it would be easy for this Court to overlook the details of the 510(k) in question. Unfortunately, the 510(k) number that that Mr. Cohen alludes to, K990748, is for a "Sterile Tubing" that is "for use in removing smoke from laser and/or electrosurgical procedures". This device has nothing to do with the Plaintiff's Hydrafacial microdermabrasion device. Yet, Mr. Cohen gives the impression that the 510(k) that he is referencing is for the Plaintiff's Hydrafacial device. In fact, the Plaintiff's Hydrafacial device has no 510(k) number and was never approved by the FDA because microdermabrasion machines are exempt from the FDA's 510(k) approval procedures.

The declaration of Mr. Ali R. Razai should also be looked at with severe reservations due to the fact that he is one of the Plaintiffs' attorneys. Mr. Razai also makes a reference to the Defendant violating the trademark of a separate company called Lumenis. This is simply not true and the Plaintiff never received a Cease & Desist letter from Lumenis.

The declaration of Mr. Rabinder N. Narula is strange because he only makes his patent law analysis based on some photos that Ms. Lealani made. It is also not clear that the handpieces that are shown on the photos belong to the Defendant, since the handpieces for both the HydraDerm MD and the Hydradermabrasion MD look very different. Lastly, Mr. Narula is works for the law firm of the Plaintiffs' attorneys, so his continued employment at Knobbe would be endangered if he made contrary observations.

The declaration of Ms. Rosemarie Holcomb should be discounted due to the fact that she is a Senior Marketing Manager for the Plaintiffs and her employment may be endangered if she did not comply with

employer's demands. In addition, the Defendant would never claim that he is associated with the Edge Systems LLC from California.

## CONCLUSION

The Plaintiffs have failed to establish a substantial likelihood of success on the merits, failed to establish that it would be irreparably harmed if injunctive relief were denied, and failed to establish that the balance of threatened injury outweighs damage of the injunction to the alleged infringer, and failed to establish that this injunction would not be adverse to the public interest. Plaintiff has failed to present any evidence of harm, irreparable or otherwise because it cannot show that the Defendant made false or misleading statements to their prospective customers. The failure of the movant to carry his burden of persuasion in any one of these aspects is cause for denial of the Motion and for an injunction not to issue. *Davidoff & Cie, S.A. v. PLD International Corp.*, 263 F.3d 1297 (11th Cir. 2001). The Court should deny Plaintiffs' motion because he cannot meet the legal standard to obtain a preliminary injunction. Lastly, the Plaintiffs' motion was 24 pages long, when they had only received permission for 23 pages.

WHEREFORE, the Defendant, Rafael Newton Aguila, respectfully request that the Plaintiff's Motion For Preliminary Injunction be denied and the Defendant be awarded damages (e.g. the $10,000 bond) for the *ex parte* Temporary Restraining Order due to the erroneous facts and bad faith that the Plaintiffs used to receive the *ex parte* Temporary Restraining Order from this Court. Defendant also asks that this Court, under its inherent power sanctions, to both censure and report the Plaintiffs' lawyers to their respective State Bars for unethical behavior due to the fact that they misrepresented to this Court that the Plaintiffs' HydraFacial device had a 510(k) approval from the FDA, when it does not, and the 510(k) number that they provided to back up their claim was for an entirely different device.

Dated: December 15th, 2014

Respectfully submitted,

Rafael Newton Aguila, *pro se*
e-mail: raguila@gmail.com
Weittenauerstrasse 11
72108 Rottenburg am Neckar
GERMANY
Telephone: +49 7472 941 9465

20

## CERTIFICATE OF CONFERENCE

Undersigned Defendant has attempted but not been able to communicate with the Plaintiff to resolve the issues raised in this Motion.

_____
Rafael Aguila, pro se

## CERTIFICATE OF SERVICE

I HEREBY certify that on December 15, 2014, I conventionally filed the foregoing document with the Clerk of the Court.  I also certify that the foregoing document is being served this day on all counsel of record by U.S. mail.

_____
Rafael Aguila, pro se

**SERVICE LIST**
*Edge Systems, LLC v. Rafael Newton Aguila*
**Case No.: 1:14-cv-24517-KMM**
**United States District Court, Southern District of Florida**

James A. Gale, Esq. (FBN 371726)
Richard Guerra (FBN 689521)
**FELDMAN GALE**
One Biscayne Tower, 30th Floor
2 South Biscayne Blvd.
Miami, FL 33131
Telephone:  (305) 358-5001
Facsimile:  (305) 358-3309


Brenton R. Babcock, Esq.
(*admitted pro hac vice*)
Ali S. Razai, Esq.
(*admitted pro hac vice*)
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

*Attorneys for Plaintiffs,*
EDGE SYSTEMS LLC and
AXIA MEDSCIENCES, LLC

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:14-cv-24517-KMM/McAliley

EDGE SYSTEMS, *et al.*,
               Plaintiffs,
    v.

