FILED by _____ D.C.

DEC 1 8 2014

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:14-cv-24517-KMM/McAliley**

EDGE SYSTEMS, *et al.*,
            Plaintiffs,
   v.

Rafael Newton Aguila,
            Defendant.
_____/

**DEFENDANT'S MOTION FOR SANCTIONS**

**FOR FRAUD UPON THE COURT**

1

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ 2

TABLE OF AUTHORITIES ....................................................................................................... 3

PRELIMINARY STATEMENT ................................................................................................. 4

  A.  The Plaintiffs' HydraFacial device has received more than 90 customer complaints in 3-years, while the Defendant has never received a single customer complaint about his microdermabrasion machines in over 18 years. ..................................................................... 5

  B.  The Plaintiffs, specifically William Cohen (President of Edge Systems LLC) falsely claimed that the Defendant's device is dangerous to the public because it is not approved by the FDA, while Plaintiffs' Hydrafacial device is both safe and FDA-approved.......................... 6

  C.  The Plaintiffs benefited from their misleading the Court about their device's FDA approval status by claiming that the Temporary Restraining Order was necessary in order to "serve the public interest" by keeping Defendant's unapproved medical device from the marketplace. ............................................................................................................................ 8

  D.  Plaintiffs' argument that the trade dress between their Hydrafacial device and the Defendant's Hydraderm MD is identical. ................................................................................. 9

  E.  The Plaintiffs lied to the USPTO during their trademark application for the term "Hydrafacial MD" in 2005. ................................................................................................... 11

ARGUMENT .............................................................................................................................. 14

  A.  THIS COURT HAS THE INHERENT POWER TO SANCTION THE PLAINTIFFS ... 14

  B.  DEFENDANTS' BAD FAITH ACTS WARRANT THE ULTIMATE SANCTIONS .... 17

    1.  The President of Edge Systems LLC (William Cohen) Lied Under The Penalty Of Perjury and Buried Key Documents .................................................................................... 17

CONCLUSION ........................................................................................................................... 19

# TABLE OF AUTHORITIES

*Chambers u. NASCO, Inc.,* 501 U.S. 32, 43-51 (1991)     14, 15

*Vargas v. Peltz,* 901 F. Supp. 1572, 1581-82 (S.D. Fla. 1995)     14, 15

*Allapattah Serus., Inc. u. Exxon Corp.,* 372 F. Supp. 2d 1344, 1373 (S.D. Fla. 2005)     14

*Byrne u. Nezhat,* 261 F.3d 1075, 1106 (11th Cir. 2001)     14

*Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1118 (1st Cir. 1989)     15

*Nichols v. Klein Tools, Inc.,* 949 F.2d 1047, 1049 (8th Cir. 1991)     16

*McDowell v. Seaboard Farms of Athens, Inc.,* 1996 WL 684140, at *8 (M.D. Fla.)     16

*Thomas v. Gen. Motors Acceptance Corp.,* 288 F.3d 305, 308 (7th Cir. 2002)     16

*Key West. Corneal v. Niemie,* 1999 WL 737884, at *3 (S.D. Fla. June 24, 1999)     16

*In Chemtall, Inc. v. Citi-Chem, Inc.,* 992 F. Supp. 1390, 1410 (S.D. Ga. 1998)     16, 19

*Telectron, Inc. v. Overhead Door Corp.,* 116 F.R.D. 107, 126-27 (S.D. Fla. 1987)     17

*Televideo Systems, Inc. v. Heidenthal,* 826 F.2d 915, 916 (9th Cir. 1987)     14, 17

*Pope v. Federal Express Corporation*, 138 F.R.D. 675 (W.D.Mo.1990), aff'd in relevant part, 974 F.2d 982 (8th Cir.1992)     18, 19

# OTHER AUTHORITIES

Federal Rules on Civil Procedure 41(b)     18

## PRELIMINARY STATEMENT

Defendant Rafael Newton Aguila ("Aguila"), moves this Court to enter sanctions in Aguila's favor against Plaintiffs, Edge Systems LLC ("Edge") and Axia MedSciences LLC ("Axia"), and states:

## INTRODUCTION

From the outset of this litigation, Plaintiffs tried to undermine the judicial process by interfering with this Court's ability to adjudicate the key issues in the case. Plaintiffs lied under the penalty of perjury and mislead the Court on several key issues that are pertinent to the case. Defendants' misconduct should not be countenanced by the Court.

As a long line of case law indicates, this Court has the inherent power to protect its integrity by imposing "ultimate sanctions" such as the striking of pleadings, dismissal with prejudice, or subjecting the Plaintiffs' claims to a higher standard of proof such as "clear and convincing evidence" instead of a "preponderance of the evidence". The Court also has the inherent power to protect the Defendant from Plaintiffs' vexatious, unconscionable and dilatory conduct. Under the facts of this case, no lesser sanctions would suffice.

4

## FACTUAL BACKGROUND

**A. The Plaintiffs' HydraFacial device has received more than 90 customer complaints in 3-years, while the Defendant has never received a single customer complaint about his microdermabrasion machines in over 18 years.**

On pages 17 and 18 of Plaintiffs' EMERGENCY MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW, the Plaintiffs write that:

> "Further, Defendant's product may pose a danger to patients. (*Irby Decl., ¶9.*) The Edge Machine is an FDA-registered medical device. (*Cohen Decl., ¶8, Exs. J&K.*) Defendant's low quality products are distributed as if they are manufactured by Edge, use the same good manufacturing practices as Edge, and are certified Edge products. (*Razai Decl., ¶¶ 11, 12.*) If Defendant's products harm any patients, the consequences to Edge's business would be severe. Defendant has assumed Edge's identity and there is, thus, the reality that any such injury would be attributed to Edge. **Edge's goodwill and reputation** may be damaged if customers are injured by Defendant's knock-off or are even dissatisfied with the quality of Defendant's knock-off, yet associate that experience with Edge's name and marks. Unless enjoined by this Court, Defendant's trademark and trade dress infringement will cause Edge to be irreparably harmed.

However, as Plaintiff's Exhibit KK[1] shows an FDA inspection report of Plaintiffs' manufacturing facilities in California in 2013, the Hydrafacial-family of machines (i.e. "Edge's Class 1 devices") is responsible for more than 90 different customer complaints over 3-years. On pages 6 & 7 of the inspection, the FDA inspector mentions that the customer complaints included "irritation/allergic reactions, burning sensations, lacerations, breakouts, and skin infections regarding the firm's class 1 devices".[2] In fact, the doubling every year of the amount of complaints

---

[1] Plaintiffs' Exhibit KK is included here as Defendant's Exhibit 21.
[2] See pages 6 & 7 of Defendant's Exhibit 21.

*is* troubling. In 2011, the Plaintiffs had 5 customer complaints. In 2012, the Plaintiffs had 22 customer complaints. And in 2013, the Plaintiffs had 45 customer complaints. However, the Defendant has not had a single customer complaint in more than 18-years of selling microdermabrasion machines.

**B. The Plaintiffs, specifically William Cohen (President of Edge Systems LLC) falsely claimed that the Defendant's device is dangerous to the public because it is not approved by the FDA, while Plaintiffs' Hydrafacial device is both safe and FDA-approved.**

On pages 17 and 18 of Plaintiffs' EMERGENCY MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW, the Plaintiffs write that "*The Edge Machine is an FDA-registered medical device. (Cohen Decl., '118, Exs. J&K.)*". Supposedly, the Plaintiffs are referring to their Hydrafacial device as "The Edge Machine". Furthermore, Mr. William Cohen (the President for Plaintiff Edge Systems LLC) writes in his declaration[3] that a "*true and correct copy of a February 25, 1999 FDA 501(k)* [sic] *notification from Edge*" is attached as Plaintiffs' Exhibit "I".[4][5] Unfortunately, the 510(k) notification that Mr. Cohen alludes to is for a "Sterile Tubing" that is "for use in removing smoke from laser and/or electrosurgical procedures" with a 510(k) number of K990748. This device has **nothing** to do with the Plaintiff's Hydrafacial microdermabrasion device. Yet, Mr. Cohen gives the impression in his declaration that the 510(k) that he is referring to is for the Plaintiff's Hydrafacial device. Why else would he refer to an Exhibit with a 510(k) in such circumstances, if not to show the Court the 510(k) for the Hydrafacial, which is the subject of this case and not a smoke extractor used in laser procedures. In fact, the Plaintiff's Hydrafacial device had **no** 510(k) number and was **never** approved by the FDA because microdermabrasion machines are exempt from the FDA's 510(k) approval procedures.

---

[3] See Plaintiffs' Exhibit B for Mr. Cohen's declaration. Herein incorporated as Defendant's Exhibit 22.
[4] See Defendant's Exhibit 22, Cohen Decl. ¶33.
[5] See Plaintiff's Exhibit I. Herein incorporated as Defendant's Exhibit 23

Although Edge Systems LLC is registered with the FDA as a medical device manufacturer, it is important to note that it does not list neither the Hydrafacial nor "The Edge System" as one of the devices in their registration information.[6] Mr. Cohen goes on to claim that a "*true and correct copy a screenshot (November 24, 2014) listing Edge's **HydraFacial MD** in the FDA's Establishment Registration & Device Listing is attached hereto*" as Plaintiffs' Exhibit J.[7] Unfortunately for the Plaintiffs, the name HydraFacial MD does **not** appear in the Plaintiffs' FDA listing.

By going to the FDA's online database on 510(k) Premarket Notifications (http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPMN/pmn.cfm), one can discover if a device has a 510(k) from the FDA. A 510(k) is a premarket submission made to the FDA to demonstrate that the device to be marketed is at least as safe and effective – that is, substantially equivalent – to a legally marketed device (21 CFR §807.92(a)(3)). However, Plaintiffs never received a 510(k) approval for their Hydrafacial device. This is allowed by the FDA because microdermabrasion machine are 510(k) exempt. The FDA classifies microdermabrasion devices under 21 CFR 878.4820 (Surgical instrument motors and accessories/attachments). Furthermore, microdermabrasion devices are classified as "Class 1" medical devices (the lowest of the 3 different classes that the FDA assigns to medical devices), exempt from the 510(k) premarket notification procedures mentioned in subpart E of 21 CFR 807. Therefore, Defendant's HydraDerm MD and Hydradermabrasion MD devices are also 510(k) exempt by the FDA. Wherefore, Plaintiffs' argument that Defendant's products are **potentially dangerous** to the public because they have not been approved by the FDA is clearly false because Plaintiffs' Hydrafacial MD device is also not approved by the FDA.

---

[6] See Plaintiffs' Exhibit K. Herein incorporated as Defendant's Exhibit 24.
[7] See Defendant's Exhibit 22, Cohen Decl. ¶34.

7

**C.  The Plaintiffs benefited from their misleading the Court about their device's FDA approval status by claiming that the Temporary Restraining Order was necessary in order to "serve the public interest" by keeping Defendant's unapproved medical device from the marketplace.**

On Page 18 of the Plaintiffs' *ex parte* motion, they claim that a injunction will serve the public interest because it is "*necessary to protect consumers from Defendant's potentially harmful knock-off products. The Edge Machine is registered with the FDA as a medical device. (Cohen Decl., ¶8, Exs. J&K.) Although Defendant makes claims that its products are registered with the FDA, Edge has not found any such registration and believes that Defendant's claims are false. (Razai, ¶¶10, 11) Allowing Defendant to continue selling its knock-off product poses a risk to the safety of consumers*". In fact, the Defendant is registered with the FDA[8], and he has listed all of his devices with the FDA, including both the HydraDerm MD and Hydradermabrasion MD. While the Plaintiff has failed to list the Hydrafacial in their FDA device listing.