Rafael Newton Aguila,
               Defendant.

_____/

**DECLARATION OF RAFAEL NEWTON AGUILA IN SUPPORT OF DEFENDANT'S MEMORANDUM OPPOSING THE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Rafael Newton Aguila, declare as follows:

1. My name is Rafael Newton Aguila, I am over the age of eighteen (13) and competent to execute this Declaration, and the following statements are true and correct based on my personal knowledge or information transmitted to me from records made at or near the time of the transactions referenced therein by person(s) with personal knowledge thereof.

2. I am the Defendant in this case.

3. I first used the trade name and logo of Edge Systems in 2006.

4. I currently manufacture the HydraDerm MD and Hydradermabrasion MD devices.

5. The current trade dress of the HydraDerm MD was not copied from the HydraFacial's trade dress.

6. The Defendant's company, and his products are registered and listed with the FDA.

7. The Defendant has never stopped selling any of his products since 1996 because of any Cease & Desist letter.

1

8. The Defendant did not stop selling any of the supposedly infringing products from his website after the Plaintiffs sent a Cease & Desist letter in January 2010.

9. The handpieces that are shown in Mr. Narula's declaration are not the ones used with any of Defendant's products, including the HydraDerm MD and the Hydradermabrasion MD.

10. I have no other way of supporting myself except through selling the microdermabrasion machines.

11. If this Preliminary Injunction is ordered, then I would lose all income-producing abilities and will have to declare bankruptcy.


     I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 15th day of December 2014 at Miami, Florida.


Dated: December 15th, 2014

Respectfully submitted,

Rafael Newton Aguila, *pro se*

# EXHIBIT 2

**MAUDE Adverse Event Report: EDGE SYSTEMS LLC HYDRAFACIAL GFE, HYDRADERMABRASION**

FDA Home[3] Medical Devices[4] Databases[5]



| 510(k)[7] | DeNovo[8] | Registration & Listing[9] | | Adverse Events[10] | | Recalls[11] | PMA[12] | Classification[13] | Standards[14] |
| CFR Title 21[15] | | Radiation-Emitting Products[16] | | X-Ray Assembler[17] | | Medsun Reports[18] | | CLIA[19] | TPLC[20] | Inspections[21] |

**EDGE SYSTEMS LLC HYDRAFACIAL GFE, HYDRADERMABRASION**        Back to Search Results

**Model Number** HYDRAFACIAL WAVE
**Event Date** 07/27/2010
**Event Type** Injury
**Event Description**

Patient received a facial acid peel (cosmetic treatment) performed by the health professional during the above dates. The suspect products used were cosmetic products containing glycolic acid and salicylic acid; the products were used in conjunction with the hydrafacial wave device. The operator failed to follow instructions for use and precaution to properly cover and protect patient's eyes during facial treatment, causing the acidic fluids to get into patient's eyes and surrounding areas, resulting in reported patient injuries. Those reports include excessive tearing of both eyes; itchiness, swelling, and burning sensation of the eyes and surrounding areas; rash an irritated skin; mild contact dermatitis; lacrimal tear duct stenosis; mild sinusitis with nasal obstruction; mild periorbital cellulitis, etc. Patient also complained about blurry vision, sensitive to light, etc. Patient was caused to use eye drops, facial ointments, warm compresses, medications, and underwent a bilateral lower eyelid punctoplasty. Patient was not hospitalized or confined to bed, but was confined to her home for approximately 30 days intermittently.

**Manufacturer Narrative**

The incident occurred in 2010, but was not brought to edge systems' (manufacturer) attention until recently by the lawsuit between the consumer and the health professional. The attorney provided medical records and details on (b)(6) 2013, so edge systems was able to file a report. The incident was caused by operator neglecting to follow the instructions for use (ifu). It was operator error; no device malfunction or product defects. The suspect cosmetic product(s) used in conjunction with the device contain glycolic acid and salicylic acid at low concentration that are safe to use on human skin surface to remove stratum corneum if the recommend instructions for use are followed properly. The suspect product(s) are not intended to be used on or around the eyes. The ifu provided by edge systems, including use manuals, training dvds, and labels, provide adequate and proper instructions and recommend the use of eye protection for patient during treatment. The ifu also state that if the fluids get into the eyes, rinse with water immediately, and seek medical care if irritation occurs/persists. Edge systems also provided training to the health professional at time of device purchase, educating operators the proper treatment protocols and procedures. In addition, all the lots of suspect product(s) that could possibly be use around the date of event all showed compliance to specifications and no microbial growth or defects were found.