Plaintiffs' have offered this argument in bad faith to this Court in order to show an immediate need for the *ex parte* TRO and a Preliminary Injunction. Plaintiffs' false argument on the lack of FDA approval, for the HydraDerm MD, has prejudiced the Defendant since the Court accepted Plaintiffs' argument that Defendant's devices were potentially harmful to the public in its *ex parte* Temporary Restraining Order. The Plaintiffs made it appear that their Hydrafacial MD device has a 510(k) approval, by including a 510(k) number of a completely different device.

In addition, the FDA maintains a database on all medical device-related complaints in the United States called MAUDE (Manufacturer and User Facility Device Experience). This database can be found at www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm. If one types the brand name of one of the Defendant's current or former devices into the MAUDE database (e.g. HydraDerm MD, Hydradermabrasion MD, DiamondSkin, DiamondPeel, HydraPeel, or DermisPeel), one would find no results. Even if one selects 1996 as the beginning of "date range". However, there is one MAUDE report against the Plaintiffs' Hydrafacial device.[9] This MAUDE report was submitted by Edge Systems itself, and is, therefore, written in a manner that diminishes the Plaintiff's potential responsibility in this medical accident. Nevertheless, this evidence does

---

[8] Defendant's FDA Owner/Operator Number is 10048208.
[9] See Defendant's Exhibit 25.

show that the Plaintiffs' Hydrafacial device has more FDA / MAUDE complaints than the Defendant's products. Further demonstrating that the Defendant's products do not present a danger to the public.

**D. Plaintiffs' argument that the trade dress between their Hydrafacial device and the Defendant's Hydraderm MD is identical.**

This argument appears to be valid because of the side-by-side comparison found on the second page of the Plaintiffs' *ex parte* motion. However, in fact, the real facts are the exact reverse. The Plaintiffs' Hydrafacial device has copied the Defendant's Hydraderm MD trade dress. The Plaintiff showed the following comparison in their Complaint:



**THE EDGE MACHINE**



**ACCUSED PRODUCT**

However, originally in 2005, the Plaintiffs' first Hydrafacial devices looked like the images below:

   

As the second set of images images clearly show, there is no comparison between Defendant's HydraDerm MD device (i.e the Accused Product) and the original Hydrafacial devices. The Court should note that the Plaintiffs still sell both of the older HydraFacial devices today.

Nevertheless, the Defendant's HydraDerm MD trade dress was already present since 2004. As can be seen in a screenshot of Defendant's www.diamondskin.com website from August 2004, using the Wayback Machine[10], the writing on the website includes the fact that the "*DiamondSkin machine uses advanced Oxygen infusion technology to assist skin cell recuperation at the moment of dermabrasion*".[11] Furthermore, the website makes the claim about the device's "*Transdermal Oxygen delivery system*". The DiamondSkin was a family of various microdermabrasion machines, which ranged from the low-end to expensive. The HydraDerm MD was considered to be the high-end in the DiamondsSkin family of devices because it had a touchscreen monitor and wheels on its base.

As can be seen in the Wayback Machine's retrieval of the Plaintiffs' website from 2004, www.edgesystem.net, it shows that the Plaintiffs were only selling the Delphia microdermabrasion device and some other products.[12] Only in 2005 did the Plaintiffs start selling the Hydrafacial on

---

[10] The Wayback Machine is a service that enables users to see archived versions of web pages across time. It is maintained by the Internet Archive, a non-profit organization. www.archive.org
[11] See Defendant's Exhibit 26.
[12] See Defendant's Exhibit 27.

their website.[13,14] As can be shown with the evidence presented, the Defendant was selling a serum-based, transdermal microdermabrasion device before the Plaintiffs. In addition, the Plaintiffs' original Hydrafacial device in 2005 looked nothing like the current iteration.

Notwithstanding the evidence presented, thus far, on how the Plaintiffs have imitated the Defendant's Hydraderm MD trade dress. On page 2 of the Plaintiffs' *ex parte* motion, it is clear that the image on their Hydrafacial computer screen is strikingly **dissimilar** to the HydraDerm MD's computer screen. Not only do they display the word "Hydrafacial", but their background is a dark color. The HydraDerm MD's computer screen, in contrast, shows a light gray background with a wave-like streak, right below the word "HydraDerm MD".

### E. The Plaintiffs lied to the USPTO during their trademark application for the term "Hydrafacial MD" in 2005.

On February 9, 2005, the Plaintiffs applied for a trademark for the term "Hydrafacial MD". The trademark was subsequently registered on November 20, 2007.[15] However, on September 12, 2005, the examining attorney for the USPTO sent the Plaintiffs a letter asking them to place a disclaimer for the term "Hydrafacial" since "it describes a feature of the goods, namely, that they are used to provide hydra facials".[16] On March 13, 2006, the Plaintiffs responded to the USPTO's office action by arguing the following points[17]:

> "The term HYDRAFACIAL cannot immediately convey any knowledge of Applicant's medical apparatus and instruments because a multi-step reasoning process must be employed by a consumers and potential consumers to arrive at any conclusion about the goods.   That is, a consumer must make a substantial mental leap if he is to make any connection between the term HYDRAFACIAL and Applicant's medical goods".

---

[13] Mr. Cohen writes that "*Edge has been selling product bearing this unique and distinctive design as early as 2010 and has been selling a product bearing a nearly identical design since 2005*". See Cohen Decl. ¶9 in Defendant's Exhibit 22.
[14] See Defendant's Exhibit 28.
[15] The USPTO Registration Number for the "HydraFacial MD" is 3341027. For the term "HydraFacial" (without the MD), it is 4317059.
[16] See Defendant's Exhibit 29.
[17] See Defendant's Exhibit 30.

"On the other hand, the terms "Hydra," "hydra," and "facial" do have recognized definitions.  The definition of "Hydra" is:

1. Greek Mythology - The many-headed monster that was slain by Hercules.
2. A constellation in the equatorial region of the southern sky near Cancer, Libra, and Centaurus. Also called Snake.
3. A persistent or multifaceted problem that cannot be eradicated by a single effort.

The definition of "hydra" is "[a]ny of several small freshwater polyps of the genus Hydra and related genera, having a naked cylindrical body and an oral opening surrounded by tentacles." The definition of "facial" is "[a] treatment for the face, usually consisting of a massage and the application of cosmetic creams." See the attached dictionary definitions from The American Heritage® Dictionary of the English Language (4th ed. 2000).

Thus, the term HYDRAFACIAL has numerous literal meanings – e.g., **a facial for a many-headed monster from Greek mythology, a facial for a constellation**, etc. – but none of these literal definitions has any relevance to Applicant's medical apparatus and instruments, and the Board has made it clear that the literal meaning of a mark must be considered in determining mere descriptiveness".

Notwithstanding the Plaintiffs' claim that the term "HydraFacial" is not a generic term used to describe a "hydra facial" treatment, but instead means "a facial for a many-headed monster from Greek mythology". On the Plaintiffs' website, www.hydrafacial.com/faq.htm, they drop all pretence that the term "Hydrafacial" is merely suggestive by stating the following[18]:

"What is HydraFacial™?
The HydraFacial™ treatment is a new breakthrough in aesthetic technology. **It takes its name from the root word Hydrate; "to cause to take up moisture".** This ability to moisturize the skin separates the HydraFacial™ from all other skin resurfacing procedures. The HydraFacial™ treatment removes dead skin cells and extracts impurities while simultaneously bathing the new skin with cleansing, hydrating and moisturizing serums.

Why is HydraFacial™ good for my skin?
Hydration is the foundation of healthy, radiant skin. Irritation of the

---

[18] See Defendant's Exhibit 31

skin has been proven to increase signs of aging. **The HydraFacial™ is a hydrating and non-irritating treatment**.

Am I a candidate for this treatment?
**The HydraFacial™ treatment is designed for all skin types.** Even the most sensitive skin easily tolerates the HydraFacial™ treatment. Your physician or skincare professional may choose specific treatment serums and/or customize the treatment for your unique skin conditions and needs. Consult your physician or skincare professional for a skin evaluation and sensitivity test.

"When the relevant public ceases to identify a trademark with a particular source of a product or service but instead identifies the mark with a class of products or services regardless of source, that mark has become generic and is lost as an enforceable trademark." It is only common sense to see that the term "HydraFacial" refers to a facial that includes water or liquids for the purposes of performing a hydrating facial.[19] Just like there are other types of facials such as "mud facials", "caviar facials", "chocolate facials", or "European facials". No reasonable person would think of allowing a term such as "mud facial" to be trademarked by a company.

---

[19] A "facial" is commonly understood to be a procedure involving a variety of skin treatments that might include: steam, exfoliation, extraction, creams, lotions, facial masks, peels, and/or massage.

## ARGUMENT

### A. THIS COURT HAS THE INHERENT POWER TO SANCTION THE PLAINTIFFS

Federal courts possess the inherent power to sanction parties and attorneys who conduct litigation in bad faith or who perpetrate a fraud on the court. *Chambers u. NASCO, Inc.,* 501 U.S. 32, 43-51 (1991); *Vargas v. Peltz,* 901 F. Supp. 1572, 1581-82 (S.D. Fla. 1995) (Ryskamp, J.).

"The key to unlocking a court's inherent power is a finding of bad faith." *Allapattah Serus., Inc. u. Exxon Corp.,* 372 F. Supp. 2d 1344, 1373 (S.D. Fla. 2005) (Gold, J.) (striking defendant's affirmative defenses through inherent powers doctrine) (citing *Byrne u. Nezhat,* 261 F.3d 1075, 1106 (11th Cir. 2001) (sanctioning attorney who filed a frivolous lawsuit in bad faith for the purpose of extorting a settlement)). Bad faith exists where a party or its counsel "[defiles the] very temple of justice" by committing a fraud on the court, or "knowingly or recklessly raises a frivolous argument, delays or disrupts the litigation, or hampers the enforcement of a court order." Id. (citing *Chambers,* 501 U.S. at 46).

The imposition of sanctions under the inherent powers doctrine serves the dual role of "vindicating judicial authority" and providing redress for the litigants who bear the brunt of a party's bad faith acts. See *Chambers,* 501 U.S. at 46. Although the courts' inherent powers should be exercised with restraint, the courts have complete discretion to fashion appropriate sanctions for conduct that abuses the judicial process. 7 *Id.* at 44-45. As a result, a robust body of case law has developed in which federal courts have employed various means to sanction parties and their counsel for assorted bad faith acts and unconscionable schemes.