**Search Alerts/Recalls[22]**

New Search | Submit an Adverse Event Report[23]

**Brand Name** HYDRAFACIAL
**Type of Device** GFE, HYDRADERMABRASION
**Manufacturer (Section F)** EDGE SYSTEMS LLC
Signal Hill CA
**Manufacturer (Section D)** EDGE SYSTEMS LLC
Signal Hill CA
**Manufacturer Contact** Gary Mocnik

49 Coastal Oak
Aliso Viejo , CA 92656

**Device Event Key** 3138584
**MDR Report Key** 3108813
**Event Key** 3005368
**Report Number** 2031227-2013-00001
**Device Sequence Number** 1
**Product Code** GFE24
**Report Source** Manufacturer
**Source Type** Unknown
**Reporter Occupation** NOT APPLICABLE
**Type of Report** Initial
**Report Date** 05/06/2013
*1* **Device Was Involved in the Event**
*1* **Patient Was Involved in the Event**
**Date FDA Received** 05/06/2013
**Is This An Adverse Event Report?** Yes
**Is This A Product Problem Report?** No
**Device Operator** Health Professional
**Device EXPIRATION Date** 05/01/2017
**Device MODEL Number** HYDRAFACIAL WAVE
**Device Catalogue Number** 70159-03
**Was Device Available For Evaluation?** Yes
**Is The Reporter A Health Professional?** No
**Was The Report Sent To Manufacturer?** No
**Date Manufacturer Received** 04/05/2013
**Was Device Evaluated By Manufacturer?** Device Not Returned To Manufacturer
**Date Device Manufactured** 05/01/2010
**Is The Device Single Use?** No
**Is this a Reprocessed and Reused Single-Use Device?** No
**Is the Device an Implant?** No
**Is this an Explanted Device?**
**Type of Device Usage** Invalid Data

**Patient TREATMENT DATA**
**Date Received: 05/06/2013 Patient Sequence Number: 1**
**Treatment**
GLYSAL PREP, 7.5%
GLYCOLIC ACID AND 2%
SLICYLIC ACID
GLYSAL PEEL
15% GLYCOLIC ACID
1.5% SALICYLIC ACID

Links on this page:

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain
2. http://www.addthis.com/bookmark.php
3. http://www.fda.gov/default.htm
4. http://www.fda.gov/MedicalDevices/default.htm
5. http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Databases/default.htm
6. /scripts/cdrh/devicesatfda/index.cfm
7. /scripts/cdrh/cfdocs/cfPMN/pmn.cfm
8. /scripts/cdrh/cfdocs/cfpmn/denovo.cfm

# EXHIBIT 3



http://www.diamondskin.com/   Go

INTERNET ARCHIVE
WayBack Machine

98 captures
15 Jun 04 - 18 Aug 14

JUN   SEP
23
2003  2004  2005

**Call toll-free at 1-866-766-0639**         **support@diamondskin.com**

Welcome to the latest in Crystal-Free Microdermabrasion with oxygenation. Our DiamondSkin machine uses advanced Oxygen infusion technology to assist skin cell recuperation at the moment of dermabrasion.

This new Transdermal Oxygen delivery system assists skin cell oxygenation. destroys blemish causing bacteria, and detoxifies most skin cell waste.

The dangers of using Aluminum Oxide and Sodium Bicarbonate have been well documented in many scientific journals. If you have previously used a microdermabrasion machine or had a treatment done, then you realize how messy it is when loose crystals go everywhere.

Clogging is also a constant danger when using a regular microdermabrasion machine. Even the best, most expensive machines breakdown unexpectedly. This is to be expected because of humidity entering the crystals, defective crystals, or bad-machine design.

With the DiamondSkin, we absolutely guarantee that the machine will never breakdown because of the high quality materials used in the construction and the high-caliber of engineering which went into its production. The vacuum used to take out the skin cell debris will never fail because there are no crystals to clog it up.

The 0.3 micron HEPA filter prevent cross-contamination between patients and your room.  We also include a special air-filter to make sure that the oxygenated air used is 100% pure of bacteria or viruses.