*Chambers* involved the bad faith acts of a television station owner who reneged on a contract to sell the station. *Id.* at 35-36. The buyer, NASCO, sued for specific performance, only to become

the victim of a litany of tactics designed to frustrate its claim. *Id.* at 35. For example, to avoid NASCO's motion for a preliminary injunction, the defendant and his lawyer conducted a simulated sale of the station's assets to the defendant's sister. *Id.* at 36-37. When that scheme failed, the defendant filed a series of meritless motions and, in derogation of the injunction, petitioned the FCC to transfer the station's license. *Id.* at 38-39. After the district court entered a judgment for NASCO on the merits of its specific performance claim, NASCO moved for $996,644.65 in attorney's fees as sanctions for the actions of the defendant and his attorneys. *Id.* at 40. The district court awarded NASCO's fees, and the Fifth Circuit affirmed. *Id.* at 40-42. The U.S. Supreme Court also affirmed, holding that sanctions such as "outright dismissal" and attorney's fees are within the courts' inherent power where a party's conduct evidences bad faith and an attempt to perpetrate a fraud on the court. *Id.* at 44-45.

Although *Chambers* involved a particularly egregious set of facts, the inherent powers doctrine is most often invoked where, like here, a party commits perjury or destroys or doctors evidence. For example, Vargas involved a sexual harassment suit in which it eventually was revealed that the plaintiff had fabricated evidence and lied at deposition. 901 F. Supp. at 1574-76. Judge Ryskamp dismissed the plaintiff's claims, finding that they were part of an "unconscionable scheme" to defraud the court:

> Dismissal is appropriate where[ ] a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense.

Id. at 1579 (citing *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1118 (1st Cir. 1989)). The *Vargas* court held that the need for sanctions is heightened when, as here, the scheme goes to the pivotal

or "lynchpin" issue in the case. Id. at 1582; see also *Nichols v. Klein Tools, Inc.,* 949 F.2d 1047, 1049 (8th Cir. 1991) (dismissing plaintiff's claims after he repeatedly and pointedly lied under oath regarding the case's pivotal issue).

Similarly, in *McDowell v. Seaboard Farms of Athens, Inc.,* 1996 WL 684140, at *8 (M.D. Fla. Nov. 4, 1996), the Middle District of Florida found the plaintiff had submitted a fabricated diary as evidence and lied at deposition regarding the diary's authenticity. The court held that the plaintiffs "unconscionable scheme" warranted the complete dismissal of his claims. Id. at **2, 10. In another case, the Seventh Circuit affirmed the district court's dismissal of a plaintiff's claim where the plaintiff lied on his application for leave to proceed in *forma pauperis. Thomas v. Gen. Motors Acceptance Corp.,* 288 F.3d 305, 308 (7th Cir. 2002) (Posner, J.). And in 1999, Judge Moore dismissed the claims of a particularly litigious and abusive plaintiff who "mistakenly" appeared for hearing in Miami despite the fact that the hearing had been set in *Key West. Corneal v. Niemie,* 1999 WL 737884, at *3 (S.D. Fla. June 24, 1999).

In addition to dismissing a plaintiff's claims, courts often invoke the inherent powers doctrine to strike defendants' answers and enter default judgments. *In Chemtall, Inc. v. Citi-Chem, Inc.,* 992 F. Supp. 1390, 1410 (S.D. Ga. 1998), the defendant repeatedly lied under oath at deposition and produced misleading documents in an effort to hinder plaintiffs efforts to collect a debt. To prove the defendant's deception, the plaintiff conducted third-party discovery and confronted the defendant with documents that contradicted his previous testimony. Id. At 1409. The court "unsheathed the [proverbial] 'samurai sword'" and entered a default judgment against the defendant, finding by clear and convincing evidence that he had engaged in abusive behavior, and finding that a lesser sanction would not suffice given the defendant's actions. Id. at 1407-08, 1410;

see also *Telectron, Inc. v. Overhead Door Corp.,* 116 F.R.D. 107, 126-27 (S.D. Fla. 1987) (Marcus, J.) (entering default judgment against defendant that purposely destroyed documents).

In *Televideo Systems, Inc. v. Heidenthal,* 826 F.2d 915, 916 (9th Cir. 1987), the defendant testified at deposition that he diverted $700,000 from the corporate plaintiff at the behest of the corporation's president. Later, the defendant filed a written declaration recanting his prior testimony and admitting that he lost the money gambling. *Id.* The district court struck the defendant's answer, entered a default judgment and awarded the plaintiff its attorney's fees. *Id.* The Ninth Circuit affirmed on appeal, holding that the defendant's "elaborate scheme involving perjury clearly qualifies as a willful deceit of the court" and "interfered egregiously with the court's administration of justice." *Id.* at 917.

## B.  DEFENDANTS' BAD FAITH ACTS WARRANT THE ULTIMATE SANCTIONS

### 1.  The President of Edge Systems LLC (William Cohen) Lied Under The Penalty Of Perjury and Buried Key Documents

Much like the sanctioned parties in the cases cited above, Plaintiffs' attempted to enhance their case through perjurious testimony and the burying of key documents. Plaintiffs' scheme was calculated to serve one purpose: to improperly influence and defraud this Court regarding a key issue in the case - whether the Defendant's device was unsafe and a danger to the public because it was both unlisted and unapproved by the FDA, while the Plaintiffs' Hydrafacial device was both listed and approved by the FDA with a 510(k). Toward that end, Cohen lied repeatedly under the penalty of perjury in his declaration.[20] Furthermore, Cohen placed the 510(k) approval that he was

_____

[20] See Exhibit 42 for William Cohen's Declaration.

referring to as Plaintiff's Exhibit I. This Exhibit consists of set of 12-pages full of impenetrable FDA regulatory verbiage, within a motion for Preliminary Injunction that consists of at least 650 pages. Clearly, the Plaintiffs were counting on the inability of the Court to read every single line within Plaintiff's 650-page motion. In essence, the Plaintiffs were providing the Hydrafacial with a fake 510(k), since the 510(k) that they made reference to was for a completely separate device. A fact that the Plaintiffs never expressed to the Court in their motion. See e.g. *Pope v. Federal Express Corporation*, 138 F.R.D. 675 (W.D.Mo.1990), aff'd in relevant part, 974 F.2d 982 (8th Cir.1992)

The District Court in *Pope* concluded that the document was indeed manufactured. Accordingly, the *Pope* court found that the plaintiff lied in her deposition concerning the note, and knowingly made false references to the note in various discovery responses and pleadings filed with the Court. *Pope*, 138 F.R.D. at 678–680. The Court found that plaintiff and her attorney violated Rule 11 and that plaintiff violated Rule 26 of the Federal Rules of Civil Procedure because of her repeated false statements and references to the manufactured document throughout the litigation. The Court entered dismissal with prejudice of the action under Rule 41(b) and its own inherent power to impose sanctions upon a party which "has engaged in bad faith or abusive practices in conducting litigation". Pope, 138 F.R.D. at 682, 683 (citations omitted). The District Court in *Pope* concluded:

> Clear and convincing evidence has been presented that plaintiff knowingly advanced a document which she knew was not what she represented it to be, and that she relied upon it in her pleadings. She repeatedly attempted to promote the use of the document on her behalf in this litigation, even though she knew it was manufactured. She acted in bad faith and with improper purpose in a manner which jeopardizes the integrity of the judicial system. Accordingly, sanctions pursuant to Rules 11, 26(g) and 41(b), may be awarded to defendants at plaintiff's expense.

WHEREFORE, for the foregoing reasons, Defendant, Rafael Newton Aguila, respectfully requests that this Court enter sanctions in Aguila's favor against Plaintiffs, Edge and Axia, and either (1) dismiss this case with prejudice or (2) subject the Plaintiffs' claims to a higher standard of proof such as "clear and convincing evidence" instead of a "preponderance of the evidence" or (3) impose any other sanction it deems proper.

Dated: December 18th, 2014

Respectfully submitted,

Rafael Newton Aguila, *pro se*
e-mail: raguila@gmail.com
Weittenauerstrasse 11
72108 Rottenburg am Neckar
GERMANY
Telephone: +49 7472 941 9465

19

## CERTIFICATE OF CONFERENCE

Undersigned Defendant has attempted but not been able to communicate with the Plaintiff to resolve the issues raised in this Motion.

_____

Rafael Aguila, pro se

## CERTIFICATE OF SERVICE

I HEREBY certify that on December 18, 2014, I conventionally filed the foregoing document with the Clerk of the Court.  I also certify that the foregoing document is being served this day on all counsel of record by U.S. mail.

_____

Rafael Aguila, pro se

**SERVICE LIST**
*Edge Systems, LLC v. Rafael Newton Aguila*
**Case No.: 1:14-cv-24517-KMM**
**United States District Court, Southern District of Florida**

James A. Gale, Esq. (FBN 371726)
Richard Guerra (FBN 689521)
**FELDMAN GALE**
One Biscayne Tower, 30th Floor
2 South Biscayne Blvd.
Miami, FL 33131
Telephone:  (305) 358-5001
Facsimile:  (305) 358-3309


Brenton R. Babcock, Esq.
(*admitted pro hac vice*)
Ali S. Razai, Esq.
(*admitted pro hac vice*)
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

*Attorneys for Plaintiffs,*
EDGE SYSTEMS LLC and
AXIA MEDSCIENCES, LLC

v

# EXHIBIT 21



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Food and Drug Administration
Los Angeles District
Pacific Region

19701 Fairchild
Irvine, CA 92612-2506
Telephone:   949-608-2900

FAX:   949-608-4415

JAN 1 6 2014



President
William Cohen
Edge Systems LLC
2277 Redondo Ave
Signal Hill, CA  90755

Dear Mr. Cohen:

We are enclosing a copy of the Establishment Inspection Report (EIR) for the inspection conducted at your premises at 2277 Redondo Ave, Signal Hill, CA on August 28, 2013.  This inspection was conducted by or for the U.S. Food and Drug Administration (FDA).  Effective April 1, 1997, when the Agency determines an inspection is closed under 21 C.F.R. 20.64(d)(3), FDA releases a copy of the EIR to the inspected firm for those inspections completed prior to the above date, a copy of the EIR may still be made available through the Freedom of Information Act (FOIA).

The Agency is working to make its regulatory process and activities more transparent to the regulated industry.  Releasing this EIR to you is part of this effort.  The copy being provided to you is comprised of the narrative portion of the report.   FDA might have redacted some information in accordance with FOIA and Title 21, Code of Federal Regulations, Part 20.

If there are any questions about released information, feel free to contact me at (949) 608-2900 or to write to:

U.S. Food and Drug Administration
ATTN:  Compliance Branch
19701 Fairchild
Irvine, CA  92612-2506

Sincerely,

Alonza E. Cruse, Director
Los Angeles District

Enclosure

ace

| | | |
|---|---|---|
| **Establishment Inspection Report** | FEI: | **3002477421** |
| Edge Systems LLC. | EI Start: | 08/28/2013 |
| Signal Hill, CA  90755-4017 | EI End: | 08/28/2013 |



## TABLE OF CONTENTS

Summary ............................................................................. 1
Administrative Data ............................................................ 2
History ................................................................................. 3
Interstate Commerce ........................................................... 3
Jurisdiction .......................................................................... 3
Individual Responsibility and Persons Interviewed ........... 3
Firm's Training Program ..................................................... 4
Manufacturing/Design Operations ...................................... 4
Manufacturing Codes .......................................................... 4
Complaints ........................................................................... 4
CAPAS .................................................................................. 5
Recall Procedures ................................................................ 5
Objectionable Conditions and Management's Response ...... 5
Refusals ................................................................................ 6
Samples Collected ................................................................ 6
Exhibits Collected ............................................................... 6
Attachments ......................................................................... 6

## SUMMARY

*Class II* ℳⱴ, 6⌊⌊⌊ℓ⌊⁴

This was a routine pre-announced level I inspection of a medical device manufacturer and distributor of class II LED light therapy devices and a class III smoke evacuator device that was conducted in accordance with FY' 13 in response to FACTS assignment number 1521847. The assignment requested a surveillance medical device QSIT level I (abbreviated) inspection of the firm per Compliance Program 7382.845. The inspection is reported under PAC code 82845A and profile code ELE and MTL were covered. The firm's registration status in FACTS is current and they are listed as a Class I, II, and II medical device manufacturer. The firm does not manufacture any tracked devices.