# EXHIBIT 4



INTERNET ARCHIVE
WaybackMachine

http://www.edgesystem.net/                                    Go

JUL   AUG   OCT
◀ 27
2003        2005

186 captures
19 Sep 00 - 17 May 14

Se habla Español



Delphia™ Microdermabrasion
& Massage Therapy Systems

Crystals & Accessories

UltraCam™ Color
UV Camera  NEW

Telangitron®
Telangiectasia Removal  NEW

OxyMax™ Oxygen
Therapy  NEW

UltraMax® Ultrasonic
Skincare System

SAFE™ System
Surgical Smoke Evacuator

Replacement Filters
& Tubing



We're
**Moving!**

In order to serve you better - we
are moving! Click here for details.

Moving Date: June 18, 2004

## Products

## What's New



# EXHIBIT 5


INTERNET ARCHIVE
WayBackMachine

http://www.edgesystem.net/HydraFacialMD.htm          Go

81 captures
3 Mar 05 - 19 May 14

FEB          MA
2004   2005   2006

*Introducing the...*



*NEW!*

# HYDRAFACIAL MD™

*Fluid-Based Skin Resurfacing System*

*Multiple Modalities that Work Together on One Platform with Tutorials*



**HYDRAFACIAL™**
- Patented HydraPeel™ Tip resurfaces skin while simultaneously introducing topically applied serums
- For oily & acne-prone skin, fine lines, wrinkles and hyperpigmentation
- **Proprietary Serums** for deep cleansing, exfoliating, extracting, hydrating, antioxidant treatment and more

**LED LIGHT THERAPY**
- Red & infrared light improves the appearance of age signs & skin texture
- Blue light for oily & acne-prone skin
- Can be combined with other modalities for best results

**DIAMOND TIP ABRASION**
- Dry diamond tip abrasion can be combined with wet HydraFacial™ treatment for deeper abrasion
- Various diamond tips, from fine to extra coarse

**VACUUM THERAPY**
- Lymphatic Drainage
- Cellulite Massage

*Go to* **Proprietary Serums**, **Before & After Pictures**, *and* **Testimonials**

[ HydraFacial MD™ Multi-Modality System ] [ Delphia™ Microdermabrasion Systems & Massage Therapy ]
[ Del Sol ™ LED Light Therapy ] [ Telangitron® Spider Vein Removal ] [ UltraCam ™ Color UV Camera ]
[ UltraMax ™ Ultrasonic Skincare System ] [ SAFE ™ System Surgical Smoke Evacuator ]
[ Replacements & Tubing ] [ Crystals & Accessories ] [ Contact Us ]

Edge Systems Corporation · 2277 Redondo Avenue, Signal Hill, CA 90755 · USA.
1-800-603-4996 · FAX 562-597-0148· Contact@edgesystem.net
For technical questions regarding website only please contact Webmaster.
Copyright © 2003. Edge Systems Corporation. All rights reserved.

# EXHIBIT 6

# Knobbe Martens Olson & Bear LLP

### Intellectual Property Law

2040 Main Street
Fourteenth Floor
Irvine, CA 92614
Tel 949-760-0404
Fax 949-760-9502
www.kmob.com

## FACSIMILE TRANSMITTAL SHEET

### CONFIRMATION COPY WILL FOLLOW VIA:

❏ MAIL                          ■ WILL NOT FOLLOW
❏ INTERNATIONAL AIRMAIL         ❏ HAND DELIVERY
❏ COURIER                       ❏ WITH ENCLOSURES
❏ E-MAIL                        ❏ WITHOUT ENCLOSURES

### Confidentiality Notice:

The documents accompanying this facsimile transmission contain confidential information which may be legally privileged. The information is intended only for the use of the recipient named below. If you have received this facsimile in error, please immediately notify us by telephone to arrange for return of the original documents to us; and any disclosure, copying, distribution or the taking of any action in reliance on the contents of this faxed information is strictly prohibited.

| | |
|---|---|
| TO: | **Ralph Aguila** |
| FIRM: | Diamondskin Systems, Inc. |
| FACSIMILE NO.: | (305) 675-8225 |
| OUR REF.: | EDGE.010TIS |
| YOUR REF.: | |
| FROM: | Catherine J. Holland |
| OPERATOR: | Moira Timney |
| DATE: | February 4, 2010 |

NO. OF PAGES: 6    (incl. cover sheet)

TIME:

### IF YOU DID NOT RECEIVE ALL OF THE PAGES PLEASE CALL BACK IMMEDIATELY
OPERATOR PHONE NO.: (949) 760-0404      FACSIMILE NO.: (949) 760-9502

**MESSAGE**:

## PLEASE RESPOND TO THE ATTACHED LETTER.

| San Diego | San Francisco | Los Angeles | Riverside | Seattle | Washington, DC |
|---|---|---|---|---|---|
| 619-235-8550 | 415-954-4114 | 310-551-3450 | 951-781-9231 | 206-405-2000 | 202-640-6400 |