The previous inspection was conducted on 05/24/10 and was classified NAI. The previous inspection focused on management controls, design controls, and the CAPA subsystem. There was no FDA-483, Inspectional Observations, issued at the end of the previous inspection.

The current inspection revealed that the firm continues to manufacture a line of hydrafacial devices that are mostly classified as class I. The firm also manufactures a red light LED light therapy device

| Establishment Inspection Report | FEI: | 3002477421 |
|---|---|---|
| Edge Systems LLC. | EI Start: | 08/28/2013 |
| Signal Hill, CA  90755-4017 | EI End: | 08/28/2013 |

(k072399) that is cleared for temporary muscle pain relief and a blue LED light therapy device (k061470) that is cleared for acne lugaris treatment; both devices are classified as class II medical devices. The only class III device that the firm manufactures is the smoke evacuator (k880890) that sucks the surgical smoke from the air during surgery. Majority of the firm's devices are class I exempt devices.

There have not been any changes to the design of the firm's devices since the prior inspection. This inspection focused on the firm's following sub-systems; CAPA, Complaints, and Design Controls. There was no FDA-483 issued at the close of the inspection. There was one discussion item discussed with the firm in reference to CAPA 103104 that should have a preventative action plan included. There were no samples collected during the inspection and there were no refusals encountered.


## ADMINISTRATIVE DATA


| | |
|---|---|
| Inspected firm: | Edge Systems Corp |
| Location: | 2277 Redondo Ave |
| | Signal Hill, CA  90755-4017 |
| Phone: | 800-603-4996 |
| FAX: | |
| Mailing address: | |

| | |
|---|---|
| Dates of inspection: | 8/28/2013 |
| Days in the facility: | 1 |
| Participants: | Durell Giles, Investigator |


On 08/28/13, I presented my credentials and issued the FDA-482, Notice of Inspection, to the President of Edge Systems LLC., Mr. William Cohen. Mr. Cohen was present throughout the entire inspection and provided me with the information regarding the firm's operations.


Correspondence should be addressed to:

Mr. William Cohen, President

Edge Systems LLC.

2277 Redondo Ave.

Signal Hill, CA.

| **Establishment Inspection Report** | FEI: | **3002477421** |
|---|---|---|
| Edge Systems LLC. | EI Start: | 08/28/2013 |
| Signal Hill, CA  90755-4017 | EI End: | 08/28/2013 |

## HISTORY

The firm's history of business has not changed since the previous inspection. The changes since the previous inspection are as follows.

- On December 12, 2012 the name of the company changed from Edge Systems Corporation to Edge Systems LLC.
- The company is now owned by Western Presidio 5 LP.
- Mr. Roger Ignon was formerly the CEO of the company, now his title is the Head of The Board of Directors.
- Mr. William "Bill" Cohen formerly the Vice President of Sales is now the President & CEO of the company.
- Mr. Greg Stickley is now the Vice President of Sales.

## INTERSTATE COMMERCE

Mr. Cohen stated that less than 20% of the firm's raw materials are received from outside of California and that approximately 85% of finished devices are sold outside of California.

## JURISDICTION

The firm continues to manufacture red light LED light therapy, blue LED light therapy, and smoke evacuator devices that are all subject to the FD&C Act. Mr. Cohen stated that the firm sales their products to distributors outside of the United States. Within the Unites States the products are sold directly to the professionals that use the devices such as doctor's offices and spas.

Mr. Cohen stated that the firm also advertises their products online at www.edgeforlife.com and they participate in various monthly trade shows. Mr. Cohen stated that some of the firm's biggest customers are Lifetime fitness and Neoderm (Hong Kong).

## INDIVIDUAL RESPONSIBILITY AND PERSONS INTERVIEWED

Mr. William "Bill" Cohen, President/CEO- Mr. Cohen stated that he has been the President of the firm since 2012 and that he was previously the Vice-President of Sales for the firm. Mr. Cohen stated that he started with Edge Systems in 1997 when he founded the company along with Mr. Roger Ignon. Mr. Cohen also stated that he is responsible for managing the direction of all departments and all employees report to him.

Mr. David Hernandez, QA/Technical Support Supervisor- Mr. Hernandez stated that he has been employed at Edge Systems for 5 years. Mr. Hernandez stated that he originally started as a QA Tech and he has been in his current position for 3 years. Mr. Hernandez has 4 direct reports and he reports to Ms. Eva Chang, Regulatory/ QA Manager. Mr. Hernandez stated that he does not have the

**Exhibit KK Page 5 of 9**

| Establishment Inspection Report | FEI: | 3002477421 |
| --- | --- | --- |
| Edge Systems LLC. | EI Start: | 08/28/2013 |
| Signal Hill, CA  90755-4017 | EI End: | 08/28/2013 |

authority to hire or fire any of the firm's employees and he can make company expenditures to no set limit. Mr. Hernandez also stated that his responsibilities at the firm include handling complaints, customer issues, production, and quality.

Ms. Eva Chang, Regulatory/QA Manager- Ms. Chang stated that she has been with the company for 10 years, starting in Marketing. Ms. Chang has been in her current position for 1 year and she has 2 direct reports. Ms. Chang stated that she reports to the owner of the company Mr. Bill Cohen. Ms. Chang also stated that she has the authority to hire or fire any of the firm's employees and she can make company expenditures to no set limit. Ms. Chang also stated that her responsibilities at the firm include regulatory standards, international submissions, complaints, and CAPAs.

## FIRM'S TRAINING PROGRAM

I viewed the firm's training program (Training Doc #: SOP-018 Rev. 03) which states that new hire orientation and specific job related training will be established and documented. I pulled training records for four employees (Alvin Belt, Eva Chang, Rodrigo, and Ricardo), I did not find any observations with the firm's training program.

## MANUFACTURING/DESIGN OPERATIONS

Mr. Cohen provided me a walk-through of the facility, accompanied by Ms. Chang and Mr. Hernandez. The firm was in the process of manufacturing hydrafacial devices. There have not been any changes in the firm's manufacturing operations since the last inspection. Work orders are still prepared as orders are received for devices. The work order continues to include a build of materials on the specifications and work sheets provided. I observed the employees following the work instructions and completing the work order forms.

### Design Controls

I reviewed the firm's Design Control Doc. #: SOP-004 Rev. 02. There have not been any changes in the firm's class II devices since the prior inspection. Management stated that there are no future plans to change any design features of the class II devices. Management also stated that the firm does not sell many class II devices as most of their sells are from class I devices.

## MANUFACTURING CODES

The manufacturing codes for the devices have not changed since the last inspection.

## COMPLAINTS

During the inspection I reviewed the firm's "Complaint and MDR Reporting Doc. # QASI-14.028 Rev. B as well as the complaint logs for the years of 2011, 2012, and 2013. The firm received 5 complaints for 2011, 22 complaints for 2012, and 45 complaints for 2013. Many of the firm's complaints were for the class I devices. Many of the 2012 complaints were for irritation/allergic

| **Establishment Inspection Report** | FEI: | **3002477421** |
|---|---|---|
| Edge Systems LLC. | EI Start: | 08/28/2013 |
| Signal Hill, CA  90755-4017 | EI End: | 08/28/2013 |

reaction, burning sensation, lacerations, breakouts, and skin infections regarding the firm's class I devices.

When asked about the increase in complaints from 2011 to 2013, Ms. Chang justified the spike in complaints by stating that sales went up drastically and also Edge Systems began calling customers to get feedback and they were really forth-coming with information.

I pulled complaints 11-001, 12-012, 12-018, 12-003, 12-006, 12-008, 12-010, 13-002, 13-010, 13-016, 13-004, 13-008, 13-019, 13-025, and 13-040.  I did not find any observations with the firm's complaints or Complaint Handling Procedure.

## CAPAS
I reviewed the firm's Corrective Action Doc # SOP-014 Rev. 04 as well as the CAPA logs for 2011, 2012, and 2013. The firm opened 30 CAPAs in 2011, 39 CAPAs in 2012, and 30 CAPAs in 2013. Many of the CAPAs for 2011 were moved to 2012, Management stated that this was because the CAPAs were still opened and needed to be updated.

Of the CAPAs for 2011, 2012, and 2013 which totaled 99, only 1 CAPA from all three years was related to a class II device. CAPA 130104 was the only CAPA opened for any of the firm's class II devices.

CAPA 130104 was opened due to 8 safe systems being sent out with the wrong labeling. The 8 devices were sent out labeled as "10001" when the correct labeling for the devices was actually "18009-B". There were 12 in-house units that were also found with the same issue and corrected. QA and QC failed to check correct part numbers and specifications for the units during creation of the labels and during application of the labels to the units. The preventative action for this CAPA was identified as "N/A" in which I explained to Management that there are preventative actions that the firm could take to ensure that this mishap does not happen again. I discussed with Management that they should re-train employees to the label control procedure and make sure that they are double checking all of the information before applying the labels to the devices.

## RECALL PROCEDURES
Management stated the firm has not had to initiate any recalls. A search in the FDA data base revealed that the firm does not have any recalls on file with the FDA.

## OBJECTIONABLE CONDITIONS AND MANAGEMENT'S RESPONSE
During the close out meeting of the inspection there was Mr. Cohen (President), Ms. Chang (QA Manager), and Mr. Hernandez (Tech. Support Supervisor) was present from the firm. There was no FDA-483 issued however, there was two items I did discuss with Management. I stated that in regards to CAPA 13040, a preventative action could have been completed for that CAPA.  I also

| **Establishment Inspection Report** | FEI: | **3002477421** |
|---|---|---|
| Edge Systems LLC. | EI Start: | 08/28/2013 |
| Signal Hill, CA  90755-4017 | EI End: | 08/28/2013 |

stated to Management that the firm's organizational chart should include names as well as titles. Management agreed with my discussion items and promised to fill in that section for future CAPAs and update their organizational chart.

## REFUSALS
There were no refusals encountered during the inspection.

## SAMPLES COLLECTED
There were no samples collected during this inspection.

## EXHIBITS COLLECTED
1. Copy of the firm's organizational chart. 1 page
2. Brochure 6 pages
3. Marketing leaflet 2 pages
4. Marketing leaflet 2 pages
5. Marketing leaflet 2 pages
6. Marketing leaflet 1 page

## ATTACHMENTS
1. Assignment ID: 1521847
2. FDA-482, Notice of Inspection, issued to the President of Edge Systems LLC, Mr. William Cohen
3.

**Establishment Inspection Report**                              FEI:        **3002477421**

Edge Systems LLC.                                            EI Start:      08/28/2013

Signal Hill, CA  90755-4017                                   EI End:       08/28/2013

Durell Giles, Investigator

# EXHIBIT 22

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| EDGE SYSTEMS LLC, a California limited liability company, and AXIA MEDSCIENCES, LLC, a Delaware limited liability company, | ) ) ) ) | Civil Action No._____ |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Rafael Newton Aguila, a/k/a Ralph Aguila, an individual, d/b/a Hydradermabrasion Systems, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## DECLARATION OF WILLIAM COHEN IN SUPPORT OF PLAINTIFFS' MOTION FOR *EX PARTE* TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

-1-

I, William Cohen, declare as follows:

1.       My name is William Cohen, I am over the age of eighteen (18) and competent to execute this Declaration, and the following statements are true and correct based on my personal knowledge or information transmitted to me from records made at or near the time of the transactions referenced therein by person(s) with personal knowledge thereof.

2.       I am the President for Plaintiff Edge Systems LLC ("Edge"), and have held this position since January of 2013.

**Edge's History and Current Success**

3.       Edge was founded in 1997, and has always been at the forefront of the aesthetic industry.  Edge has worked continuously to bring new technology and breakthrough processes to the market.

4.       Since its founding, Edge has continuously operated under the trade name "Edge Systems," using the mark EDGE SYSTEMS in connection with the sale and promotion of its products.

5.       Since 1999, Edge has used the following variations of its chevron-styled "E" logo formed by three triangles, including the examples below.

      *a.  1999*



      *b.  2003–2007 (FROM WEBSITE)*



    *c.  2007–2008 (FROM WEBSITE)*



    *d.  1999–2011*



    *e.  2011–PRESENT*



6.       Edge's trademarks relevant to this motion are shown in the table below:

| MARK | REG. NO. | REG. DATE/FIRST USE |
|------|----------|---------------------|
| "EDGE SYSTEMS" | Common Law | 1997 |
| Chevron "E" Logo | Common Law | 1999 |
| "THE EDGE SYSTEMS" | 2,992,734 | September 6, 2005 |
| "HYDROPEEL" | 3,500,086 | September 9, 2008 |
| "VORTEX-FUSION" | 4,114,466 | March 20, 2012 |
| "HYDRAFACIAL MD" | 3,341,027 | November 20, 2007 |

| "HYDRAFACIAL" | 4,317,059 | April 9, 2013 |
| "ACTIV-4" | Common Law | 2006 |
| "ANTIOX+" | Common Law | 2013 |
| "ANTIOX-6" | Common Law | 2006 |
| "BETA-HD" | Common Law | 2006 |
| "DERMABUILDER" | Common Law | 2010 |
| "GLYSAL" | Common Law | 2010 |

7.      Edge's best-selling product is its HydraFacial MD® hydradermabrasion system ("HydraFacial MD").  The HydraFacial MD is an innovative non-ablative facial rejuvenation system.  Edge's HydraFacial MD incorporates the technology claimed in U.S. Patent Nos. 6,299,620, 6,641,591, 7,678,120, 7,789,886, 8,066,716, and 8,337,513 ("Axia Patents").  Edge is the exclusive licensee of the Axia Patents.  The features of the HydraFacial MD claimed in the Axia Patents drive consumer demand for the product.

8.      The HydraFacial MD is registered with the FDA as a Class 1 Device in the classification BRUSH, DERMABRASION, POWERED, regulation number 878.4820, for the medical specialty General & Plastic Surgery.  The HydraFacial MD also conforms with all of the legal requirements for CE marking for a Class 1 Device.

9.      The HydraFacial MD has a unique and distinctive design consisting of a light grey body with a translucent blue cover over the serum bottles, a darker-grey base, a monitor positioned on top of the tower, and four wheels at the corners of the base, as shown below.  The design of the HydraFacial MD is not necessarily the simplest or most inexpensive possible design for the machine.  Edge has been selling product bearing this unique and distinctive design as early as 2010 and has been selling a product bearing a nearly identical design since 2005.



10.     Since the beginning of 2010, Edge has spent approximately $4 million advertising its products in connection with Edge's trade name, trademarks, and the design of the HydraFacial MD.  In 2014 alone, Edge spent nearly $1.4 million on advertising.  Edge advertises its products at trade shows, seminars, and through trade publications, social media, search engine optimization, emails, and webinars.

11.     Edge includes its chevron "E" trademark on nearly everything affiliated with the company including, for example, its products, letterhead, envelopes, business cards, company banners, website, email signatures, pens, mugs, t-shirts, collared shirts, and windbreakers.

12.     The following media outlets have profiled Edge and its products, including the HydraFacial MD: *People Magazine, Allure, The Hollywood Reporter, Tampa Bay Times, New Beauty, OK! Magazine, Star Magazine, Elle Beauty Book, Harper's Bazaar Magazine, Essence, Simply Her, Examiner.com, In Style, Good Day LA, The Doctors, KLBK News, Great Day Houston,* and the *Real Housewives of Beverly Hills.*

13.     Edge products and services are offered at more than 2,500 locations throughout the United States, including all 50 states.

14.     Edge sells its products to many consumers, including dermatologists, plastic surgeons, and health spas.

15.     The Edge trade name, trademarks and trade dress are extremely valuable to Edge as identifiers of the company.  Edge has developed and cultivated immense goodwill and brand recognition in its distinctive trademarks and trade dress.  Edge's trade name, trademarks, and trade dress have become synonymous in the consumer's mind with Edge's business and high quality products.

16.     Edge has continuously operated a website since 1999, displaying Edge's trademarks in connection with the sales and promotion of its products.  Edge's website has reached over 56,000 individual users since July 2013 and averages over 55,000 page views per month.

17.     Edge has a sales force of over 60 employees in the United States covering each of the 50 states.  Edge has been selling products in the state of Florida since 2000, and has sold versions of the HydraFacial MD in Florida beginning as early as 2005.

18.     Over the last five years, Edge has generated over $93 million in revenue, including over $48 million in revenue from sales of the HydraFacial MD.

**Mr. Aguila's Conduct**

19.     In October of 2014, Edge was surprised to learn that one of its main competitors, Lumenis, was offering a copycat version of the HydraFacial MD on the website www.hydradermabrasion.com.  Edge contacted Lumenis and learned that Lumenis was just as surprised as Edge.  Edge and Lumenis both discovered that the website was actually registered to Ralph Aguila.   Mr. Aguila was apparently using Lumenis' trade name and trademarks to advertise a knock-off HydraFacial MD.

20.     On October 27, 2014, Edge sent Mr. Aguila a cease and desist letter and asked that it stop infringing the asserted patents.

21.     Upon information and belief, Lumenis separately asked that Mr. Aguila stop using Lumenis' trade name and trademarks.  Mr. Aguila then changed his website, replacing Lumenis' trade name and trademarks with Edge's trade name and trademarks.

22.     Mr. Aguila responded to our October 27 cease and desist letter with two separate letters.  In the first letter, he discussed allegations of fraudulent credit card purchases from 2006.  In the second letter, he accused Edge of mounting a "fraudulent click" campaign against his infringing advertising.

23.     Mr. Aguila also started using a second website, www.edge-systems.com, that has nearly identical content as www.hydradermabrasion.com and advertises the same infringing material.  Mr. Aguila also sells the same serums and solutions as Edge on both these websites.

**Edge's History With Mr. Aguila**

24.     Edge first became aware of Mr. Aguila in early 2006, when Mr. Aguila—doing business as DiamondSkin Systems—was selling a microdermabrasion machine on eBay that appeared to infringe some of the Axia Patents.  In response to Edge's request to eBay, Mr. Aguila sent an email accusing a former Edge employee of making fraudulent purchases with his credit card information. The employee's name was Marshae Colbert, and she had already been terminated at the time of the accusations.   Nonetheless, Edge took additional precautions to ensure no private customer information could be accessed by the former employee.  Aguila again raised this allegation in response to the October 27, 2014 cease and desist letter.

25.    In January 2010, Edge became aware that Mr. Aguila, again as DiamondSkin Systems, was infringing Edge's trademarks and copyrights and at least two of the Axia Patents. Edge sent Defendant a cease and desist letter.  Although Defendant did not respond, the infringing products were removed from the offending websites.

26.    In October 2011, Edge sent a notice letter to Yahoo regarding infringement of Edge's trademarks and copyrights, including text from Edge's website on the website www.hydradermabrasion.com.  At that time, the website was registered to Mr. Aguila.  To my knowledge, Mr. Aguila did not respond to the takedown notice, but did appear to cease his activity.

27.    A    true    and    correct    copy    of    a    screenshot    of    the    website www.hydradermabrasion.com from October 21, 2014 is attached hereto as Exhibit C.

28.    A true and correct copy of the cease and desist letter sent from me to Mr. Aguila, dated October 27, 2014 is attached hereto as Exhibit D.

29.    A true and correct copy of a letter sent on November 7, 2014 from Mr. Aguila to Ted Papagiannis, a partner at Knobbe Martens, is attached hereto as Exhibit E.

30.    A true and correct copy of a letter sent on November 11, 2014 from Mr. Aguila to me and Ted Papagiannis is attached hereto as Exhibit F.

31.    A true and correct copy of the October 17, 2006 email from Ralph Aguila to me is attached hereto as Exhibit G.

32.    A true and correct copy of a letter sent on October 12, 2011 from Edge's former President, Roger Ignon, to Yahoo!, Inc. is attached hereto as Exhibit H.

33.    A true and correct copy of a February 25, 1999 FDA 501(k) notification from Edge is attached hereto as Exhibit I.

34.    A true and correct copy a screenshot (November 24, 2014) listing Edge's HydraFacial MD in the FDA's Establishment Registration & Device Listing is attached hereto as Exhibit J.

35.    A true and correct copy of a screenshot (November 24, 2014) listing Edge's FDA Registered Devices in the FDA's Establishment Registration & Device Listing is attached hereto as Exhibit K.

36.    A true and correct copy of Edge's Device Manufacturing License issued by the State of California, Department of Public Health, Food and Drug Branch, is attached hereto as Exhibit L.

37.    A true and correct copy of the Declaration of Conformity to the specified Directives and Standards for CE marking of the HydraFacial MD, executed by me on September 10, 2014, is attached hereto as Exhibit M.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 25th day of November 2014 at Signal Hill, California.

William Cohen

19397990

-7-

# EXHIBIT 23

February 25, 1999


510(k) Document Mail Center (HFZ-401)
Center for Devices and Radiological Health
Food and Drug Administration
9200 Corporate Blvd.
Rockville, MD 20850


Reference:       Section 510(k) Notification.


Dear Sir/Madam:

Edge Systems Inc. is submitting notification of its intention to deliver for introduction into
commercial distribution the Edge Sterile Tubing device.


The Edge Sterile Tubing is substantially equivalent to existing devices cleared by the Food and
Drug Administration.  The Edge Sterile Tubing device is identical to the companies existing
products which have been determined to be substantially equivalent by the FDA (K880890).
The only difference is that the proposed devices will be offered in a sterile configuration.  The
Stackhouse (K790877), and the Buffalo Filters (K924732) are other examples of substantially
equivalent devices with the same intended use requested by Edge Systems Inc..

Attached for review is a Table of Contents, 510(k) General Information, Summary and
Certification, Proposed Labeling, Device Description, and Comparative Information to support
the claim of substantial equivalency.

Please contact me at 562.988.1175 if you have any questions regarding this 510(k)
Notification.


Sincerely,



Roger Ignon
President


Exhibit I
Page 1 of 12

## TRUTHFUL AND ACCURATE STATEMENT

"Per 21 CFR 807.87 (j), I certify that in my capacity as President of Edge Systems Inc. Inc., all data and information submitted in the premarket notification submission is truthful and accurate and that no material fact has been omitted."

(Signature of Certifier)

ROGER IGNON

(Printed Name)

2/23/99

(Date)

(*Premarket Notification 510(k) Number)

Exhibit I
Page 2 of 12

510(k) Number (if known): _____

Device Name:     Edge Systems Sterile Tubing

<u>Indication For Use:</u>  For use in removing smoke from laser and/or electrosurgical procedures.

(PLEASE DO NOT WRITE BELOW THIS LINE-CONTINUE ON ANOTHER PAGE IF NEEDED)

_____
Concurrence of CDRH, Office of Device Evaluation (ODE)

Prescription Use_____     OR          Over-The-Counter Use_____
Per 21 CFR 801.109

Exhibit I
Page 3 of 12

# TABLE OF CONTENTS

1. 510(k) GENERAL INFORMATION

2. SUMMARY CERTIFICATION

3. PROPOSED LABELING

4. DEVICE DESCRIPTION

5. COMPARITIVE INFORMATION

6. BIOCOMPATIBILITY ASSESSMENT

7. STERILIZATION INFORMATION

8. SPECIFIC STANDARDS AND GUIDANCES

9. PREDICATE DEVICE LITERATURE

Exhibit I
Page 4 of 12

## <u>510(k) GENERAL INFORMATION</u>

The following information is being submitted in conformance with 21 CFR 807.87:

A.    Device Name:

i.     Classification Name:          Surgical Exhaust Apparatus
ii.    Common/Usual Name:          Smoke Evacuator Accessories
iii.   Trade Name:               Edge Systems Sterile Tubing

B.    Establishment Registration Number:        2031227

C.    Manufacturing Facility Name and Address:  Edge Systems Inc.
                                 2321 28th Street Suite 404
                                 Signal Hill, CA  90806

D.    Sterilization Facilities:    Isomedix            Sterigenics Int.
                              9120 South 150 East     344 Bonnie Circle
                              Sandy, UT 84070         Corona, CA 91720

E.    Devices of this type have been classified by the General and Restorative Device Panel into Class II, under 21 CFR, 878.4040, Product Code FYD.

F.    The purpose of this 510(k) Notification is to notify the FDA of Edge Systems Inc. intent to deliver for introduction into commercial distribution the "Edge Systems Sterile Tubing" device.

G.    The "Edge Systems Sterile Tubing" device is substantially equivalent to existing smoke evacuation tubing sets cleared by the FDA.  The companies' existing tubing sets (non-sterile), Stackhouse (K790877), and the Buffalo Filters (K924732) are two examples of , many substantially equivalent devices with the same intended use requested by Edge Systems Inc..

H.    No specific performance standards or guidances have been established by the FDA for devices of this type.

Exhibit I
Page 5 of 12

## 510(k) STATEMENT

"I certify that in my capacity as President of Edge Systems Inc. Inc., I will make
available all information included in this premarket notification on safety and
effectiveness within 30 days of request by any person if the device described in
the premarket notification submission is determined to be substantially
equivalent.  The information I agree to make available will be a duplicate of the
premarket notification, including any adverse safety and effectiveness
information, but excluding all patient identifiers, and trade secret and confidential
commercial information, as defined in 21 CFR 20.61

_____
(Signature of Certifier)


ROGER IGNON
_____
(Printed Name)


2/22/99
_____
(Date)


_____
(*Premarket Notification 510(k) Number)

Exhibit I
Page 6 of 12

# EXHIBIT 24

Exhibit K
Page 1 of 1



U.S. Food and Drug Administration
Protecting and Promoting Your Health

Establishment Registration & Device Listing

○ FDA Home ○ Medical Devices ○ Databases

1 result found for Establishment Registration
Number: 2001227

| Establishment Name | ▲ | Registration Number | Current Registration Yr |
|---|---|---|---|
| EDGE SYSTEMS LLC | CA/USA. | 2001227 | 2014 |

• Batch Demonstration Powered, Abrasion System, Cross System Particle System, Electric
  System, Quick System, Torus System | Manufacturer
• Camera, Still, Surgical - EDGE SYSTEMS ULTRACIM | Specification Developer
• Camera, Hand Processor, Needle-Type, TELANGIECTRON | Specification Developer
• Dermabrasion - DPL/PHILCUERM ABRASION SYSTEM | Manufacturer
• Powered Laser Surgical Instrument, One Set Blue Light Number System One Set (Step Light) | Manufacturer
• Trocar System | Manufacturer
• Accessories, Powered, Surgical - Self, System | Manufacturer
• Powered Laser Surgical Instrument, Edge Skine Tubing | Manufacturer

Can't find what you're looking for? Try a new search.

New Search

Page Last Updated: 1/24/2014
Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.

# EXHIBIT 25



FDA Home[3] Medical Devices[4] Databases[5]

# MAUDE Adverse Event Report: EDGE SYSTEMS LLC HYDRAFACIAL GFE, HYDRADERMABRASION

| 510(k)[7] | DeNovo[8] | Registration & Listing[9] | Adverse Events[10] | Recalls[11] | PMA[12] | Classification[13] | Standards[14] |
| CFR Title 21[15] | Radiation-Emitting Products[16] | X-Ray Assembler[17] | Medsun Reports[18] | CLIA[19] | TPLC[20] | Inspections[21] |

### EDGE SYSTEMS LLC HYDRAFACIAL GFE, HYDRADERMABRASION

Back to Search Results

**Model Number** HYDRAFACIAL WAVE
**Event Date** 07/27/2010
**Event Type**  Injury
**Event Description**

Patient received a facial acid peel (cosmetic treatment) performed by the health professional during the above dates. The suspect products used were cosmetic products containing glycolic acid and salicylic acid; the products were used in conjunction with the hydrafacial wave device. The operator failed to follow instructions for use and precaution to properly cover and protect patient's eyes during facial treatment, causing the acidic fluids to get into patient's eyes and surrounding areas, resulting in reported patient injuries. Those reports include excessive tearing of both eyes; itchiness, swelling, and burning sensation of the eyes and surrounding areas; rash an irritated skin; mild contact dermatitis; lacrimal tear duct stenosis; mild sinusitis with nasal obstruction; mild periorbital cellulitis; etc. Patient also complained about blurry vision, sensitive to light, etc. Patient was caused to use eye drops, facial ointments, warm compresses, medications, and underwent a bilateral lower eyelid punctoplasty. Patient was not hospitalized or confined to bed, but was confined to her home for approximately 30 days intermittently.

**Manufacturer Narrative**

The incident occurred in 2010, but was not brought to edge systems' (manufacturer) attention until recently by the lawsuit between the consumer and the health professional. The attorney provided medical records and details on (b)(6) 2013, so edge systems was able to file a report. The incident was caused by operator neglecting to follow the instructions for use (ifu). It was operator error; no device malfunction or product defects. The suspect cosmetic product(s) used in conjunction with the device contain glycolic acid and salicylic acid at low concentration that are safe to use on human skin surface to remove stratum corneum if the recommend instructions for use are followed properly. The suspect product(s) are not intended to be used on or around the eyes. The ifu provided by edge systems, including use manuals, training dvds, and labels, provide adequate and proper instructions and recommend the use of eye protection for patient during treatment. The ifu also state that if the fluids get into the eyes, rinse with water immediately, and seek medical care if irritation occurs/persists. Edge systems also provided training to the health professional at time of device purchase, educating operators the proper treatment protocols and procedures. In addition, all the lots of suspect product(s) that could possibly be use around the date of event all showed compliance to specifications and no microbial growth or defects were found.

### Search Alerts/Recalls[22]

New Search  |  Submit an Adverse Event Report[23]

**Brand Name** HYDRAFACIAL
**Type of Device** GFE, HYDRADERMABRASION
**Manufacturer *(Section F)*** EDGE SYSTEMS LLC
Signal Hill CA
**Manufacturer *(Section D)*** EDGE SYSTEMS LLC
Signal Hill CA
**Manufacturer Contact** Gary Mocnik

12/15/2014                    MAUDE Adv     Event Report: EDGE SYSTEMS LLC HYDRAFACIAL C     HYDRADERMABRASION

49 Coastal Oak
Aliso Viejo , CA 92656

**Device Event Key** 3138584
**MDR Report Key** 3108813
**Event Key** 3005368
**Report Number** 2031227-2013-00001
**Device Sequence Number** 1
**Product Code** GFE 24
**Report Source** Manufacturer
**Source Type** Unknown
**Reporter Occupation** NOT APPLICABLE
**Type of Report** Initial
**Report Date** 05/06/2013
*1* **Device Was Involved in the Event**
*1* **Patient Was Involved in the Event**
**Date FDA Received** 05/06/2013
**Is This An Adverse Event Report?** Yes
**Is This A Product Problem Report?** No
**Device Operator** Health Professional
**Device EXPIRATION Date** 05/01/2017
**Device MODEL Number** HYDRAFACIAL WAVE
**Device Catalogue Number** 70159-03
**Was Device Available For Evaluation?** Yes
**Is The Reporter A Health Professional?** No
**Was The Report Sent To Manufacturer?** No
**Date Manufacturer Received** 04/05/2013
**Was Device Evaluated By Manufacturer?** Device Not Returned To Manufacturer
**Date Device Manufactured** 05/01/2010
**Is The Device Single Use?** No
**Is this a Reprocessed and Reused Single-Use Device?** No
**Is the Device an Implant?** No
**Is this an Explanted Device?**
**Type of Device Usage** Invalid Data

**Patient TREATMENT DATA**
**Date Received: 05/06/2013 Patient Sequence Number: 1**
**Treatment**
GLYSAL PREP, 7.5%
GLYCOLIC ACID AND 2%
SLICYLIC ACID
GLYSAL PEEL
15% GLYCOLIC ACID
1.5% SALICYLIC ACID

**Links on this page:**

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain

2. http://www.addthis.com/bookmark.php

3. http://www.fda.gov/default.htm

4. http://www.fda.gov/MedicalDevices/default.htm

5. http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Databases/default.htm

6. /scripts/cdrh/devicesatfda/index.cfm

7. /scripts/cdrh/cfdocs/cfPMN/pmn.cfm

8. /scripts/cdrh/cfdocs/cfpmn/denovo.cfm

# EXHIBIT 26



INTERNET ARCHIVE
WayBackMachine
http://www.newcell-technologies.com/    Go    JUL SEP DE
46 captures
24 Feb 04 - 4 Jan 14    ◀ 24 ▶
2003 2004 2005

**Call toll-free at 1-866-766-0639**    **support@diamondskin.com**

Welcome to the latest in Crystal-Free Microdermabrasion with oxygenation. Our DiamondSkin machine uses advanced Oxygen infusion technology to assist skin cell recuperation at the moment of dermabrasion.

This new Transdermal Oxygen delivery system assists skin cell oxygenation. destroys blemish causing bacteria, and detoxifies most skin cell waste.

The dangers of using Aluminum Oxide and Sodium Bicarbonate have been well documented in many scientific journals. If you have previously used a microdermabrasion machine or had a treatment done, then you realize how messy it is when loose crystals go everywhere.

Clogging is also a constant danger when using a regular microdermabrasion machine. Even the best, most expensive machines breakdown unexpectedly. This is to be expected because of humidity entering the crystals, defective crystals, or bad-machine design.

With the DiamondSkin, we absolutely guarantee that the machine will never breakdown because of the high quality materials used in the construction and the high-caliber of engineering which went into its production. The vacuum used to take out the skin cell debris will never fail because there are no crystals to clog it up.

The 0.3 micron HEPA filter prevent cross-contamination between patients and your room.  We also include a special air-filter to make sure that the oxygenated air used is 100% pure of bacteria or viruses.

# EXHIBIT 27











Moving Date: June 18, 2004

### Products

### What's New

# EXHIBIT 28

INTERNET ARCHIVE
WayBackMachine

http://www.edgesystem.net/HydraFacialMD.htm   Go

81 captures
3 Mar 05 - 19 May 14

FEB MAR MAY
◀ 3 ▶
2004 2005 2006




*Introducing the...*



# HYDRAFACIAL MD™

*Fluid-Based Skin Resurfacing System*

*Multiple Modalities that Work Together on One Platform with Tutorials*



**HYDRAFACIAL™**
- Patented HydraPeel™ Tip resurfaces skin while simultaneously introducing topically applied serums
- For oily & acne-prone skin, fine lines, wrinkles and hyperpigmentation
- **Proprietary Serums** for deep cleansing, exfoliating, extracting, hydrating, antioxidant treatment and more

**LED LIGHT THERAPY**
- Red & infrared light improves the appearance of age signs & skin texture
- Blue light for oily & acne-prone skin
- Can be combined with other modalities for best results

**DIAMOND TIP ABRASION**
- Dry diamond tip abrasion can be combined with wet HydraFacial™ treatment for deeper abrasion
- Various diamond tips, from fine to extra coarse

**VACUUM THERAPY**
- Lymphatic Drainage
- Cellulite Massage

VIP Advertising Program --- Special Offer for a Limited Time Only! Call 800-603-4996 Now!

*Go to Proprietary Serums, Before & After Pictures, and Testimonials*

[ HydraFacial MD™ Multi-Modality System ] [ Delphia™ Microdermabrasion Systems & Massage Therapy ]
[ Del Sol ™ LED Light Therapy ] [ Telangitron® Spider Vein Removal ] [ UltraCam ™ Color UV Camera ]
[ UltraMax ™ Ultrasonic Skincare System ] [ SAFE™ System Surgical Smoke Evacuator ]
[ Replacements & Tubing ] [ Crystals & Accessories ] [ Contact Us ]

Edge Systems Corporation · 2277 Redondo Avenue, Signal Hill, CA 90755 · USA.
1-800-603-4996 · FAX 562-597-0148· Contact@edgesystem.net .
For technical questions regarding website only please contact Webmaster .
Copyright © 2003.  Edge Systems Corporation.  All rights reserved.

# EXHIBIT 29

# UNITED STATES PATENT AND TRADEMARK OFFICE

**SERIAL NO**:    78/563560

**APPLICANT**:    Edge Systems Corporation

# *78563560*

**CORRESPONDENT ADDRESS**:
    CATHERINE J. HOLLAND
    KNOBBE, MARTENS, OLSON & BEAR
    2040 MAIN ST FL 14
    IRVINE, CA 92614-7216

**RETURN ADDRESS:**
Commissioner for Trademarks
P.O. Box 1451
Alexandria, VA 22313-1451

**MARK**:    HYDRAFACIAL MD

**CORRESPONDENT'S REFERENCE/DOCKET NO** :  EDGE.013T

**CORRESPONDENT EMAIL ADDRESS**:
    efiling@kmob.com

Please provide in all correspondence:

1. Filing date, serial number, mark and
   applicant's name.
2. Date of this Office Action.
3. Examining Attorney's name and
   Law Office number.
4. Your telephone number and e-mail
   address.

## OFFICE ACTION

<u>**RESPONSE TIME LIMIT**</u>: TO AVOID ABANDONMENT, THE OFFICE MUST RECEIVE A PROPER RESPONSE TO THIS OFFICE ACTION WITHIN 6 MONTHS OF THE MAILING OR E-MAILING DATE.

Serial Number  78/563560

The assigned examining attorney has reviewed the referenced application and determined the following.

## NO CONFLICTING MARKS NOTED

The examining attorney has searched the Office records and has found no similar registered or pending mark which would bar registration under Trademark Act Section 2(d), 15 U.S.C. §1052(d).  TMEP §704.02.

## DISCLAIMER

The applicant must insert a disclaimer of HYDRAFACIAL in the application because it describes a feature of the goods, namely, that they are used to provide hydra facials.  See the attached Google evidence demonstrating that many different companies provide hydra facials.  Trademark Act Section 6, 15 U.S.C. Section 1056; TMEP sections 1213 and 1213.08(a)(i).  A disclaimer does not remove the disclaimed matter from the mark.  It is simply a statement that the applicant does *not* claim exclusive rights in the disclaimed wording or design apart from the mark as shown in the drawing.

A properly worded disclaimer should read as follows:

> No claim is made to the exclusive right to use HYDRA FACIAL apart from the mark as shown.

**IDENTIFICATION OF GOODS**
The identification of goods is unacceptable as indefinite.  The applicant must specify each and every medical instrument and apparatus using the common commercial name for the goods.

For aid in selecting acceptable identifications of goods and services and determining proper classification, the searchable Manual of Acceptable Identifications of Goods and Services is available on the Agency website at the following address: http://www.uspto.gov/web/offices/tac/doc/gsmanual/. The applicant may adopt the following identification, if accurate:

Medical apparatus and instruments, namely, lasers for the cosmetic treatment of the face and skin; medical apparatus and instruments for peeling and resurfacing tissue, namely, medical skin abraders and dermabraders, in International Class 10;

Please note that, while an application may be amended to clarify or limit the identification, additions to the identification are not permitted.  37 C.F.R. Section 2.71(a); TMEP section 1402.06.  Therefore, the applicant may not amend to include any goods that are not within the scope of goods set forth in the present identification.

**TELEPHONE CALL SUGGESTED**
PLEASE NOTE: All of the issues raised can be resolved by telephone.  The applicant may telephone the examining attorney, instead of submitting a written response, to expedite the application.


/Tanya Amos/
Trademark Examining Attorney
Law Office 113
(571) 272-9423 Phone
(571) 273-9423 Fax


**HOW TO RESPOND TO THIS OFFICE ACTION:**
- ONLINE RESPONSE:  You may respond formally using the Office's Trademark Electronic Application System (TEAS) Response to Office Action form (visit http://www.uspto.gov/teas/index.html and follow the instructions, but if the Office Action has been issued via email, you must wait 72 hours after receipt of the Office Action to respond via TEAS).
- REGULAR MAIL RESPONSE:  To respond by regular mail, your response should be sent to the mailing return address above and include the serial number, law office number and examining attorney's name in your response.

**STATUS OF APPLICATION:** To check the status of your application, visit the Office's Trademark Applications and Registrations Retrieval (TARR) system at http://tarr.uspto.gov.

**VIEW APPLICATION DOCUMENTS ONLINE:** Documents in the electronic file for pending applications can be viewed and downloaded online at http://portal.uspto.gov/external/portal/tow.

**GENERAL TRADEMARK INFORMATION:** For general information about trademarks, please visit the Office's website at  http://www.uspto.gov/main/trademarks.htm

**FOR INQUIRIES OR QUESTIONS ABOUT THIS OFFICE ACTION, PLEASE CONTACT THE ASSIGNED EXAMINING ATTORNEY SPECIFIED ABOVE.**

# EXHIBIT 30

## Response to Office Action
## To the Commissioner for Trademarks:

Application serial no. **78563560** has been amended as follows:
**Argument(s)**
In response to the substantive refusal(s), please note the following:

# REMARKS

The following amendment and remarks are submitted in response to the Examining Attorney's Office Action, dated September 12, 2005, which (1) required a disclaimer of HYDRAFACIAL on the ground that it is merely descriptive of Applicant's goods; and (2) required an amendment to the identification of goods.

### I.  Requirement for Disclaimer of HYDRAFACIAL

In addition to the requirement for an amended identification of goods, the Examining Attorney has required a disclaimer of the word HYDRAFACIAL on the ground that it is merely descriptive of Applicant's goods.   The Examining Attorney believes that the term HYDRAFACIAL is merely descriptive of Applicant's goods – which, as amended, are "medical apparatus and instruments for peeling, resurfacing and nourishing tissue" – because "it describes a feature of the goods, namely, that they are used to provide hydra facials."   Applicant respectfully traverses this requirement.

### A.  The Term HYDRAFACIAL Is At Most Vaguely Suggestive of Applicant's Goods

"[A] mark is merely descriptive if it <u>immediately</u> conveys knowledge of a quality or characteristic of the product." In re Oppedahl & Larson LLP, 71 U.S.P.Q.2d 1370, 1371 (Fed. Cir. 2004) (emphasis added).  A term is merely descriptive if it "describes a <u>significant</u> function or attribute or property" of the goods or services in question. In re H.U.D.D.L.E., 216 U.S.P.Q. 358, 359 (T.T.A.B. 1982) (emphasis added).  It follows that in order for a term to be merely descriptive, a term must <u>immediately</u> convey knowledge about a <u>significant</u> feature or characteristic of the goods or services at issue.

On the other hand, a term is suggestive if its "import would not be grasped without some measure of imagination and 'mental pause.'" In re Shutts, 217 U.S.P.Q. 363, 364-65 (T.T.A.B. 1983) (SNO-RAKE not merely descriptive of "a snow removal hand tool having a handle with a snow-removing head at one end, the head being of solid uninterrupted construction without prongs").  "If information about the product or service given by the term used as a mark is indirect or vague, then this indicates that the term is being used in a 'suggestive,' not descriptive, manner."   2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11:19 (4th ed. 2006).  This notion is simply the flip side of the aforementioned immediacy requirement, for if there is a "mental pause" in the mind of the consumer, the term does not immediately convey knowledge about the goods or services.

The term HYDRAFACIAL cannot immediately convey any knowledge of Applicant's medical apparatus and instruments because a multi-step reasoning process must be employed by a consumers and potential consumers to arrive at any conclusion about the goods.   That is, a consumer must make a substantial mental leap if he is to make any connection between the term HYDRAFACIAL and Applicant's medical goods.  That the term HYDRAFACIAL is suggestive is buttressed by the fact that neither "hydrafacial" nor "hydra facial" has any definition according to Onelook.com, a website that searches numerous online dictionaries at once.  <u>See</u> the attached printouts from Onelook.com.

On the other hand, the terms "Hydra," "hydra," and "facial" do have recognized definitions.      The definition of "Hydra" is

> **1.** *Greek Mythology* The many-headed monster that was slain by Hercules. **2.** A constellation in the equatorial region of the southern sky near Cancer, Libra, and Centaurus. Also called *Snake*. **3.** A persistent or multifaceted problem that cannot be eradicated by a single effort.

The definition of "hydra" is "[a] ny of several small freshwater polyps of the genus *Hydra* and related genera, having a naked cylindrical body and an oral opening surrounded by tentacles." The definition of "facial" is "[a] treatment for the face, usually consisting of a massage and the application of cosmetic creams." See the attached dictionary definitions from The American Heritage® Dictionary of the English Language (4th ed. 2000).

Thus, the term HYDRAFACIAL has numerous literal meanings – e.g., a facial for a many-headed monster from Greek mythology, a facial for a constellation, etc. – but none of these literal definitions has any relevance to Applicant's medical apparatus and instruments, and the Board has made it clear that the literal meaning of a mark must be considered in determining mere descriptiveness. For instance, in finding the mark AIR-CARE not merely descriptive of a "program of scheduled maintenance of hospital and medical anesthesia and inhalation therapy equipment and hospital piping systems for medical gases," the Board reasoned that

> [t]he literal meaning of the mark, namely, "care of the air", may, through an exercise of mental gymnastics and extrapolation suggest or hint at the nature of applicant's services, but it does not, in any clear or precise way, serve merely to describe applicant's preventive maintenance services directed to a scheduled maintenance program for hospital and medical anesthesia and inhalation therapy equipment and the like. Furthermore, applicant's registration of "AIR-CARE" and the presumptions afforded the registration under Section 7(b), if and when issued, would extend to the unitary term "AIR-CARE" and not to the words "AIR" and "CARE", per se, so that it cannot interfere with [another's] right to use these terms, separately and apart from each other, in a descriptive sense to describe its goods and/or services.

Airco, Inc. v. Air Prods. And Chems., Inc., 196 U.S.P.Q. 832, 835 (T.T.A.B. 1977). Much more so than the registrable mark AIR-CARE, the literal meaning of the term HYDRAFACIAL is utterly nonsensical, particularly as applied to Applicant's goods, and this indicates that the word is at most vaguely suggestive and hence registrable.

As noted above, the words "Hydra," "hydra," and "facial" do not describe Applicant's medical apparatus and instruments. The words "Hydra" and "hydra" have no relationship to Applicant's goods, and though the word "facial" may be suggestive of a function of Applicant's goods, it would be odd to describe Applicant's medical instruments as a "treatment" for the face.

In any event, even were it assumed arguendo that the words "Hydra" and "facial" were by themselves descriptive of Applicant's medical apparatus and instruments, it does not follow that the term as a whole, HYDRAFACIAL, is merely descriptive of Applicant's goods.  In In re Ada Milling Co., 98 U.S.P.Q. 267 (C.C.P.A. 1953), the Court of Customs and Patent Appeals reversed a merely-descriptive refusal of "Startgrolay," as applied to poultry feed, despite the fact that the evidence of record indicated that the words "start," "grow," and "lay" were commonly used to indicate various types of poultry food:

> Here appellant has so combined three words into a unitary notation as to result in a mark which in our opinion, may suggest but does not necessarily describe the character of its goods.  While it is, of course, true that if the mark were dissected, the words "Start," "grow," and "lay" might well be descriptive of the characteristics of various types of poultry feed, it is our belief that when the mark is viewed in its entirety, as it is viewed in the market place, it is capable of distinguishing applicant's goods from those of others.

98 U.S.P.Q. at 269.

In short, Applicant maintains that the term HYDRAFACIAL has no readily-understood meaning with regard to Applicant's goods, and that consumers and potential consumers encountering the term HYDRAFACIAL would have to engage in mature reflection to cull any information about the goods from this term.

**B.  The Evidence of Record Is Insufficient To Support the Refusal**

In support of the merely-descriptive refusal, there are printouts from eight websites; of these, the first five listed below appear to use variations of HYDRAFACIAL in connection with facial services. However, Applicant is not providing facials, but rather medical instruments.

1.  The first website is that of the Four Seasons Residence Club at Jackson Hole.  This website uses the term "hydra facial" in apparent reference to "facial" services, as defined above.    This usage does

not describe Applicant's medical apparatus and instruments, as explained above.  This website also uses the term "Ultra Hydra Facial," also in reference to facials.   Not only does this usage not refer to goods such as Applicant's, it is also unclear whether this usage is even descriptive usage inasmuch as the words "Hydra Facial" are capitalized.   "Some of the common markers of whether a word, phrase or picture is being used as a trademark are: larger-sized print, all capital letters <u>or initial capitals,</u> distinctive or different print style, color, and prominent position on label or advertising copy."  1 McCarthy, <u>supra</u>, at § 3:3 (emphasis added).

2.  The second website belongs to an entity whose name apparently is HeavenSpa Inc.  It includes a reference to "Insparations' Hydra-Facial – (60 minutes)."    Whatever this refers to, this event requires 60 minutes and therefore cannot refer to Applicant's medical goods.   Moreover, this usage includes a hyphen not found in the term HYDRAFACIAL and it, too, uses capitalization suggesting that it is proprietary usage, not descriptive usage.

3.  The third website is also from a spa and, similar to the second website, states "DNA Hydra Facial, 75 minutes $250."  Thus, it uses the term "Hydra Facial" in a trademark manner in reference to services (the bottom of the page states that "prices and services subject to change") and not Applicant's medical apparatus and instruments.

4.  The fourth website is also from a spa, and states "$110.00 ANTI-OXIDANT HYDRA FACIAL." Because "all capital letters" is also trademark usage, this usage suffers from the same infirmities as the above-noted usages.

5.  The fifth website includes the wording "Aroma Hydra Facial plus Eye Rejuvenation."   Given that this wording appears under the heading "QUICK PLEASURES FOR FACE," the above-noted objections also apply to this website.

The three remaining websites cited by the Examining Attorney in support of her position are foreign websites from Canada and India whose probative value is minimal. " Since it is the American public's perception of a term that is determinative, evidence from foreign publications is given little or no weight." T.M.E.P. § 1211.02(b)(ii). The copyright notice on the sixth website refers to an entity in Bangalore, India. The seventh website uses the term "Hydra Facial" in a trademark manner to refer to services, not Applicant's medical goods, and this entity is located in Nova Scotia, Canada. See the attached printout from that website. The eighth website is from an entity named Pantages located in Manitoba, Canada, as evidenced by its 204 area code and the attached printout of area codes and their assigned territories. See the attached printout from Pantages' website and the listing of area codes.

The sufficiency of the evidence in this case is notably similar to that proffered in In re Vaughan Furniture Co. Inc., 24 U.S.P.Q.2d 1068 (T.T.A.B. 1992), in which an examining attorney made of record 87 Nexis® articles in refusing the mark PINE CRAFTS for furniture. In reversing the refusal, the Board found that only one article made clear use of the mark in connection with furniture and that three others arguably did, but that "[t]he most we can determine from these three articles is that CRAFTS may have a suggestive significance." Id. at 1069. "Thus, after a close examination of what was apparently meant to appear as overwhelming evidence of the descriptiveness of CRAFTS or PINE CRAFTS for furniture, there is really only one article that supports the Examining Attorney's position." Id. at 1069-70. For the reasons noted above, Applicant respectfully submits that the evidence of record is insufficient to support the disclaimer requirement.

### C. Doubt Must Be Resolved in Applicant's Favor

"As with tonal shade variations in the colors of the visible spectrum of sunlight, the categories of the trademark spectrum often become difficult to distinguish at the boundaries." 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11:2 (4th ed. 2005). As the Examining Attorney is doubtless aware, "where reasonable men may differ, it has been the practice to resolve such doubt in an applicant's behalf and publish the mark for opposition." In re The Gracious Lady Serv., Inc., 175 U.S.P.Q. 380, 382 (T.T.A.B. 1972). Accordingly, because there is serious doubt as to the propriety of the refusal, Applicant respectfully submits that the application should be passed to publication without disclaimer of the word HYDRAFACIAL.

### II. Conclusion

Applicant submits that it has responded to all outstanding issues raised in the Office Action and that its application is now in condition for publication. Should the Examining Attorney have any questions or require any additional information, she is encouraged to contact the undersigned.

### Evidence

Evidence in the nature of dictionary printout from Onelook.com; dictionary printout from The American Heritage Dictionary of the English Language; website printouts; and a listing of area codes has been attached.

**Classification and Listing of Goods/Services**

**Applicant hereby amends the following class of goods/services in the application as follows:**
Current: Class 010 for Medical apparatus and instruments; medical apparatus and instruments for peeling and resurfacing tissue
Original Filing Basis: 1(b).
Proposed: Class 010 for MEDICAL APPARATUS AND INSTRUMENTS FOR PEELING, RESURFACING AND NOURISHING TISSUE

**Declaration Signature**
I hereby elect to bypass the submission of a signed declaration, because I believe a declaration is not required by the rules of practice. I understand that the examining attorney could still, upon later review, require a signed declaration.
**Response Signature**

Signature: /Catherine J. Holland/    Date: 03/13/2006
Signatory's Name: Catherine J. Holland
Signatory's Position: Attorney for Applicant

Serial Number: 78563560
Internet Transmission Date: Mon Mar 13 17:40:28 EST 2006
TEAS Stamp: USPTO/ROA-67.133.124.210-200603131740283
33617-78563560-32073e75f1bcdb79e5a0c6b76
591f02d-N/A-N/A-20060313171047734703

# EXHIBIT 31



FOR PROFESSIONALS



contact us
1-800-603-4996

FIND A **PROVIDER**     RESULTS     DAILY **ESSENTIALS**     SKIN **SOLUTIONS**



**Frequently Asked Questions**

**What is HydraFacial™?**
The HydraFacial™ treatment is a new breakthrough in aesthetic technology. It takes its name from the root word Hydrate; "to cause to take up moisture". This ability to moisturize the skin separates the HydraFacial™ from all other skin resurfacing procedures. The HydraFacial™ treatment removes dead skin cells and extracts impurities while simultaneously bathing the new skin with cleansing, hydrating and moisturizing serums. The treatment is soothing, refreshing, non-irritating and immediately effective.

**Why is HydraFacial™ good for my skin?**
Hydration is the foundation of healthy, radiant skin. Irritation of the skin has been proven to increase signs of aging. The HydraFacial™ is a hydrating and non-irritating treatment.

**Am I a candidate for this treatment?**
The HydraFacial™ treatment is designed for all skin types. Even the most sensitive skin easily tolerates the HydraFacial™ treatment. Your physician or skincare professional may choose specific treatment serums and/or customize the treatment for your unique skin conditions and needs. Consult your physician or skincare professional for a skin evaluation and sensitivity test.

**How long does the treatment take? Is there any downtime or pain involved?**
The HydraFacial™ treatment is a fast, efficient treatment that takes as little as 15 minutes. The treatment is often described as a feeling like "a cool paintbrush moving over the face". You may put on make-up and return to your normal activities right after the treatment since there is no downtime.

**What results may be expected? How many treatments are needed to see results? How long do the results last?**
Many people report seeing visible skin refinement and an even, radiant skin tone after just one treatment. The smooth results and hydration may last 5 to 7 days or even longer. 1 treatment per month is recommended for improving the appearance of fine lines, wrinkles, hyperpigmentation, oily and congested skin. Continued HydraFacial™ treatments are highly recommended to maintain results.

RAVE **REVIEWS**     MEDIA **BUZZ**     SKIN **HEALTH**     FAQ

