UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:14-cv-24517-KMM/MCALILEY

EDGE SYSTEMS, *et al.*,
                    Plaintiffs,

v.

Rafael Newton Aguila,
                    Defendant.

_____/



**DEFENDANT'S MOTION TO ALLOW TIME FOR DISCOVERY UNDER RULE 56(d)
*AND* OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Defendant Rafael Newton Aguila ("Defendant"), *pro se,* hereby submits this Motion for Rule 56(d) Relief and in Opposition to the Plaintiffs' Motion for Summary Judgment dated 12/04/15 [Dkt 176]. The Defendant responds as follows:

**I.      PRELIMINARY STATEMENT**

The Plaintiffs are only asking for a "partial" summary judgment because they left out four of their patents-in-suit from their "Motion for Summary Judgment" [Dkt 176].[1] Although the Plaintiffs had asked for stipulation from the Defendant to dismiss four of their patents-in-suit from this case, the Defendant believed that the Plaintiffs were asking to dismiss those patent <u>with</u> prejudice. When the Plaintiffs made it clear that they only wanted to dismiss the patents <u>without</u> prejudice, then the Defendant made it clear that they would not sign such a stipulation to dismiss without prejudice. See Exhibit A. Rule 41(a)(1)(A)(ii) provides that "the plaintiff may dismiss an action without a court order by filing: . . . a stipulation of dismissal signed by all parties who have appeared." Fed. R. Civ. P. 41(a)(1)(A)(ii). This is not the case here.

Importantly, it is premature for this court to consider the Plaintiffs' motion for summary judgment because more evidence in the form of the Plaintiffs' financial and sales information, as well as the depositions from Plaintiffs' employees and their Expert Witness was first needed. In fact, the Plaintiffs' only provided the Defendant with their Expert Witness' report

---

[1] U.S. Patent Nos. 7,678,120, 7,789,886; 8,066,716; and 8,337,513.

## II.   THE SUBMISSION OF THE PLAINTIFFS' EXPERT WITNESS REPORT AFTER THE DISCOVERY CUTOFF DATE

In this case, the Plaintiffs did not produce their expert witness' written report, nor the name of their expert, until after the close of discovery. See Exhibit A. Thus, Defendant's disclosure of the Plaintiffs' expert written report after the close of discovery ran afoul of Rule 26 and Local Rule 26.2(C), as interpreted in *Reese. See OFS Fitel, LLC v. Epstein, Becker and Green, P.C.,* 549 F.3d 1344 (11th Cir. 2008).

"Discovery must be completed in accordance with the court-ordered discovery cutoff date." S.D. Fla. Local R. 26.1(f). The only exception to this rule is if the parties agree to conduct discovery after the discovery cutoff date, but such is not the circumstance here. The discovery cutoff in this case was November 14, 2015.[2] *See Jones v. Royal Caribbean Cruises, Ltd.*, No. 12-20322-CIV, 2013 WL 8695361 (S.D. Fla. Apr. 4, 2013).

The parties are to submit their expert disclosures "at the times and in the sequence that the court orders." Fed.R.Civ.P. 26(a)(2)(D). According to Rule 26(a)(2), it requires a party to disclose to the other parties the identity of any expert witness it may use at trial to present evidence and "[e]xcept as otherwise stipulated or directed by the court, this disclosure shall ... be accompanied by a written report prepared and signed by the witness." Fed.R.Civ.P. 26(a)(2). Thus, '[d]isclosure of expert testimony' within the meaning of [Rule 26] contemplates not only the identification of the expert, but also the provision of [the expert's] written report." *Reese v. Herbert,* 527 F.3d 1253, 1265 (11th Cir. 2008); *see Prieto v. Malgor*, 361 F.3d 1313, 1317–18 (11th Cir.2004).

The counsel for the Plaintiffs seemed to recognize this mistake because they stated that they would allow the Defendant to depose their Expert Witness after the Discovery cutoff date. Mr. Razai, the Plaintiffs' counsel, wrote in an e-mail on December 2, 2015 the following: "Please let mw [*sic*] know how you intend to take the deposition and we will ask Mr. Loomis for dates". See Exhibit A, pg. 3.

Permitting the Plaintiffs to use their untimely expert witness report would unduly prejudice Defendant. The Court should not be inclined to cause this inequitable result. *See Reese v. Herbert*, 527 F.3d 1253, 1265 (11th Cir. 2008) (affirming order striking expert's affidavit and

---

[2] This court had previously ordered in D.E. 104 that "[a]ll discovery, *including expert discovery*, shall be completed one hundred (100) days prior to the date of trial" (emphasis added).

noting that "the expert disclosure rule is intended to provide opposing parries reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses") (internal quotation marks omitted). See also, *Cook v. Royal Caribbean Cruises, Ltd.,* No. 11-20723-CIV, 2012 WL 2319089 (S.D. Fla. June 15, 2012). The Defendant has already filed a Motion to Strike the Plaintiffs' Expert Witness report for its submission after the discovery cutoff and not allowing the Defendant to depose their Expert Witness.

Because Defendant has not been able to take the deposition of the Plaintiffs' expert because they only filed their report on November 24, 2015 – ten days after the discovery cutoff. The Defendant does not now have the ability to obtain additional experts to rebut the Plaintiffs' expert opinions. Nor can the Defendant use the deposition testimony of the Plaintiffs' expert witness in his summary judgment motion, because the Defendant was never able to depose the Plaintiffs' expert witness because of the discovery cutoff.

On June 22, 2015, the Defendant had asked the Plaintiffs in its interrogatory number 3, to "[p]lease provide the name of each person whom you may use as an expert witness at trial". The Plaintiffs responded on July 27, 2015 to this interrogatory as follows:

> "Plaintiffs incorporate by reference their Preliminary Statement and their General Objections. Plaintiffs further object to this interrogatory as premature, and on that ground, as unduly burdensome. Plaintiffs have not completed their investigation and discovery. Plaintiffs will identify their expert witnesses and provide reports at the appropriate time pursuant to Fed. R. Civ. P. 26(a)(2) and/or the Court's case scheduling orders in this matter".

The expert disclosure rule is intended to provide opposing parties "reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir.2000) (quoting Fed. R. Civ. P. 26(a)(2) advisory committee's note). In this case, the Plaintiffs did not even designate their expert witness, Mr. Loomis, as a potential witness in their Rule 26 disclosures.

The Defendant would need at least two weeks to properly notice the Plaintiffs' Expert Witness, who resides outside of Florida. In addition to thirty (30) more days after the deposition of the Plaintiffs' Expert Witness in order for the Defendant to have its own Expert Witness write the Defendant's rebuttal to the Plaintiff's Expert's report.

The Defendant believes that this failure is not harmless because there are only 80 days to trial and expert and percipient witness discovery has closed.

The timing to file an expert report is controlled by this Court's order from May 5, 2015 [D.E. 104], which states that "[a]ll discovery, including expert discovery, shall be completed one hundred (100) days prior to the date of trial". Fed. R. Civ. P. 26(2)(D) states that:

> "A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order …"

### III.     RULE 56(d) MOTION TO ALLOW TIME FOR DISCOVERY

Due process requires courts to "afford the parties a full opportunity to present their respective cases" before ruling on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In their Motion for Summary Judgment, the Plaintiffs' discuss the following:

a. "The balance of hardships favors Plaintiffs because Edge faces hardship from the loss of sales";

b. "Defendant's infringement of the '620 Patent has already damaged Plaintiff's market exclusivity"; and

c. "Finally Defendant's sales of his cheap knock-off product at one-fourth the price of Edge's product threatens to irreversibly erode the price the market will bear for Edge's microdermabrasion systems".

### a.  The facts sought by the Defendant were directly relevant and were within the exclusive control of the Plaintiffs, and the Defendant diligently sought the discovery.

However, this court granted the Plaintiffs' request for a protective order on Plaintiffs' customer lists, vendor lists, and financial information. This court wrote in its order that the "Plaintiffs argue persuasively that this highly confidential and commercially sensitive information is not relevant to Plaintiffs' claims". See Dkt. 150. Nevertheless, the Plaintiffs are clearly using their supposed "loss of sales" and the damage to their "market exclusivity" as arguments for this

court to grant their request for a Permanent Injunction and to grant Summary Judgment. Without access to the Plaintiffs' customer lists, vendor lists, and financial information – the Defendant is unable to mount a defense to argue that the Plaintiffs have not faced a "loss of sales" or damage to their "market exclusivity". In fact, there are many substitutable products in the market that are very similar to the Plaintiffs' Hydrafacial MD device and handpiece. See Composite Exhibit B.

The nonmovant will generally be given a chance to conduct discovery that is reasonably directed to obtaining facts essential to its case. *Opryland USA Inc. v. Great Am. Music Show, Inc.,* 970 F.2d 847, 852 (Fed.Cir.1992) (citations omitted); *see Dunkin' Donuts of Am., Inc. v. Metallurgical Exoproducts Corp.,* 840 F.2d 917, 919 (Fed.Cir.1988) (vacating a grant of summary judgment because no opportunity for the discovery of pertinent facts was afforded the nonmovant). If a continuance is granted under this rule, the court must ensure that the nonmovant has "adequate time for discovery." *Dunkin' Donuts,* 840 F.2d at 919 (citing *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548).

## b. The Defendant more than satisfied the requirements of Rule 56(d) by expressly, and repeatedly, informing the district court of the exact discovery needed to oppose the motion for summary judgment

During a November 5, 2015 hearing, this court discussed this potential problem with the Plaintiffs' counsel (Dkt. 166, pgs. 23-25):

**THE COURT:** BECAUSE SOME OF THIS DISCOVERY THAT MR. AGUILA IS RAISING I THINK HE'S TRYING TO GO INTO DOLLARS -- YOU KNOW, THE NOTION THAT DOLLARS HAVE BEEN LOST AND QUANTIFYING THOSE DOLLARS LOST BY PLAINTIFF. AND IT'S NOT  CLEAR TO ME THAT THAT'S EXACTLY WHAT YOU ARE TRYING TO PROVE AND THAT'S WHAT I'M TRYING TO UNDERSTAND A LITTLE BIT BETTER.

**MR. RAZAI:** NO, YOUR HONOR. I DON'T THINK IT'S A MATTER THAT'S NECESSARILY OF LOSING A COUPLE OF SALES TO MR. AGUILA AS MUCH AS IT IS OUR REPUTATION BEING HARMED BY SOMEBODY PRETENDING TO BE EDGE SYSTEMS.

**THE COURT:** RIGHT. RIGHT. SO THAT WAS MY RECOLLECTION.

In addition, the Plaintiffs used this protective order to prevent the Defendant from asking questions related to sales information of used HydraFacial MD devices, during the depositions of the Plaintiffs' President, Mr. Cohen:[3]

> **Q**: Is it common for you to sell used devices?
> **A:** I don't know the definition of common. We do sell them, yes.
> **Q:** Well, can you give me a number?
> **MR. RAZAI:** Objection. Are you asking for how many he sells?
> **Q (By Mr. Aguila):** Right. How many used devices do you sell?
> **MR. RAZAI:** You are not entitled to that information, Mr. Aguila.

See Exhibit I, pg 37.

Clearly, the Plaintiffs misled this court into believing that it would only focus its arguments on the supposed reputational harm caused by the Defendant's products. This is why the court granted the Plaintiffs' motion for a protective order on its customer lists, vendor lists, and financial information. However, because this very information is at the heart of the Plaintiffs' Motion for Summary Judgment, the Defendant should now gain access to this protected information to allow the Defendant to prepare a proper defense.

As the Defendant explains in its accompanying declaration, if this Rule 56(d) motion is granted, the Defendant will conduct discovery of plaintiffs and others to show that the Plaintiffs have not suffered any loss of sales or a loss of market exclusivity. For example, the Defendant only sells his machines through eBay or similar "used-items" platforms, as used devices. The Defendant believes that this discovery of the Plaintiffs' currently protected information should take less than 30 days after the Defendant first receives the currently protected information from the Plaintiffs. In addition, the Defendant would need to re-depose Mr. Cohen and Mr. Ignon with questions related to their sales, customer, vendor, and financial information – as well as the Plaintiffs' Expert Witness and several of their sales managers.

As the Federal Circuit discussed in *Baron Servs., Inc. v. Media Weather Innovations LLC*, 717 F.3d 907 (Fed. Cir. 2013), according to the Eleventh Circuit, Rule 56(d) (which was

---

[3] Supposedly, the Plaintiffs had sold a "used" Hydrafacial MD device that is normally worth $29,000 to Mr. Dubois, for only $10,000. However, the Plaintiffs were arguing that this was a completely normal transaction and was not a special favor to Mr. Dubois for his testimony.

contained in Rule 56(f) prior to the 2010 amendments) is "infused with a spirit of liberality." *Reflectone, Inc. v. Farrand Optical Co., Inc.*, 862 F.2d 841, 844 (11th Cir. 1989). *See also Walters v. City of Ocean Springs*, 626 F.2d 1317, 1321 (5th Cir. 1980). A party opposing summary judgment has "a right to challenge" affidavits submitted in support of the motion, by conducting "sufficient discovery so as to enable him to determine whether he can furnish opposing affidavits." *Snook v. Trust Co. of Ga. Bank of Savannah, N.A.*, 859 F.2d 865, 870 (11th Cir. 1988). If the discovery "would be relevant" to issues presented by the summary judgment motion, the non-movant "should be allowed the opportunity to utilize the discovery process to gain access to the requested materials." *Snook v. Trust Co.*, 859 F.2d at 870. *See also Allen v. U.S. EEOC Office*, 366 Fed. Appx. at 974.

In determining whether a district court improperly denied an opportunity to discover information relevant to a summary judgment motion, the question is whether the non-movant "*may* have been denied this opportunity." *Dean v. Barber*, 951 F.2d at 1214 (emphasis added). *See also Fernandez v. Bankers Nat'l. Life Ins. Co.*, 906 F.2d 559, 570 (11th Cir. 1990) (holding that the district court abused its discretion in granting summary judgment without permitting discovery of certain documents, and observing that the documents' relevance was evident based on what "they *might* have shown") (emphasis added); *Williams v. Le Crewe De Spaniards*, 2009 WL 3381519 at *2 (S.D. Ala. 2009) (ruling that the party opposing a summary judgment motion was entitled to its requested discovery because it "holds reasonable promise" of eliciting information relevant to the summary judgment motion). An order granting summary judgment "on a *potentially* inadequate record" is "improper and must be vacated." *Dean v. Barber*, 951 F.2d at 1214 (emphasis added).

The parties' comparative access to witnesses or materials is "a particularly salient factor" in determining whether relief is appropriate under Rule 56(d). *Walters v. City of Ocean Springs*, 626 F.2d at 1321. *See also Burks v. Am. Cast Iron Pipe Co., 212 F.3d 1333, 1338 (11th Cir. 2000) (holding that the party opposing a summary judgment motion should have been allowed to conduct discovery of documents which were "in the exclusive control of the defendant"). Cases where "knowledge of the relevant facts is exclusively with or largely within the control of the moving party" present the "typical situation" where relief under Rule 56(d) is appropriate.*

*Parks v. Doan, 2007 WL 1482770 at \*5 (N.D. Ga. 2007). See also Toffoloni v. LFP Publ'g. Grp.,*
*LLC, 2010 WL 187274 at \*2 (N.D. Ga. 2010).*

      The Plaintiffs had exclusive control over its "financial data" and its employee witnesses.
The Defendant diligently sought this information and the employees' depositions, and this was
perhaps the most relevant discovery to be had from the Plaintiffs. This is exactly the situation
where relief under 56(d) should be granted.

      Subsequent to *Snook*, the Eleventh Circuit has reaffirmed that it is error for a district
court to grant summary judgment without ruling on a pending motion to compel production of
evidence which could be relevant to the summary judgment motion. *See Vining v. Runyon*, 99
F.3d 1056, 1058 (11th Cir. 1996) (vacating summary judgment and remanding the case for a
ruling on a motion to compel, because "it is error for a district court to decide a summary
judgment motion before ruling on an outstanding motion to compel"); *Fernandez v. Bankers
Nat'l.*, 906 F.2d at 570-571 ("The district court's failure to rule on the motion to compel
deprived plaintiff-appellant of the right to use the discovery process in order to obtain the facts
necessary to oppose Banker's renewed summary judgment motion and constitutes reversible
error.").

## IV.    OPPOSITION TO THE PLAINTIFFS MOTION FOR SUMMARY JUDGMENT

      A trial court is required to resolve disputed factual issues in favor of the nonmoving
party. *See Matsushita Elec. Indus. Co. v. \*643 Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct.
1348, 89 L.Ed.2d 538 (1986). And, all reasonable inferences and presumptions must be resolved
in favor of the nonmoving party. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *see also
Moden*, 404 F.3d at 1342 ("[A]ll justifiable inferences [are drawn] in favor of the party opposing
summary judgment."). The fact that both parties have moved for summary judgment does not
relieve the trial court of its responsibility to determine the appropriateness of summary
disposition. *See Stratos Mobile Networks U.S.A., L.L.C. v. United States*, 213 F.3d 1375, 1379
(Fed.Cir.2000) ("[The court] determines for itself whether the standards for summary judgment
have been met." (citations omitted)).

**a. The Defendant did not infringe on the Plaintiffs' trademarks for HYDROPEEL nor VORTEX-FUSION.**

The Plaintiffs have not shown anywhere in the record how the Defendant has ever infringed their trademarks for "Hydropeel" or "Vortex-Fusion". The Defendant have never used the term "HydroPeel" to describe his handpiece tips, like the Plaintiffs do. Although Aguila does call one of the accused devices as the "HydraPeel", the Plaintiffs' have not shown if this has caused actual confusion with customers or not. See Aguila Declaration. In addition, the Defendant has never used the term "Vortex-Fusion" in any manner. See Aguila Declaration. In addition, the Defendant has provided into evidence with an exhibit attached to his amended answer, an invoice from 1996 that was kept by the Defendant in the due course of normal business, that shows the Defendant using the logo and trade name of "Edge Systems" to describe one of his companies at that time. See Aguila Declaration and Exhibit C.

**b. The Defendant does not infringe on the Plaintiffs' trademark for "The Edge System".**

The President of Edge Systems admits that they no longer sell any devices that are called "The Edge Systems" as required to maintain its trademark status. Although the Defendant could not receive any sales information on any item called "The Edge System" by the Plaintiffs because of the protective order on all of their financial and sales information. Instead, the Plaintiffs merely use the trademarked term "The Edge System" to describe the name of their company. Something that was not part of the trademark application for "The Edge System".[4] See Cohen's testimony from the evidentiary hearing. See Dkt. 55, pg 291-292.

Q. Do you sell currently any microdermabrasion machines that are called the Edge System?
MR. RAZAI: Objection. Relevance.
THE COURT: You can answer the question.
Q. Yes or no?
A. We sell some of the fluids that go into the machine under the Edge Systems.
THE COURT: That's your answer.
Q. Well, which fluids?
A. I believe it's our -- I believe it's the Activ-4.

---

[4] Their trademark application describes "The Edge System" as a "Medical apparatus, namely, systems comprised primarily of a vacuum source and hand piece used for medical body care treatments, microdermabrasion, and massage therapy".

Q. So the Activ-4 is called the Edge System?
A. It has it on the bottle.
Q. But it's called the Edge System?
A. Uh-huh. (Nodding affirmatively.) It has both.
Q. Activ-4?
A. (Nodding affirmatively).
Q. Okay. Thank you. That's exactly what I wanted to hear.

Importantly, exhibit C shows that the Defendant first used the tradename and logo for Edge Systems back in 1996, one year before the Plaintiffs. In fact, the trademark application for "The Edge Systems" describes that its "first use" was on 04/02/2001, and not on 1997 as the Plaintiffs claim. See Exhibit D.

### c.  The Defendant does not infringe on the Plaintiffs' trademark for Activ-4, Beta-HD, Antiox-6, or Dermabuilder.

The Defendant does not infringe these four trademarks because it actually owns them as U.S. registered trademarks. Antiox-6 (U.S. Reg. 4,768,712); Activ-4 (U.S. Reg. 4,768,710); Beta-HD (U.S. Reg. 4,768,711); and Dermabuilder (U.S. Reg. 4,772,995). All four trademarks are for "non-medicated skin care preparations, namely, lotions and serums". In fact, the Defendant began selling items under these trademarks before the Plaintiffs.

### V.  THE DEFENDANT'S DEVICES DO NOT INFRINGE ON THE PLAINTIFFS' '620 PATENT

### a.  The Defendant's diamond-tip heads

Although there is a "diamond-treatment head" that is optional with all of the accused devices, it is not used in conjunction with a vacuum source. Instead, this special diamond-tipped wand simply sprays the solution onto the patient's skin to lubricate the diamond-treatment head that then passes over the hydrated skin. There is never any vacuum involved. This is similar to the "JetPeel 3V" treatment, which also sprays a solution onto the skin of the patient, without a vacuum source. See Exhibit E. The Defendant did this to avoid violating the '739 patent, which has an earlier priority than the Plaintiffs' '620 patent. Both patents require a vacuum source in

their claims. See Exhibit F (Aguila's operator's manual) and Aguila's Declaration in Opposition to the Plaintiffs' Motion for Summary Judgment.

**b. The Defendant's plastic tips that are used with both vacuum and liquid sources.**

The main point of all of the accused devices is to provide a simultaneous solution and vacuum to the skin surface using a plastic tip with dull edges, in order to further stimulate the skin. In no way do these tips use any kind of "abrasive fragment composition" as described in patent '620. The tips are made of ordinary smooth plastic, in order to easily glide over the skin. In fact, the marketplace is already inundated with abrasive microdermabrasion tips, so there is no real profit to be made by selling these tips. For example, both the DiamondTome and SilkPeel sell devices that use diamond-tips with a simultaneous infusion of liquid. See Composite Exhibit B. See the manual, Exhibit F.

**c. The '620 patent is invalid because it is both indefinite and obvious, as well as anticipated by the '739 patent.**

Plaintiffs' patent is invalid because it is not novel because the exact same claimed inventions were invented earlier by another person. For a patent claim to be invalid as anticipated, that prior art reference must disclose each element, either explicitly or inherently, as arranged in the claim. An inherent disclosure occurs where the element is not expressly disclosed but the practice of the prior art reference would inevitably include the element.

US Patent 6,241,739 ("the '739 patent) was filed with the USPTO on November 12, 1999, more than one month before the '620 patent was filed on December 30th, 1999. The '739 patent clearly anticipates the '620 patent by mentioning the following:

*"FIG. 36 shows a second tube 54 mounted on the treatment tip 22. The tube could be used to allow the metered use of chemicals to enhance the abrasion or supply or other liquids to reduce friction".*



| Plaintiffs' '620 Patent | Disclosure of U.S. Patent No. 6,241,739 |
|---|---|
| Preamble: A system for treating surface layers of a patient's skin, comprising: | The device for microdermabrasion comprises a hollow tube with and abrasive material permanent attached to a **skin contacting end**. The abrasive coated tip is moved over the skin surface While a vacuum is applied through the tube to the skin surface to remove cells abraded from the skin surface. The vacuum also causes the skin to be held in intimate contact With the abrasive tip during the treatment procedure. |
| (a) an instrument body with a distal working end for engaging a skin surface; | This is generally accomplished by the use of a tube **having a treatment tip with an abrasive material** permanently attached thereto. The term "tube" or "tubular" used herein refers to **an elongated hollow structure** of any cross section, which includes, but is not limited to, a round, oval, square or rectangle cross section. |
| (b) a skin interface portion of the working end comprising an abrasive fragment composition secured thereto; | The abrasive tip is **rubbed over the skin surface** being treated. The tube and related instrumentation also provides a vacuum collection and an optional filter system for collection of the skin cells removed by the procedure, the skin cells being aspirated through a hole or holes in the central portion of the abrasive tip. |
| (c) at least one inflow aperture in said skin interface in fluid communication with a fluid reservoir; and | FIG. 36 shows a second tube mounted on the treatment tip. The tube could be used to allow the metered use of **chemicals** to enhance the abrasion or supply or other **liquids** to reduce friction. |
| (d) at least one outflow aperture in said skin interface in communication with a negative pressurization source. | A tubular device for performing micro-abrasion of a skin surface comprising a tubular device with a lumen there through, the tubular device having a first end with an abrasive surface and means on a second end thereof for attachment to a source of a vacuum to apply a **negative pressure** to a skin surface to be treated, said vacuum causing increased contact between the skin surface and the abrasive surface. |

Defendant's Motion for Rule 56(d) Relief and Opposition to the Plaintiffs' Motion for Summary Judgment

Aguila has not and does not infringe any claim of the Plaintiffs' Patent for at least the reason that one or more claim limitations are not, and have not been, present in the Aguila's products. Aguila does not infringe, and has not infringed, literally or under the doctrine of equivalents; Aguila does not infringe, and has not infringed, directly, indirectly, jointly, or contributorily; Aguila does not induce, and has not induced, infringement. As noted above, the limitation of Claim 1 of the '620 patent requiring "a skin interface portion of the working end comprising an abrasive fragment composition secured thereto" means that the actual handpiece used by the appellees is different from what is mentioned in Claim 1 of the '620 patent. Instead of having an "abrasive fragment", the Plaintiffs' handpiece has smooth plastic tips with small ridges. Therefore, neither the Plaintiffs' nor the Aguila's handpiece meet every limitation of Claim 1 of the '620 without making any kind of claim construction analysis; (2) construing appellees' handpiece to contain an "abrasive fragment" when it has no abrasive materials that make contact with the skin.



Aguila's handpiece



Plaintiffs' handpiece

#### d. U.S. Patent 6,299,620

Claim 1 of U.S. Patent 6,299,620 ("'620 patent") states that it is:

> A system for treating surface layers of a patient's skin, comprising: (a) an instrument body with a distal working end for engaging a skin surface; (b) a skin interface portion of the working end comprising an abrasive fragment composition secured thereto; (c) at least one inflow aperture in said skin interface in fluid communication with a fluid

reservoir; and (d) at least one outflow aperture in said skin interface in communication with a negative pressurization source.

However, Aguila's devices do not infringe on this claim because Aguila's handpieces do not have "a skin interface portion of the working end comprising an abrasive fragment composition secured thereto" as taught by the '620 patent. In fact, Aguila's handpieces do not have anything in common with any of the other subsections of found in Claim 1 of the '620 patent. For example, Aguila's handpieces do not have any "abrasive fragment composition" that come into contact with the skin surface.

For example, Aguila would include a metal handpiece with an abrasive tip, but for only dry microdermabrasion, not to use with liquids. The metal handpieces did have diamond fragments on it to act as an abrasive. For the "wet" microdermabrasion, Aguila would only use the plastic handpiece with the special plastic tip and no diamond or abrasive material. Similar to the Hydrafacial MD. As noted above, the limitation of Claim 1 of the '620 patent requiring "a skin interface portion of the working end comprising an abrasive fragment composition secured thereto" means that the actual handpiece used by the appellees is different from what is mentioned in Claim 1 of the '620 patent. Instead of having an "abrasive fragment", the Plaintiffs' handpiece has smooth plastic tips with small ridges. Therefore, neither the Plaintiffs' nor the Aguila's handpiece meet every limitation of Claim 1 of the '620 without making any kind of claim construction analysis; (2) construing appellees' handpiece to contain an "abrasive fragment" when it has no abrasive materials that make contact with the skin. According to the Merriam-Webster dictionary, the ordinary meaning of the term "**abrasive**" is defined as: "a substance (as emery or pumice) used for abrading, smoothing, or polishing".

### e.   IRREPARABLE HARM

1.  How can there be irreparable if the Defendant has been selling the same items since a Cease & Desist letter from January 2010, without ever filing a lawsuit until November 2014. Using the same trademarks and violating the same patents. The Plaintiffs argue that the Defendant

cancelled his corporation after their letter in early 2010. However, the Defendant just ended his corporate structure and became a sole proprietorship soon after the end of the corporation. See Exhibit L. Indeed, in May 2010, the Defendant sold one Hydradermabrasion machine. See Exhibit M.

2.  Importantly, the Plaintiffs are not seeking any damaged for lost profits from the Defendant, because the Plaintiffs know that they have not lost any sales to the Defendant. Indeed, the Plaintiffs are not seeking any monetary benefits from this lawsuit, just a Permanent Injunction against the Defendant.

3.  The Plaintiffs submitted a letter to eBay in 2006 saying that they believe that the Defendant's device violates their patents back then. eBay's "vero" program was used by the Plaintiffs to cancel all of the Defendant's sales on eBay in 2006 because the supposed infringement by the Defendant. However, now, the Plaintiffs claim that the Defendant never actually infringed any of their products back in 2006. See Exhibit G.

4.  The Defendant's diamond-tip handpiece are specifically designed to accept any vacuum. It is a solid metal piece, with industrial diamond chips encrusted to the tip. There is a small tube in the upper portion that supplies a small film of the solution on to the skin. Similar to the "JetPeel". See Exhibit E.  The reasoning behind this design was to avoid any potential infringement of the '739 patent. And not the Plaintiffs' patents-in-suit. Without the vacuum supply, the Ds diamond handpiece cannot violate neither the '739 nor the '630. The only handpiece that the D has which allows a vacuum to go through it, at the same time with liquid, does not have the capability of using a diamond tip. It is only designed to be used with non-sharp plastic tips to glide over the skin.

5.  The presumption of irreparable harm, based just on proof of infringement, has been discarded. The burden is now on the patentee to demonstrate that its potential losses cannot be compensated by monetary damages". *Automated Merchandising Systems v. Crane Co.* (Fed. Cir. 2009).

These supposed harms by the Defendant's accused products include loss of revenue, loss of market share, and price erosion.

However, the **lost sales** standing alone are insufficient to prove irreparable harm; if they were, irreparable harm would be found in every case involving a "manufacturer/patentee, regardless of circumstances." Abbott Labs. v. Andrx Pharms., Inc., 452 F.3d 1331, 1348 (Fed. Cir. 2006). Lost sales (without more) are presumed to be compensable through damages, so they do not require injunctive relief. Thus, we find that, no matter how much evidence of lost revenue AMS presented, this evidence by itself could not support a finding of irreparable injury".

Second, **lost market share** must be proven (or at least substantiated with some evidence) in order for it to support entry of a preliminary injunction, because granting preliminary injunctions on the basis of speculative loss of market share would result in granting preliminary injunctions "in every patent case where the patentee practices the invention." Nutrition 21 v. United States, 930 F.2d 867, 871 (Fed. Cir. 1991).

It is not up to the "defendant to demonstrate that the potential harm from not granting a preliminary injunction was finite, calculable, and compensable". *See eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 392-94 (2006) (in which the presumption of irreparable harm, based just on proof of infringement, was discarded).

The burden is now on the patentee to demonstrate that its potential losses cannot be compensated by monetary damages. The proof of lost market share and lost sales cited by the district court here was insufficient to meet this standard.

Furthermore, it is hard to believe that the Defendant is able to affect the reputation of the Plaintiffs. For example, the Plaintiffs have a complaint on the FDA's website (MAUDE) where one of their patients suffered dangerous burns in the eyes because of one of the Plaintiffs' glycolic acid solutions (GlySal). See Exhibit K.

In fact, Mr. Ignon even admitted that they have had to recall many of their plastic tips due to complaints from customers on scratches for burrs on the plastic tips. Exhibit H, pg. 23.

"At a while back, I don't exactly know the date, there were
some tips that had a burr on them. And there were some
complaints regarding that burr on the tip".

In addition, the FDA report on the Plaintiffs mentions that there have been more than 100
complaints against the quality of the Plaintiffs' products. See Exhibit J.

Although the '739 patent was not mentioned as a prior art reference for the '620 patent, the
'739 patent is still capable of raising any substantial question of patentability. *See KSR
International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) (which changed the state of obviousness
law). This reference, which certainly relates to wet-microdermabrasion devices, are in a field so
different from the wet-microdermabrasion patent at issue that they could not conceivably support
an obviousness argument.

Importantly, Mr. Duboy's credibility is reduced by the fact that he received a "used"
HydraFacial MD machine from the Plaintiff Edge Systems that was worth more $29,000 for only
$10,000. When they normally did not provide such large discounts to customers, nor do the
Plaintiffs normally sell "used" machines because they are the manufacturers of the Hydrafacial
MD. A savings for Mr. Duboy of more than $19,000. See Exhibit I for Cohen's Deposition, pgs
36-37.

Moreover, Ms. Irby's credibility is reduced by the fact that she received a tabletop
HydraFacial Allegro machine from the Plaintiff Edge Systems that was worth more than $19,600
– for only $13,400. When they normally did not provide such large discounts to customers. A
savings for Ms. Irby of more than $6,000. See Exhibit H for Cohen's Deposition, pgs 33 to 35.

-----------------------------------------------------------------

Defendant's Motion for Rule 56(d) Relief and Opposition to the Plaintiffs' Motion for Summary Judgment

**f.   OBVIOUSNESS under 35 U.S.C. § 103(a).**

    In this case, a jury could have reasonably concluded that Defendant could have proven invalidity due to obviousness. Especially when compared to the older '739 patent, there is nothing really new about the Plaintiffs' '620 patemt.

    Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or nonobviousness of the subject matter is determined. Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966).

    *LNP Engineering Plastics, Inc. v. Miller Waste Mills, Inc.,* 275 F.3d 1347, 1353 (Fed. Cir. 2001) ("the record supplies substantial evidence for a reasonable jury to find that claim 1... would have been obvious").

    *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.,* 381 F.3d 1371, 1378 (Fed. Cir. 2004) ("The record contains substantial evidence whereby a reasonable jury could have reached the verdict that it would not have been obvious ... [i]n view of this evidentiary support, the district court's grant of JMOL cannot stand.").

    Where there is but one difference over the closest prior art and where there was an express motivation to combine, a combination of well-known components being used for their established function should be unpatentable as a matter of law. *See* 550 U.S. at 418.

    **Evidence of Common Sense**: The district court held on summary judgment that *KSR* style "common sense" would lead one of ordinary skill in the art to perform the iterative step (D). On appeal, the Federal Circuit affirmed that finding – holding particularly that the finding of common sense does not require "explication in any reference or expert opinion."

Although a court need not have documentary support of its common sense analysis, a court (or patent examiner) must at least clearly explain its reasoning.

        We reiterate that, on summary judgment, to invoke "common sense" or
        any other basis for extrapolating from prior art to a conclusion of

> obviousness, a district court must articulate its reasoning with sufficient
> clarity for review.

In this case, the appellate panel agreed that the idea of repeating already known steps until a threshold is met was simply a common sense extension:

> Thus, this last step, and the claim as a whole, simply recites repetition of a known procedure until success is achieved. Recognizing this, the district court explained: "If 100 e-mail deliveries were ordered, and the first transmission delivered only 95, common sense dictates that one should try again. One could do little else."

> **Obvious to Try**: As a corollary to its common sense holding, the appellate court also held that the additional step (D) would have been "obvious to try" under KSR. "[S]imple logic suggests that sending messages to new addresses is more likely to produce successful deliveries than re-sending messages to addresses that have already failed... [I]ndeed, the predictable and actual result of performing step (D) is that more e-mail messages reach more recipients."

### g. Anticipation

The factual finding that a single prior art reference ('739 patent) teaches and enables each element of the asserted patent claim.

At trial, the defendants had presented their case that Hassick taught each element of the claimed invention while the plaintiffs pointed only to "teaching away" found in patent. Unfortunately for the plaintiffs, "teaching away" is legally irrelevant to the question of anticipation. See *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998).

Rather, under 35 U.S.C. § 102 a claim will be anticipated and therefore invalid if a single prior art reference describes "each and every claim limitation and enable[s] one of skill in the art to practice an embodiment of the claimed invention without undue experimentation." *Quoting Am. Calcar, Inc. v. Am. Honda Motor Corp.*, 651 F.3d 1318, 1341 (Fed. Cir. 2011).

Defendant's Motion for Rule 56(d) Relief and Opposition to the Plaintiffs' Motion for Summary Judgment

In that case, There, both the hypothetical "person having skill in the art" (PHOSITA) and the patentee agreed that there was something special or "critical" about the claimed temperature range. The court distinguished this case from *Atofina* based upon its factual conclusion that "there is no allegation of criticality or any evidence demonstrating any difference across the range." See ClearValue v. Pearl River Polymers (Fed. Cir. 2012).

### h. Indefinite under 35 U.S.C. §112 ¶2.

The court found that brief description to be an insufficient "disclosure of the structure that corresponds to the claimed function" and consequently indefinite under 35 U.S.C. §112 ¶2.

"[W]hat the patent calls the 'access control manager' is simply an abstraction that describes the function of controlling access to course materials, which is performed by some undefined component of the system. The ACM is essentially a black box that performs a recited function. But how it does so is left undisclosed." *See In re Donaldson*, 16 F.3d 1189 (Fed. Cir. 1994)(en banc).

Important for patent drafter, means-plus-function claims require disclosure in the specification even if the means are already well known in the art.

Importantly, it is not clear what is meant by their claim that their handpiece must "abrasive fragment composition". Does it just refer to diamond-tips or other compositions? *See Blackboard v. Desire2Learn* (Fed. Cir. 2009)

Respectfully submitted,

Dated: December 21, 2014

Rafael Aguila, *pro se*

## CERTIFICATE OF SERVICE

I HEREBY certify that on December 21st, 2015, I conventionally filed the foregoing document with the Clerk of the Court.  I also certify that a true and correct copy of the foregoing document was served by U.S. mail on all counsel or parties of record on the Service List below.

Rafael Aguila, *pro se*

December 21, 2015

## SERVICE LIST

James A. Gale, Esq. (FBN 371726)
Richard Guerra (FBN 689521)
**FELDMAN GALE**
One Biscayne Tower, 30th Floor
2 South Biscayne Blvd.
Miami, FL 33131
Telephone:  (305) 358-5001
Facsimile:  (305) 358-3309


Brenton R. Babcock, Esq.
(*admitted pro hac vice*)
Ali S. Razai, Esq.
(*admitted pro hac vice*)
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

*Attorneys for Plaintiffs,*
EDGE SYSTEMS LLC and
AXIA MEDSCIENCES

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:14-cv-24517-KMM/MCALILEY**

EDGE SYSTEMS, *et al.*,
                    Plaintiffs,

            v.

Rafael Newton Aguila,
                    Defendant.

_____/

**DECLARATION IN SUPPORT OF DEFENDANT'S MOTION FOR**
**AN EXTENSION OF TIME UNDER FED. R. CIV. P. 56(d)**

I, Rafael Newton Aguila, *pro se*, declare as follows:

1.  My name is Rafael Newton Aguila, I am over the age of eighteen (18) and competent to execute this Declaration, and the following statements are true and correct based on my personal knowledge or information transmitted to me from records made at or near the time of the transactions referenced therein by person(s) with personal knowledge thereof.

2.  I am the Defendant in this case.

3.  I have personal knowledge of the following facts, and, if called as a witness, I could and would competently testify thereto.

4.  Plaintiffs' Expert Witness' report by Mr. Loomis was only provided to the Defendant after the discovery cut-off date on November 24, 2015.

5.  Defendant believes that it has not infringed any of the patents-in-suit of the Plaintiffs, and to declare that Plaintiffs' patents to be invalid due to the prior art of Patent 6,241,739.

6.  The Plaintiffs use several arguments in their Motion for Summary Judgment to help their case for a Permanent Injunction against the Defendant that involve information about sales, market share, and market exclusivity.

7. The Defendant asked the Plaintiff to be allowed to conduct a deposition after the Discovery cut-off, to which the counsel for the Plaintiffs initially agreed on December 2, 2015. Only to change their minds. Their counsel also objected to my questions about sales during depositions.

8. I did not agree to a stipulation to dismiss the four patent-in-suit without prejudice.

9. The documents and information that is hidden because of this court protective order on the Plaintiffs' sales and financial information, is relevant to the factual issues raised in the Plaintiffs' Motion for (partial) Summary Judgment.

10. The Defendant would need to depose the Plaintiffs' expert witness in order to help prepare the Defendant's own rebuttal expert witness report.

11. In the absence of the documents, reports, sales, and financial information currently held by the Plaintiffs, the Defendant's experts will not have sufficient information to develop and offer their opinions through either expert reports or affidavits.

12. Without the additional discovery on the highly contested factual issues in this case, as described above, the Defendant believes that he will be foreclosed from discovering and presenting the facts essential to justify their opposition to the Plaintiffs' Motion for Summary Judgement.

13. All of the Exhibits provided with the document are true and correct.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 21st day of December 2015, in Miami, Florida.

Respectfully submitted,

Dated: December 21, 2015

Rafael Aguila, *pro se*

Defendant's Motion for Rule 56(d) Relief and Opposition to the Plaintiffs' Motion for Summary Judgment

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:14-cv-24517-KMM/MCALILEY**

EDGE SYSTEMS, *et al.*,
            Plaintiffs,

    v.

Rafael Newton Aguila,
            Defendant.
_____/

**DECLARATION IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

I, Rafael Newton Aguila, *pro se*, declare as follows:

1.   My name is Rafael Newton Aguila, I am over the age of eighteen (18) and competent to execute this Declaration, and the following statements are true and correct based on my personal knowledge or information transmitted to me from records made at or near the time of the transactions referenced therein by person(s) with personal knowledge thereof.

2.   I am the Defendant in this case.

3.   I have personal knowledge of the following facts, and, if called as a witness, I could and would competently testify thereto.

4.   Plaintiffs' Expert Witness' report by Mr. Loomis was only provided to the Defendant after the discovery cut-off date on November 24, 2015.

5.   Defendant believes that it has not infringed any of the patents-in-suit of the Plaintiffs, and to declare that Plaintiffs' patents to be invalid due to the prior art of Patent 6,241,739.

6.   The Plaintiffs use several arguments in their Motion for Summary Judgment to help their case for a Permanent Injunction against the Defendant that involve information about sales, market share, and market exclusivity.

Defendant's Motion for Rule 56(d) Relief and Opposition to the Plaintiffs' Motion for Summary Judgment

7. The Defendant asked the Plaintiff to be allowed to conduct a deposition after the Discovery cut-off, to which the counsel for the Plaintiffs initially agreed on December 2, 2015. Only to change their minds.

8. I did not agree to a stipulation to dismiss the four patent-in-suit without prejudice.

9. The documents and information that is hidden because of this court protective order on the Plaintiffs' sales and financial information, is relevant to the factual issues raised in the Plaintiffs' Motion for (partial) Summary Judgment.

10. The Defendant would need to depose the Plaintiffs' expert witness in order to help prepare the Defendant's own rebuttal expert witness report.

11. In the absence of the documents, reports, sales, and financial information currently held by the Plaintiffs, the Defendant's experts will not have sufficient information to develop and offer their opinions through either expert reports or affidavits.

12. Without the additional discovery on the highly contested factual issues in this case, as described above, the Defendant believes that he will be foreclosed from discovering and presenting the facts essential to justify their opposition to the Plaintiffs' Motion for Summary Judgement.

13. The Defendant owns the registered trademarks for Dermabuilder, Antiox-6, Activ-4, and Beta-HD, and was using these same trademarks before the Plaintiffs.

14. The Defendant has never used the term HydroPeel to describe the tips of his handpieces.

15. The Defendant has never used the term Vortex-Fusion.

16. The Plaintiffs only began, according to their USPTO trademark application for "The Edge Systems" to use this term in 2001, not 1997.

17. The Defendant first began using the tradename and logo for Edge Systems in 1996.

Defendant's Motion for Rule 56(d) Relief and Opposition to the Plaintiffs' Motion for Summary Judgment

18. The tips used by the Hydraderm handpiece are only made out of plastic with the tips having only dull edges, so not to cut the skin. It has no "abrasive fragment composition".

19. The diamond tip, as described in the Defendant's second amended answer, does not use any kind of vacuum. Instead, it simply sprays the Defendant's solution on to the skin in front of the diamond head, similar to the JetPeel.

20. All of the Exhibits provided with the document are true and correct.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 21st day of December 2015, in Miami, Florida.

Respectfully submitted,

Dated: December 21, 2015

Rafael Aguila, *pro se*

Defendant's Motion for Rule 56(d) Relief and Opposition to the Plaintiffs' Motion for Summary Judgment

# EXHIBIT A



**raguila11 . <raguila@gmail.com>**

---

## Edge v. Aguila | Expert Report

---

**Consuelo.Durand** <Consuelo.Durand@knobbe.com>                   Tue, Nov 24, 2015 at 8:14 PM
To: "raguila@gmail.com" <raguila@gmail.com>
Cc: "Brent.Babcock" <Brent.Babcock@knobbe.com>, "Ali.Razai" <Ali.Razai@knobbe.com>, "Lit EDGEL.091L"
<LitEDGEL.091L@knobbe.com>, "rguerra@feldmangale.com" <rguerra@feldmangale.com>, "Yvonne Freixas
Acevedo (yacevedo@feldmangale.com)" <yacevedo@feldmangale.com>, "jgale@feldmangale.com"
<jgale@feldmangale.com>

Dear Mr. Aguila:


Please find below a link to the Expert Report of Gary L. Loomis and related exhibits.  A copy of same will follow
by mail.


https://knobbe.sharefile.com/d-s79116719f9c4b06b


Sincerely,

Consuelo


**Consuelo Durand**

Litigation Paralegal

Consuelo.Durand@knobbe.com

949-721-5386 Direct


**Knobbe | Martens**

INTELLECTUAL PROPERTY LAW


**five decades. one focus.**

2040 Main Street, 14th Floor

Irvine, CA 92614

www.knobbe.com

12/21/2015                        Gmail - Edge v. Aguila | Expert Report

 **raguila11 . <raguila@gmail.com>**

---

## Edge v. Aguila | Expert Report

**Aguila** <raguila@gmail.com>                                    Tue, Nov 24, 2015 at 8:24 PM
To: "Consuelo.Durand" <Consuelo.Durand@knobbe.com>
Cc: "Brent.Babcock" <Brent.Babcock@knobbe.com>, "Ali.Razai" <Ali.Razai@knobbe.com>, "Lit EDGEL.091L"
<LitEDGEL.091L@knobbe.com>, "rguerra@feldmangale.com" <rguerra@feldmangale.com>, "Yvonne Freixas
Acevedo (yacevedo@feldmangale.com)" <yacevedo@feldmangale.com>, "jgale@feldmangale.com"
<jgale@feldmangale.com>

> Hello,
>
> The Defendant would like to notice a deposition for your expert, Gary L. Loomis. When will both you and
> him prefer to have the deposition held?
>
>
> Regards,
> Rafael Aguila
>
> _____
>
>
>
> Please let me know when you would prefer to come
> [Quoted text hidden]



**raguila11 . <raguila@gmail.com>**

## Edge v. Aguila | Expert Report

**Ali.Razai** <Ali.Razai@knobbe.com>                                    Wed, Dec 2, 2015 at 10:53 PM
To: Aguila <raguila@gmail.com>, "Consuelo.Durand" <Consuelo.Durand@knobbe.com>
Cc: "Brent.Babcock" <Brent.Babcock@knobbe.com>, "Lit EDGEL.091L" <LitEDGEL.091L@knobbe.com>,
"rguerra@feldmangale.com" <rguerra@feldmangale.com>, "Yvonne Freixas Acevedo
(yacevedo@feldmangale.com)" <yacevedo@feldmangale.com>, "jgale@feldmangale.com"
<jgale@feldmangale.com>

Please let mw know how you intend to take the deposition and we will ask Mr. Loomis for dates.

**From:** Aguila [raguila@gmail.com]
**Sent:** Tuesday, November 24, 2015 5:24 PM
**To:** Consuelo.Durand
**Cc:** Brent.Babcock; Ali.Razai; Lit EDGEL.091L; rguerra@feldmangale.com; Yvonne Freixas Acevedo
(yacevedo@feldmangale.com); jgale@feldmangale.com
**Subject:** Re: Edge v. Aguila | Expert Report

[Quoted text hidden]
[Quoted text hidden]

 **raguila11 . <raguila@gmail.com>**

## Edge v. Aguila | Expert Report

**Aguila** <raguila@gmail.com>                                    Thu, Dec 3, 2015 at 12:01 PM
To: "Ali.Razai" <Ali.Razai@knobbe.com>
Cc: "Consuelo.Durand" <Consuelo.Durand@knobbe.com>, "Brent.Babcock" <Brent.Babcock@knobbe.com>, "Lit
EDGEL.091L" <LitEDGEL.091L@knobbe.com>, "rguerra@feldmangale.com" <rguerra@feldmangale.com>, "Yvonne
Freixas Acevedo (yacevedo@feldmangale.com)" <yacevedo@feldmangale.com>, "jgale@feldmangale.com"
<jgale@feldmangale.com>

Dear Mr. Razai,

What date and time would your Expert Witness be available for a deposition?

Regards,
Rafael Aguila

[Quoted text hidden]

# EXHIBIT C


**EDGE**

# Invoice – May 6, 1996

Buyer:

GERMAINE de CAPUCCINI, Inc.
782 N.W. 42 Avenue
Suite 200
Miami, FL 33126


Item: HydraPeel system


Amount: $450

---


Seller:

Edge Systems
Rafael Aguila
2860 SW 35 Avenue
Miami, FL 33133

---


Warranty: 1-year, including parts and labor.


Serial number: 96-003

# EXHIBIT D



**United States Patent and Trademark Office**

Home  Site Index  Search  FAQ  Glossary  Guides  Contacts  eBusiness  eBiz alerts  News  Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Mon Dec 21 03:20:59 EST 2015*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | | CURR LIST |
|---|---|---|---|---|---|---|---|---|---|
| | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC | | | | | |

**Logout**  Please logout when you are done to release system resources allocated for you.

**Start**  List At: [          ]  OR  **Jump**  to record: [          ]  **Record 3 out of 9**

---

**TSDR**   **ASSIGN Status**   **TTAB Status**   *( Use the "Back" button of the Internet Browser to return to TESS)*

# The Edge System

| | |
|---|---|
| **Word Mark** | THE EDGE SYSTEM |
| **Goods and Services** | IC 010. US 026 039 044. G & S: Medical apparatus, namely, systems comprised primarily of a vacuum source and hand piece used for medical body care treatments, microdermabrasion, and massage therapy. FIRST USE: 20010402. FIRST USE IN COMMERCE: 20010402 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 76112304 |
| **Filing Date** | August 17, 2000 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | September 24, 2002 |
| **Registration Number** | 2992734 |
| **Registration Date** | September 6, 2005 |

Trademark Electronic Search System (TESS)

| | |
|---|---|
| **Owner** | (REGISTRANT) Edge Systems Corporation CORPORATION CALIFORNIA 2321 E. 28th St. Bldg. 404 Signal Hill CALIFORNIA 90806 |
| | (LAST LISTED OWNER) EDGE SYSTEMS LLC LIMITED LIABILITY COMPANY CALIFORNIA 2277 REDONDO AVENUE Signal Hill CALIFORNIA 90755 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | M. Alim Malik, Esq. |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "SYSTEM" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20151011. |
| **Renewal** | 1ST RENEWAL 20151011 |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | | CURR LIST |
| | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

| HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY |

# EXHIBIT E

12/21/2015                                                                Jet Peel 3V Treatment



BOOK NOW

Call our friendly team now

# 1890 650 750

International: Call +353 1 619 1450

Home    Our Clinics    Email Sign Up    Blog    Offers    Christmas Store

Laser Hair Removal | Anti-Wrinkle Injectables | Skin Clinic | Body Clinic | Pricing

Contact Us

## JetPeel 3V Treatment



For All Skin Types

For Dull & Tired Skin

Up to 77% reduction in Lines and Wrinkles

No injections, No Downtime

**Book your Skin Consultation**

First Name *

Last Name *

Email *

Phone *

Treatment of Interest *

Submit

*required fields

Before & After Pictures | Frequently Asked Questions | Treatment Cost

## What is a JetPeel 3V Treatment?

The Jet Peel 3V treatment is an all-natural, virtually painless skin treatment procedure that dramatically improves the appearance and texture of your skin, and is the very latest in non-chemical skincare techniques. Using water and oxygen, this treatment exfoliates skin; improving texture, tone, hydration and circulation. Jet Peel™ has several benefits: it deep cleanses, exfoliates, hydrates and oxygenates the skin. Infusions of vitamins and other ingredients to treat specific skin iss[ue]s can also be added.



Book Free Consultation

## How does JetPeel 3V work?

The Jet Peel 3V system uses a specially designed hand piece to create a supersonic two-phase jet, made up of micro droplets of saline solution. This supersonic stream accelerates the droplets velocity to up to 200m/second, and when applied directly to the skin peels off dead skin cells – almost like a powerwash – which leaves the skin surface smooth. It also creates a level of humidity which is ideal for toning, and deeply moisturising the skin.



'A water-based treatment that ▮
will improve your skin significantly'



## The Results – Before & After Pictures



**Case 1:** Wrinkles on forehead

Before Treatment          After Treatment

**Case 2:** Fine lines and wrinkles around the upper lip area

Before Treatment          After Treatment

## Frequently Asked Questions



# EXHIBIT G

Hi! Sign in   | Sell                                                                          My eBay   🔔   🛒

**ebay**   Search...                                                     All Categories   ▾   🔍

Home > VeRO > **Reporting an Infringement**

# VeRO: Reporting an Infringement

**Helpful Links**

Introduction
About VeRO
Reporting an Infringement
eBay Against Counterfeits
VeRO Participant Profile page
Create a VeRO Participant Profile page
If You Are Not a Rights Owner
Information for eBay Users

## How to report a listing to eBay

If you have a good faith belief that an item or listing infringes on your intellectual property rights, you can report the alleged infringement to eBay by submitting a Notice of Claimed Infringement (NOCI) to eBay's VeRO program. The NOCI is located here.

You can fill this form out through the DocuSign service via the provided link or print out the form and email/fax the signed form to us at the contact information below. Once your initial report has been processed, we will provide you with information on how to submit additional reports, if necessary, through other electronic means.

eBay's VeRO Program may be contacted at:

**By email**
vero@ebay.com

**By phone**
(866) 322-9106

**By fax**
(801) 757-9521

If you are unable to fill out the Notice of Claimed Infringement you can report copyright claims via a DMCA notification to eBay's designated agent by providing the following information:

1. A physical or electronic signature of the person authorized to act on behalf of the owner of the copyright that is allegedly infringed;
2. Identification or description of the copyrighted work that you claim has been infringed.
3. Identification or description of where the material that you claim is infringing is located on the eBay site, with enough detail that we may find it on eBay's website;
4. Your address, telephone number, and email address;
5. A statement by you that you have a good faith belief that the use of the material complained of is not authorized by the copyright owner, its agent, or the law;
6. A statement by you, made under penalty of perjury, that the information in your notice is accurate and that you are the copyright owner or authorized to act on the copyright owner's behalf.

eBay's designated agent may be contacted as follows:

**By mail**
eBay's Designated Agent
583 W. eBay Way
Draper, UT 84020

**By phone**
(866) 322-9106

**By fax**
(801) 757-9521

**By email**
copyright@ebay.com

eBay has adopted and implements a policy that provides for the termination in appropriate circumstances of the accounts of users who repeatedly infringe copyrights or other intellectual property rights of eBay and/or others.

---

About eBay   Announcements   Community   Security Center   Resolution Center   Seller Information Center   Policies   Affiliates   Help & Contact
Site Map

Copyright © 1995-2015 eBay Inc. All Rights Reserved. User Agreement, Privacy, Cookies and AdChoice ⓘ

# EXHIBIT H

# In The Matter Of:
## *EDGE SYSTEMS, LLC v.*
## *RAFAEL NEWTON AGUILA*

---

## *ROGER IGNON*
### *November 12, 2015*

---

### *Barkley Court Reporters*
### *barkley.com*
### *800.222.1231*

Original File 400053.txt
Min-U-Script® with Word Index

EDGE SYSTEMS, LLC v.
RAFAEL NEWTON AGUILA

ROGER IGNON
November 12, 2015

---

**Page 2**

```
1              UNITED STATES DISTRICT COURT
2             SOUTHERN DISTRICT OF FLORIDA
3
4   EDGE SYSTEMS, LLC, et al., )
5          Plaintiffs,        )
6                             )
7   vs.                       ) Case No. 1:14-CV-24517
8                             ) KMM/McAliley
9   RAFAEL NEWTON AGUILA,     )
10  aka RALPH AGUILA, and     )
11  individual dba            )
12  HYDRADERMABRASION,        )
13         Defendants.        )
14  _____
15
16          Video Conference Deposition of
17      ROGER IGNON, taken on behalf of Defendants, at
18         2040 Main Street, 14th Floor, Irvine,
19         California, commencing at 11:19 a.m.
20         on Thursday, November 12, 2015, before
21      Rebecca A. Harp, Certified Shorthand Reporter
22         No. 11895.
23
24
25
```

---

**Page 3**

```
1   APPEARANCES:
2
3   For Plaintiffs:
4      KNOBBE, MARTENS, OLSON & BEAR LLP
       BY:  ALI S. RAZAI
5      Attorney at law
       2040 Main Street, 14th Floor
6      Irvine, California  92614
       (949) 760-0404
7      ali.razai@knobbe.com
8
9   For Defendants:
10     RAFAEL AGUILA (via video conference)
       5338 SW 57th Avenue
11     Miami, Florida  33155
       (305) 508-5052
12     raguila@gmail.com
13
14  Also Present:
15     William Cohen
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
1                   INDEX                  PAGE
2
3   BY MR. AGUILA                            6
4
5
6                 EXHIBITS
7
8           (None offered.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 5**

```
1              IRVINE, CALIFORNIA
2          THURSDAY, NOVEMBER 12, 2015
3                11:19 A.M.
4                 * * * *
5        MR. RAZAI: Mr. Ignon will be testifying on
6   topics 1, 4, 14, 15, 16, and 19 of Defendant Rafael
7   Aguila's Rule 30(b)6 deposition of Edge Systems.  Mr.
8   Ignon will also be testifying in his personal capacity
9   as those depositions will be combined.
10       Mr. Aguila, do you plan on starting with the
11  30(b)6 topics first, or are you going to proceed with
12  the personal topics first?
13       MR. AGUILA: Tell me again the topics, the
14  numbers.
15       MR. RAZAI: Sure.  For the record, Mr. Aguila,
16  the objections and designations were served on you
17  yesterday.  Just for your clarification, I will
18  announce them again.  The topics that Mr. Ignon is
19  designated for are topics, 1, 4, 14, 15, 16, and 19.
20  The remaining topics will be handled by Mr. Cohen
21  during that deposition.
22       MR. AGUILA: All right.
23
24
25
```

Page 6

1      ROGER IGNON
2  was sworn, examined and testified as follows:
3
4      THE REPORTER: You do solemnly state that the
5  evidence you shall give in this matter shall be the
6  truth, the whole truth, and nothing but the truth, so
7  help you God?
8      THE WITNESS: I do.
9      * * * *
10      MR. RAZAI: Mr. Aguila, you didn't answer my
11  question. Are we starting with the 30(b)6 topics, or
12  are we going to jump straight into the personal?
13      MR. AGUILA: The 30(b)6.
14      MR. RAZAI: Perfect. When you do transition,
15  if you can let me know that would be great.
16      (EXAMINATION)
17  BY MR. AGUILA:
18      Q   All right. We are on the record. So,
19  Mr. Ignon, my name is Rafael Aguila. I am the
20  defendant in this case. As you may know, Edge Systems
21  has filed a lawsuit against me concerning some patents
22  and trademarks, trade dress, unfair competition, and
23  other claims.
24      Today I will be asking you questions to learn
25  information that might be relevant to that lawsuit. My

Page 7

1  questions and your answers will be taken down by the
2  court reporter. At the conclusion of the questioning,
3  the court reporter will transcribe my questions and
4  your answers. And you will be -- it will be known as
5  the deposition transcript. It will contain my
6  questions and your answers. Do you understand that?
7      A   I do.
8      Q   Now, the court reporter cannot take down nods
9  or shakes of the head, so it is necessary for you to
10  answer my questions audibly. Do you understand that?
11      A   Yes.
12      Q   When I begin a question, you may know what I
13  am going to ask before I finish my question. But it is
14  easier for the court reporter to get everything down
15  correctly, if you let me finish my question before you
16  start to answer. Will you try to do that?
17      A   Yes.
18      Q   Have you ever been deposed before, Mr. Ignon?
19      A   No.
20      Q   Do you understand that you were administered
21  an oath by the court reporter, and are testifying today
22  under penalty of perjury?
23      A   Yes.
24      Q   And do you understand that your deposition
25  testimony has the same importance and significance it

Page 8

1  would have if you were testifying in court before a
2  judge and a jury?
3      A   Yes.
4      Q   And you will do your best to tell the complete
5  truth at this deposition. Do you understand?
6      A   Yes.
7      Q   If you don't understand a question I ask you,
8  you should not answer it. Instead of answering a
9  question you don't understand, please just tell me that
10  you don't understand the question. Will you agree to
11  that?
12      A   Yes.
13      Q   So if you do answer a question, I will assume
14  that you have understood the question and that you were
15  giving me your best possible answer. Do you understand
16  that?
17      A   Yes.
18      Q   Sometimes you will understand my question
19  perfectly well, but you are not sure you know the
20  answer because your answer is a guess or an estimate.
21  When your answer is a guess or an estimate, you should
22  tell me that you are guessing or giving an estimate.
23  Will you agree to tell me when your answer is a guess
24  or an estimate?
25      A   Yes.

Page 9

1      Q   If you answer a question and don't tell me
2  that you are guessing at the answer, I will assume that
3  you are not guessing. Will that be a fair assumption
4  on my part?
5      A   Yes.
6      Q   After you have answered a question, you may
7  realize that for one reason or another you need to
8  change an answer that you have previously given. If
9  this happens, just tell me that you need to change an
10  earlier answer. I will give you an opportunity to do
11  so. If you want to change an answer to an earlier
12  question, will you tell me that you want to do so?
13      A   Yes.
14      Q   Also, after you have given your best complete
15  answer to a question, you may sometimes later in the
16  deposition remember additional information that
17  responds to the question. If this happens, just tell
18  me that you have remembered additional information that
19  relates to an earlier question, and you can tell me
20  about the additional information. If after you have
21  answered a question you recall additional information,
22  will you tell me that?
23      A   Yes.
24      Q   If you find yourself getting tired at any time
25  during the deposition, please let me know and we will

EDGE SYSTEMS, LLC v.
RAFAEL NEWTON AGUILA

ROGER IGNON
November 12, 2015

Page 10

1    talk about taking a break.  Is that all right?
2        A    Yes.
3        Q    After the deposition is over, the court
4    reporter will prepare a written transcript of my
5    questions and your answers.  You may have an
6    opportunity to review and sign the transcript under
7    penalty of perjury.  If you review your transcript, you
8    may change answers that you believe are inaccurate.
9            You should know, however, if you make changes
10   in the sworn testimony in your transcript after you
11   review it, I will be entitled at trial to ask you why
12   you have made changes in your sworn testimony and to
13   point out to the judge or jury at trial that you made
14   those changes.  Do you understand that?
15       A    Yes.
16       Q    So it is important today that you give me your
17   most complete answers to my questions, and to avoid any
18   need to make changes in your testimony.  Do you
19   understand that?
20       A    Yes.
21       Q    You should also know that if you testify at
22   trial differently than you testified here today, I may
23   have an opportunity to ask you why there were changes
24   in your sworn testimony.  Do you understand that?
25       A    Yes.

Page 11

1        Q    Also, I am going to ask you a few questions
2    about how you are feeling today.  I am not trying to
3    pry in your medical situation.  I need to make sure
4    anyone reading the transcript of this deposition will
5    understand you were feeling fine, and are able to
6    testify today.  Are you feeling ill today?
7        A    Pretty good.
8        Q    Do you feel fine physically?
9        A    Yes.
10       Q    Are you under any medication?
11       A    Yes.
12       Q    Are you currently under a doctor's care for
13   any illness?
14       A    No.
15       Q    Will that medication affect any of your mental
16   abilities?
17       A    I believe not.
18       Q    Have you had any alcohol today?
19       A    No.
20       Q    Is there anything at all preventing you in any
21   way from giving accurate testimony today?
22       A    I believe not.
23       Q    Do you have any questions about what we have
24   covered so far?
25       A    No.

Page 12

1        Q    Do you have any questions of any kind before I
2    begin the questioning?
3        A    How long do you think this will go?
4        Q    Maybe, I would say, two hours at most, I
5    believe.  I think that should be a good estimate.
6        A    Okay.
7        Q    Now, lastly, are you willing and able to state
8    all the opinions in this deposition that you believe
9    you will express at trial?
10       A    Lost you.
11           MR. RAZAI:  I object.  Mr. Ignon is not here
12   as an expert witness, nor is he giving opinion
13   testimony.  He is a fact witness and giving factual
14   testimony.  Your admonition and your question is not
15   applicable to this deposition.
16       Q    (By Mr. Aguila)  Okay.  That is fine.  Let's
17   get started here.
18           MR. RAZAI:  For clarification, you are
19   starting with the 30(b)6, right?
20           MR. AGUILA:  Could you say that again?
21           MR. RAZAI:  You are starting off with the
22   30(b)6 topics?
23           MR. AGUILA:  That's correct.
24           MR. RAZAI:  Thank you.
25       Q    (By Mr. Aguila)  So, Mr. Ignon, could you

Page 13

1    please identify for me the documents you reviewed to
2    prepare for your deposition today?
3        A    Could you be more specific than that?
4        Q    Well --
5        A    I can't remember everything on the list.  Tell
6    me what you want to talk about, and I can answer it.
7        Q    Well, it is important to know what documents
8    you reviewed to prepare for your deposition.  Can you
9    at all remember?
10       A    I reviewed the list that you have in front of
11   you.
12       Q    Right.  Are there documents that you reviewed
13   to prepare for your deposition, that have not been sent
14   to me in my discovery requests?
15       A    I don't know.
16       Q    Can you find out?
17       A    I can't find out right at this moment.
18           MR. AGUILA:  Well, let me ask counsel.
19   Counsel, has he reviewed any documents to prepare for
20   this deposition that have not been sent to me already?
21           MR. RAZAI:  No, Mr. Aguila.  I think if there
22   are any documents that he may have reviewed that
23   weren't sent to you, they will be sent to you.  But I
24   don't think that was the case.  I think everything that
25   he reviewed has either already been produced in the

Page 14

1  litigation in the form of documents, or it was mostly
2  written discovery that was served upon you in the
3  ordinary course of discovery.  Or documents that are
4  already of record, such as patents and documents you
5  produced or you have sent over.  You didn't actually
6  produce anything.
7      Q   (By Mr. Aguila)  Now, Mr. Ignon, do you
8  remember being a witness in Miami on December 19, 2014,
9  in this case?
10     A   Yes.
11     Q   Do you remember stating that Plaintiff's
12  Exhibit SS, a CAD drawing of the hydrafacial MD device
13  was created during a design meeting on October 29,
14  2004?
15     A   It was created at that date, yes.
16     Q   Do you remember that in other questions
17  related to that month, you were not able to recall any
18  other events in October 2004?
19     A   Correct.
20         MR. RAZAI: I am going to object, Mr. Aguila.
21  Outside the scope.
22         MR. AGUILA: That is speaking objection.  And
23  no speaking objections, please.
24         MR. RAZAI: Right.  I am just clarifying, I
25  thought you were going to start with the 30(b)6 topics.

Page 15

1  Are you starting with the personal questions?  I am
2  trying to figure out what my objections should be.
3         Aguila: So let me do the personal first.
4         MR. RAZAI: Just so this is his personal
5  deposition, and it is not binding on the corporation.
6  It is just from his personal knowledge.
7         MR. AGUILA: Right.
8         MR. RAZAI: Great.
9      Q   (By Mr. Aguila)  How could you remember on
10  October 29th regarding the Exhibit SS, but not remember
11  any other events that months?
12         MR. RAZAI: Objection.  Argumentative.
13     Q   (By Mr. Aguila)  You can answer.
14     A   I don't know why.  I just remember that.
15  Possibly because it was Halloween.
16     Q   The audio is a little difficult.  Could you
17  say more words?  It is hard to hear you.
18         MR. RAZAI: Can you hear me?
19     Q   (By Mr. Aguila)  I can hear you.  Can you
20  speak, Mr. Ignon?
21     A   Roger Ignon.
22     Q   Okay.  That is fine.  Now, do you believe that
23  you were lying to the Court when you stated that you
24  remember Plaintiff's Exhibit SS being created during
25  design meeting on October 29, 2004?

Page 16

1          MR. RAZAI: Objection.  Argumentative.
2  Mr. Aguila, there is a certain level of decorum with
3  which I expect you to conduct this deposition.  You are
4  not observing that.
5          MR. AGUILA: Please answer the question.
6          MR. RAZAI: You are welcome to answer the
7  question, but I expect a certain level of decorum from
8  you, Mr. Aguila.
9          THE WITNESS: Do I answer or not?
10     Q   (By Mr. Aguila)  Please answer the question.
11         MR. RAZAI: You can answer whether you were
12  lying or not, Mr. Ignon.
13         THE WITNESS: Could you repeat the question?
14         MR. AGUILA: Could the court reporter repeat
15  my question?
16         (Whereupon, the court reporter read back the
17  previous question.)
18         MR. RAZAI: Objection.  Form.
19         THE WITNESS: No.
20     Q   (By Mr. Aguila)  How can you be sure that your
21  statements are correct, when you have a hard time
22  remembering events?
23         MR. RAZAI: Objection.  Form.
24     Q   (By Mr. Aguila)  Go ahead and answer.
25     A   I remember what I remember.  And I don't

Page 17

1  remember what I don't remember.
2      Q   Is it possible that you remember certain
3  events or facts that, in fact, either did not happen
4  that way or did not happen at all?
5          MR. RAZAI: Objection.  Form.
6      Q   (By Mr. Aguila)  You can answer.
7      A   Am I supposed to answer you?
8      Q   Right.
9      A   Could you repeat the question again?
10     Q   Could the court reporter repeat my question?
11         (Whereupon, the court reporter read back the
12  previous question.)
13         MR. RAZAI: Objection.  Form.  Answer to the
14  extent you understand the question.
15         THE WITNESS: That could possibly be.  Most of
16  the time I only -- or all the time that I know and
17  respond to is what I recall.
18     Q   (By Mr. Aguila)  Now, the handpiece, the
19  Aguila alleged handpiece that was shown during the
20  evidentiary hearing, did you receive that directly from
21  Aguila?
22     A   No.
23     Q   Who did Aguila send that to?
24     A   I believe that unit was, if I remember
25  correctly, Urby's unit.  Urby sent the unit to us.

EDGE SYSTEMS, LLC v.
RAFAEL NEWTON AGUILA

ROGER IGNON
November 12, 2015

Page 18

1  Q  And did she also include the handpiece?
2  A  I believe so.
3  Q  Were you -- did you receive the shipment from
4  Ms. Urby?
5  A  Our shipping department received it.
6  Q  When were you able to see that handpiece for
7  the first time?
8  A  I don't recall the exact date.  It was prior
9  to the Florida meeting however.
10  Q  Now, I am going to switch over to the 30(b)6,
11  Edge Systems.  As a representative of Edge Systems now.
12  MR. RAZAI:  Okay.
13  Q  (By Mr. Aguila)  So, for the first topic, what
14  is the factual basis behind Edge Systems' contentions
15  that the defendant's accused devices infringes the
16  patent in suit?
17  A  Can you be more specific, please?
18  Q  So, what is the factual basis behind Plaintiff
19  Edge Systems' contention that the defendant's accused
20  devices infringes the 620 patent?
21  A  It is primarily in the handpiece area.  The
22  patent specifically talks about a handpiece with a
23  delivery lumen with fluid being delivered, media being
24  delivered to the head of the handpiece.  That there is
25  a secondary lumen, that is a vacuum lumen, that takes

Page 19

1  the fluid and abraded skin away from the site and into
2  a waste canister.
3  Q  Now, Mr. Ignon, or Edge Systems, the 620
4  patent mentions in its first claim that it has a skin
5  interface portion of the working and comprising an
6  abrasive fragment composition.  Does the hydrafacial MD
7  handpiece have an abrasive fragment composition?
8  A  We have several different tips.  And yes, one
9  of them does have that.
10  Q  Now, the hydrafacial MD has several
11  handpieces, correct?  Or just one?
12  A  It has several handpieces.
13  Q  Could you describe them all?
14  A  I can describe them in generality.  We have
15  different tips that go on the handpiece.
16  Q  But the handpiece itself.  Could you describe
17  the different handpieces?
18  MR. RAZAI:  Mr. Aguila, please don't interrupt
19  the witness.
20  Q  (By Mr. Aguila)  Go ahead.
21  A  We have one handpiece which is plastic.  It
22  has an entry lumen, and it has an exit lumen.  And
23  different tips can be attached to the distal end of the
24  handpiece.
25  Q  What is the name of the plastic handpiece?

Page 20

1  A  Hydrafacial MD is printed on the outside.
2  Q  But do you call it by another name?  Or just
3  the hydrafacial MD handpiece?
4  A  Yes.
5  Q  You call it the hydrafacial MD handpiece?
6  A  Correct.
7  Q  Any other handpieces?
8  A  We also have a dry diamond handpiece.
9  Q  And any others?
10  A  And we also have a cartridge handpiece.  The
11  hydrafacial MD has the capability of also introducing a
12  supply cartridge.
13  Q  And is this supply cartridge handpiece called
14  something differently from the hydrafacial MD
15  handpiece?
16  A  There are two.  One is the hydrafacial MD
17  handpiece that has the ability to introduce a
18  cartridge.  Then we have a separate handpiece that is
19  not released, that has a cartridge only design.
20  Q  Could you say that again?  I couldn't hear the
21  last couple words.
22  (Whereupon, the court reporter read back the
23  previous answer.)
24  Q  Okay.  Now, regarding the hydrafacial MD
25  handpiece -- and you are saying it has one tip that

Page 21

1  does have an abrasive fragment composition?
2  A  It has a tip.  I believe it has four different
3  abrasive -- different abrasive pads that can be added
4  to it.
5  Q  And what color is the tip?
6  A  It is a polished stainless steel.
7  Q  And all the hydrafacial MD handpieces have the
8  tip included?
9  A  They have the ability to put that tip on it.
10  Q  Well, how common is it to have the tip?
11  MR. RAZAI:  Objection.  Form.
12  THE WITNESS:  I don't know.  It is an option.
13  We have several options that we sell.
14  Q  (By Mr. Aguila)  Well, can you give a number?
15  A  No.  I can't give a number.  I am in
16  engineering.  Not in sales.
17  MR. RAZAI:  For the record, your line of
18  questioning is currently outside the scope of the
19  deposition topics that Mr. Ignon is designated for.
20  MR. AGUILA:  Could you say that again?
21  MR. RAZAI:  The line of questioning with
22  respect to the questions you are asking is outside the
23  scope of the topics that Mr. Ignon is designated for.
24  He is here -- with respect to the hydrafacial, he is
25  here to talk about the design, manufacturing, and

**Page 22**

1   testing and he has knowledge to speak to those things.
2   Q   (By Mr. Aguila) Okay. Now, Plaintiff Edge,
3   are you suggesting that Aguila's accused devices are
4   literally infringing your device?
5   MR. RAZAI: Objection, Mr. Aguila. Mr. Ignon
6   is not a lawyer. He is not here as an expert witness.
7   Please ask him factual questions.
8   Q   (By Mr. Aguila) Now, topic four says whether
9   the edge machine or the hydrafacial MD handpiece has a
10  sharp edge. So would you testify that the hydrafacial
11  MD handpiece has a sharp edge?
12  MR. RAZAI: Objection. Form.
13  Q   (By Mr. Aguila) You can answer.
14  A   **Remember it has -- we have several tips. They**
15  **are sharp.**
16  Q   Can you define what you mean by sharp edge?
17  A   **Well, it is not dull.**
18  Q   What?
19  A   **I can't define it, other than to say sharp is**
20  **sharp and dull is dull.**
21  Q   Can a sharp edge cut the skin?
22  A   **Could.**
23  Q   Do your tips cut the skin?
24  A   **They do not.**
25  Q   So --

**Page 23**

1   A   **I would like to amend that to some degree.**
2   **They don't -- if properly used, they do not cut the**
3   **skin.**
4   Q   Now, your tips, now which tips have the sharp
5   edges that you were mentioning?
6   A   **Many of them.**
7   Q   Can you tell me the colors?
8   A   **That would include some of the tips. We have**
9   **a blue tip and a clear tip.**
10  Q   Have you received complaints that skin has
11  been cut with your tips before?
12  MR. RAZAI: Objection. Outside the scope.
13  Mr. Cohen is designated on that topic, Mr. Aguila. You
14  can answer with respect to your personal knowledge,
15  Mr. Ignon.
16  Q   (By Mr. Aguila) Go ahead and answer.
17  A   **At a while back, I don't exactly know the**
18  **date, there were some tips that had a burr on them.**
19  **And there were some complaints regarding that burr on**
20  **the tip.**
21  Q   And the patient's skin was cut?
22  MR. RAZAI: Objection. Form.
23  THE WITNESS: I am not sure. There was a
24  complaint that they felt a sharpness.
25  Q   (By Mr. Aguila) Do your tips have a sharp

**Page 24**

1   edge like a razor?
2   MR. RAZAI: Objection. Form.
3   THE WITNESS: They are sharp.
4   Q   (By Mr. Aguila) Say that again.
5   A   **They are sharp.**
6   Q   Well, are they sharp -- do they have a sharp
7   edge like a razor?
8   MR. RAZAI: Objection. Form.
9   THE WITNESS: Not as sharp as a razor.
10  Q   (By Mr. Aguila) How do you categorize the
11  sharpness of the hydrafacial MD handpiece?
12  MR. RAZAI: Objection. Form.
13  THE WITNESS: I don't know how to categorize
14  it. The tips are designed in a spiral manner, so that
15  if you know a knife blade can be an early dermabrasion.
16  They did this with a scalpel. You can draw a sharp
17  edge across the skin at 90 degrees to the cutting
18  surface, and it acts as an abrasion tool that doesn't
19  cut the skin. So the reason we design the tip, or
20  these particular tips, was that they have a spiral
21  design. So if you draw it across the skin in any
22  direction, it will not cut like a knife.
23  Q   (By Mr. Aguila) Now, US patent 8337513,
24  states that "wherein at least one surface element
25  comprises at least one sharp edge configured to abrade

**Page 25**

1   skin." Does your hydrafacial MD handpiece have at
2   least one surface element comprises at least one sharp
3   edge?
4   MR. RAZAI: Objection. Form.
5   THE WITNESS: Many of the tips.
6   Q   (By Mr. Aguila) And in what way does it have
7   that feature?
8   MR. RAZAI: Objection. Form.
9   THE WITNESS: I thought I just -- two ways.
10  One is the diamond tip. That has a flat --
11  Q   (By Mr. Aguila) well, that is not the
12  hydrafacial MD handpiece.
13  MR. RAZAI: Please stop interrupting the
14  witness.
15  Q   (By Mr. Aguila) Just for the hydrafacial MD
16  handpiece.
17  MR. RAZAI: Mr. Aguila, please stop
18  interrupting the witness.
19  THE WITNESS: I think I have to educate you on
20  the hydrafacial MD handpiece. It has several different
21  tips that can be adapted to it. It is hard to answer
22  your questions in a general manner.
23  Q   (By Mr. Aguila) Well, can you do that in a
24  specific manner?
25  A   **Well, our plastic spiral tip would answer that**

EDGE SYSTEMS, LLC v.
RAFAEL NEWTON AGUILA

ROGER IGNON
November 12, 2015

Page 26

1 question.
2 Q Do you have a diamond tip that is optional for
3 the hydrafacial MD handpiece?
4 A We have a diamond tip as well.
5 MR. RAZAI: If I can request you pause for a
6 second to give me a chance to also object if necessary.
7 THE WITNESS: Okay.
8 MR. RAZAI: Thank you.
9 Q (By Mr. Aguila) For the US patent 7678120, it
10 says that the abrading surface comprising apices
11 extending upwardly from the abrading surface and the
12 apices from or having sharp edges. Would the
13 hydrafacial MD handpiece have similar features?
14 MR. RAZAI: Objection. Form.
15 THE WITNESS: The diamond tips are similar in
16 that they have diamond crystals adhered to the surface.
17 Q (By Mr. Aguila) I am having some difficulties
18 with the audio. Do you know, could you move the audio
19 microphone closer to Mr. Ignon.
20 Thank you. On your web site, hydrafacial.com,
21 you don't show any images with a diamond tip or diamond
22 embedded or encrusted tip. Is this true?
23 MR. RAZAI: Objection. Form. Outside the
24 scope.
25 THE WITNESS: I don't know. I haven't looked

Page 27

1 at the web site in a long time.
2 Q (By Mr. Aguila) Most of your marketing does
3 show the hydrafacial with a blue plastic tip. Is that
4 not right?
5 MR. RAZAI: Objection. Form. Outside the
6 scope. You can answer from your personal knowledge.
7 THE WITNESS: I think probably it emphasizes
8 that. Those tips, but it doesn't preclude the other
9 tips.
10 Q (By Mr. Aguila) The name hydrafacial, who
11 came up with that term?
12 MR. RAZAI: Objection. Outside the scope.
13 You can answer from your personal knowledge, Mr. Ignon.
14 THE WITNESS: I think we got input from one of
15 our sales people, and we thought that was a good
16 description of what we were trying to do with the
17 system.
18 Q (By Mr. Aguila) Does it just mean hydrating
19 facial?
20 MR. RAZAI: I will object to this line of
21 questioning. Hydrafacial is not part of this lawsuit.
22 I understand where you are trying to go with this.
23 MR. AGUILA: This is a speaking objection.
24 MR. RAZAI: Right. That is fine, Mr. Aguila.
25 Mr. Ignon, you can answer the question. But after

Page 28

1 that, please move on to a line of questioning that is
2 relevant to this lawsuit. You can answer that
3 question, and then we can move on.
4 THE WITNESS: I am sorry. Can you we repeat
5 that again?
6 Q (By Mr. Aguila) by hydrafacial, do you mean
7 hydrating facial?
8 MR. RAZAI: This is not relevant to your --
9 MR. AGUILA: I am repeating the question, sir.
10 That is all I am doing.
11 MR. RAZAI: I am asking you to move on to your
12 next line of questioning. You tried to put a claim to
13 cancel the mark hydrafacial, based on --
14 MR. AGUILA: This is speaking objection.
15 MR. RAZAI: Right. This is not relevant to
16 the lawsuit. You are wasting everyone's time. Please
17 move on to a topic that is in this lawsuit. You don't
18 have to answer the question.
19 MR. AGUILA: You asked me to repeat it.
20 MR. RAZAI: You don't have to answer,
21 Mr. Ignon. I am instructing my witness not to answer.
22 Move on to your next line of questioning.
23 MR. AGUILA: Well, I will be filing a motion
24 to compel.
25 MR. RAZAI: Okay. Please understand, and I

Page 29

1 understand, we can do the meet and confer right now on
2 this issue. If you want to call the court, we can call
3 the court. You tried to put in a claim that the
4 hydrafacial mark should be cancelled. The hydrafacial
5 mark is not part of this lawsuit. You moved to amend
6 the complaint to add it. Judge Moore denied your
7 motion.
8 MR. AGUILA: This is a speaking objection.
9 MR. RAZAI: This is a meet and confer. You
10 can file your motion, but I will ask for sanctions if
11 you file a motion to continue with this line of
12 questioning. Judge Moore has explicitly said you do
13 not have a right to bring it into this lawsuit. Now
14 you can move on to your next line of questioning, sir.
15 MR. AGUILA: You can be quiet now. Thank you.
16 Q (By Mr. Aguila) Mr. Ignon, as your personal,
17 30(b)1 deponent, what do you mean by the term
18 hydrafacial?
19 MR. RAZAI: Mr. Aguila, we have discussed
20 this. He is not answering this line of questioning.
21 Please move on. You already said you will file your
22 motion. Please file your motion, and move on to your
23 next line of questioning. Would you like to call the
24 court instead?
25 Q (By Mr. Aguila) please answer the question.

EDGE SYSTEMS, LLC v.
RAFAEL NEWTON AGUILA

ROGER IGNON
November 12, 2015

**Page 30**

1    MR. RAZAI: I instructed him not to answer.
2    Mr. Ignon, will you take my advice and not answer this
3    line of questioning?
4        THE WITNESS: I will take your advice.
5        MR. AGUILA: Under what authority are you
6    telling him to not answer my question?
7        MR. RAZAI: Under the authority that this has
8    been explicitly thrown out of the lawsuit, and you have
9    no right to this information.
10       MR. AGUILA: That is not true. I do have a
11   right to this information. This is part of the
12   lawsuit.
13       MR. RAZAI: You can spend your time however
14   you like. This line of questioning will not be
15   answered. Mr. Ignon will take my advice. If you would
16   like to call the court, we can all the court. You want
17   to hang up and call the court?
18       MR. AGUILA: Could you say that again?
19       MR. RAZAI: If you would like to call the
20   court, you can go on to the rest of the questions. And
21   once the court hears the argument about this line of
22   questioning, then whatever the court orders I am more
23   than happy to go along with. With respect to at this
24   time and point, I will not allow the witness to answer
25   this line of questioning unless so ordered.

**Page 31**

1        I am asking, do you want to call the court and
2    figure this out?
3        MR. AGUILA: One second.
4        MR. RAZAI: Are you emailing your attorney,
5    Mr. Aguila?
6        MR. AGUILA: I don't have an attorney.
7        MR. RAZAI: Should be calling the court,
8    Mr. Aguila.
9        MR. AGUILA: I will call the court and ask
10   them about this. So let's -- I will just email them
11   actually.
12       MR. RAZAI: Why don't you call, and ask if the
13   court will call you back?
14       MR. AGUILA: Could you say that again?
15       MR. RAZAI: If you really want to insist on
16   this line of questioning and your insisting on filing a
17   motion, I insist you call the court the same way you
18   did last time and get instruction. If you are truly
19   insisting. I am happy for you to move on and ignore
20   this entire line of questioning all together.
21       But if you would like to reach the court, I
22   suggest you call the court. And once you call the
23   court, they will call you back and you can continue
24   with other questions until we get resolution on this
25   issue. Or handle it however way you like.

**Page 32**

1        MR. AGUILA: I will email them first. If they
2    don't respond, I will call them.
3        MR. RAZAI: Can you make sure you CC me on
4    your email to the Court, so it is not an ex parte
5    communication?
6        MR. AGUILA: I will include you in the email.
7        MR. RAZAI: Okay.
8        MR. AGUILA: Okay. So in the meantime --
9        MR. RAZAI: Have you sent the email yet,
10   Mr. Aguila.
11       MR. AGUILA: I have not.
12       MR. RAZAI: Since it is 3:30 at the court, we
13   should get resolution on this now as opposed to
14   5 o'clock when they are gone.
15       MR. AGUILA: Yes. I am writing it as I am
16   speaking.
17       MR. RAZAI: I will give you time to write it
18   because I don't see an email on my email yet.
19       MR. AGUILA: Well, I don't want to disturb
20   this deposition. So I will just do that as a motion to
21   compel right now.
22       MR. RAZAI: Just so you understand for
23   whatever basis you file your motion to compel, first of
24   all I will seek sanctions not only for the motion you
25   are filing. But I will make sure the court understands

**Page 33**

1    I offered for you to call the court and resolve the
2    issue here.
3        So you insist on filing a motion and prejudice
4    my witness to re-call him, if for some reason the court
5    thinks the line of questioning is proper. But you
6    don't want to choose that route. You insist on filing
7    a motion to increase our costs, and to potential pull
8    Mr. Ignon back for another deposition.
9        MR. AGUILA: I will email them.
10       MR. RAZAI: Okay. Can we take a quick
11   three-minute break while you are doing that, Mr.
12   Aguila?
13       MR. AGUILA: Say that again.
14       MR. RAZAI: Can we take a quick three-minute
15   break while you are doing that?
16       MR. AGUILA: It is hard to hear you.
17       MR. RAZAI: Can we take a quick break while
18   you are doing that?
19       MR. AGUILA: No. This will be --
20       MR. RAZAI: We would like to take a break and
21   use the rest room, if that is ok with you.
22       MR. AGUILA: No.
23       MR. RAZAI: My witness would like to use the
24   rest room. There is obviously no question pending.
25   Can we go off the record?

EDGE SYSTEMS, LLC v.
RAFAEL NEWTON AGUILA

ROGER IGNON
November 12, 2015

---

**Page 34**

1

2   Q   (By Mr. Aguila)  okay.  Here is a question
3   pending.  Mr. Ignon, what harm has Edge Systems
4   suffered from Aguila's accused devices?
5       MR. RAZAI: That question wasn't pending
6   before.  You can answer the question.  After that
7   question, can we take a break?
8   Q   (By Mr. Aguila)  Sure.
9   A   Can you repeat the question?  I am sorry.  I
10  am a little hard of hearing.  You have to speak up as
11  well.
12  Q   No problem.  In what way has Edge Systems been
13  harmed by Aguila's accused devices?
14  A   Well, several.  First of all, we have gotten
15  calls, in particular from Dr. Dubois, who thought that
16  he was buying our machine.  And, in fact, he was buying
17  an altered machine by yourself.
18      Ms. Urby had the same problem.  She thought
19  she was buying our machine.  So the physical
20  misrepresentation makes us have to take care of your
21  quality issues.  And both those calls were based upon
22  requests for repairing the unit, and also concern that
23  the unit was not what had been purported to be the unit
24  in the initial contact with you.
25  Q   Were there any other harms?

---

**Page 35**

1   A   Plenty of harms.
2   Q   Yes.
3   A   Well, misrepresentation of your product.  I
4   can't see you by the way.  Misrepresentation of your
5   product harms us from the standpoint of your quality,
6   from the standpoint of how our systems works, from the
7   standpoint of how we market our system.
8       The way we market our system is not just the
9   unit itself, but we supply quality customer service and
10  we supply advertising materials, we supply training.
11  All of those things, which don't appear to be what you
12  do.
13      MR. RAZAI: Can we take a break now,
14  Mr. Aguila?
15      MR. AGUILA: I think that is -- that is the
16  end of the deposition.
17      MR. RAZAI: You are ending the deposition?
18      MR. AGUILA: Yes.  I will end it there.
19      MR. RAZAI: Okay.  You are welcome to ask any
20  questions you like, but you are done?
21      MR. AGUILA: Yes.  I am done.
22      MR. RAZAI: So tomorrow morning, 9 a.m. with
23  Mr. Cohen.  See you then.
24      (Deposition session concluded at 12:42 p.m.)
25

---

**Page 36**

1                   * * * *
2       I have read the foregoing deposition
3   transcript and by signing hereafter, approve same.
4
5   Dated_____.
6
7
8                   _____
9                   (Signature of Deponent)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 37**

1           DEPOSITION OFFICER'S CERTIFICATE
2   STATE OF CALIFORNIA    )
3   COUNTY OF ORANGE       )  ss.
4                          )
5
6       I, Rebecca A. Harp, hereby certify:
7       I am a duly qualified Certified Shorthand
8   Reporter in the State of California, holder of
9   Certificate Number CSR 11895 issued by the Certified Court
10  Reporters' Board of California and which is in full
11  force and effect.   (Fed. R. Civ. P. 28(a)(1)).
12      I am authorized to administer oaths or
13  affirmations pursuant to California Code of Civil
14  Procedure, Section 2093(b) and prior to being examined,
15  the witness was first duly sworn by me.  (Fed. R. Civ.
16  P. 28(a)(a)).
17      I am not a relative or employee or attorney or
18  counsel of any of the parties, nor am I a relative or
19  employee of such attorney or counsel, nor am I
20  financially interested in this action.  (Fed. R. Civ. P.
21  28).
22      I am the deposition officer that
23  stenographically recorded the testimony in the foregoing
24  deposition and the foregoing transcript is a true record
25                          / / /

---

**EDGE SYSTEMS, LLC v.**
**RAFAEL NEWTON AGUILA**

**ROGER IGNON**
**November 12, 2015**

Page 38

1  of the testimony given by the witness.  (Fed. R. Civ. P.

2  30(f)(1)).

3      Before completion of the deposition, review of

4  the transcript [XX] was [  ] was not requested.  If

5  requested, any changes made by the deponent (and

6  provided to the reporter) during the period allowed, are

7  appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9  Dated: December 2, 2015

10

11      _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## A

**abilities (1)**
11:16
**ability (2)**
20:17;21:9
**able (3)**
11:5;12:7;14:17;
18:6
**abrade (1)**
24:25
**abraded (1)**
19:1
**abrading (2)**
26:10,11
**abrasion (1)**
24:18
**abrasive (5)**
19:6,7;21:1,3,3
**accurate (1)**
11:21
**accused (5)**
18:15,19;22:3;34:4,
13
**across (2)**
24:17,21
**acts (1)**
24:18
**actually (2)**
14:5;31:11
**adapted (1)**
25:21
**add (1)**
29:6
**added (1)**
21:3
**additional (4)**
9:16,18,20,21
**adhered (1)**
26:16
**administered (1)**
7:20
**admonition (1)**
12:14
**advertising (1)**
35:10
**advice (3)**
30:2,4,15
**affect (1)**
11:15
**again (11)**
5:13,18;12:20;17:9;
20:20;21:20;24:4;28:5;
30:18;31:14;33:13
**against (1)**
6:21
**agree (2)**
8:10,23
**Aguila (99)**
5:10,13,15,22;6:10,
13,17,19;12:16,20,23,
25;13:18,21;14:7,20,

22;15:3,7,9,13,19;16:2,
5,8,10,14,20,24;17:6,
18,19,21,23;18:13;
19:18,20;21:14,20;
22:2,5,8,13;23:13,16,
25;24:4,10,23;25:6,11,
15,17,23;26:9,17;27:2,
10,18,23,24;28:6,9,14,
19,23;29:8,15,16,19,
25;30:5,10,18;31:3,5,6,
8,9,14;32:1,6,8,10,11,
15,19,33:9,12,13,16,
19,22;34:2,8;35:14,15,
18,21
**Aguila's (4)**
5:7;22:3;34:4,13
**ahead (3)**
16:24;19:20;23:16
**alcohol (1)**
11:18
**alleged (1)**
17:19
**allow (1)**
30:24
**along (1)**
30:23
**altered (1)**
34:17
**amend (2)**
23:1;29:5
**announce (1)**
5:18
**answered (3)**
9:6,21;30:15
**apices (2)**
26:10,12
**appear (1)**
35:11
**applicable (1)**
12:15
**area (1)**
18:21
**argument (1)**
30:21
**Argumentative (2)**
15:12;16:1
**assume (2)**
8:13;9:2
**assumption (1)**
9:3
**attached (1)**
19:23
**attorney (2)**
31:4,6
**audibly (1)**
7:10
**audio (3)**
15:16;26:18,18
**authority (2)**
30:5,7
**avoid (1)**
10:17
**away (1)**

19:1

## B

**back (7)**
16:16;17:11;20:22;
23:17;31:13,23;33:8
**based (2)**
28:13;34:21
**basis (3)**
18:14,18;32:23
**begin (2)**
7:12;12:2
**behind (2)**
18:14,18
**best (3)**
8:4,15;9:14
**binding (1)**
15:5
**blade (1)**
24:15
**blue (2)**
23:9;27:3
**both (1)**
34:21
**break (7)**
10:1;33:11,15,17,20;
34:7;35:13
**bring (1)**
29:13
**burr (2)**
23:18,19
**buying (3)**
34:16,16,19

## C

**CAD (1)**
14:12
**CALIFORNIA (1)**
5:1
**call (18)**
20:2,5;29:2,2,23;
30:16,17,19;31:1,9,12,
13,17,22,22,23;32:2;
33:1
**called (1)**
20:13
**calling (1)**
31:7
**calls (2)**
34:15,21
**came (1)**
27:11
**can (51)**
6:15;9:19;13:6,8,16;
15:13,18,19,19;16:11,
20;17:6;18:17;19:14,
23;21:3,14;22:13,16,
21;23:7,14,24;25:16,
25:21,23;26:5;27:6,13,
25;28:2,3,4;29:1,2,10,
14,15;30:13,16,20;

31:23;32:3;33:10,14,
17,25;34:6,7,9;35:13
**cancel (1)**
28:13
**cancelled (1)**
29:4
**canister (1)**
19:2
**capability (1)**
20:11
**capacity (1)**
5:8
**care (2)**
11:12;34:20
**cartridge (5)**
20:10,12,13,18,19
**case (3)**
6:20;13:24;14:9
**categorize (2)**
24:10,13
**CC (1)**
32:3
**certain (3)**
16:2,7;17:2
**chance (1)**
26:6
**change (4)**
9:8,9,11;10:8
**changes (5)**
10:9,12,14,18,23
**choose (1)**
33:6
**claim (3)**
19:4;28:12;29:3
**claims (1)**
6:23
**clarification (2)**
5:17;12:18
**clarifying (1)**
14:24
**clear (1)**
23:9
**closer (1)**
26:19
**Cohen (3)**
5:20;23:13;35:23
**color (1)**
21:5
**colors (1)**
23:7
**combined (1)**
5:9
**common (1)**
21:10
**communication (1)**
32:5
**compel (3)**
28:24;32:21,23
**competition (1)**
6:22
**complaint (2)**
23:24;29:6
**complaints (2)**

31:23;32:3;33:10,14,
17,25;34:6,7,9;35:13
**complete (3)**
8:4;9:14;10:17
**composition (3)**
19:6,7;21:1
**comprises (2)**
24:25;25:2
**comprising (2)**
19:5;26:10
**concern (1)**
34:22
**concerning (1)**
6:21
**concluded (1)**
35:24
**conclusion (1)**
7:2
**conduct (1)**
16:3
**confer (2)**
29:1,9
**configured (1)**
24:25
**contact (1)**
34:24
**contain (1)**
7:5
**contention (1)**
18:19
**contentions (1)**
18:14
**continue (2)**
29:11;31:23
**corporation (1)**
15:5
**correctly (2)**
7:15;17:25
**costs (1)**
33:7
**counsel (2)**
13:18,19
**couple (1)**
20:21
**course (1)**
14:3
**court (35)**
7:2,3,8,14,21;8:1;
10:3;15:23;16:14,16;
17:10,11;20:22;29:2,3,
24;30:16,16,17,20,21,
22;31:1,7,9,13,17,21,
22,23;32:4,12,25;33:1,
4
**covered (1)**
11:24
**created (3)**
14:13,15;15:24
**crystals (1)**
26:16
**currently (2)**
11:12;21:18
**customer (1)**
35:9

**cut (7)**
22:21,23;23:2,11,21;
24:19,22
**cutting (1)**
24:17

**D**

**date (3)**
14:15;18:8;23:18
**December (1)**
14:8
**decorum (2)**
16:2,7
**Defendant (2)**
5:6;6:20
**defendant's (2)**
18:15,19
**define (2)**
22:16,19
**degree (1)**
23:1
**degrees (1)**
24:17
**delivered (2)**
18:23,24
**delivery (1)**
18:23
**denied (1)**
29:6
**department (1)**
18:5
**deponent (1)**
29:17
**deposed (1)**
7:18
**deposition (23)**
5:7,21;7:5,24;8:5;
9:16,25;10:3;11:4;
12:8,15;13:2,8,13,20;
15:5;16:3;21:19;32:20;
33:8;35:16,17,24
**depositions (1)**
5:9
**dermabrasion (1)**
24:15
**describe (3)**
19:13,14,16
**description (1)**
27:16
**design (6)**
14:13;15:25;20:19;
21:25;24:19,21
**designated (4)**
5:19;21:19,23;23:13
**designations (1)**
5:16
**designed (1)**
24:14
**device (2)**
14:12;22:4
**devices (5)**
18:15,20;22:3;34:4,

13
**diamond (8)**
20:8;25:10;26:2,4,
15,16,21,21
**different (7)**
19:8,15,17,23;21:2,
3;25:20
**differently (2)**
10:22;20:14
**difficult (1)**
15:16
**difficulties (1)**
26:17
**direction (1)**
24:22
**directly (1)**
17:20
**discovery (3)**
13:14;14:2,3
**discussed (1)**
29:19
**distal (1)**
19:23
**disturb (1)**
32:19
**doctor's (1)**
11:12
**documents (8)**
13:1,7,12,19,22;24:1,
3,4
**done (2)**
35:20,21
**down (3)**
7:1,8,14
**Dr (1)**
34:15
**draw (2)**
24:16,21
**drawing (1)**
14:12
**dress (1)**
6:22
**dry (1)**
20:8
**Dubois (1)**
34:15
**dull (3)**
22:17,20,20
**during (5)**
5:21;9:25;14:13;
15:24;17:19

**E**

**earlier (3)**
9:10,11,19
**early (1)**
24:15
**easier (1)**
7:14
**Edge (20)**
5:7;6:20;18:11,11,
14,19;19:3;22:2,9,10,

11,16,21;24:1,7,17,25;
25:3;34:3,12
**edges (2)**
23:5;26:12
**educate (1)**
25:19
**either (2)**
13:25;17:3
**element (2)**
24:24;25:2
**email (8)**
31:10;32:1,4,6,9,18,
18;33:9
**emailing (1)**
31:4
**embedded (1)**
26:22
**emphasizes (1)**
27:7
**encrusted (1)**
26:22
**end (3)**
19:23;35:16,18
**ending (1)**
35:17
**engineering (1)**
21:16
**entire (1)**
31:20
**entitled (1)**
10:11
**entry (1)**
19:22
**estimate (5)**
8:20,21,22,24;12:5
**events (4)**
14:18;15:11;16:22;
17:3
**everyone's (1)**
28:16
**evidence (1)**
6:5
**evidentiary (1)**
17:20
**ex (1)**
32:4
**exact (1)**
18:8
**exactly (1)**
23:17
**EXAMINATION (1)**
6:16
**examined (1)**
6:2
**Exhibit (3)**
14:12;15:10,24
**exit (1)**
19:22
**expect (2)**
16:3,7
**expert (2)**
12:12;22:6
**explicitly (2)**

11,16,21;24:1,7,17,25;
25:3;34:3,12
**express (1)**
12:9
**extending (1)**
26:11
**extent (1)**
17:14

**F**

**facial (2)**
27:19;28:7
**fact (3)**
12:13;17:3;34:16
**facts (1)**
17:3
**factual (4)**
12:13;18:14,18;22:7
**fair (1)**
9:3
**far (1)**
11:24
**feature (1)**
25:7
**features (1)**
26:13
**feel (1)**
11:8
**feeling (3)**
11:2,5,6
**felt (1)**
23:24
**few (1)**
11:1
**figure (2)**
15:2;31:2
**file (5)**
29:10,11,21,22;
32:23
**filed (1)**
6:21
**filing (5)**
28:23;31:16;32:25;
33:3,6
**find (3)**
9:24;13:16,17
**fine (5)**
11:5,8;12:16;15:22;
27:24
**finish (2)**
7:13,15
**first (9)**
5:11,12;15:3;18:7,
13;19:4;32:1,23;34:14
**flat (1)**
25:10
**Florida (1)**
18:9
**fluid (2)**
18:23;19:1
**follows (1)**
6:2
**form (16)**

29:12;30:8
**express (1)**
12:9
**extending (1)**
26:11
**extent (1)**
17:14

14:1;16:18,23;17:5,
13;21:11;22:12;23:22;
24:2,8,12;25:4,8;26:14,
23;27:5
**four (2)**
21:2;22:8
**fragment (3)**
19:6,7;21:1
**front (1)**
13:10

**G**

**general (1)**
25:22
**generality (1)**
19:14
**given (2)**
9:8,14
**giving (5)**
8:15,22;11:21;12:12,
13
**God (1)**
6:7
**good (3)**
11:7;12:5;27:15
**great (2)**
6:15;15:8
**guess (3)**
8:20,21,23
**guessing (3)**
8:22;9:2,3

**H**

**Halloween (1)**
15:15
**handle (1)**
31:25
**handled (1)**
5:20
**handpiece (31)**
17:18,19;18:1,6,21,
22,24;19:7,15,16,21,
24,25;20:3,5,8,10,13,
15,17,18,25;22:9,11;
24:11;25:1,12,16,20;
26:3,13
**handpieces (5)**
19:11,12,17;20:7;
21:7
**hang (1)**
30:17
**happen (2)**
17:3,4
**happens (2)**
9:9,17
**happy (2)**
30:23;31:19
**hard (5)**
15:17;16:21;25:21;
33:16;34:10
**harm (1)**

34:3
**harmed (1)**
34:13
**harms (3)**
34:25;35:1,5
**head (2)**
7:9;18:24
**hear (5)**
15:17,18,19;20:20;
33:16
**hearing (2)**
17:20;34:10
**hears (1)**
30:21
**help (1)**
6:7
**hours (1)**
12:4
**hydrafacial (29)**
14:12;19:6,10;20:1,
3,5,11,14,16,24;21:7,
24;22:9,10;24:11;25:1,
12,15,20;26:3,13;27:3,
10,21;28:6,13;29:4,4,
18
**hydrafacialcom (1)**
26:20
**hydrating (2)**
27:18;28:7

**I**

**identify (1)**
13:1
**Ignon (26)**
5:5,8,18;6:1,19;7:18;
12:11,25;14:7;15:20,
21;16:12;19:3;21:19,
23;22:5;23:15;26:19;
27:13,25;28:21;29:16;
30:2,15;33:8;34:3
**ignore (1)**
31:19
**ill (1)**
11:6
**illness (1)**
11:13
**images (1)**
26:21
**importance (1)**
7:25
**important (2)**
10:16;13:7
**inaccurate (1)**
10:8
**include (3)**
18:1;23:8;32:6
**included (1)**
21:8
**increase (1)**
33:7
**information (7)**
6:25;9:16,18,20,21;

30:9,11
**infringes (2)**
18:15,20
**infringing (1)**
22:4
**initial (1)**
34:24
**input (1)**
27:14
**insist (4)**
31:15,17;33:3,6
**insisting (2)**
31:16,19
**Instead (2)**
8:8;29:24
**instructed (1)**
30:1
**instructing (1)**
28:21
**instruction (1)**
31:18
**interface (1)**
19:5
**interrupt (1)**
19:18
**interrupting (2)**
25:13,18
**into (3)**
6:12;19:1;29:13
**introduce (1)**
20:17
**introducing (1)**
20:11
**IRVINE (1)**
5:1
**issue (3)**
29:2;31:25;33:2
**issues (1)**
34:21

**J**

**judge (4)**
8:2;10:13;29:6,12
**jump (1)**
6:12
**jury (2)**
8:2;10:13

**K**

**kind (1)**
12:1
**knife (2)**
24:15,22
**knowledge (5)**
15:6;22:1;23:14;
27:6,13
**known (1)**
7:4

**L**

last (2)
20:21;31:18
**lastly (1)**
12:7
**later (1)**
9:15
**lawsuit (10)**
6:21,25;27:21;28:2,
16,17;29:5,13;30:8,12
**lawyer (1)**
22:6
**learn (1)**
6:24
**least (4)**
24:24,25;25:2,2
**level (2)**
16:2,7
**line (17)**
21:17,21;27:20;28:1,
1,22;29:11,14,20,23;
30:3,14,21,25;31:16,
20;33:5
**list (2)**
13:5,10
**literally (1)**
22:4
**litigation (1)**
14:1
**little (2)**
15:16;34:10
**long (2)**
12:3;27:1
**looked (1)**
26:25
**Lost (1)**
12:10
**lumen (5)**
18:23,25,25;19:22,
22
**lying (2)**
15:23;16:12

**M**

**machine (4)**
22:9;34:16,17,19
**makes (1)**
34:20
**manner (3)**
24:14;25:22,24
**manufacturing (1)**
21:25
**Many (2)**
23:6;25:5
**mark (3)**
28:13;29:4,5
**market (2)**
35:7,8
**marketing (1)**
27:2
**materials (1)**
35:10
**matter (1)**

6:5
**may (8)**
6:20;7:12;9:6,15;
10:5,8,22;13:22
**Maybe (1)**
12:4
**MD (20)**
14:12;19:6,10;20:1,
3,5,11,14,16,24;21:7;
22:9,11;24:11;25:1,12,
15,20;26:3,13
**mean (4)**
22:16;27:18;28:6;
29:17
**meantime (1)**
32:8
**media (1)**
18:23
**medical (1)**
11:3
**medication (2)**
11:10,15
**meet (2)**
29:1,9
**meeting (3)**
14:13;15:25;18:9
**mental (1)**
11:15
**mentioning (1)**
23:5
**mentions (1)**
19:4
**Miami (1)**
14:8
**microphone (1)**
26:19
**might (1)**
6:25
**misrepresentation (3)**
34:20;35:3,4
**moment (1)**
13:17
**month (1)**
14:17
**months (1)**
15:11
**Moore (2)**
29:6,12
**more (4)**
13:3;15:17;18:17;
30:22
**morning (1)**
35:22
**most (4)**
10:17;12:4;17:15;
27:2
**mostly (1)**
14:1
**motion (12)**
28:23;29:7,10,11,22,
22;31:17;32:20,23,24;
33:3,7
**move (10)**

26:18;28:1,3,11,17,
22;29:14,21,22;31:19
**moved (1)**
29:5

**N**

**name (4)**
6:19;19:25;20:2;
27:10
**necessary (2)**
7:9;26:6
**need (4)**
9:7,9;10:18;11:3
**next (3)**
28:12,22;29:14,23
**nods (1)**
7:8
**nor (1)**
12:12
**NOVEMBER (1)**
5:2
**number (2)**
21:14,15
**numbers (1)**
5:14

**O**

**oath (1)**
7:21
**object (4)**
12:11;14:20;26:6;
27:20
**objection (24)**
14:22;15:12;16:1,18,
23;17:5,13;21:11;22:5,
12;23:12,22;24:2,8,12;
25:4,8;26:14,23;27:5,
12,23;28:14;29:8
**objections (3)**
5:16;14:23;15:2
**observing (1)**
16:4
**obviously (1)**
33:24
**o'clock (1)**
32:14
**October (4)**
14:13,18;15:10,25
**off (2)**
12:21;33:25
**offered (1)**
33:1
**ok (1)**
33:21
**once (2)**
30:21;31:22
**one (13)**
9:7;19:8,11,21;
20:16,25;24:24,25;
25:2,2,10;27:14;31:3
**only (3)**

opinion (1)
17:16;20:19;32:24
12:12
opinions (1)
12:8
opportunity (3)
9:10;10:6,23
opposed (1)
32:13
option (1)
21:12
optional (1)
26:2
options (1)
21:13
ordered (1)
30:25
orders (1)
30:22
ordinary (1)
14:3
others (1)
20:9
out (3)
10:13;13:16,17;15:2;
30:8;31:2
Outside (8)
14:21;20:1;21:18,22;
23:12;26:23;27:5,12
over (3)
10:3;14:5;18:10

**P**

pads (1)
21:3
part (4)
9:4;27:21;29:5;
30:11
parte (1)
32:4
particular (2)
24:20;34:15
patent (6)
18:16,20,22;19:4;
24:23;26:9
patents (2)
6:21;14:4
patient's (1)
23:21
pause (1)
26:5
penalty (2)
7:22;10:7
pending (3)
33:24;34:3,5
people (1)
27:15
Perfect (1)
6:14
perfectly (1)
8:19
perjury (2)

7:22;10:7
personal (11)
5:8,12;6:12;15:1,3,4,
6;23:14;27:6,13;29:16
physical (1)
34:19
physically (1)
11:8
Plaintiff (2)
18:18;22:2
Plaintiff's (2)
14:11;15:24
plan (1)
5:10
plastic (4)
19:21,25;25:25;27:3
please (17)
8:9;9:25;13:1;14:23;
16:5,10;18:17;19:18;
22:7;25:13,17;28:1,16,
25;29:21,22,25
Plenty (1)
35:1
pm (1)
35:24
point (2)
10:13;30:24
polished (1)
21:6
portion (1)
19:5
possible (2)
8:15;17:2
Possibly (2)
15:15;17:15
potential (1)
33:7
preclude (1)
27:8
prejudice (1)
33:3
prepare (5)
10:4;13:2,8,13,19
Pretty (1)
11:7
preventing (1)
11:20
previous (3)
16:17;17:12;20:23
previously (1)
9:8
primarily (1)
18:21
printed (1)
20:1
prior (1)
18:8
probably (1)
27:7
problem (2)
34:12,18
proceed (1)
5:11

produce (1)
14:6
produced (2)
13:25;14:5
product (2)
35:3,5
proper (1)
33:5
properly (1)
23:2
pry (1)
11:3
pull (1)
33:7
purported (1)
34:23
put (3)
21:9;28:12;29:3

**Q**

quality (3)
34:21;35:5,9
quick (3)
33:10,14,17
quiet (1)
29:15

**R**

Rafael (2)
5:6;6:19
RAZAI (77)
5:5,15;6:10,14;
12:11,18,21,24;13:21;
14:20,24;15:4,8,12,18;
16:1,6,11,18,23;17:5,
13;18:12;19:18;21:11,
17,21;22:5,12;23:12,
22;24:2,8,12;25:4,8,13,
17;26:5,8,14,23;27:5,
12,20,24;28:8,11,15,
20,25;29:9,19;30:1,7,
13,19;31:4,7,12,15;
32:3,7,9,12,17,22;
33:10,14,17,20,23;
34:5;35:13,17,19,22
razor (3)
24:1,7,9
reach (1)
31:21
read (3)
16:16;17:11;20:22
reading (1)
11:4
realize (1)
9:7
really (1)
31:15
reason (3)
9:7;24:19;33:4
recall (4)
9:21;14:17;17:17;

18:8
re-call (1)
33:4
receive (2)
17:20;18:3
received (2)
18:5;23:10
record (5)
5:15;6:18;14:4;
21:17;33:25
regarding (3)
15:10;20:24;23:19
related (1)
14:17
relates (1)
9:19
released (1)
20:19
relevant (4)
6:25;28:2,8,15
remaining (1)
5:20
remember (17)
9:16;13:5,9;14:8,11,
16;15:9,10,14,24;
16:25,25;17:1,1,2,24;
22:14
remembered (1)
9:18
remembering (1)
16:22
repairing (1)
34:22
repeat (7)
16:13,14;17:9,10;
28:4,19;34:9
repeating (1)
28:9
REPORTER (12)
6:4;7:2,3,8,14,21;
10:4;16:14,16;17:10,
11;20:22
representative (1)
18:11
request (1)
26:5
requests (2)
13:14;34:22
resolution (2)
31:24;32:13
resolve (1)
33:1
respect (4)
21:22,24;23:14;
30:23
respond (2)
17:17;32:2
responds (1)
9:17
rest (3)
30:20;33:21,24
review (3)
10:6,7,11

reviewed (7)
13:1,8,10,12,19,22,
25
right (17)
5:22;6:18;10:1;
12:19;13:12,17;14:24;
15:7;17:8;27:4,24;
28:15;29:1,13;30:9,11;
32:21
ROGER (2)
6:1;15:21
room (2)
33:21,24
route (1)
33:6
Rule (1)
5:7

**S**

sales (2)
21:16;27:15
same (3)
7:25;31:17;34:18
sanctions (2)
29:10;32:24
saying (1)
20:25
scalpel (1)
24:16
scope (3)
14:21;21:18,23;
23:12;26:24;27:6,12
second (2)
26:6;31:3
secondary (1)
18:25
seek (1)
32:24
sell (1)
21:13
send (1)
17:23
sent (7)
13:13,20,23,23;14:5;
17:25;32:9
separate (1)
20:18
served (2)
5:16;14:2
service (1)
35:9
session (1)
35:24
several (7)
19:8,10,12;21:13;
22:14;25:20;34:14
shakes (1)
7:9
shall (2)
6:5,5
sharp (18)
22:10,11,15,16,19,

20,21;23:4,25;24:3,5,6,
  6,9,16,25;25:2;26:12
**sharpness (2)**
  23:24;24:11
**shipment (1)**
  18:3
**shipping (1)**
  18:5
**show (2)**
  26:21;27:3
**shown (1)**
  17:19
**sign (1)**
  10:6
**significance (1)**
  7:25
**similar (2)**
  26:13,15
**site (3)**
  19:1;26:20;27:1
**situation (1)**
  11:3
**skin (11)**
  19:1,4;22:21,23;
  23:3,10,21;24:17,19,
  21;25:1
**solemnly (1)**
  6:4
**Sometimes (2)**
  8:18;9:15
**sorry (2)**
  28:4;34:9
**speak (3)**
  15:20;22:1;34:10
**speaking (6)**
  14:22,23;27:23;
  28:14;29:8;32:16
**specific (3)**
  13:3;18:17;25:24
**specifically (1)**
  18:22
**spend (1)**
  30:13
**spiral (3)**
  24:14,20;25:25
**SS (3)**
  14:12;15:10,24
**stainless (1)**
  21:6
**standpoint (3)**
  35:5,6,7
**start (2)**
  7:16;14:25
**started (1)**
  12:17
**starting (5)**
  5:10;6:11;12:19,21;
  15:1
**state (2)**
  6:4;12:7
**stated (1)**
  15:23
**statements (1)**

16:21
**states (1)**
  24:24
**stating (1)**
  14:11
**steel (1)**
  21:6
**stop (2)**
  25:13,17
**straight (1)**
  6:12
**suffered (1)**
  34:4
**suggest (1)**
  31:22
**suggesting (1)**
  22:3
**suit (1)**
  18:16
**supply (5)**
  20:12,13;35:9,10,10
**supposed (1)**
  17:7
**Sure (8)**
  5:15;8:19;11:3;
  16:20;23:23;32:3,25;
  34:8
**surface (6)**
  24:18,24;25:2;26:10,
  11,16
**switch (1)**
  18:10
**sworn (1)**
  6:2;10:10,12,24
**system (3)**
  27:17;35:7,8
**Systems (8)**
  5:7;6:20;18:11,11;
  19:3;34:3,12;35:6
**Systems' (2)**
  18:14,19

## T

**talk (3)**
  10:1;13:6;21:25
**talks (1)**
  18:22
**telling (1)**
  30:6
**term (2)**
  27:11;29:17
**testified (2)**
  6:2;10:22
**testify (3)**
  10:21;11:6;22:10
**testifying (4)**
  5:5,8;7:21;8:1
**testimony (8)**
  7:25;10:10,12,18,24;
  11:21;12:13,14
**testing (1)**
  22:1

**thought (5)**
  14:25;25:9;27:15;
  34:15,18
**three-minute (2)**
  33:11,14
**thrown (1)**
  30:8
**THURSDAY (1)**
  5:2
**tip (17)**
  20:25;21:2,5,8,9,10;
  23:9,9,20;24:19;25:10,
  25;26:2,4,21,22;27:3
**tips (18)**
  19:8,15,23;22:14,23;
  23:4,4,8,11,18,25;
  24:14,20;25:5,21;
  26:15;27:8,9
**tired (1)**
  9:24
**Today (10)**
  6:24;7:21;10:16,22;
  11:2,6,6,18,21;13:2
**together (1)**
  31:20
**tomorrow (1)**
  35:22
**tool (1)**
  24:18
**topic (4)**
  18:13;22:8;23:13;
  28:17
**topics (12)**
  5:6,11,12,13,18,19,
  20;6:11;12:22;14:25;
  21:19,23
**trade (1)**
  6:22
**trademarks (1)**
  6:22
**training (1)**
  35:10
**transcribe (1)**
  7:3
**transcript (6)**
  7:5;10:4,6,7,10;11:4
**transition (1)**
  6:14
**trial (4)**
  10:11,13,22;12:9
**tried (2)**
  28:12;29:3
**true (2)**
  26:22;30:10
**truly (1)**
  31:18
**truth (4)**
  6:6,6,6;8:5
**try (1)**
  7:16
**trying (4)**
  11:2;15:2;27:16,22
**two (1)**

12:4;20:16;25:9

## U

**under (6)**
  7:22;10:6;11:10,12;
  30:5,7
**understands (1)**
  32:25
**understood (1)**
  8:14
**unfair (1)**
  6:22
**unit (5)**
  17:24,25,25;34:22,
  23,23;35:9
**unless (1)**
  30:25
**up (3)**
  27:11;30:17;34:10
**upon (2)**
  14:2;34:21
**upwardly (1)**
  26:11
**Urby (3)**
  17:25;18:4;34:18
**Urby's (1)**
  17:25
**use (2)**
  33:21,23
**used (1)**
  23:2

## V

**vacuum (1)**
  18:25

## W

**waste (1)**
  19:2
**wasting (1)**
  28:16
**way (8)**
  11:21;17:4;25:6;
  31:17,25;34:12;35:4,8
**ways (1)**
  25:9
**web (2)**
  26:20;27:1
**welcome (2)**
  16:6;35:19
**weren't (1)**
  13:23
**wherein (1)**
  24:24
**Whereupon (3)**
  16:16;17:11;20:22
**whole (1)**
  6:6
**willing (1)**
  12:7

**WITNESS (31)**
  6:8;12:12,13;14:8;
  16:9,13,19;17:15;
  19:19;21:12;22:6;
  23:23;24:3,9,13;25:5,9,
  14,18,19;26:7,15,25;
  27:7,14;28:4,21;30:4,
  24;33:4,23
**words (2)**
  15:17;20:21
**working (1)**
  19:5
**works (1)**
  35:6
**write (1)**
  32:17
**writing (1)**
  32:15
**written (2)**
  10:4;14:2

## Y

**yesterday (1)**
  5:17

## 1

**1 (2)**
  5:6,19
**11:19 (1)**
  5:3
**12 (1)**
  5:2
**12:42 (1)**
  35:24
**14 (2)**
  5:6,19
**15 (2)**
  5:6,19
**16 (2)**
  5:6,19
**19 (3)**
  5:6,19;14:8

## 2

**2004 (3)**
  14:14,18;15:25
**2014 (1)**
  14:8
**2015 (1)**
  5:2
**29 (2)**
  14:13;15:25
**29th (1)**
  15:10

## 3

**3:30 (1)**
  32:12
**30b1 (1)**

29:17
**30b6 (8)**
  5:7,11;6:11,13;
  12:19,22;14:25;18:10

**4**

**4 (2)**
  5:6,19

**5**

**5 (1)**
  32:14

**6**

**620 (2)**
  18:20;19:3

**7**

**7678120 (1)**
  26:9

**8**

**8337513 (1)**
  24:23

**9**

**9 (1)**
  35:22
**90 (1)**
  24:17

# EXHIBIT I

EDGE SYSTEMS, LLC  v.
RAFAEL NEWTON AGUILA

WILLIAM COHEN
November 13, 2015

**Page 2**

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF FLORIDA
 3
 4   EDGE SYSTEMS, LLC, et al., )
 5          Plaintiffs,        )
 6                             )
 7   vs.                       ) Case No. 1:14-CV-24517
 8                             ) KMM/McAliley
 9   RAFAEL NEWTON AGUILA,     )
10   aka RALPH AGUILA, and     )
11   individual dba            )
12   HYDRADERMABRASION,        )
13          Defendants.        )
14   _____)
15
16          Video Conference Deposition of
17      WILLIAM COHEN, taken on behalf of Defendants,
18         at 2040 Main Street, 14th Floor, Irvine,
19         California, commencing at 9:15 a.m.
20         on Friday, November 13, 2015, before
21      Rebecca A. Harp, Certified Shorthand Reporter
22         No. 11895.
23
24
25
```

**Page 3**

```
 1   APPEARANCES:
 2
 3   For Plaintiffs:
 4      KNOBBE, MARTENS, OLSON & BEAR LLP
        BY:  ALI S. RAZAI
 5      Attorney at law
        2040 Main Street, 14th Floor
 6      Irvine, California  92614
        (949) 760-0404
 7      ali.razai@knobbe.com
 8
 9   For Defendants:
        RAFAEL AGUILA
10      5338 SW 57th Avenue
        Miami, Florida  33155
11      (305) 508-5052
        raguila@gmail.com
12
13
14   Also Present:
15      Daniel Kiang
        Joy Wang
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              INDEX                        PAGE
 2
 3   BY MR. AGUILA                              6
 4   BY MR. RAZAI                              54
 5
 6              EXHIBITS
 7
 8         (None offered.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1              IRVINE, CALIFORNIA
 2              FRIDAY, NOVEMBER 13, 2015
 3              9:15 A.M.
 4              * * * *
 5         WILLIAM COHEN
 6   was sworn, examined and testified as follows:
 7
 8      THE REPORTER: You do solemnly state that the
 9   evidence you shall give in this matter shall be the
10   truth, the whole truth, and nothing but the truth, so
11   help you God?
12      THE WITNESS: I do.
13              * * * *
14      MR. RAZAI: Mr. Aguila, this is Ali Razai from
15   Knobbe, Martens. I am counsel for Edge Systems and
16   Axia MedScience. I am also counsel for the witness,
17   Mr. Bill Cohen. With me here also is Joy Wang, one of
18   my associates, and Daniel Kiang, another one of my
19   associates.
20      Mr. Cohen is designated to testify on behalf
21   of Edge Systems on topics number 2, 3, 5, 6, 7, 8, 9,
22   10, 11, 12, 13, 17, 18, and 20.  Mr. Cohen is also
23   testifying on his personal behalf.  Mr. Aguila, are you
24   going to be starting with the 30(b)6 topics first, or
25   did you want to proceed with the personal deposition
```

**Page 6**

1  before?
2      MR. AGUILA: Let me start with the personal
3  deposition.
4      MR. RAZAI: That sounds great. As soon as you
5  want to switch over to Edge Systems, please let me know
6  so I know when that is happening. So it is clear on
7  the record whether the testimony is binding on the
8  corporation, or whether it is in his personal capacity.
9          (EXAMINATION)
10 BY MR. AGUILA:
11     Q  Mr. Cohen, could you speak a couple words?
12 Make sure his microphone works.
13     A  Can you hear me? I am speaking a couple
14 words.
15     Q  Yes. Okay. So this is the personal
16 deposition right now. Mr. Cohen, do you remember --
17 well --
18     A  I am sorry. I can't understand what you are
19 saying.
20     Q  I am having a little bit of feedback here.
21     MR. RAZAI: And you are cutting in and out as
22 well. I think your connection might be compromised.
23 You want to try to reconnect?
24     MR. AGUILA: Okay. I will do that.
25         (Off the record.)

**Page 7**

1      Q  (By Mr. Aguila) So, Mr. Cohen, do you
2  remember attending the December 19, 2014, evidentiary
3  hearing in Miami?
4      A  I am sorry. I couldn't understand you. The
5  what in Miami?
6      Q  The evidentiary hearing?
7      A  Yes.
8      Q  And do you remember that the first witness for
9  the plaintiffs was Mr. Ignon?
10     A  I was out of the room at that time, so I am
11 not sure.
12     Q  Okay. And do you remember around noon for
13 lunch entering the courtroom?
14     A  I don't think we came back at noon. We broke
15 for lunch. I do remember that.
16     Q  Do you remember entering the courtroom around
17 the lunchtime?
18     A  After lunchtime.
19     Q  Do you remember seeing Mr. Aguila around in
20 the courtroom with only Aguila and Mr. Babcock, one of
21 the attorneys, present?
22     A  I don't remember that.
23     Q  And you don't remember threatening Mr. Aguila
24 during this time?
25     A  No. I have never threatened Mr. Aguila, ever.

**Page 8**

1      Q  Have you ever been convicted of a crime?
2      A  No. Other than parking tickets and moving
3  violations.
4      Q  Has the federal protective service
5  contacted you?
6      A  Can you repeat that?
7      Q  Has the federal protective service contacted
8  you at all?
9      A  Never.
10     Q  Has the U.S. Marshal ever contacted you this
11 year?
12     A  No.
13     Q  Now, when you were there, Mr. Cohen, that the
14 defendant had applied for US trademarks for --
15     COURT REPORTER: I am sorry, Mr. Aguila. You
16 are cutting out a little bit again. Could you restate
17 that question for me, please?
18     Q  (By Mr. Aguila) Mr. Cohen, were you aware
19 that defendant had applied for a U.S. trademark for the
20 term dermabrasion?
21     MR. RAZAI: Objection. Form. Vague as to
22 time.
23     Q  (By Mr. Aguila) You can answer.
24     A  I remember you applied for several of our
25 trademarks. I don't know the specifics of each one.

**Page 9**

1      Q  And when did you learn about the trademark?
2      A  There was a lot of feedback here. It was
3  shortly after -- I am not exactly sure of the month.
4  It was around November, December of 2014. It was after
5  you changed your web site from Luminous to Edge
6  Systems, and suddenly there was a flurry of
7  applications. Either before or after, somewhere in
8  there. I am not sure when you changed it. It was
9  right in that time frame when suddenly there was a
10 flurry of applications for our company name and
11 trademarks, etc.
12     Q  Do you remember Aguila applying for the Active
13 4 trademark?
14     MR. RAZAI: Objection. Form.
15     THE WITNESS: You asked me this prior. I
16 can't remember exactly. Get a little nervous with
17 deposition. I know you applied for several of the
18 solutions. I can't tell you exactly which ones.
19     Q  (By Mr. Aguila) Okay. And Mr. Cohen, have
20 you ever been in a deposition before?
21     A  No. Not that I remember.
22     Q  Now, Mr. Cohen, do you remember sending the
23 defendant a cease and desist letter in January of 2010?
24     MR. RAZAI: Objection. Form.
25     THE WITNESS: I don't remember that, no. We

EDGE SYSTEMS, LLC v.
RAFAEL NEWTON AGUILA

WILLIAM COHEN
November 13, 2015

**Page 10**

1  sent -- at that time, no. I don't remember that. We
2  did not send it to Rafael Aguila.
3    Q   (By Mr. Aguila) Who did you send it to?
4      MR. RAZAI: Objection. Form.
5      THE WITNESS: I am not sure if that was the
6  exact date either. But I remember we sent a cease and
7  desist. I believe it was to a different company that
8  now I know you owned or started or had the name of. I
9  believe that was Diamond Skin. There was a long series
10  of these, it is hard to know the exact. You seem to
11  keep changing your company name so often and jumping on
12  our bandwagon, and then we send you a letter.
13    Q   (By Mr. Aguila) The letter from January 2010
14  says the name Rafael Aguila, underneath Diamond Skin
15  Systems.
16      MR. RAZAI: Is there a letter you want to show
17  Mr. Cohen? Or are you asking him to recall from memory
18  or someone from his company wrote five years ago?
19    Q   (By Mr. Aguila) Right.
20    A   Right, meaning what?
21    Q   So this letter from January 2010 does say the
22  name Rafael Aguila, and underneath it says Diamond Skin
23  Systems. Do you recall that?
24    A   No.
25    Q   You don't recall sending this letter?

**Page 11**

1    A   I recall sending a letter, but I don't recall
2  your last question.
3    Q   To what company did you send the letter?
4      MR. RAZAI: Objection. Form. Let the record
5  reflect there is no letter in evidence or being shown
6  to the witness.
7    Q   (By Mr. Aguila) That is a speaking objection.
8  Let the witness answer.
9    A   Like I said before, it would be easier if I
10  had it laid out. A chronology of the events. I don't
11  have that. It is difficult to remember offhand. It is
12  five years ago.
13    Q   Go ahead.
14    A   No. I don't remember that.
15    Q   So Mr. Cohen, you don't remember sending the
16  cease and desist letter in January 2010 to Rafael
17  Aguila for Diamond Skin Systems?
18    A   You are mixing two questions. I think if you
19  took the first question, do you remember sending a
20  cease and desist, I stated yes. The answer was yes.
21  Do I remember exactly who it was addressed to, I said
22  no.
23    Q   And Mr. Cohen, what documents did you review
24  to prepare for this deposition?
25    A   Several documents. Interrogatories, motions,

**Page 12**

1  patents. I read through the hearing transcript of the
2  preliminary injunction hearing. Several other
3  documents as well.
4    Q   And have you provided all these documents to
5  the defendant already?
6    A   Most everything was from the court or motions
7  or from our attorneys sent to you and to the Court. So
8  most of it, you have. I believe you asked some
9  questions of me to prepare for today. And those we
10  will supply, but I have not supplied them to you.
11  Example would be you asked quality questions. Those I
12  don't think we have sent you anything yet.
13      MR. RAZAI: Mr. Aguila, same as yesterday.
14  The documents were either of the record produced in
15  litigation, waiting to be produced pending the approval
16  of the protective order that I sent you a little while
17  ago, or will be produced in the regular course of
18  discovery.
19    Q   (By Mr. Aguila) Okay. Mr. Cohen, what is
20  your title exactly of Edge Systems?
21    A   President.
22    Q   And who is the CEO?
23    A   Roger Ignon.
24    Q   Now, have you ever received any complaints
25  regarding the hydrafacial MD device or the patents?

**Page 13**

1    A   You have to define complaints.
2    Q   Well, complaints from customers. You want the
3  definition of complaint?
4    A   Yes.
5    Q   Okay. Let me look it up. See what the
6  official definition is. Okay, Mr. Cohen, can you hear
7  me?
8    A   Yes.
9    Q   So, a complaint is a statement that a
10  situation is satisfactory or acceptable. Did you find
11  any customers of the hydrafacial MD statements that
12  they were unsatisfied or not acceptable?
13    A   Yes.
14    Q   And did any of those complaints or statements
15  involve the hydrafacial MD harming the patient?
16      MR. RAZAI: Objection. Form.
17      THE WITNESS: Under the FDA guidelines, only
18  one.
19    Q   (By Mr. Aguila) Can you describe that for me?
20    A   It was a procedural error by the operator, and
21  our glysel got into the corner of a woman's eye and
22  irritated her eye. This was in 2010, I believe.
23    Q   Were you sent back this machine or --
24      COURT REPORTER: Mr. Aguila, I am sorry. I am
25  really having trouble with the connection today. All I

EDGE SYSTEMS, LLC  v.
RAFAEL NEWTON AGUILA

WILLIAM COHEN
November 13, 2015

**Page 14**

1  got was "Were you sent back this machine or"
2     MR. RAZAI: Mr. Aguila, I don't know if it is
3  because your mouth is going back on and forth on the
4  microphone, or if the connection is poor.  It is almost
5  like a bad phone call where you are coming in and out.
6     MR. AGUILA: Okay.
7     MR. RAZAI: Is there any way to speed up your
8  internet connection, or is there something on your
9  wireless that is a band width you can turn off?  The
10 connection is poor on your end.
11    MR. AGUILA: Well, I will hang up and call
12 again.
13    (Off the record.)
14    Q   (By Mr. Aguila)  Now, Mr. Cohen, are you
15 there?
16    A   Yes.
17    Q   Now, in 2006, you had apparently asked Ebay to
18 cancel my filing, my listing with Ebay.  Do you
19 remember that?
20    MR. RAZAI: Objection.  Form.
21    Q   (By Mr. Aguila)  You can answer.
22    A   It is difficult to answer.  You tend to ask
23 two questions.  I remember we contacted Ebay.  I don't
24 remember asking them to cancel anything.  I remember us
25 mentioning that you were infringing on our -- or

**Page 15**

1  infringing.
2     Q   Which product was infringing your patent?
3     A   I don't remember exactly.  I just remember
4  2006, I don't remember exactly.  I am not sure if it
5  was infringing, or could have been something else.
6     Q   And do you remember anything else in your
7  conversation with Ebay?
8     MR. RAZAI: Objection, form.  Give me a second
9  to get my objections in.
10    THE WITNESS: I didn't have the conversation
11 with Ebay personally, so I don't remember.
12    Q   (By Mr. Aguila)  So who did have the
13 conversation with Ebay?
14    A   I don't remember in 2006.
15    Q   Now, Mr. Cohen, I thought you had a surgery in
16 July or June; is that right?
17    MR. RAZAI: Objection.  Form.
18    THE WITNESS: I just recently had surgery.  I
19 am trying to remember what you mean in July or June.
20 It was originally scheduled for July or June, and then
21 it was rescheduled.  Frankly I kept moving it around
22 because of the dates of depositions and other things.
23 I just had the surgery last Friday.
24    Q   (By Mr. Aguila)  Okay.  But you did not have
25 surgery in June or July?

**Page 16**

1     MR. RAZAI: Objection.  Form.
2     THE WITNESS: I don't remember what that was.
3  It was something medical.  I can't remember what it
4  was.
5     Q   (By Mr. Aguila)  Well, answer the question.
6  Did you have surgery in June or July?
7     MR. RAZAI: Objection.  Form.
8     THE WITNESS: I don't remember.  I am trying
9  to remember.  I can't remember.
10    Q   (By Mr. Aguila)  Okay.  So for the record, you
11 cannot remember if you had surgery in June or July?
12    MR. RAZAI: You are cutting out again,
13 Mr. Aguila.
14    THE WITNESS: Can you repeat that?
15    Q   (By Mr. Aguila)  Yes.  So just for the record,
16 you do not remember having surgery in July or
17 June 2015?
18    A   No.  I don't remember that.
19    Q   Okay.
20    A   I had a medical procedure, but I don't
21 remember being a surgery.  I can't remember what it
22 was.  I don't know what it was.  Recently I had a
23 surgery, last Friday.
24    Q   Okay.  So I guess -- let me ask, well,
25 questions regarding the patents.

**Page 17**

1     Do you know how Aguila's devices are
2  infringing the patent 6641591?
3     MR. RAZAI: Objection.  Form.
4     THE WITNESS: I don't have the patent in front
5  of me.  I did review it.  I do remember reading two of
6  the claims, and that you are infringing the elements
7  within those claims.  I can't recite them by heart
8  though.
9     Q   (By Mr. Aguila)  Now, patent 591 mentions that
10 wherein the skin interface comprises an abrading
11 structure, with substantially sharp edges perforating
12 tissue.  Would you say that Aguila's device meets that
13 claim, that element?
14    MR. RAZAI: Objection.  Form.
15    THE WITNESS: Is that claim one?
16    Q   (By Mr. Aguila)  Right.
17    MR. RAZAI: You can answer with respect to
18 your personal knowledge, Mr. Cohen.
19    THE WITNESS: I am not a patent expert.  I
20 want to make that clear.  I rely on my attorneys, and
21 my attorneys would be better suited to answer that
22 question.
23    Q   (By Mr. Aguila)  Go ahead and answer as best
24 you can.
25    A   Could you repeat the claim again?

EDGE SYSTEMS, LLC  v.
RAFAEL NEWTON AGUILA

WILLIAM COHEN
November 13, 2015

**Page 18**

1    Q    Could the reporter reread my question?
2         (Whereupon, the court reporter read back the
3    previous question.)
4         MR. RAZAI: Objection. Form. For the record,
5    there is no patents in evidence, and Mr. Aguila is
6    reading something that we are not sure what he is
7    reading from.
8    Q    (By Mr. Aguila)  You can answer.
9    **A    It is difficult to answer because I don't**
10   **remember that being the claim verbatim, word by word,**
11   **and patents are very specific by words.**
12   Q    Now, you are aware of the --
13        COURT REPORTER: I am sorry. Could you say
14   that again, sir?
15        MR. RAZAI: Mr. Aguila, it is going back to
16   cutting in and out. Could you call in through the
17   telephone number?  We are not having an easy time
18   hearing you, and the reporter is not having an easy
19   time writing down what you are saying.
20        COURT REPORTER: That would really help.
21   Honestly, I am having to guess at some of your words,
22   and I am not comfortable right now.
23        MR. AGUILA: Okay.
24        (Off the record.)
25        MR. RAZAI: For the record, both Ms. Wang and

**Page 19**

1    Mr. Kiang have left the room. They are no longer
2    sitting in on the deposition. If they reenter, we will
3    announce them on the record again.
4         MR. AGUILA: Okay. So let's back on the
5    record.
6    Q    (By Mr. Aguila)  Now, Mr. Cohen, would you say
7    that -- well, let's start with the hydrafacial MD has
8    the hydrafacial handpiece, correct?
9         MR. RAZAI: Objection. Form.
10        THE WITNESS: I am sorry. Repeat that. I
11   didn't get it.
12   Q    (By Mr. Aguila)  The hydrafacial MD device has
13   a handpiece?
14   **A    Yes. It has several handpieces.**
15   Q    Now, what do you call the handpiece that
16   allows the solution to go through and back in at the
17   same time?
18        MR. RAZAI: Objection. Form.
19        THE WITNESS: We have a history of different
20   handpieces that do that. The current one has the name
21   hydrafacial. I believe it is hydrafacial MD written on
22   the side of it.
23   Q    (By Mr. Aguila)  Is that what you call it the
24   hydrafacial MD handpiece?
25   **A    What I personally call it, I just call it the**

**Page 20**

1    handpiece.
2    Q    Okay. So let's call it the handpiece. Your
3    handpiece, does it have substantially sharp edges for
4    abrading skin?
5    **A    Well, we have several different tips. Some of**
6    **the tips have edges, and some don't.**
7    Q    Does one of your tips have a diamond
8    encrusted, or is it diamond encrusted?
9    **A    We have both a dry diamond tips, and there is**
10   **four different tips and that is for those. We have a**
11   **wet diamond tips as well that fit the handpiece. There**
12   **is fluid going through those. There are several of**
13   **those different tips as well.**
14   Q    Just talking about those tips with the fluid,
15   do you have a diamond encrusted tip that would go with
16   the fluid handpiece?
17   **A    Yes.**
18   Q    And what color is it?
19   **A    It is -- the tip is stainless steel with**
20   **diamond encrusted on top.**
21   Q    And this is an option for customers?
22        MR. RAZAI: Objection. Form.
23        THE WITNESS: Yes.
24   Q    (By Mr. Aguila)  So your customers can
25   purchase a diamond encrusted tip for the handpiece?

**Page 21**

1    **A    Yes.**
2    Q    And how long has this tip been sold?
3    **A    I don't know exactly. For quite some time.**
4    Q    And well, how many customers have received
5    this tip?
6         MR. RAZAI: Objection. You are not entitled
7    to that information.
8         MR. AGUILA: Well, is it financial?
9         MR. RAZAI: Yes. The number of units old is
10   financial.
11        MR. AGUILA: Not the number of units. Just
12   the tips.
13        MR. RAZAI: That is number of units. That is
14   information you are not entitled to.
15   Q    (By Mr. Aguila)  Well, let me ask this. Does
16   every hydrafacial unit come with the diamond tip?
17   **A    No.**
18   Q    So the person would have to order it extra?
19   **A    Correct.**
20   Q    And did you send me a order form, or some kind
21   of form that, catalog, that has this diamond tip as an
22   option?
23        MR. RAZAI: Objection, form. Mr. Aguila, you
24   haven't signed a confidentiality form yet. You haven't
25   even agreed informally to it. We will send you those

EDGE SYSTEMS, LLC v.
RAFAEL NEWTON AGUILA

WILLIAM COHEN
November 13, 2015

**Page 22**

1    documents upon your assent to that confidentiality form
2    that we are trying to negotiate.
3       Q   (By Mr. Aguila)  Now, Mr. Cohen, does the
4    hydrafacial MD fluid handpiece, does it have an
5    abrasive fragment composition?
6         MR. RAZAI: Objection.  Form.
7         THE WITNESS: I am not the best with
8    descriptions, so fragment, I am not sure what that
9    would mean.  We have several tips.  Perhaps the diamond
10   one could be called a fragment tip, I guess.
11      Q   (By Mr. Aguila)  So the diamond tip could be
12   called an abrasive fragment composition tip?
13        MR. RAZAI: Objection.  Form.
14   Mischaracterizes the testimony.
15      Q   (By Mr. Aguila)  You can answer.
16      A   I don't know.  I really don't know what
17   composition would mean.  I don't know.
18      Q   Okay.  Now, does a hydrafacial MD handpiece,
19   does it have at least one sharp edge configured to
20   abrade the skin?
21        MR. RAZAI: Objection.  Form.
22        THE WITNESS: There are several handpieces,
23   several tips.  And many of the tips do have more than
24   one edge.
25      Q   (By Mr. Aguila)  Would you call the edges

**Page 23**

1    sharp edges?
2         MR. RAZAI: Objection.  Form.
3         THE WITNESS: I think so, yes.  I would call
4    that, I guess.  Again, it is just a definition.
5       Q   (By Mr. Aguila)  Well, what does the sharp
6    edge mean to you?
7       A   I wouldn't call them dull.  I would call them
8    sharp.
9       Q   Now, on your web site, there are no images of
10   the hydrafacial MD handpiece with the diamond tip; is
11   that correct?
12        MR. RAZAI: Objection.  Form.
13        THE WITNESS: On the current web site, that is
14   correct.
15      Q   (By Mr. Aguila)  Was it visible in previous
16   versions of your web site?
17      A   I don't remember.
18      Q   Would you say that the principal tip shown on
19   the web site and in your marketing is the blue tip?
20        MR. RAZAI: Objection.  Form.
21        THE WITNESS: No.  I wouldn't say that.
22      Q   (By Mr. Aguila)  So which tip is the most
23   prevalent that is used in your web site and your
24   marketing?
25        MR. RAZAI: Objection.  Form.

**Page 24**

1         THE WITNESS: We ask our customers to use
2    several tips, and there are several procedures.  We
3    like them to use multiple uses of different tips.
4       Q   (By Mr. Aguila)  But on your web site, would
5    you say that the blue plastic tip, the blue tip, is the
6    principal tip that you show on your web site?
7         MR. RAZAI: Objection.  Form.  Asked and
8    answered.
9       Q   (By Mr. Aguila)  You can answer.
10      A   It is shown.  I don't know if I would
11   characterize it as the principal.
12      Q   Now, would you say that the hydrafacial MD
13   fluid handpiece has sharp elements?
14        MR. RAZAI: Objection.  Form.
15        THE WITNESS: Again, I am not a patent
16   attorney or really that good with language at all.  I
17   don't know if elements -- I am not sure if that is the
18   proper use.  I would say that the tips are sharp.
19      Q   (By Mr. Aguila)  Are they sharp like a razor
20   blade?
21        MR. RAZAI: Objection.  Form.
22        THE WITNESS: No.  I don't think so.
23      Q   (By Mr. Aguila)  To what other device can you
24   compare the sharpness to of the hydrafacial MD?
25        MR. RAZAI: Objection.  Form.

**Page 25**

1         THE WITNESS: I don't know.  I don't really
2    know.  I never thought of it that way.
3       Q   (By Mr. Aguila)  Can the hydrafacial MD
4    handpiece, fluid handpiece, can it cut the skin?
5         MR. RAZAI: Objection.  Form.
6         THE WITNESS: It is not intended to.  Probably
7    if you misused it, or if you define a cut as going to
8    abrade a lot of skin.  Just depends on your definition
9    of cut.
10      Q   (By Mr. Aguila)  Well, can it cut it so you
11   can see blood?
12        MR. RAZAI: Objection.  Form.
13        THE WITNESS: Probably possible.
14      Q   (By Mr. Aguila)  But it is not intended to do
15   so?
16      A   Correct.
17      Q   And on your web site, it mentions technology
18   of vortex extraction.  How does the vortex in the
19   hydrafacial MD handpiece, fluid handpiece, how does
20   that exfoliate?
21        MR. RAZAI: Objection.  Form.
22        THE WITNESS: My theory and my thought is that
23   that tip concentrates the vacuum, and the action of the
24   fluid in the tip pulls the sebum and debris out of the
25   skin.

EDGE SYSTEMS, LLC  v.
RAFAEL NEWTON AGUILA

WILLIAM COHEN
November 13, 2015

**Page 26**

1  Q   (By Mr. Aguila)  And how does that help with
2  the exfoliation?
3  A   Well, that is the extraction portion.  Not
4  exfoliation.
5  Q   How does it exfoliate then?
6  A   Exfoliation is done -- the tip has -- I don't
7  know what you call it.  But there is kind of
8  semicircular rings.  Each ring abrades the skin as it
9  is drawn across, and the fluid pulls the skin up
10  against the abraded edge.
11  Q   These rings are inside the tip?
12  A   They are part of the tip.
13  Q   How about the outside ring of the tip, does
14  that exfoliate?
15  A   I think so, yes.
16  Q   Do you have studies that show that this
17  exfoliates?
18      MR. RAZAI: Objection.  Form.
19      THE WITNESS: I don't know.
20  Q   (By Mr. Aguila)  But you are the president?
21      MR. RAZAI: Objection.  Argumentative.
22  Q   (By Mr. Aguila)  Shouldn't you know if there
23  was any study made on whether your hydrafacial MD
24  handpiece, fluid handpiece, exfoliates or not?
25      MR. RAZAI: Objection.  Form.  Argumentative.

**Page 27**

1  Q   (By Mr. Aguila)  You can answer.
2  A   We had studies done, but the point of the
3  study was not necessarily abrasion, exfoliation.  We
4  are all very confident, and the market is very
5  confident, that the product exfoliates skin.  We never
6  --
7  Q   Pardon me.
8  A   That is it.
9  Q   What was the objection of those studies?
10      MR. RAZAI: Objection.  Form.
11      THE WITNESS: The study was just to see what
12  change happened in the skin.
13  Q   (By Mr. Aguila)  Do you know what the name of
14  the study was?
15  A   It was -- we call it the Friedman study.  It
16  was done by Dr. Bruce Friedman.
17  Q   And it was published?
18  A   Correct.
19  Q   Do you know what year?
20  A   I don't.  I can't remember.
21  Q   Now, how is the hydrafacial MD's tradedress
22  unique?
23  A   Well, the look of the machine is known in the
24  industry.  It has been around for some time.  We show
25  it in -- not all, but a lot of our ads.  We show it at

**Page 28**

1  all the booths.  Shows all the exhibits, seminars,
2  webinars.  Not all, but many of them.  Lot of customers
3  have seen it and know it in order to buy second ones or
4  third ones.  So many people recognize that look as our
5  device.
6  Q   And can you describe the look?
7  A   Yes.  Very basically, it has a computer
8  monitor on top that is a touch screen.  It has a
9  section in the midsection that has a manifold that
10  holds the fluid bottles.  It has a blue door, nice blue
11  door that has the word hydrafacial MD written on it.
12      Then the sheet metal casing is kind of an
13  off-white, medical white.  It has four castors at the
14  bottom and a skirt that covers the castors.  The
15  castors are kind of a medical looking grade, medical
16  grade castors.
17      Then on the top portion, right below the
18  computer, it has a rail around it on the top of the
19  manifold that holds all the different handpieces.  So
20  there is pretty easy access to get to the handpieces.
21  Then the screen itself has the control and the touch
22  screen controls.
23  Q   Right.  Of all those features, those are
24  functional, right?
25      MR. RAZAI: Objection.  Form.  Calls for legal

**Page 29**

1  conclusion.
2      THE WITNESS: Again, that is verbiage.  I
3  don't know if I call it functional.  There is many ways
4  to design it.
5  Q   (By Mr. Aguila)  But the touch screen, that is
6  a functional feature, right?
7  A   In some aspects it is functional.  In some it
8  is editorial teaching.  It is aesthetic for look.
9  Q   So do the actual screen shots -- or the touch
10  screen you have several screen shots, right?
11      MR. RAZAI: Objection.  Form.
12      THE WITNESS: I believe you call them screen
13  shots.  I don't know.  It has different screens.
14  Q   (By Mr. Aguila)  Those screens are not
15  necessarily functional?
16  A   Some are.  Some are not.
17  Q   And are those screens part of the tradedress
18  of your machine?
19  A   Yes.  I would think so, yes.
20  Q   Well, now, did you apply for any patents in
21  the European union for the hydrafacial MD?
22  A   Yes.
23  Q   And what was the result of that application?
24  A   I don't remember offhand.
25  Q   Was it accepted, or was it denied?

EDGE SYSTEMS, LLC  v.
RAFAEL NEWTON AGUILA

WILLIAM COHEN
November 13, 2015

---

**Page 30**

1  A  Some were accepted, and I can't remember if
2  any were denied.
3  Q  So do you remember how many patents you had in
4  the European union?
5  A  I don't.
6  Q  Do you remember if any limitations were placed
7  on your patents by the examiner?
8  MR. RAZAI: Objection. Form.
9  THE WITNESS: No, I don't.
10  Q  (By Mr. Aguila) But you participated in the
11  application, correct?
12  MR. RAZAI: Objection. Form.
13  THE WITNESS: My attorneys took the lead on
14  it. I paid the attorneys. I guess that is
15  participation.
16  Q  (By Mr. Aguila) Which attorneys were those?
17  A  I think that is attorney-client privilege.
18  MR. RAZAI: You can tell him who it is.
19  THE WITNESS: Knobbe, Martens, Olson & Bear.
20  Q  (By Mr. Aguila) Mr. Cohen, do you believe
21  that any of your responses to these questions were
22  purposely evasive?
23  MR. RAZAI: Objection. Argumentative.
24  THE WITNESS: No. I don't think so at all.
25  Q  (By Mr. Aguila) Okay. Let's go to the

---

**Page 31**

1  30(b)6, the Edge Systems deposition. Now, starting
2  with the number two topic, describe all communications
3  with potential witness Lee Urby. When was the first
4  time that Edge Systems spoke with Ms. Urby?
5  A  I don't know the exact first time. I don't
6  know if it was -- I know she spoke to my employees at a
7  trade show. I don't know if she spoke to them prior to
8  that trade show.
9  Q  Is there any relationship between Ms. Urby and
10  Edge Systems before her communication with you?
11  A  There is a lot of parts to that question.
12  Number one, she never communicated to me.
13  Q  Well, Edge Systems.
14  A  I don't know whether or not she -- whether our
15  sales reps contacted her or not. They might have. I
16  don't know. They did meet at a trade show. I believe
17  they might have. I don't know. I would be guessing.
18  I am completely guessing.
19  Q  Now, Edge Systems, when was the first time
20  that you spoke with Ms. Urby?
21  A  I don't know if it is the first time, but the
22  time that I know of is at a trade show in Atlanta. We
23  were showing our products and she came in -- actually
24  prior to that, she might have called for -- she might
25  have called our office prior to that for instruction.

---

**Page 32**

1  That might have been what it was. It is difficult to
2  remember exactly the flow of things.
3  She didn't have a serial number that matched
4  our system. I think she was instructed by you, or your
5  group there, to ask us for training and we didn't know
6  who she was. I think at that time my office was very
7  confused.
8  Then at the show in Atlanta she came into the
9  show, and saw and met with Gary Conway and Gary was
10  confused as well. He went through it after a while and
11  realized she did not buy our system. She had bought a
12  knockoff or odd looking nonfunctional system, and she
13  was very upset.
14  She was a young gal. She borrowed $10,000
15  from her grandmother. This was her dream, and she was
16  trying to launch her business. She was extremely
17  upset. Gary tried to tell her, we will do what we can.
18  We are not sure what happened, to try to help you. We
19  didn't know. I believe that was the first time Gary
20  had spoken to her.
21  Q  Tell me what did Edge Systems do to help
22  Ms. Urby?
23  A  Well, we sued you. That is the main thing.
24  We were hoping to get people's money back for them.
25  Q  So did you provide Ms. Urby with a device?

---

**Page 33**

1  A  We did sell her a device, and I am not exactly
2  sure the date. It was not the tower system. It was
3  the tabletop. She told us she was never able to get --
4  or told Gary she was never able to get the $10,000 back
5  from you. You wouldn't take it back. You wouldn't
6  even answer her phone calls. She had no way of running
7  that system. So she didn't have that money. She
8  couldn't afford another tower system.
9  Q  Did you offer her a discount on the tabletop
10  system?
11  A  No. Not a discount, no.
12  Q  Did you reduce the price though?
13  A  Not in compared to anything we have done for
14  anybody else, no.
15  Q  How much did you reduce the price?
16  MR. RAZAI: Objection. Form. He stated he
17  didn't reduce the price.
18  Q  (By Mr. Aguila) I mean exactly what was the
19  reduction in price?
20  MR. RAZAI: Objection. He said he didn't
21  reduce the price.
22  Q  (By Mr. Aguila) I need to know the amount.
23  A  We did not reduce the price, but we sold the
24  machine to her for around -- I don't know the exact
25  number. Around $13,400 for the tabletop unit. It was

---

**Page 34**

1 not the large tower unit. It was the tabletop, what we
2 call the allegro hydrafacial.
3    Q   Is $13,400 what an Allegro normally cost?
4    A   It is in the range of what it costs.
5    Q   It normally might cost more than $13,400?
6    A   And it may cost less.
7    Q   Is there any way of you knowing?
8    A   Yes.
9    Q   You don't know the price for Allegro?
10    MR. RAZAI: Objection. Form.
11 Mischaracterizes the testimony.
12    Q   (By Mr. Aguila)  You can answer.
13    A   I just told you it is in the range of what we
14 sell them for. So yes, I do know the price.
15    Q   But you have an official set price, right? Or
16 is it always a range?
17    A   We have an official list price, yes. We do.
18    Q   What is the official list price for the
19 Allegro?
20    A   Do I need to answer that? I would rather have
21 him sign an NDA before I get into that.
22    MR. RAZAI: Mr. Aguila, do you agree to that
23 confidentiality order that I sent you via email?
24    MR. AGUILA: No. I don't agree to your
25 changes.

**Page 35**

1    THE WITNESS: I would rather not answer then.
2    MR. RAZAI: I sent you that with plenty of
3 time to let me know what the changes were. I didn't
4 make many changes.
5    MR. AGUILA: Are you going to answer or not?
6    MR. RAZAI: He just told you he won't give you
7 confidential information unless you agree to a
8 protective order. If you will agree to it. Actually,
9 it is a published price. You can tell him what the
10 list price is.
11    THE WITNESS: I am not exactly sure. It is
12 $19,695 or 690. I am not exactly sure of the end. It
13 is in the mid $19,000 thousand. Quite frankly, we
14 don't sell many of the tabletop units.
15    Q   (By Mr. Aguila)  How many do you sell?
16    A   That is privileged information.
17    MR. RAZAI: It is information you are not
18 entitled to under the court's order.
19    Q   (By Mr. Aguila)  But you just said you don't
20 sell as many of them. I want to know what many are.
21    MR. RAZAI: Mr. Aguila, I understand what you
22 are saying, but please move on. You are not entitled
23 to that information.
24    Q   (By Mr. Aguila)  Mr. Cohen, I understand that
25 you reduced the price for the Allegro by around $6,000

**Page 36**

1 for Ms. Urby. Is that true?
2    A   No.
3    Q   You just said that the list price was $19,690.
4 You sold it to her for $13,400?
5    A   I think a better question is, have you ever --
6 do you sell many Allegros at list price. The answer
7 would be no. We do not. We did not reduce it or give
8 her a discount. She was in the range of what we sell
9 them for. We really don't sell them at the list price
10 that often, that I know of.
11    Q   Now, for Mr. Dubois, when was the first time
12 -- for Mr. Elliot Dubois, did you provide him with any
13 discounts?
14    A   No.
15    Q   Did you sell Mr. Elliot Dubois, or his
16 company, any hydrafacial MD devices?
17    A   Yes.
18    Q   How many did you sell?
19    A   One.
20    Q   And what was the price?
21    A   $10,000.
22    Q   And for which -- the tower or the Allegro
23 again?
24    A   It was a used two and a half, or two-year old
25 -- two and a half used tower that was refurbished.

**Page 37**

1    Q   And what is the normal price for your tower?
2    A   Used one or new one?
3    Q   The new one.
4    A   Again, at list, which we don't sell many at
5 list, about $29,000 and change.
6    Q   And how about for the used devices?
7    A   Depending on the age, they range from -- I
8 have seen them sell as low as $8 or $9,000 all the way
9 up to maybe $18, I think. Just depends how old they
10 are.
11    Q   Is it common for you to sell used devices?
12    A   I don't know the definition of common. We do
13 sell them, yes.
14    Q   Well, can you give me a number?
15    MR. RAZAI: Objection. Are you asking for how
16 many he sells?
17    Q   (By Mr. Aguila)  Right. How many used devices
18 do you sell?
19    MR. RAZAI: You are not entitled to that
20 information, Mr. Aguila.
21    Q   (By Mr. Aguila)  Okay.
22    A   Every month we sell some. Leave it at that.
23    Q   And do you have an agreement with Mr. Dubois
24 to sell him more in the future?
25    A   No.

EDGE SYSTEMS, LLC  v.
RAFAEL NEWTON AGUILA

WILLIAM COHEN
November 13, 2015

**Page 38**

1    Q   Topic number six. The capability of the
2    computer system and software that plaintiff Edge
3    Systems uses. Mr. Cohen, do you have knowledge on
4    these capabilities?
5    A   **Not really. I am not a computer expert or**
6    **anywhere near an expert.**
7    Q   Okay. Now, can you tell me where Edge Systems
8    searched for the identification and production of
9    documents that are responsive to the discovery
10   requests?
11   A   **We are in the process of searching now, and we**
12   **looked -- we have hard files. We have information**
13   **stored on our server at our office. We have**
14   **information stored in the backup on the cloud from**
15   **years past.**
16   Q   Do you have information located at your
17   attorney's office?
18   A   **Yes. Some is duplicate. Some is what they**
19   **have created as well.**
20   Q   Was this also searched for documents?
21   A   **I personally have never gone to my attorneys**
22   **to search for anything. You would have to ask them.**
23   Q   Can you describe the document retention
24   policies for Edge Systems' emails related to this
25   lawsuit?

**Page 39**

1        MR. RAZAI: Objection. Form.
2        THE WITNESS: We don't have a retention
3    policy. We don't have a written policy for email
4    retention.
5    Q   (By Mr. Aguila)  So on topic number nine
6    regarding the destruction, alteration, or loss of any
7    of the Edge Systems responsive emails, do you know if
8    you had any -- if any responsive emails have been
9    deleted?
10   A   **I have instructed all the personnel that have**
11   **any access or privilege to any of these emails not to**
12   **destroy them. Verbally instructed.**
13   Q   And when did you do this verbal instruction?
14   A   **Some time ago. I am not sure of the date.**
15   Q   How do you know that all the people who would
16   have the responsive emails received your instruction?
17       MR. RAZAI: Objection. Form.
18       THE WITNESS: I don't have any doubt that they
19   wouldn't do what I asked them to do.
20   Q   (By Mr. Aguila)  But how do you know who
21   exactly has these emails?
22   A   **There is not that many people involved in that**
23   **at our company.**
24   Q   Can you name them?
25   A   **Myself, Roger Ignon, Carol Ferrin.**

**Page 40**

1    Q   Can you spell that name, Ferrin?
2    A   F-E-R-R-I-N.
3    A   **Eva Chang, C-H-A-N-G. Rosemary Holcomd,**
4    **H-O-L-M -- H-O-L-C-O-M-D, I think. Greg Stickley.**
5    **G-R-E-G  S-T-I-C-K-L-E-Y.**
6    Q   Anybody else?
7    A   **Not that I know of, or can remember at this**
8    **time.**
9    Q   But you do remember giving all these people
10   verbal instructions not to destroy all the emails?
11   A   **Yes.**
12   Q   Did you give them the verbal instruction at
13   the same time or different times?
14   A   **Different times.**
15   Q   Spread out by how long would you say?
16   A   **A day or two.**
17   Q   Can you tell me about the computer disk drives
18   and data bases that were searched for, that are
19   responsive documents, this is number 11.
20       MR. RAZAI: Objection. Form.
21       THE WITNESS: You need to be more specific. I
22   am not sure what you mean, can I tell you about them.
23   Q   (By Mr. Aguila)  Where are they located?
24   A   **The main servers are located at our facility**
25   **at our factory at 227 Redondo Avenue, Signal Hill.**

**Page 41**

1    Q   Where is --
2    A   **The backup is on a cloud, and that is**
3    **administered by an outside service. By an outside**
4    **computer service company.**
5    Q   It is a secure cloud. What is the name of the
6    third party?
7    A   **TCS. The letter is TCS, I believe is the name**
8    **of it. I spoke to him two days ago just to verify all**
9    **that.**
10   Q   What was the name of the person you spoke to?
11   A   **Keith Hernandez.**
12   Q   The servers and backup, that is where you have
13   all your emails and data bases and files?
14   A   **I am not the guy to know where the break is**
15   **between what is at the servers at the business, versus**
16   **what is in backup. I don't really understand how all**
17   **that works.**
18   Q   Go ahead.
19   A   **I know it is secure, and that we have it.**
20   Q   Number 12, what was done to prevent deletion
21   or destruction of the responsive emails related to this
22   lawsuit?
23       MR. RAZAI: Objection. Form. Asked and
24   answered.
25       THE WITNESS: I believe I answered that. You

EDGE SYSTEMS, LLC v.
RAFAEL NEWTON AGUILA

WILLIAM COHEN
November 13, 2015

**Page 42**

1  asked for the names of the people.
2  Q   (By Mr. Aguila) The verbal instructions?
3  A   Correct.
4  Q   Do you remember exactly what you had told
5  them, what words you used?
6  MR. RAZAI: Objection. Form.
7  THE WITNESS: No. I don't remember exactly
8  what they were. An additional person was Michael Watz.
9  He was also told.
10  Q   (By Mr. Aguila) Topic number 13. Who is
11  plaintiff Edge Systems E discovery vendor, and what was
12  the vendor instructed to do, and what did it do?
13  A   Can you define E discovery vendor? What is
14  that?
15  MR. RAZAI: On the record, Mr. Aguila, I can
16  testify that Edge Systems doesn't have an E discovery
17  vendor.
18  Q   (By Mr. Aguila) Okay. Go ahead.
19  A   I have never heard that until your letter. I
20  never heard that. We don't have that.
21  MR. RAZAI: That is in connection with -- Edge
22  Systems LLC does not have an E discovery vendor for
23  this case.
24  Q   (By Mr. Aguila) All right. Topic number
25  17 --

**Page 43**

1  MR. RAZAI: Is this a nice time for a break?
2  I do need a break.
3  MR. AGUILA: Okay.
4  (Off the record.)
5  Q   (By Mr. Aguila) On the record again.
6  Mr. Cohen, regarding topic 17, the licensing payment
7  with other companies. Can you tell me whether Edge
8  Systems licenses edge machine hydrafacial MD for
9  handpiece --
10  MR. RAZAI: You are cutting out again
11  Mr. Aguila. It is getting hard to hear you again. Is
12  there something different you are doing this time?
13  MR. AGUILA: No.
14  (Off the record.)
15  MR. AGUILA: I guess -- well, can everyone
16  hear me?
17  MR. RAZAI: We hear you. It is still loading
18  your image. Let's proceed. Let's get this wrapped up,
19  if we can.
20  THE WITNESS: Mr. Aguila, I wanted to amend my
21  answer to your question about the price of Dubois'
22  machine. I was thinking it through. It was not
23  $10,000. It was $8,000. I believe it is higher than
24  what you charged him for your machine.
25  Q   (By Mr. Aguila) Okay. What led you to change

**Page 44**

1  or remember the exact price?
2  A   Just recollection.
3  Q   So regarding topic 17, the licensing
4  agreements. Does Edge Systems have any licensing
5  agreements?
6  MR. RAZAI: Objection. Form. You asked that
7  question in a different way last time. Can you please
8  repeat the question?
9  Q   (By Mr. Aguila) Well, could the reporter, did
10  you take it down before?
11  COURT REPORTER: No, I couldn't hear that
12  question before. I am sorry.
13  Q   (By Mr. Aguila) Topic 17 says, "Any licensing
14  agreements with other companies entered into by the
15  Plaintiffs, Edge Systems, pertaining to any of the
16  plaintiffs Edge machine, hydrafacial handpiece, or
17  hydrafacial MD." So regarding that topic, does Edge
18  Systems have any licensing agreements with other
19  companies?
20  A   So if I understand the question correctly, are
21  you -- maybe you can clarify. Are you asking do we
22  license the name for use on somebody else's machine to
23  be made on somebody else's machine? Is that what you
24  are asking?
25  Q   Well, yes. Any kind of licensing agreement.

**Page 45**

1  Yes. That as well.
2  A   We do not do that. We do not license the name
3  to be used on anybody else's machine. The only license
4  we have is we allow our purchaser to use our trademark
5  within their business.
6  Q   So your customers are allowed to use the term
7  hydrafacial and other trademarks, that is what you are
8  saying?
9  A   Yes. I don't know if you can define it as
10  other trademarks. But when you ask a particular about
11  hydrafacial, yes. They are allowed to use it, and
12  there is terms and conditions around that.
13  Q   And have you ever spoken with Diamond Tone or
14  Alter Instruments regarding a licensing agreement?
15  A   No.
16  Q   Have you ever spoken to Sophiel or E-Med
17  regarding a licensing agreement?
18  A   No.
19  Q   So you have no licensing agreements with other
20  manufacturers?
21  A   Of hydrafacial, no.
22  Q   How about microdermabrasion manufacturers?
23  MR. RAZAI: Objection. Form.
24  THE WITNESS: I don't think we do any longer.
25  We did but no longer.

EDGE SYSTEMS, LLC  v.
RAFAEL NEWTON AGUILA

WILLIAM COHEN
November 13, 2015

**Page 46**

1  Q  (By Mr. Aguila) Can you describe like when
2  you did?
3  A  You mean the time frame?  Is that what you are
4  asking?
5  Q  Time frame and what exactly the company
6  involved and -- right.
7  A  I don't know if there were licenses.  I take
8  that back.  We manufactured private label machinery for
9  some other companies.  We didn't license any of our
10  trademarks to them, that I remember.
11  Q  What machines did you manufacture?
12  A  Some of our crystal microdermabrasion and non
13  crystal, the diamond type.  But never the hydrafacial.
14  No, we did with the hydrafacial.  We made one for a
15  company, but they did not use the hydrafacial name.
16  Q  What name did they use?
17  A  I don't remember.
18  Q  Do you remember the name of the company?
19  A  It was Cinneron.
20  Q  And do you remember when this was?
21  A  I don't remember the exact dates.
22  Q  Was it for the tower hydrafacial?
23  A  No.  It was a tabletop unit that we made for
24  them specifically.  It wasn't our machine relabeled.
25  It was a different machine -- different looking

**Page 47**

1  machine.
2  Q  It was not the Allegro or Wave or Nectar?
3  A  No.
4  Q  So regarding topic 18, the existence and
5  location of any documents.  We spoke about that.  Now,
6  topic number 20 regarding the complaints.  The FDA
7  published an inspection report of Edge Systems, that
8  mentioned that there were more than 100 complaints.  Do
9  you remember what these complaints were?
10  A  I don't remember 100 complaints, no.  The FDA,
11  no.  I don't remember that.
12  Q  Do you remember the last FDA inspection report
13  for Edge Systems?
14  A  I remember the inspection.  We did not have
15  100 complaints.  We had -- we didn't even have anywhere
16  near that as far as write ups.  We had some write ups
17  as far as procedure and how things were done, but they
18  were all non reportable or correctable write ups.
19  Q  Do you remember reading the FDA inspection
20  report?
21  A  No.  I did not read it.
22  Q  And what type of complaints would you say that
23  were less than 100, can you mention these complaints?
24  MR. RAZAI: Objection. Form.
25  THE WITNESS: In 2015, we had roughly 15

**Page 48**

1  notifications from customers that were predominantly
2  allergic reactions to the fluids.  Or to some of the
3  take home product.  In 2014, we had -- I think it was
4  less than 30.  It was 28, none of these are complaints.
5  These are all adverse reactions.  Out of the 28, we had
6  an instance where we had a small burr that was being
7  formed on one of the tips.  Some of the patients were
8  getting an uneven treatment.  I think there were seven
9  call call-ins or reports on that.  Then we corrected
10  it.  We got rid of all the tips and corrected the issue
11  on the tool.
12  Then we also had, I think, one motor failure.
13  That might have been a shipping problem.  We had one
14  labeling problem.  Then we had a problem with a device
15  that is not related to hydrafacial.  It is our very
16  original device.  So that is three there.  The other 18
17  were all, if I remember correctly, were all allergic
18  reactions to solutions.
19  So the FDA, the way they look at all that,
20  those are non injury bearing.  They want us to report
21  it and keep track of it.  When we keep track of it, we
22  are doing over a million procedures at that time a
23  year.  And it is just such a small percentage, even in
24  the cosmetic industry, that is really a minimal amount.
25  Q  You mentioned the FDA wants you to keep track.

**Page 49**

1  Can you tell me how you keep track of your complaints
2  or notifications or call-ins?
3  A  They want us to keep track.  They don't keep
4  track.
5  Q  How do you do that?
6  A  We follow the GMP, the good manufacturing
7  practices.  The FDA.  We keep a complaint log.  We have
8  a whole department that keeps track of regulatory
9  complaints, the FDA.  Compliance to all the GMP's.
10  Q  This complaint log has a list of all the
11  complaints or notifications or call-ins?
12  A  Correct.
13  Q  Have you sent me this complaint log?
14  A  No.  I pulled it up, I think it was two days
15  ago, to take a look at it to prepare for this.
16  MR. RAZAI: We have that.  It is sitting in
17  the production that will go out, once we have a
18  protective order agreed to.  Or even an assent to a
19  proposed protective order, which we are still waiting
20  for.
21  Q  (By Mr. Aguila) Have you had any other FDA
22  inspections since the last one?
23  A  Yes.  Since 1997, I don't know the exact
24  number, but we have had several.  Sure.  Our write ups
25  have been pretty minimal.  I am not exactly sure on the

EDGE SYSTEMS, LLC  v.
RAFAEL NEWTON AGUILA

WILLIAM COHEN
November 13, 2015

Page 50

1 language there. But I do know they have been very
2 limited. In fact, prior to this, the FDA had asked us
3 if we could be an instructional or testing facility for
4 them to show other companies how to handle the FDA
5 compliance.
6   Q   Now, let me go back to the 30(b)1, the
7 personal.
8       MR. RAZAI: Back to personal now.
9   Q   (By Mr. Aguila) In your preliminary
10 injunction motion, document, you mentioned that the
11 defendants' actions also strip Edge of its market
12 exclusivity.
13       COURT REPORTER: I am sorry, Mr. Aguila. I
14 lost you.
15   Q   (By Mr. Aguila) You mentioned in this motion
16 the defendants' actions also strip Edge of its market
17 exclusivity, and the price the market will bear for
18 Edge's innovative product. Is this true?
19   A   Yes.
20   Q   Would you say that Edge has been harmed
21 financially by Aguila's actions?
22   A   Yes.
23   Q   And in what way has it been harmed?
24   A   Well, several ways. We show the device on a
25 lot of our ads and a lot of our marketing, trade shows.

Page 51

1 We show it as our device. Suddenly somebody shows up
2 with a similar device at a much lower price, a lot of
3 people are going to look at it.
4       Case in point, Dr. Dubois. You sold him a
5 machine at $7,600, and he came, wanted to get his money
6 back. I don't know if he was able to do that. But at
7 the time he also still needed a machine, and we were
8 only able to sell it to him -- a used one. We couldn't
9 sell him a new one because he didn't have the $7,600
10 anymore. He could afford about $8,000, and I don't
11 think he was that happy spending that much at that time
12 because he was already $7,600 into it.
13       That is a specific case. A more general case
14 is our reps were very concerned as to what was going
15 on. Why there was this person in Florida or company,
16 Luminous, and then it was you. This whole litany of
17 change. Nobody really understood it. It was kind of
18 market confusion amongst our reps and our managers were
19 upset. They didn't understand it.
20       We had a guy in Louisiana, that your office
21 spoke to that was one of our reps, that was pretty
22 upset. He thought he was losing a sale. Then he did
23 lose a sale, and he didn't lose a sale. It was
24 problematic for a lot of people.
25       At the same time, our technology and our

Page 52

1 patents and our stance in the business was just being
2 addressed and eroded. Just overall it was a difficult
3 process for us. I could go on and on, but I don't
4 think I need to.
5   Q   Now, customers who purchased the hydrafacial
6 MD on Ebay, for example, they must pay a $7,500 fee
7 before they are able to buy your serums, your
8 solutions, and products; is this true?
9       MR. RAZAI: Objection. Form.
10       THE WITNESS: No.
11   Q   (By Mr. Aguila) Can someone purchase the
12 hydrafacial MD from a third party like Ebay to use
13 hydrafacial, and purchase directly from you serums and
14 other product without paying an additional fee?
15   A   The $7,500 is for -- we bring that back the
16 machine. We make sure it is running correctly. We
17 refurbish anything not working. We pay for the
18 shipping. We pay to return it. We give them a new
19 handpiece. In many cases, the handpiece is old and not
20 very good.
21       We allow them to license the hydrafacial name.
22 We give them training. We have a person going in and
23 show their staff how to properly use the device. We do
24 marketing, etc. We do several things for them. It is
25 not just a fee to be able to buy solutions.

Page 53

1   Q   But if a third party purchaser of the
2 hydrafacial does not pay the fee, they don't get any of
3 these? The solutions or anything else?
4   A   No. That is not true. We would still sell
5 them product as long as they are not violating our
6 trademark use. They wouldn't be able to call it a
7 hydrafacial procedure. They don't have a license from
8 us.
9   Q   Hydrafacial procedure that is a hydrating
10 facial, or what other word would you call it?
11       MR. RAZAI: We are back to this again?
12 Objection, Mr. Aguila.
13   Q   (By Mr. Aguila) Now, Mr. Cohen, I think I --
14 for the record, what is your primary home address?
15       MR. RAZAI: Objection. You don't have to give
16 that information.
17       THE WITNESS: I am not going to tell you my
18 home address.
19   Q   (By Mr. Aguila) And you agree that all the
20 answers that you have given so far in this deposition
21 are truthful?
22   A   Well, there was one line of questioning that
23 you had on trademarks. I think I was confused on which
24 trademarks came when.
25       So that portion I think, and others I did my

EDGE SYSTEMS, LLC v.
RAFAEL NEWTON AGUILA

WILLIAM COHEN
November 13, 2015

Page 54

1 best. But that portion, I think, some of the
2 trademarks that you jumped on you just recently did.
3 And others you did when you created the Edge Systems
4 web site and jumped on the web site. So I don't have
5 those exactly in calendar order. You were asking me
6 for specifics on certain calendar dates, and those I
7 probably had I don't know if I had them correct or not.
8    Q   Okay. So I guess that is it. That is the end
9 of the deposition then.
10    MR. RAZAI: I have a couple quick questions to
11 follow up on what Mr. Cohen was just saying a second
12 ago.
13        (FURTHER EXAMINATION)
14 BY MR. RAZAI:
15    Q   Mr. Cohen, you just said there were a few
16 different days with respect to trademarks Mr. Aguila
17 had jumped on, correct?
18    A   Correct.
19    Q   So you were aware that Mr. Aguila applied for
20 certain marks on your company's name, correct?
21    A   Correct.
22    Q   You are aware that your trademarks attorney
23 did file trademark oppositions against Mr. Aguila's
24 applications for your company name, correct?
25    A   Correct.

Page 55

1    Q   And you were recently informed Mr. Aguila had
2 also obtained trademark registration for four separate
3 marks to use on serums, correct?
4    A   Correct.
5    Q   Those include the Beta-HD mark, Active-4 mark,
6 Derma Builder mark, and Antiox-6 mark?
7    A   Yes.
8    Q   To reiterate, you recently found out those
9 registrations were obtained, correct?
10    A   Yes.
11    Q   You had no personal knowledge that those
12 trademark applications were pending when they were
13 pending, correct?
14    A   No.
15    Q   No, that is correct?
16    A   That is correct.
17    Q   And you are aware that your attorneys at
18 Knobbe, Martens have filed petitions for cancellation
19 for the four marks; Beta HD, Active-4, Derma Builder,
20 and Antiox-6 that Mr. Aguila applied for, correct?
21    A   Correct.
22    MR. RAZAI: Any other questions, Mr. Aguila?
23    MR. AGUILA: No. That is all.
24    (Deposition session concluded at 11:07 a.m.)
25

Page 56

1                 * * * *
2        I have read the foregoing deposition
3 transcript and by signing hereafter, approve same.
4
5 Dated_____.
6
7
8                    (Signature of Deponent)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 57

1        DEPOSITION OFFICER'S CERTIFICATE
2 STATE OF CALIFORNIA    )
3 COUNTY OF ORANGE       ) ss.
4
5
6        I, Rebecca A. Harp, hereby certify:
7        I am a duly qualified Certified Shorthand
8 Reporter in the State of California, holder of
9 Certificate Number CSR 11895 issued by the Certified Court
10 Reporters' Board of California and which is in full
11 force and effect.  (Fed. R. Civ. P. 28(a)(1)).
12        I am authorized to administer oaths or
13 affirmations pursuant to California Code of Civil
14 Procedure, Section 2093(b) and prior to being examined,
15 the witness was first duly sworn by me.  (Fed. R. Civ.
16 P. 28(a)(a)).
17        I am not a relative or employee or attorney or
18 counsel of any of the parties, nor am I a relative or
19 employee of such attorney or counsel, nor am I
20 financially interested in this action.  (Fed. R. Civ. P.
21 28).
22        I am the deposition officer that
23 stenographically recorded the testimony in the foregoing
24 deposition and the foregoing transcript is a true record
25                    / / /

**EDGE SYSTEMS, LLC v.**
**RAFAEL NEWTON AGUILA**

Page 58

1  of the testimony given by the witness.   (Fed. R. Civ. P.

2  30(f)(1)).

3          Before completion of the deposition, review of

4  the transcript [XX] was [  ] was not requested.   If

5  requested, any changes made by the deponent (and

6  provided to the reporter) during the period allowed, are

7  appended hereto.   (Fed. R. Civ. P. 30(e)).

8

9  Dated: December 2, 2015

10

11

12                         ————————————————————

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$10,000 (4)**
32:14;33:4;36:21;
43:23
**$13,400 (4)**
33:25;34:3,5;36:4
**$18 (1)**
37:9
**$19,000 (1)**
35:13
**$19,690 (1)**
36:3
**$19,695 (1)**
35:12
**$29,000 (1)**
37:5
**$6,000 (1)**
35:25
**$7,500 (2)**
52:6,15
**$7,600 (3)**
51:5,9,12
**$8 (1)**
37:8
**$8,000 (2)**
43:23;51:10
**$9,000 (1)**
37:8

**A**

**able (7)**
33:3,4;51:6,8;52:7,
25;53:6
**abrade (2)**
22:20;25:8
**abraded (1)**
26:10
**abrades (1)**
26:8
**abrading (2)**
17:10;20:4
**abrasion (1)**
27:3
**abrasive (2)**
22:5,12
**acceptable (2)**
13:10,12
**accepted (2)**
29:25;30:1
**access (2)**
28:20;39:11
**across (1)**
26:9
**action (1)**
25:23
**actions (3)**
50:11,16,21
**Active (1)**
9:12
**Active-4 (2)**

55:5,19
**actual (1)**
29:9
**actually (2)**
31:23;35:8
**additional (2)**
42:8;52:14
**address (2)**
53:14,18
**addressed (2)**
11:21;52:2
**administered (1)**
41:3
**ads (2)**
27:25;50:25
**adverse (1)**
48:5
**aesthetic (1)**
29:8
**afford (2)**
33:8;51:10
**again (15)**
8:16;14:12;16:12;
17:25;18:14;19:3;23:4;
24:15;29:2;36:23;37:4;
43:5,10,11;53:11
**against (2)**
26:10;54:23
**age (1)**
37:7
**ago (7)**
10:18;11:12;12:17;
39:14;41:8;49:15;
54:12
**agree (5)**
34:22,24;35:7,8;
53:19
**agreed (2)**
21:25;49:18
**agreement (4)**
37:23;44:25;45:14,
17
**agreements (1)**
44:4,5,14,18;45:19
**Aguila (124)**
5:14,23;6:2,10,24;
7:1,19,20,23,23;8:15,
18,23;9:12,19;10:2,3,
13,14,19,22;11:7,17;
12:13,19;13:19,24;
14:2,6,11,14,21;15:12,
24;16:5,10,13,15;17:9,
16,23;18:5,8,15,23;
19:4,6,12,23;20:24;
21:8,11,15,23;22:3,11,
15,25;23:5,15,22;24:4,
9,19,23;25:3,10,14;
26:1,20,22;27:1,13;
29:5,14;30:10,16,20,
25;33:18,22;34:12,22,
24;35:5,15,19,21,24;
37:17,20,21;39:5,20;
40:23;42:2,10,15,18,

24;43:3,5,11,13,15,20,
25;44:9,13;46:1;49:21;
50:9,13,15;52:11;
53:12,13,19;54:16,19;
55:1,20,22,23
**Aguila's (4)**
17:1,12;50:21;54:23
**ahead (4)**
11:13;17:23;41:18;
42:18
**Ali (1)**
5:14
**allegro (7)**
34:2,3,9,19;35:25;
36:22;47:2
**Allegros (1)**
36:6
**allergic (2)**
48:2,17
**allow (2)**
45:4;52:21
**allowed (2)**
45:6,11
**allows (1)**
19:16
**almost (1)**
14:4
**Alter (1)**
45:14
**alteration (1)**
39:6
**always (1)**
34:16
**amend (1)**
43:20
**amongst (1)**
51:18
**amount (2)**
33:22;48:24
**announce (1)**
19:3
**answered (3)**
24:8;41:24,25
**Antiox-6 (2)**
55:6,20
**anymore (1)**
51:10
**apparently (1)**
14:17
**application (2)**
29:23;30:11
**applications (4)**
9:7,10;54:24;55:12
**applied (6)**
8:14,19,24;9:17;
54:19;55:20
**apply (1)**
29:20
**applying (1)**
9:12
**approval (1)**
12:15
**Argumentative (3)**

24;43:3,5,11,13,15,20,
25;44:9,13;46:1;49:21;
26:21,25;30:23
**around (11)**
7:12,16,19;9:4;
15:21;27:24;28:18;
33:24,25;35:25;45:12
**aspects (1)**
29:7
**assent (2)**
22:1;49:18
**associates (2)**
5:18,19
**Atlanta (2)**
31:22;32:8
**attending (1)**
7:2
**attorney (2)**
24:16;54:22
**attorney-client (1)**
30:17
**attorneys (9)**
7:21;12:7;17:20,21;
30:13,14,16;38:21;
55:17
**attorney's (1)**
38:17
**Avenue (1)**
40:25
**aware (5)**
8:18;18:12;54:19,22;
55:17
**Axia (1)**
5:16

**B**

**Babcock (1)**
7:20
**back (17)**
7:14;13:23;14:1,3;
18:2,15;19:4,16;32:24;
33:4,5;46:8;50:6,8;
51:6;52:15;53:11
**backup (4)**
38:14;41:2,12,16
**bad (1)**
14:5
**band (1)**
14:9
**bandwagon (1)**
10:12
**bases (2)**
40:18;41:13
**basically (1)**
28:7
**Bear (2)**
30:19;50:17
**bearing (1)**
48:20
**behalf (2)**
5:20,23
**below (1)**
28:17
**best (3)**

17:23;22:7;54:1
**Beta (1)**
55:19
**Beta-HD (1)**
55:5
**better (2)**
17:21;36:5
**Bill (1)**
5:17
**binding (1)**
6:7
**bit (2)**
6:20;8:16
**blade (1)**
24:20
**blood (1)**
25:11
**blue (5)**
23:19;24:5,5;28:10,
10
**booths (1)**
28:1
**borrowed (1)**
32:14
**both (2)**
18:25;20:9
**bottles (1)**
28:10
**bottom (1)**
28:14
**bought (1)**
32:11
**break (3)**
41:14;43:1,2
**bring (1)**
52:15
**broke (1)**
7:14
**Bruce (1)**
27:16
**Builder (2)**
55:6,19
**burr (1)**
48:6
**business (4)**
32:16;41:15;45:5;
52:1
**buy (4)**
28:3;32:11;52:7,25

**C**

**calendar (2)**
54:5,6
**CALIFORNIA (1)**
5:1
**call (20)**
14:5,11;18:16;19:15,
23,25,25;20:2;22:25;
23:3,7,7;26:7;27:15;
29:3,12;34:2;48:9;
53:6,10
**called (4)**

22:10,12;31:24,25
**call-ins (3)**
48:9;49:2,11
**Calls (2)**
28:25;33:6
**came (5)**
7:14;31:23;32:8;
51:5;53:24
**Can (45)**
6:13;8:6,23;13:6,19;
14:9,21;16:14;17:17,
24;18:8;20:24;22:15;
24:9,23;25:3,4,10,11;
27:1;28:6;30:18;32:17;
34:12;35:9;37:14;38:7,
23;39:24;40:1,7,17,22;
42:13,15;43:7,15,19;
44:7,21;45:9;46:1;
47:23;49:1;52:11
**cancel (2)**
14:18,24
**cancellation (1)**
55:18
**capabilities (1)**
38:4
**capability (1)**
38:1
**capacity (1)**
6:8
**Carol (1)**
39:25
**case (4)**
42:23;51:4,13,13
**cases (1)**
52:19
**casing (1)**
28:12
**castors (5)**
28:13,14,15,16
**catalog (1)**
21:21
**cease (4)**
9:23;10:6;11:16,20
**CEO (1)**
12:22
**certain (2)**
54:6,20
**Chang (1)**
40:3
**C-H-A-N-G (1)**
40:3
**change (4)**
27:12;37:5;43:25;
51:17
**changed (2)**
9:5,8
**changes (3)**
34:25;35:3,4
**changing (1)**
10:11
**characterize (1)**
24:11
**charged (1)**

43:24
**chronology (1)**
11:10
**Cinneron (1)**
46:19
**claim (4)**
17:13,15,25;18:10
**claims (2)**
17:6,7
**clarify (1)**
44:21
**clear (2)**
6:6;17:20
**cloud (3)**
38:14;41:2,5
**COHEN (28)**
5:5,17,20,22;6:11,
16;7:1;8:13,18;9:19,
22;10:17;11:15,23;
12:19;13:6;14:14;
15:15;17:18;19:6;22:3;
30:20;35:24;38:3;43:6;
53:13;54:11,15
**color (1)**
20:18
**comfortable (1)**
18:22
**coming (1)**
14:5
**common (2)**
37:11,12
**communicated (1)**
31:12
**communication (1)**
31:10
**communications (1)**
31:2
**companies (5)**
43:7;44:14,19;46:9;
50:4
**company (13)**
9:10;10:7,11,18;
11:3;36:16;39:23;41:4;
46:5,15,18;51:15;
54:24
**company's (1)**
54:20
**compare (1)**
24:24
**compared (1)**
33:13
**complaint (5)**
13:3,9;49:7,10,13
**complaints (15)**
12:24;13:1,2,14;
47:6,8,9,10,15,22,23;
48:4;49:1,9,11
**completely (1)**
31:18
**Compliance (2)**
49:9;50:5
**composition (3)**
22:5,12,17

**comprises (1)**
17:10
**compromised (1)**
6:22
**computer (6)**
28:7,18;38:2,5;
40:17;41:4
**concentrates (1)**
25:23
**concerned (1)**
51:14
**concluded (1)**
55:24
**conclusion (1)**
29:1
**conditions (1)**
45:12
**confident (2)**
27:4,5
**confidential (1)**
35:7
**confidentiality (3)**
21:24;22:1;34:23
**configured (1)**
22:19
**confused (3)**
32:7,10;53:23
**confusion (1)**
51:18
**connection (6)**
6:22;13:25;14:4,8,
10;42:21
**contacted (5)**
8:5,7,10;14:23;31:15
**control (1)**
28:21
**controls (1)**
28:22
**conversation (3)**
15:7,10,13
**convicted (1)**
8:1
**Conway (1)**
32:9
**corner (1)**
13:21
**corporation (1)**
6:8
**correctable (1)**
47:18
**corrected (2)**
48:9,10
**correctly (3)**
44:20;48:17;52:16
**cosmetic (1)**
48:24
**cost (3)**
34:3,5,6
**costs (1)**
34:4
**counsel (2)**
5:15,16
**couple (3)**

6:11,13;54:10
**course (1)**
12:17
**COURT (9)**
8:15;12:6,7;13:24;
18:2,13,20;44:11;
50:13
**courtroom (3)**
7:13,16,20
**court's (1)**
35:18
**covers (1)**
28:14
**created (2)**
38:19;54:3
**crime (1)**
8:1
**crystal (2)**
46:12,13
**current (2)**
19:20;23:13
**customers (10)**
13:2,11;20:21,24;
21:4;24:1;28:2;45:6;
48:1;52:5
**cut (4)**
25:4,7,9,10
**cutting (5)**
6:21;8:16;16:12;
18:16;43:10

## D

**Daniel (1)**
5:18
**data (2)**
40:18;41:13
**date (3)**
10:6;33:2;39:14
**dates (3)**
15:22;46:21;54:6
**day (1)**
40:16
**days (3)**
41:8;49:14;54:16
**debris (1)**
25:24
**December (2)**
7:2;9:4
**defendant (4)**
8:14,19;9:23;12:5
**defendants' (2)**
50:11,16
**define (4)**
13:1;25:7;42:13;
45:9
**definition (5)**
13:3,6;23:4;25:8;
37:12
**deleted (1)**
39:9
**deletion (1)**
41:20

**denied (2)**
29:25;30:2
**department (1)**
49:8
**Depending (1)**
37:7
**depends (2)**
25:8;37:9
**deposition (5)**
5:25;6:3,16;9:17,20;
11:24;19:2;31:1;53:20;
54:9;55:24
**depositions (1)**
15:22
**Derma (2)**
55:6,19
**dermabrasion (1)**
8:20
**describe (5)**
13:19;28:6;31:2;
38:23;46:1
**descriptions (1)**
22:8
**design (1)**
29:4
**designated (1)**
5:20
**desist (1)**
9:23;10:7;11:16,20
**destroy (2)**
39:12;40:10
**destruction (2)**
39:6;41:21
**device (13)**
12:25;17:12;19:12;
24:23;28:5;32:25;33:1;
48:14,16;50:24;51:1,2;
52:23
**devices (5)**
17:1;36:16;37:6,11,
17
**Diamond (18)**
10:9,14,22;11:17;
20:7,8,9,11,15,20,25;
21:16,21;22:9,11;
23:10;45:13;46:13
**different (15)**
10:7;19:19;20:5,10,
13;24:3;28:19;29:13;
40:13,14;43:12;44:7;
46:25,25;54:16
**difficult (5)**
11:11;14:22;18:9;
32:1;52:2
**directly (1)**
52:13
**discount (3)**
33:9,11;36:8
**discounts (1)**
36:13
**discovery (6)**
12:18;38:9;42:11,13,
16,22

EDGE SYSTEMS, LLC v.
RAFAEL NEWTON AGUILA

WILLIAM COHEN
November 13, 2015

**disk (1)**
40:17
**document (2)**
38:23;50:10
**documents (10)**
11:23,25;12:3,4,14;
22:1;38:9,20;40:19;
47:5
**done (6)**
26:6;27:2,16;33:13;
41:20;47:17
**door (2)**
28:10,11
**doubt (1)**
39:18
**down (2)**
18:19;44:10
**Dr (2)**
27:16;51:4
**drawn (1)**
26:9
**dream (1)**
32:15
**drives (1)**
40:17
**dry (1)**
20:9
**Dubois (5)**
36:11,12,15;37:23;
51:4
**Dubois' (1)**
43:21
**dull (1)**
23:7
**duplicate (1)**
38:18
**during (1)**
7:24

**E**

**easier (1)**
11:9
**easy (3)**
18:17,18;28:20
**Ebay (8)**
14:17,18,23;15:7,11,
13;52:6,12
**Edge (34)**
5:15,21;6:5;9:5;
12:20;22:19,24;23:6;
26:10;31:1,4,10,13,19;
32:21;38:2,7,24;39:7;
42:11,16,21;43:7,8;
44:4,15,16,17;47:7,13;
50:11,16,20;54:3
**edges (5)**
17:11;20:3,6;22:25;
23:1
**Edge's (1)**
50:18
**editorial (1)**
29:8

**Either (3)**
9:7;10:6;12:14
**element (1)**
17:13
**elements (3)**
17:6;24:13,17
**Elliot (2)**
36:12,15
**else (5)**
15:5,6;33:14;40:6;
53:3
**else's (3)**
44:22,23;45:3
**email (2)**
34:23;39:3
**emails (9)**
38:24;39:7,8,11,16,
21;40:10;41:13,21
**E-Med (1)**
45:16
**employees (1)**
31:6
**encrusted (5)**
20:8,8,15,20,25
**end (3)**
14:10;35:12;54:8
**entered (1)**
44:14
**entering (2)**
7:13,16
**entitled (5)**
21:6,14;35:18,22;
37:19
**eroded (1)**
52:2
**error (1)**
13:20
**etc (2)**
9:11;52:24
**European (2)**
29:21;30:4
**Eva (1)**
40:3
**evasive (1)**
30:22
**even (5)**
21:25;33:6;47:15;
48:23;49:18
**events (1)**
11:10
**everyone (1)**
43:15
**evidence (3)**
5:9;11:5;18:5
**evidentiary (2)**
7:2,6
**exact (7)**
10:6,10;31:5;33:24;
44:1;46:21;49:23
**exactly (19)**
9:3,16,18;11:21;
12:20;15:3,4;21:3;
32:2;33:1,18;35:11,12;

39:21;42:4,7;46:5;
49:25;54:5
**EXAMINATION (2)**
6:9;54:13
**examined (1)**
5:6
**examiner (1)**
30:7
**Example (2)**
12:11;52:6
**exclusivity (2)**
50:12,17
**exfoliate (3)**
25:20;26:5,14
**exfoliates (3)**
26:17,24;27:5
**exfoliation (4)**
26:2,4,6;27:3
**exhibits (1)**
28:1
**existence (1)**
47:4
**expert (3)**
17:19;38:5,6
**extra (1)**
21:18
**extraction (2)**
25:18;26:3
**extremely (1)**
32:16
**eye (2)**
13:21,22

**F**

**facial (1)**
53:10
**facility (1)**
40:24;50:3
**fact (1)**
50:2
**factory (1)**
40:25
**failure (1)**
48:12
**far (3)**
47:16,17;53:20
**FDA (12)**
13:17;47:6,10,12,19;
48:19,25;49:7,9,21;
50:2,4
**feature (1)**
29:6
**features (1)**
28:23
**federal (2)**
8:4,7
**fee (4)**
52:6,14,25;53:2
**feedback (2)**
6:20;9:2
**Ferrin (2)**
39:25;40:1

**F-E-R-R-I-N (1)**
40:2
**few (1)**
54:15
**file (1)**
54:23
**filed (1)**
55:18
**files (2)**
38:12;41:13
**filing (1)**
14:18
**financial (2)**
21:8,10
**financially (1)**
50:21
**find (1)**
13:10
**first (9)**
5:24;7:8;11:19;31:3,
5,19,21;32:19;36:11
**fit (1)**
20:11
**five (2)**
10:18;11:12
**Florida (1)**
51:15
**flow (1)**
32:2
**fluid (11)**
20:12,14,16;22:4;
24:13;25:4,19,24;26:9;
24;28:10
**fluids (1)**
48:2
**flurry (2)**
9:6,10
**follow (2)**
49:6;54:11
**follows (1)**
5:6
**Form (54)**
8:21;9:14,24;10:4;
11:4;13:16;14:20;15:8,
17;16:1,7;17:3,14;
18:4;19:9,18;20:22;
21:20,21,23,24;22:1,6,
13,21;23:2,12,20,25;
24:7,14,21,25;25:5,12,
21;26:18,25;27:10;
28:25;29:11;30:8,12;
33:16;34:10;39:1,17;
40:20;41:23;42:6;44:6;
45:23;47:24;52:9
**formed (1)**
48:7
**forth (1)**
14:3
**found (1)**
55:8
**four (4)**
20:10;28:13;55:2,19
**fragment (4)**

22:5,8,10,12
**frame (3)**
9:9;46:3,5
**Frankly (2)**
15:21;35:13
**FRIDAY (3)**
5:2;15:23;16:23
**Friedman (2)**
27:15,16
**front (1)**
17:4
**functional (2)**
28:24;29:3,6,7,15
**FURTHER (1)**
54:13
**future (1)**
37:24

**G**

**gal (1)**
32:14
**Gary (5)**
32:9,9,17,19;33:4
**general (1)**
51:13
**given (1)**
53:20
**giving (1)**
40:9
**glysel (1)**
13:21
**GMP (1)**
49:6
**GMP's (1)**
49:9
**God (1)**
5:11
**good (3)**
24:16;49:6;52:20
**grade (2)**
28:15,16
**grandmother (1)**
32:15
**great (1)**
6:4
**Greg (1)**
40:4
**G-R-E-G (1)**
40:5
**group (1)**
32:5
**guess (7)**
16:24;18:21;22:10;
23:4;30:14;43:15;54:8
**guessing (2)**
31:17,18
**guidelines (1)**
13:17
**guy (2)**
41:14;51:20

EDGE SYSTEMS, LLC v.
RAFAEL NEWTON AGUILA

WILLIAM COHEN
November 13, 2015

**H**

**half (2)**
36:24,25
**handle (1)**
50:4
**handpiece (24)**
19:8,13,15,24;20:1,2,
3,11,16,25;22:4,18;
23:10;24:13;25:4,4,19,
19;26:24,24;43:9;
44:16;52:19,19
**handpieces (5)**
19:14,20;22:22;
28:19,20
**hang (1)**
14:11
**happened (2)**
27:12;32:18
**happening (1)**
6:6
**happy (1)**
51:11
**hard (3)**
10:10;38:12;43:11
**harmed (2)**
50:20,23
**harming (1)**
13:15
**HD (1)**
55:19
**hear (6)**
6:13;13:6;43:11,16,
17;44:11
**heard (2)**
42:19,20
**hearing (5)**
7:3,6;12:1,2;18:18
**heart (1)**
17:7
**help (5)**
5:11;18:20;26:1;
32:18,21
**Hernandez (1)**
41:11
**higher (1)**
43:23
**Hill (1)**
40:25
**history (1)**
19:19
**Holcomd (1)**
40:3
**H-O-L-C-O-M-D (1)**
40:4
**holds (2)**
28:10,19
**H-O-L-M (1)**
40:4
**home (3)**
48:3;53:14,18
**Honestly (1)**

18:21
**hoping (1)**
32:24
**hydrafacial (41)**
12:25;13:11,15;19:7,
8,12,21,21,24;21:16;
22:4,18;23:10;24:12,
24;25:3,19;26:23;
27:21;28:11;29:21;
34:2;36:16;43:8;44:16,
17;45:7,11,21;46:13,
14,15,22;48:15;52:5,
12,13,21;53:2,7,9
**hydrating (1)**
53:9

**I**

**identification (1)**
38:8
**Ignon (3)**
7:9;12:23;39:25
**image (1)**
43:18
**images (1)**
23:9
**include (1)**
55:5
**industry (2)**
27:24;48:24
**informally (1)**
21:25
**information (11)**
21:7,14;35:7,16,17,
23;37:20;38:12,14,16;
53:16
**informed (1)**
55:1
**infringing (6)**
14:25;15:1,2,5;17:2,
6
**injunction (2)**
12:2;50:10
**injury (1)**
48:20
**innovative (1)**
50:18
**inside (1)**
26:11
**inspection (4)**
47:7,12,14,19
**inspections (1)**
49:22
**instance (1)**
48:6
**instructed (4)**
32:4;39:10,12;42:12
**instruction (4)**
31:25;39:13,16;
40:12
**instructional (1)**
50:3
**instructions (2)**

40:10;42:2
**Instruments (1)**
45:14
**intended (2)**
25:6,14
**interface (1)**
17:10
**internet (1)**
14:8
**Interrogatories (1)**
11:25
**into (5)**
13:21;32:8;34:21;
44:14;51:12
**involve (1)**
13:15
**involved (2)**
39:22;46:6
**irritated (1)**
13:22
**IRVINE (1)**
5:1
**issue (1)**
48:10

**J**

**January (4)**
9:23;10:13,21;11:16
**Joy (1)**
5:17
**July (7)**
15:16,19,20,25;16:6,
11,16
**jumped (3)**
54:2,4,17
**jumping (1)**
10:11
**June (7)**
15:16,19,20,25;16:6,
11,17

**K**

**keep (8)**
10:11;48:21,21,25;
49:1,3,3,7
**keeps (1)**
49:8
**Keith (1)**
41:11
**kept (1)**
15:21
**Kiang (2)**
5:18;19:1
**kind (6)**
21:20;26:7;28:12,15;
44:25;51:17
**Knobbe (3)**
5:15;30:19;55:18
**knockoff (1)**
32:12
**knowing (1)**

34:7
**knowledge (3)**
17:18;38:3;55:11
**known (1)**
27:23

**L**

**label (1)**
46:8
**labeling (1)**
48:14
**laid (1)**
11:10
**language (2)**
24:16;50:1
**large (1)**
34:1
**last (6)**
11:2;15:23;16:23;
44:7;47:12;49:22
**launch (1)**
32:16
**lawsuit (2)**
38:25;41:22
**lead (1)**
30:13
**learn (1)**
9:1
**least (1)**
22:19
**Leave (1)**
37:22
**led (1)**
43:25
**Lee (1)**
31:3
**left (1)**
19:1
**legal (1)**
28:25
**less (3)**
34:6;47:23;48:4
**letter (12)**
9:23;10:12,13,16,21,
25;11:1,3,5,16;41:7;
42:19
**license (6)**
44:22;45:2,3;46:9;
52:21;53:7
**licenses (2)**
43:8;46:7
**licensing (9)**
43:6;44:3,4,13,18,
25;45:14,17,19
**limitations (1)**
30:6
**limited (1)**
50:2
**line (1)**
53:22
**list (9)**
34:17,18;35:10;36:3,

6,9;37:4,5;49:10
**listing (1)**
14:18
**litany (1)**
51:16
**litigation (1)**
12:15
**little (4)**
6:20;8:16;9:16;
12:16
**LLC (1)**
42:22
**loading (1)**
43:17
**located (1)**
38:16;40:23,24
**location (1)**
47:5
**log (3)**
49:7,10,13
**long (4)**
10:9;21:2;40:15;
53:5
**longer (3)**
19:1;45:24,25
**look (8)**
13:5;27:23;28:4,6;
29:8;48:19;49:15;51:3
**looked (1)**
38:12
**looking (3)**
28:15;32:12;46:25
**lose (2)**
51:23,23
**losing (1)**
51:22
**loss (1)**
39:6
**lost (1)**
50:14
**lot (9)**
9:2;25:8;27:25;28:2;
31:11;50:25,25;51:2,
24
**Louisiana (1)**
51:20
**low (1)**
37:8
**lower (1)**
51:2
**Luminous (2)**
9:5;51:16
**lunch (2)**
7:13,15
**lunchtime (2)**
7:17,18

**M**

**machine (18)**
13:23;14:1;27:23;
29:18;33:24;43:8,22,
24;44:16,22,23;45:3;

46:24,25;47:1;51:5,7;
52:16
**machinery (1)**
46:8
**machines (1)**
46:11
**main (2)**
32:23;40:24
**managers (1)**
51:18
**manifold (2)**
28:9,19
**manufactured (1)**
46:8
**manufacturer (1)**
46:11
**manufacturers (2)**
45:20,22
**manufacturing (1)**
49:6
**many (18)**
21:4;22:23;28:2,4;
29:3;30:3;35:4,14,15,
20,20;36:6,18;37:4,16,
17;39:22;52:19
**mark (4)**
55:5,5,6,6
**market (5)**
27:4;50:11,16,17;
51:18
**marketing (4)**
23:19,24;50:25;
52:24
**marks (3)**
54:20;55:3,19
**Marshal (1)**
8:10
**Martens (3)**
5:15;30:19;55:18
**matched (1)**
32:3
**matter (1)**
5:9
**may (1)**
34:6
**maybe (2)**
37:9;44:21
**MD (22)**
12:25;13:11,15;19:7,
12,21,24;22:4,18;
23:10;24:12,24;25:3,
19;26:23;28:11;29:21;
36:16;43:8;44:17;52:6,
12
**MD's (1)**
27:21
**mean (7)**
15:19;22:9,17;23:6;
33:18;40:22;46:3
**meaning (1)**
10:20
**medical (5)**
16:3;20;28:13,15,15

**MedScience (1)**
5:16
**meet (1)**
31:16
**meets (1)**
17:12
**memory (1)**
10:17
**mention (1)**
47:23
**mentioned (4)**
47:8;48:25;50:10,15
**mentioning (1)**
14:25
**mentions (2)**
17:9;25:17
**met (1)**
32:9
**metal (1)**
28:12
**Miami (2)**
7:3,5
**Michael (1)**
42:8
**microdermabrasion (2)**
45:22;46:12
**microphone (2)**
6:12;14:4
**mid (1)**
35:13
**midsection (1)**
28:9
**might (8)**
6:22;31:15,17,24,24;
32:1;34:5;48:13
**million (1)**
48:22
**minimal (2)**
48:24;49:25
**Mischaracterizes (2)**
22:14;34:11
**misused (1)**
25:7
**mixing (1)**
11:18
**money (3)**
32:24;33:7;51:5
**monitor (1)**
28:8
**month (2)**
9:3;37:22
**more (6)**
22:23;34:5;37:24;
40:21;47:8;51:13
**Most (3)**
12:6,8;23:22
**motion (2)**
50:10,15
**motions (2)**
11:25;12:6
**motor (1)**
48:12
**mouth (1)**

14:3
**move (1)**
35:22
**moving (2)**
8:2;15:21
**much (3)**
33:15;51:2,11
**multiple (1)**
24:3
**must (1)**
52:6
**Myself (1)**
39:25

**N**

**name (20)**
9:10;10:8,11,14,22;
19:20;27:13;39:24;
40:1;41:5,7,10;44:22;
45:2;46:15,16,18;
52:21;54:20,24
**names (1)**
42:1
**NDA (1)**
34:21
**near (2)**
38:6;47:16
**necessarily (2)**
27:3;29:15
**Nectar (1)**
47:2
**need (5)**
33:22;34:20;40:21;
43:2;52:4
**needed (1)**
51:7
**negotiate (1)**
22:2
**nervous (1)**
9:16
**new (4)**
37:2,3;51:9;52:18
**nice (2)**
28:10;43:1
**nine (1)**
39:5
**Nobody (1)**
51:17
**non (3)**
46:12;47:18;48:20
**none (1)**
48:4
**nonfunctional (1)**
32:12
**noon (2)**
7:12,14
**normal (1)**
37:1
**normally (2)**
34:3,5
**notifications (3)**
48:1;49:2,11

**NOVEMBER (2)**
5:2;9:4
**number (18)**
5:21;18:17;21:9,11,
13;31:2,12;32:3;33:25;
37:14;38:1;39:5;40:19;
41:20;42:10,24;47:6;
49:24

**O**

**Objection (59)**
8:21;9:14,24;10:4;
11:4,7;13:16;14:20;
15:8,17;16:1,7;17:3,
14;18:4;19:9,18;20:22;
21:6,23;22:6,13,21;
23:2,12,20,25;24:7,14,
21,25;25:5,12,21;
26:18,21,25;27:9,10;
28:25;29:11;30:8,12,
23;33:16,20;34:10;
37:15;39:1,17;40:20;
41:23;42:6;44:6;45:23;
47:24;52:9;53:12,15
**objections (1)**
15:9
**obtained (2)**
55:2,9
**odd (1)**
32:12
**Off (6)**
6:25;14:9,13;18:24;
43:4,14
**offer (1)**
33:9
**offhand (2)**
11:11;29:24
**office (5)**
31:25;32:6;38:13,17;
51:20
**official (4)**
13:6;34:15,17,18
**off-white (1)**
28:13
**often (2)**
10:11;36:10
**old (3)**
21:9;36:24;37:9;
52:19
**Olson (1)**
30:19
**once (1)**
49:17
**one (25)**
5:17,18;7:20;8:25;
13:18;17:15;19:20;
20:7;22:10,19,24;
31:12;36:19;37:2,2,3;
46:14;48:7,12,13;
49:22;51:8,9,21;53:22
**ones (3)**
9:18;28:3,4

**only (4)**
7:20;13:17;45:3;
51:8
**operator (1)**
13:20
**oppositions (1)**
54:23
**option (2)**
20:21;21:22
**order (10)**
12:16;21:18,20;28:3;
34:23;35:8,18;49:18,
19;54:5
**original (1)**
48:16
**originally (1)**
15:20
**others (2)**
53:25;54:3
**out (13)**
6:21;7:10;8:16;
11:10;14:5;16:12;
18:16;25:24;40:15;
43:10;48:5;49:17;55:8
**outside (3)**
26:13;41:3,3
**over (2)**
6:5;48:22
**overall (1)**
52:2
**owned (1)**
10:8

**P**

**paid (1)**
30:14
**Pardon (1)**
27:7
**parking (1)**
8:2
**part (2)**
26:12;29:17
**participated (1)**
30:10
**participation (1)**
30:15
**particular (1)**
45:10
**parts (1)**
31:11
**party (3)**
41:6;52:12;53:1
**past (1)**
38:15
**patent (6)**
15:2;17:2,4,9,19;
24:15
**patents (9)**
12:1,25;16:25;18:5,
11;29:20;30:3,7;52:1
**patient (1)**
13:15

**patients (1)**
48:7
**pay (4)**
52:6,17,18;53:2
**paying (1)**
52:14
**payment (1)**
43:6
**pending (3)**
12:15;55:12,13
**people (7)**
28:4;39:15,22;40:9;
42:1;51:3,24
**people's (1)**
32:24
**percentage (1)**
48:23
**perforating (1)**
17:11
**Perhaps (1)**
22:9
**person (5)**
21:18;41:10;42:8;
51:15;52:22
**personal (9)**
5:23,25;6:2,8,15;
17:18;50:7,8;55:11
**personally (3)**
15:11;19:25;38:21
**personnel (1)**
39:10
**pertaining (1)**
44:15
**petitions (1)**
55:18
**phone (2)**
14:5;33:6
**placed (1)**
30:6
**plaintiff (2)**
38:2;42:11
**plaintiffs (3)**
7:9;44:15,16
**plastic (1)**
24:5
**please (4)**
6:5;8:17;35:22;44:7
**plenty (1)**
35:2
**point (2)**
27:2;51:4
**policies (1)**
38:24
**policy (2)**
39:3,3
**poor (2)**
14:4,10
**portion (4)**
26:3;28:17;53:25;
54:1
**possible (1)**
25:13
**potential (1)**

**31:3**
**practices (1)**
49:7
**predominantly (1)**
48:1
**preliminary (2)**
12:2;50:9
**prepare (3)**
11:24;12:9;49:15
**present (1)**
7:21
**President (2)**
12:21;26:20
**pretty (3)**
28:20;49:25;51:21
**prevalent (1)**
23:23
**prevent (1)**
41:20
**previous (2)**
18:3;23:15
**price (23)**
33:12,15,17,19,21,
23;34:9,14,15,17,18;
35:9,10,25;36:3,6,9,20;
37:1;43:21;44:1;50:17;
51:2
**primary (1)**
53:14
**principal (3)**
23:18;24:6,11
**prior (5)**
9:15;31:7,24,25;50:2
**private (1)**
46:8
**privilege (2)**
30:17;39:11
**privileged (1)**
35:16
**Probably (3)**
25:6,13;54:7
**problem (3)**
48:13,14,14
**problematic (1)**
51:24
**procedural (1)**
13:20
**procedure (4)**
16:20;47:17;53:7,9
**procedures (2)**
24:2;48:22
**proceed (2)**
5:25;43:18
**process (2)**
38:11;52:3
**produced (3)**
12:14,15,17
**product (6)**
15:2;27:5;48:3;
50:18;52:14;53:5
**production (2)**
38:8;49:17
**products (2)**

**31:23;52:8**
**proper (1)**
24:18
**properly (1)**
52:23
**proposed (1)**
49:19
**protective (6)**
8:4,7;12:16;35:8;
49:18,19
**provide (2)**
32:25;36:12
**provided (1)**
12:4
**published (3)**
27:17;35:9;47:7
**pulled (1)**
49:14
**pulls (2)**
25:24;26:9
**purchase (3)**
20:25;52:11,13
**purchased (1)**
52:5
**purchaser (2)**
45:4;53:1
**purposely (1)**
30:22

**Q**

**quality (1)**
12:11
**quick (1)**
54:10
**quite (2)**
21:3;35:13

**R**

**Rafael (4)**
10:2,14,22;11:16
**rail (1)**
28:18
**range (5)**
34:4,13,16;36:8;37:7
**rather (2)**
34:20;35:1
**Razai (88)**
5:14,14;6:4,21;8:21;
9:14,24;10:4,16;11:4;
12:13;13:16;14:2,7,20;
15:8,17;16:1,7,12;17:3,
14,17;18:4,15,25;19:9,
18;20:22;21:6,9,13,23;
22:6,13,21;23:2,12,20,
25;24:7,14,21,25;25:5,
12,21;26:18,21,25;
27:10;28:25;29:11;
30:8,12,18,23;33:16,
20,34:10,22;35:2,6,17,
21;37:15,19,39:1,17;
40:20;41:23;42:6,15,

**21;43:1,10,17;44:6;**
45:23;47:24;49:16;
50:8;52:9;53:11,15;
54:10,14;55:22
**razor (1)**
24:19
**reactions (3)**
48:2,5,18
**read (3)**
12:1;18:2;47:21
**reading (4)**
17:5;18:6,7;47:19
**realized (1)**
32:11
**really (10)**
13:25;18:20;22:16;
24:16;25:1;36:9;38:5;
41:16;48:24;51:17
**recall (5)**
10:17,23,25;11:1,1
**received (3)**
12:24;21:4;39:16
**recently (5)**
15:18;16:22;54:2;
55:1,8
**recite (1)**
17:7
**recognize (1)**
28:4
**recollection (1)**
44:2
**reconnect (1)**
6:23
**record (17)**
6:7,25;11:4;12:14;
14:13;16:10,15;18:4,
24,25;19:3,5;42:15;
43:4,5,14;53:14
**Redondo (1)**
40:25
**reduce (6)**
33:12,15,17,21,23;
36:7
**reduced (1)**
35:25
**reduction (1)**
33:19
**reenter (1)**
19:2
**reflect (1)**
11:5
**refurbish (1)**
52:17
**refurbished (1)**
36:25
**regarding (10)**
12:25;16:25;39:6;
43:6;44:3,17;45:14,17;
47:4,6
**registration (1)**
55:2
**registrations (1)**
55:9

**regular (1)**
12:17
**regulatory (1)**
49:8
**reiterate (1)**
55:8
**relabelled (1)**
46:24
**related (3)**
38:24;41:21;48:15
**relationship (1)**
31:9
**rely (1)**
17:20
**remember (69)**
6:16;7:2,8,12,15,16,
19,22,23;8:24;9:12,16,
21,22,25;10:1,6;11:11,
14,15,19,21;14:19,23,
24,24;15:3,3,4,6,11,14,
19;16:2,3,8,9,9,11,16,
18,21,21;17:5;18:10;
23:17;27:20;29:24;
30:1,3,6;32:2;40:7,9;
42:4,7;44:1;46:10,17,
18,20,21;47:9,10,11,
12,14,19;48:17
**repeat (5)**
8:6;16:14;17:25;
19:10;44:8
**report (4)**
47:7,12,20;48:20
**reportable (1)**
47:18
**REPORTER (11)**
5:8;8:15;13:24;18:1,
2,13,18,20;44:9,11;
50:13
**reports (1)**
48:9
**reps (4)**
31:15;51:14,18,21
**requests (1)**
38:10
**reread (1)**
18:1
**rescheduled (1)**
15:21
**respect (2)**
17:17;54:16
**responses (1)**
30:21
**responsive (6)**
38:9;39:7,8,16;
40:19;41:21
**restate (1)**
8:16
**result (1)**
29:23
**retention (1)**
38:23;39:2,4
**return (1)**
52:18

EDGE SYSTEMS, LLC v.
RAFAEL NEWTON AGUILA

WILLIAM COHEN
November 13, 2015

review (2)
    11:23;17:5
rid (1)
    48:10
right (16)
    6:16;9:9;10:19,20;
    15:16;17:16;18:22;
    28:17,23,24;29:6,10;
    34:15;37:17;42:24;
    46:6
ring (2)
    26:8,13
rings (2)
    26:8,11
Roger (2)
    12:23;39:25
room (2)
    7:10;19:1
Rosemary (1)
    40:3
roughly (1)
    47:25
running (2)
    33:6;52:16

**S**

sale (3)
    51:22,23,23
sales (1)
    31:15
same (4)
    12:13;19:17;40:13;
    51:25
satisfactory (1)
    13:10
saw (1)
    32:9
saying (5)
    6:19;18:19;35:22;
    45:8;54:11
scheduled (1)
    15:20
screen (8)
    28:8,21,22;29:5,9,10,
    10,12
screens (3)
    29:13,14,17
search (1)
    38:22
searched (3)
    38:8,20;40:18
searching (1)
    38:11
sebum (1)
    25:24
second (3)
    15:8;28:3;54:11
section (1)
    28:9
secure (2)
    41:5,19
seeing (1)

7:19
seem (1)
    10:10
sell (20)
    33:1;34:14;35:14,15,
    20;36:6,8,9,15,18;37:4,
    8,11,13,18,22,24;51:8,
    9;53:4
sells (1)
    37:16
semicircular (1)
    26:8
seminars (1)
    28:1
send (6)
    10:2,3,12;11:3;
    21:20,25
sending (5)
    9:22;10:25;11:1,15,
    19
sent (10)
    10:1,6;12:7,12,16;
    13:23;14:1;34:23;35:2;
    49:13
separate (1)
    55:2
serial (1)
    32:3
series (1)
    10:9
serums (3)
    52:7,13;55:3
server (1)
    38:13
servers (3)
    40:24;41:12,15
service (4)
    8:4,7;41:3,4
session (1)
    55:24
set (1)
    34:15
seven (1)
    48:8
several (16)
    8:24;9:17;11:25;
    12:2;19:14;20:5,12;
    22:9,22,23;24:2,2;
    29:10;49:24;50:24;
    52:24
shall (2)
    5:9,9
sharp (9)
    17:11;20:3;22:19;
    23:1,5,8;24:13,18,19
sharpness (1)
    24:24
sheet (1)
    28:12
shipping (2)
    48:13;52:18
shortly (1)
    9:3

shots (3)
    29:9,10,13
show (15)
    10:16;24:6;26:16;
    27:24,25;31:7,8,16,22;
    32:8,9;50:4,24;51:1;
    52:23
showing (1)
    31:23
shown (3)
    11:5;23:18;24:10
Shows (1)
    28:1;50:25;51:1
side (1)
    19:22
sign (1)
    34:21
Signal (1)
    40:25
signed (1)
    21:24
similar (1)
    51:2
site (11)
    9:5;23:9,13,16,19,
    23;24:4,6,25:17;54:4,4
sitting (2)
    19:2;49:16
situation (1)
    13:10
six (1)
    38:1
Skin (14)
    10:9,14,22;11:17;
    17:10;20:4;22:20;25:4,
    8,25;26:8,9;27:5,12
skirt (1)
    28:14
small (2)
    48:6,23
software (1)
    38:2
sold (4)
    21:2;33:23;36:4;
    51:4
solemnly (1)
    5:8
solution (1)
    19:16
solutions (5)
    9:18;48:18;52:8,25;
    53:3
somebody (3)
    44:22,23;51:1
someone (2)
    10:18;52:11
somewhere (1)
    9:7
soon (1)
    6:4
Sophiel (1)
    45:16
sorry (8)

6:18;7:4;8:15;13:24;
    18:13;19:10;44:12;
    50:13
sounds (1)
    6:4
speak (1)
    6:11
speaking (2)
    6:13;11:7
specific (3)
    18:11;40:21;51:13
specifically (1)
    46:24
specifics (2)
    8:25;54:6
speed (1)
    14:7
spell (1)
    40:1
spending (1)
    51:11
spoke (8)
    31:4,6,7,20;41:8,10;
    47:5;51:21
spoken (3)
    32:20;45:13,16
Spread (1)
    40:15
staff (1)
    52:23
stainless (1)
    20:19
stance (1)
    52:1
start (2)
    6:2;19:7
started (1)
    10:8
starting (2)
    5:24;31:1
state (1)
    5:8
stated (2)
    11:20;33:16
statement (1)
    13:9
statements (2)
    13:11,14
steel (1)
    20:19
Stickley (1)
    40:4
S-T-I-C-K-L-E-Y (1)
    40:5
still (4)
    43:17;49:19;51:7;
    53:4
stored (2)
    38:13,14
strip (2)
    50:11,16
structure (1)
    17:11

studies (3)
    26:16;27:2,9
study (5)
    26:23;27:3,11,14,15
substantially (2)
    17:11;20:3
suddenly (3)
    9:6,9;51:1
sued (1)
    32:23
suited (1)
    17:21
supplied (1)
    12:10
supply (1)
    12:10
sure (18)
    6:12;7:11;9:3,8;
    10:5;15:4;18:6;22:8;
    24:17;32:18;33:2;
    35:11,12;39:14;40:22;
    49:24,25;52:16
surgery (9)
    15:15,18,23,25;16:6,
    11,16,21,23
switch (1)
    6:5
sworn (1)
    5:6
system (8)
    32:4,11,12;33:2,7,8,
    10;38:2
Systems (27)
    5:15,21;6:5;9:6;
    10:15,23;11:17;12:20;
    31:1,4,10,13,19;32:21;
    38:3,7;39:7;42:11,16,
    22;43:8;44:4,15,18;
    47:7,13;54:3
Systems' (1)
    38:24

**T**

tabletop (6)
    33:3,9,25;34:1;
    35:14;46:23
talking (1)
    20:14
TCS (2)
    41:7,7
teaching (1)
    29:8
technology (2)
    25:17;51:25
telephone (1)
    18:17
tend (1)
    14:22
term (2)
    8:20;45:6
terms (1)
    45:12

**testified (1)**
5:6
**testify (2)**
5:20;42:16
**testifying (1)**
5:23
**testimony (3)**
6:7;22:14;34:11
**testing (1)**
50:3
**theory (1)**
25:22
**thinking (1)**
43:22
**third (4)**
28:4;41:6;52:12;
53:1
**though (2)**
17:8;33:12
**thought (4)**
15:15;25:2,22;51:22
**thousand (1)**
35:13
**threatened (1)**
7:25
**threatening (1)**
7:23
**three (1)**
48:16
**tickets (1)**
8:2
**times (2)**
40:13,14
**tip (23)**
20:15,19,25;21:2,5,
16,21;22:10,11,12;
23:10,18,19,22;24:5,5,
6;25:23,24;26:6,11,12,
13
**tips (17)**
20:5,6,7,9,10,11,13,
14;21:12;22:9,23,23;
24:2,3,18;48:7,10
**tissue (1)**
17:12
**title (1)**
12:20
**today (2)**
12:9;13:25
**told (6)**
33:3,4;34:13;35:6;
42:4,9
**Tone (1)**
45:13
**took (2)**
11:19;30:13
**tool (1)**
48:11
**top (4)**
20:20;28:8,17,18
**topic (11)**
31:2;38:1;39:5;
42:10,24;43:6;44:3,13,

17;47:4,6
**topics (2)**
5:21,24
**touch (4)**
28:8,21;29:5,9
**tower (7)**
33:2,8;34:1;36:22,
25;37:1;46:22
**track (7)**
48:21,21,25;49:1,3,4,
8
**trade (5)**
31:7,8,16,22;50:25
**tradedress (2)**
27:21;29:17
**trademark (8)**
8:19;9:1,13;45:4;
53:6;54:23;55:2,12
**trademarks (11)**
8:14,25;9:11;45:7,
10;46:10;53:23,24;
54:2,16,22
**training (2)**
32:5;52:22
**transcript (1)**
12:1
**treatment (1)**
48:8
**tried (1)**
32:17
**trouble (1)**
13:25
**true (4)**
36:1;50:18;52:8;
53:4
**truth (3)**
5:10,10,10
**truthful (1)**
53:21
**try (2)**
6:23;32:18
**trying (4)**
15:19;16:8;22:2;
32:16
**turn (1)**
14:9
**two (9)**
11:18;14:23;17:5;
31:2;36:24,25;40:16;
41:8;49:14
**two-year (1)**
36:24
**type (2)**
46:13;47:22

**U**

**Under (2)**
13:17;35:18
**underneath (2)**
10:14,22
**understood (1)**
51:17

**uneven (1)**
48:8
**union (2)**
29:21;30:4
**unique (1)**
27:22
**unit (4)**
21:16;33:25;34:1;
46:23
**units (5)**
21:9,11,13;35:14
**unless (1)**
35:7
**unsatisfied (1)**
13:12
**up (9)**
13:5;14:7,11;26:9;
37:9;43:18;49:14;51:1;
54:11
**upon (1)**
22:1
**ups (4)**
47:16,18,18;49:24
**upset (4)**
32:13,17;51:19,22
**Urby (7)**
31:3,4,9,20;32:22,
25;36:1
**use (13)**
24:1,3,18;44:22;
45:4,6,11;46:15,16;
52:12,23;53:6;55:3
**used (10)**
23:23;36:24,25;37:2,
6,11,17;42:5;45:3;51:8
**uses (2)**
24:3;38:3

**V**

**vacuum (1)**
25:23
**Vague (1)**
8:21
**vendor (5)**
42:11,12,13,17,22
**verbal (4)**
39:13;40:10,12;42:2
**Verbally (1)**
39:12
**verbatim (1)**
18:10
**verbiage (1)**
29:2
**verify (1)**
41:8
**versions (1)**
23:16
**versus (1)**
41:15
**via (1)**
34:23
**violating (1)**

53:5
**violations (1)**
8:3
**visible (1)**
23:15
**vortex (2)**
25:18,18

**W**

**waiting (2)**
12:15;49:19
**Wang (2)**
5:17;18:25
**wants (1)**
48:25
**Watz (1)**
42:8
**Wave (1)**
47:2
**way (8)**
14:7;25:2;33:6;34:7;
37:8;44:7;48:19;50:23
**ways (2)**
29:3;50:24
**web (11)**
9:5;23:9,13,16,19,
23;24:4,6;25:17;54:4,4
**webinars (1)**
28:2
**wet (1)**
20:11
**wherein (1)**
17:10
**Whereupon (1)**
18:2
**white (1)**
28:13
**whole (3)**
5:10;49:8;51:16
**width (1)**
14:9
**WILLIAM (1)**
5:5
**wireless (1)**
14:9
**within (2)**
17:7;45:5
**without (2)**
52:14
**WITNESS (53)**
5:12,16;7:8;9:15,25;
10:5;11:6,8;13:17;
15:10,18;16:2,8,14;
17:4,15,19;19:10,19;
20:23;22:7,22;23:3,13,
21;24:1,15,22;25:1,6,
13,22;26:19;27:11;
29:2,12;30:9,13,19,24;
31:3;35:1,11;39:2,18;
40:21;41:25;42:7;
43:20;45:24;47:25;
52:10;53:17

**woman's (1)**
13:21
**word (4)**
18:10,10;28:11;
53:10
**words (5)**
6:11,14;18:11,21;
42:5
**working (1)**
52:17
**works (2)**
6:12;41:17
**wrapped (1)**
43:18
**write (4)**
47:16,16,18;49:24
**writing (1)**
18:19
**written (3)**
19:21;28:11;39:3
**wrote (1)**
10:18

**Y**

**year (3)**
8:11;27:19;48:23
**years (3)**
10:18;11:12;38:15
**yesterday (1)**
12:13
**young (1)**
32:14

**1**

**10 (1)**
5:22
**100 (4)**
47:8,10,15,23
**11 (2)**
5:22;40:19
**11:07 (1)**
55:24
**12 (2)**
5:22;41:20
**13 (3)**
5:2,22;42:10
**15 (1)**
47:25
**17 (5)**
5:22;42:25;43:6;
44:3,13
**18 (3)**
5:22;47:4;48:16
**19 (1)**
7:2
**1997 (1)**
49:23

**2**

**2 (1)**
5:22

5:21
**20 (2)**
  5:22;47:6
**2006 (3)**
  14:17;15:4,14
**2010 (5)**
  9:23;10:13,21;11:16;
  13:22
**2014 (3)**
  7:2;9:4;48:3
**2015 (3)**
  5:2;16:17;47:25
**227 (1)**
  40:25
**28 (2)**
  48:4,5

**9:15 (1)**
  5:3

**3**

**3 (1)**
  5:21
**30 (1)**
  48:4
**30b1 (1)**
  50:6
**30b6 (2)**
  5:24;31:1

**4**

**4 (1)**
  9:13

**5**

**5 (1)**
  5:21
**591 (1)**
  17:9

**6**

**6 (1)**
  5:21
**6641591 (1)**
  17:2
**690 (1)**
  35:12

**7**

**7 (1)**
  5:21

**8**

**8 (1)**
  5:21

**9**

**9 (1)**
  5:21

# EXHIBIT J



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Food and Drug Administration
Los Angeles District
Pacific Region

19701 Fairchild
Irvine, CA 92612-2506
Telephone:    949-608-2900

FAX:    949-608-4415

JAN 1 6 2014



President
William Cohen
Edge Systems LLC
2277 Redondo Ave
Signal Hill, CA  90755

Dear Mr. Cohen:

We are enclosing a copy of the Establishment Inspection Report (EIR) for the inspection conducted at your premises at 2277 Redondo Ave, Signal Hill, CA on August 28, 2013.  This inspection was conducted by or for the U.S. Food and Drug Administration (FDA).  Effective April 1, 1997, when the Agency determines an inspection is closed under 21 C.F.R. 20.64(d)(3), FDA releases a copy of the EIR to the inspected firm for those inspections completed prior to the above date, a copy of the EIR may still be made available through the Freedom of Information Act (FOIA).

The Agency is working to make its regulatory process and activities more transparent to the regulated industry.  Releasing this EIR to you is part of this effort.  The copy being provided to you is comprised of the narrative portion of the report.  FDA might have redacted some information in accordance with FOIA and Title 21, Code of Federal Regulations, Part 20.

If there are any questions about released information, feel free to contact me at (949) 608-2900 or to write to:

U.S. Food and Drug Administration
ATTN:  Compliance Branch
19701 Fairchild
Irvine, CA  92612-2506

Sincerely,

Alonza E. Cruse, Director
Los Angeles District

Enclosure

**Exhibit KK Page 1 of 9**

ace

**Establishment Inspection Report**

Edge Systems LLC.

Signal Hill, CA  90755-4017

FEI: **3002477421**

EI Start: 08/28/2013

EI End: 08/28/2013

 **CONFIDENTIAL**

TABLE OF CONTENTS

Summary ................................................................................................................ 1
Administrative Data ............................................................................................. 2
History .................................................................................................................... 3
Interstate Commerce ............................................................................................ 3
Jurisdiction ............................................................................................................ 3
Individual Responsibility and Persons Interviewed ...................................... 3
Firm's Training Program ...................................................................................... 4
Manufacturing/Design Operations .................................................................... 4
Manufacturing Codes ........................................................................................... 4
Complaints ............................................................................................................. 4
CAPAS ..................................................................................................................... 5
Recall Procedures .................................................................................................. 5
Objectionable Conditions and Management's Response .............................. 5
Refusals ................................................................................................................... 6
Samples Collected ................................................................................................. 6
Exhibits Collected ................................................................................................. 6
Attachments ........................................................................................................... 6

*Class II  MO, 6/13/14*

**SUMMARY**

This was a routine pre-announced level I inspection of a medical device manufacturer and distributor of class II LED light therapy devices and a class III smoke evacuator device that was conducted in accordance with FY' 13 in response to FACTS assignment number 1521847. The assignment requested a surveillance medical device QSIT level I (abbreviated) inspection of the firm per Compliance Program 7382.845. The inspection is reported under PAC code 82845A and profile code ELE and MTL were covered. The firm's registration status in FACTS is current and they are listed as a Class I, II, and II medical device manufacturer. The firm does not manufacture any tracked devices.

The previous inspection was conducted on 05/24/10 and was classified NAI. The previous inspection focused on management controls, design controls, and the CAPA subsystem. There was no FDA-483, Inspectional Observations, issued at the end of the previous inspection.

The current inspection revealed that the firm continues to manufacture a line of hydrafacial devices that are mostly classified as class I. The firm also manufactures a red light LED light therapy device

**Exhibit KK Page 3 of 9**

| Establishment Inspection Report | FEI: | 3002477421 |
|---|---|---|
| Edge Systems LLC. | EI Start: | 08/28/2013 |
| Signal Hill, CA  90755-4017 | EI End: | 08/28/2013 |

(k072399) that is cleared for temporary muscle pain relief and a blue LED light therapy device (k061470) that is cleared for acne lugaris treatment; both devices are classified as class II medical devices. The only class III device that the firm manufactures is the smoke evacuator (k880890) that sucks the surgical smoke from the air during surgery. Majority of the firm's devices are class I exempt devices.

There have not been any changes to the design of the firm's devices since the prior inspection. This inspection focused on the firm's following sub-systems; CAPA, Complaints, and Design Controls. There was no FDA-483 issued at the close of the inspection. There was one discussion item discussed with the firm in reference to CAPA 103104 that should have a preventative action plan included. There were no samples collected during the inspection and there were no refusals encountered.

## ADMINISTRATIVE DATA

| | |
|---|---|
| Inspected firm: | Edge Systems Corp |
| Location: | 2277 Redondo Ave |
| | Signal Hill, CA  90755-4017 |
| Phone: | 800-603-4996 |
| FAX: | |
| Mailing address: | |
| | |
| Dates of inspection: | 8/28/2013 |
| Days in the facility: | 1 |
| Participants: | Durell Giles, Investigator |

On 08/28/13, I presented my credentials and issued the FDA-482, Notice of Inspection, to the President of Edge Systems LLC., Mr. William Cohen. Mr. Cohen was present throughout the entire inspection and provided me with the information regarding the firm's operations.

Correspondence should be addressed to:
Mr. William Cohen, President
Edge Systems LLC.
2277 Redondo Ave.
Signal Hill, CA.

**Exhibit KK Page 4 of 9**

| **Establishment Inspection Report** | FEI: | 3002477421 |
|---|---|---|
| Edge Systems LLC. | EI Start: | 08/28/2013 |
| Signal Hill, CA  90755-4017 | EI End: | 08/28/2013 |

## HISTORY
The firm's history of business has not changed since the previous inspection. The changes since the previous inspection are as follows.

- On December 12, 2012 the name of the company changed from Edge Systems Corporation to Edge Systems LLC.
- The company is now owned by Western Presidio 5 LP.
- Mr. Roger Ignon was formerly the CEO of the company, now his title is the Head of The Board of Directors.
- Mr. William "Bill" Cohen formerly the Vice President of Sales is now the President & CEO of the company.
- Mr. Greg Stickley is now the Vice President of Sales.

## INTERSTATE COMMERCE
Mr. Cohen stated that less than 20% of the firm's raw materials are received from outside of California and that approximately 85% of finished devices are sold outside of California.

## JURISDICTION
The firm continues to manufacture red light LED light therapy, blue LED light therapy, and smoke evacuator devices that are all subject to the FD&C Act. Mr. Cohen stated that the firm sales their products to distributors outside of the United States. Within the Unites States the products are sold directly to the professionals that use the devices such as doctor's offices and spas.

Mr. Cohen stated that the firm also advertises their products online at www.edgeforlife.com and they participate in various monthly trade shows. Mr. Cohen stated that some of the firm's biggest customers are Lifetime fitness and Neoderm (Hong Kong).

## INDIVIDUAL RESPONSIBILITY AND PERSONS INTERVIEWED
Mr. William "Bill" Cohen, President/CEO- Mr. Cohen stated that he has been the President of the firm since 2012 and that he was previously the Vice-President of Sales for the firm. Mr. Cohen stated that he started with Edge Systems in 1997 when he founded the company along with Mr. Roger Ignon. Mr. Cohen also stated that he is responsible for managing the direction of all departments and all employees report to him.

Mr. David Hernandez, QA/Technical Support Supervisor- Mr. Hernandez stated that he has been employed at Edge Systems for 5 years. Mr. Hernandez stated that he originally started as a QA Tech and he has been in his current position for 3 years. Mr. Hernandez has 4 direct reports and he reports to Ms. Eva Chang, Regulatory/ QA Manager. Mr. Hernandez stated that he does not have the

**Exhibit KK Page 5 of 9**

| **Establishment Inspection Report** | FEI: | **3002477421** |
|---|---|---|
| Edge Systems LLC. | EI Start: | 08/28/2013 |
| Signal Hill, CA  90755-4017 | EI End: | 08/28/2013 |

authority to hire or fire any of the firm's employees and he can make company expenditures to no set limit. Mr. Hernandez also stated that his responsibilities at the firm include handling complaints, customer issues, production, and quality.

Ms. Eva Chang, Regulatory/QA Manager- Ms. Chang stated that she has been with the company for 10 years, starting in Marketing. Ms. Chang has been in her current position for 1 year and she has 2 direct reports. Ms. Chang stated that she reports to the owner of the company Mr. Bill Cohen. Ms. Chang also stated that she has the authority to hire or fire any of the firm's employees and she can make company expenditures to no set limit. Ms. Chang also stated that her responsibilities at the firm include regulatory standards, international submissions, complaints, and CAPAs.

## FIRM'S TRAINING PROGRAM

I viewed the firm's training program (Training Doc #: SOP-018 Rev. 03) which states that new hire orientation and specific job related training will be established and documented. I pulled training records for four employees (Alvin Belt, Eva Chang, Rodrigo, and Ricardo), I did not find any observations with the firm's training program.

## MANUFACTURING/DESIGN OPERATIONS

Mr. Cohen provided me a walk-through of the facility, accompanied by Ms. Chang and Mr. Hernandez. The firm was in the process of manufacturing hydrafacial devices. There have not been any changes in the firm's manufacturing operations since the last inspection. Work orders are still prepared as orders are received for devices. The work order continues to include a build of materials on the specifications and work sheets provided. I observed the employees following the work instructions and completing the work order forms.

### Design Controls

I reviewed the firm's Design Control Doc. #: SOP-004 Rev. 02. There have not been any changes in the firm's class II devices since the prior inspection. Management stated that there are no future plans to change any design features of the class II devices. Management also stated that the firm does not sell many class II devices as most of their sells are from class I devices.

## MANUFACTURING CODES

The manufacturing codes for the devices have not changed since the last inspection.

## COMPLAINTS

During the inspection I reviewed the firm's "Complaint and MDR Reporting Doc. # QASI-14.028 Rev. B as well as the complaint logs for the years of 2011, 2012, and 2013. The firm received 5 complaints for 2011, 22 complaints for 2012, and 45 complaints for 2013. Many of the firm's complaints were for the class I devices. Many of the 2012 complaints were for irritation/allergic

**Exhibit KK Page 6 of 9**

| **Establishment Inspection Report** | FEI: | **3002477421** |
|---|---|---|
| Edge Systems LLC. | EI Start: | 08/28/2013 |
| Signal Hill, CA  90755-4017 | EI End: | 08/28/2013 |

reaction, burning sensation, lacerations, breakouts, and skin infections regarding the firm's class I devices.

When asked about the increase in complaints from 2011 to 2013, Ms. Chang justified the spike in complaints by stating that sales went up drastically and also Edge Systems began calling customers to get feedback and they were really forth-coming with information.

I pulled complaints 11-001, 12-012, 12-018, 12-003, 12-006, 12-008, 12-010, 13-002, 13-010, 13-016, 13-004, 13-008, 13-019, 13-025, and 13-040.  I did not find any observations with the firm's complaints or Complaint Handling Procedure.

## CAPAS
I reviewed the firm's Corrective Action Doc # SOP-014 Rev. 04 as well as the CAPA logs for 2011, 2012, and 2013. The firm opened 30 CAPAs in 2011, 39 CAPAs in 2012, and 30 CAPAs in 2013. Many of the CAPAs for 2011 were moved to 2012, Management stated that this was because the CAPAs were still opened and needed to be updated.

Of the CAPAs for 2011, 2012, and 2013 which totaled 99, only 1 CAPA from all three years was related to a class II device. CAPA 130104 was the only CAPA opened for any of the firm's class II devices.

CAPA 130104 was opened due to 8 safe systems being sent out with the wrong labeling. The 8 devices were sent out labeled as "10001" when the correct labeling for the devices was actually "18009-B". There were 12 in-house units that were also found with the same issue and corrected. QA and QC failed to check correct part numbers and specifications for the units during creation of the labels and during application of the labels to the units. The preventative action for this CAPA was identified as "N/A" in which I explained to Management that there are preventative actions that the firm could take to ensure that this mishap does not happen again. I discussed with Management that they should re-train employees to the label control procedure and make sure that they are double checking all of the information before applying the labels to the devices.

## RECALL PROCEDURES
Management stated the firm has not had to initiate any recalls. A search in the FDA data base revealed that the firm does not have any recalls on file with the FDA.

## OBJECTIONABLE CONDITIONS AND MANAGEMENT'S RESPONSE
During the close out meeting of the inspection there was Mr. Cohen (President), Ms. Chang (QA Manager), and Mr. Hernandez (Tech. Support Supervisor) was present from the firm. There was no FDA-483 issued however, there was two items I did discuss with Management. I stated that in regards to CAPA 13040, a preventative action could have been completed for that CAPA.  I also

**Exhibit KK Page 7 of 9**

**Establishment Inspection Report**

Edge Systems LLC.

Signal Hill, CA  90755-4017

| FEI: | **3002477421** |
| EI Start: | 08/28/2013 |
| EI End: | 08/28/2013 |

stated to Management that the firm's organizational chart should include names as well as titles. Management agreed with my discussion items and promised to fill in that section for future CAPAs and update their organizational chart.

**REFUSALS**

There were no refusals encountered during the inspection.

**SAMPLES COLLECTED**

There were no samples collected during this inspection.

**EXHIBITS COLLECTED**

1. Copy of the firm's organizational chart. 1 page
2. Brochure 6 pages
3. Marketing leaflet 2 pages
4. Marketing leaflet 2 pages
5. Marketing leaflet 2 pages
6. Marketing leaflet 1 page

**ATTACHMENTS**

1. Assignment ID: 1521847
2. FDA-482, Notice of Inspection, issued to the President of Edge Systems LLC, Mr. William Cohen
3.

**Exhibit KK Page 8 of 9**

| | | |
|---|---|---|
| **Establishment Inspection Report** | FEI: | 3002477421 |
| Edge Systems LLC. | EI Start: | 08/28/2013 |
| Signal Hill, CA  90755-4017 | EI End: | 08/28/2013 |

Durell Giles, Investigator

**Exhibit KK Page 9 of 9**

# EXHIBIT B



**ALTAIR INSTRUMENTS**

Your **Bright** Star to **Beautiful** Skin.

Cart    Account    Contact    Login    Signup

*search products*

| Home | About | DT2 | NewApeel | NewApeel Petite | Hydro Wand | HydroSerums | Store | Professionals | Clients | News |

# HYDRO WAND

## Signature skin care treatment.

Home  >  Hydro Wand

# Hydro Wand

## Versatile, Effective, Profitable

Let's face it. Your clients come to you because of your skin care expertise and your ability to provide individual attention to their specific needs. After skin exfoliation clients may need additional serums: multi-vitamin, skin lightening, acne, or deep moisturizing to complete their treatment. Wouldn't it be fantastic to be able to enhance your signature skin care treatment while keeping costs down? Now you can with the Altair Instruments Hydro Wand®.

**The patented Hydro Wand® is a multi-faceted tool that is multi-effective.** It is offered in two tip configurations: 12mm and 19mm. There are three different surfaces to choose from: Smooth (no diamonds), Fine and Medium grit diamond tip. The Hydro Wand® can be used with any of the Altair Instruments systems. By simply attaching the wand, tubing and hydro canister to the console, you will be able to expand your services to the newest technology at minimal cost.

**Each individual wand can be filled with various types of serums.** The freedom to add any type of serum in the Hydro Wand® allows you to enhance your services and create a signature skin care treatment for each of your clients. The patent pending hand pieces and the vacuum action aids in a deeper penetration of skin care serums. No other system can provide a deep exfoliation and deep product penetration than the combination of the Altair Instruments Diamondtome™ and Hydro Wand®.

Hydro Wand, U.S. Patent No. 8,221,437.

## Hydro Wand® Kit

**Wands: Choice of 3**

- 1 HYA00 Smooth Tip 19mm
- 1 HYA75 Fine Tip 19mm
- 1 HYA100 Medium Tip 19mm
- 1 HYAR00 Smooth Tip 12mm
- 1 HYAR75 Fine Tip 12mm
- 1 HYAR100 Medium Tip 12mm
- 3 Flexible Tubing
- 150 Single Use Application Pad

- 3 Small Round Brush
- 6 Vacuum Stem Assembly Cleaner
- 2 Hydro Collection Canister
- 1 Hydro Collection Canister Stand
- 1 Tweezers
- 1 HydroSerums™ Kit
- 1 Brass Brush

## Frequently Asked Questions

**Why come out with the Hydro Wand®?**

### Quick Links

**Professionals**
Instruction Manuals
Cleaning & Sterilization
Facial Treatment Protocol
Indications/Contraindications
Training Videos
Distributors





**Clients**
FAQ's
Who Can Benefit
Testimonials
Practitioners
Before & After Pictures

**Altair Instruments**
Certificates, Patents & Validations
Terms

**Answer:** Because you asked for it. Many of our happy skin care specialists want the option of adding more to their services. Altair wanted to make something that would fulfill your requests and provide effective results for your clients.

**Why an attachment rather than a separate unit?**

**Answer:** Altair wanted to create an effective multi-faceted tool that can work with your existing system at a fraction of the cost, saving you money and valuable space. We know our diamond tip wands for skin resurfacing are the most effective microdermabrasion available. Two passes with the existing DiamondTome™ wands will remove and break down the dead skin barrier and a final pass utilizing the Hydro Wand® allows you a new modality for deep penetration of products. The patent pending hand pieces and the vacuum action aids in a deep penetration of skin care serums.

**Do I have to purchase my serums for the Hydro Wand® from Altair Instruments?**

**Answer:** No. That's the beauty of the Hydro Wand®. You can use your own products depending on the clients needs. As long as it is a liquid or serum based product the solution can be easily inserted into the wand. You can use products that you know and trust to be effective for your clients.

**Why do I want to add a Hydro Wand® Facial?**

**Answer:** To rejuvenate and expand your existing microdermabrasion business. The patent pending Hydro Wand® technology easily allows you to add in your favorite products with minimal waste. Its superior design brings the serum at your fingertips with controlled precision. You can determine the exact output through the Flow Indicator and vacuum pressure. No mess, no waste. Which means more profit.

**Who will want this add-on service?**

**Answer:** Anyone who wants deep exfoliation and deep product penetration. The results are instant. Using the patented technology of DiamondTome™ exfoliation first, followed by the Hydro Wand® you can penetrate, hydrate, and nourish the skin all in one treatment!

**Can I use this Hydro Wand® on all skin types?**

**Answer:** It is fantastic for melasma, brown spots, wrinkles, fine lines, oily & acne prone skin and more. This system can be customized to the client's individual skin type. For instance, on a client with sensitive skin you may choose the Smooth Hydro Wand® with a lipid serum. With hyperpigmentation you may choose the Medium Hydro Wand® with a lightening serum. For mature skin choose the Fine Hydro Wand® with a multi vitamin serum. You will soon experience endless possibilities of how this can be incorporated into your services. This will make the add-on Hydro Wand® system very versatile, effective and profitable.

---



DiamondTome | NewApeel | NewApeel Petite | Hydro Wand | Store | News | Contact

Copyright ©2015 Altair Instruments, Inc.  |  FDA Registered No. 2024148  |  Website by Kelly Gray Design

 CE Made in the USA





12/11/2015                                    diamond microdermabrasion | eBay



Hi! Sign in    Sell                                               My eBay       

diamond microdermabrasion                          Microdermabrasion    ▼    🔍

Related: microdermabrasion machine    diamond microdermabrasion machine    diamond microdermabrasion tips ...    ☐ Include description

**Categories**

Health & Beauty

**Skin Care**

Salon & Spa Equipment

Other Health & Beauty

Vitamins & Dietary Supplements

Hair Care & Styling

More ▼

Business & Industrial

Healthcare, Lab & Life Science

Other Business & Industrial

See all categories

**Brand**                see all

BORBA (1)

Diamond Microdermabrasion (124)

NuBrilliance (13)

Silk'n (7)

Unbranded (237)

**Type**                 see all

Diamond/Crystal Microdermabrasion (159)

Multi-Function Machine (47)

Replacement Filters (13)

Replacement Tips & Wands (24)

Microdermabrasion Crystals (1)

**Skin Type**            see all

**Gender**               see all

**Condition**            see all

New (996)

Used (26)

**Price**

Under $100.00

$100.00 - $200.00

Over $200.00

$ ___ to $ ___  ≫

**Format**               see all

All Listings (1,022)

Auction (81)

Buy It Now (942)

**Item Location**        see all

Default

Within

100 miles ▼ of 33139

US Only

North America

Worldwide

**Delivery Options**     see all

Free shipping

Free In-store pickup

**Show only**            see all

---

All Listings | Auction | Buy It Now        Sort: Best Match ▼    View: ▤ ▾

All › Health & Beauty › Skin Care › Microdermabrasion

**diamond microdermabrasion**  1,022 listings   ☐ Follow this search



**Mini Diamond Microdermabrasion Dermabrasion Peel Facial Skin Care Beauty Machine**

**$70.99**
or Best Offer
Free shipping
74 sold



**Segawe DIAMOND MICRODERMABRASION DERMABRASION FACE PEEL SKIN Care Beauty MACHINE**
Xmas Promotion!US Ship & After Sales Service! Deal Now!
**$79.98**
Was: $266.60
or Best Offer
Free shipping
314 sold
70% off



**3-1 Mini DIAMOND MICRODERMABRASION DERMABRASION FACIAL PEEL Vacuum Spray MACHINE**
**$69.20**   Top Rated Plus
Was: $239.67
or Best Offer
Free shipping  ∧
292 sold
70% off



**5-1 DIAMOND MICRODERMABRASION PHOTON SKIN PEEL SCRUBBER BEAUTY SALON MACHINE**
**$239.99**   Top Rated Plus
Buy It Now
111 sold



**5in1 Diamond Microdermabrasion Dermabrasion Photon Scrubber Beauty Machine Care**
**$239.99**   Top Rated Plus
Buy It Now
51 watching

---

BIRCHBOX • MAN

**ALWAYS PERSONAL, NEVER PREDICTABLE**



GET THE BOX

Popular on eBay



PROFESSIONAL
Diamond .
**$119.99**
Buy It Now or Best offer
Free shipping
Popular



Used 3in1
Microdermabrasion .
**$48.00**
Buy It Now
Free shipping

☐ Returns accepted
☐ Completed listings
☐ Sold listings

**More refinements...**

Sponsored Links



NuBrilliance...
$141.99
Overstock.com



THE BMW 3 SERIES.
THE ULTIMATE
SPORTS SEDAN.

Learn More



3-1 Diamond Vacuum Dermabrasion Peeling Microdermabrasion Spray Beauty Machine

**$49.99**                    From China
Buy It Now
**Free shipping**

16 watching



Mini Diamond Dermabrasion Microdermabrasion Skin Rejuvenation Vacuum Spray u1
**$42.99**                    From China
or Best Offer
**Free shipping**

59 watching



3in1 Microdermabrasion Dermabrasion Machine Diamond Skin Rejuvenation Care U1
**$67.00**                    From China
or Best Offer
**Free shipping**

91 sold



4in1 Diamond Dermabrasion Microdemabrasion Machine Skin Scrubber Tightening Care
**$320.00**                   From China
or Best Offer

26 watching



Segawe DIAMOND MICRODERMABRASION DERMABRASION BEAUTY MACHINE Skin Peel Acne n22
**$97.99**                    Top Rated Plus
Was: $139.99
or Best Offer
**Free shipping**

118 sold
**30% off**

3-1 Diamond Microdermabrasion Machine Ultrasound Scrubber MF03
w/ 360 cotton filters



**$269.00**
Buy It Now
**Free shipping**

120 watching



2 in1 Mini Diamond Microdermabrasion...
**$69.99**
Buy It Now or Best offer
Free shipping



5in1 High Frequency / Galvanic / Facial Bru...
**$135.99**
Buy It Now or Best offer
Free shipping



4 In 1 Microcurrent Diamond Micro...
**$299.98**
Buy It Now or Best offer
Free shipping



7 in 1 Digital Diamond Microdermabrasion...
**$349.88**
Buy It Now
Free shipping

**$48.00**
Buy It Now
Free shipping





SEGAwe NEW 3in1 Mini FACIAL PEEL DIAMOND
MICRODERMABRASION DERMABRASION
MACHINE

**$70.99**
or Best Offer
**Free shipping**

223 sold



Used 3in1 Microdermabrasion Dermabrasion
Machine Diamond Skin Rejuvenation Care

**$48.00**
Buy It Now
**Free shipping**

8 watching



Diamond Microdermabrasion Dermabrasion
Peeling Acne Wrinkle Removal Vacuum u1

**$42.99**              From China
or Best Offer
**Free shipping**

37 watching



DIAMOND MICRODERMABRASION
DERMABRASION FACIAL SKIN CARE PEEL
MACHINE BLACKHEAD

**$79.00**               Top Rated
Was: $112.86            ●● Plus
or Best Offer
**Free shipping**

282 sold
30% off



Segawe 3-1 Microdermabrasion Dermabrasion
Machine Diamond Skin Rejuvenation Care

**$70.99**               Top Rated
or Best Offer           ●● Plus
**Free shipping**

NEW Diamond Microdermabrasion Dermabrasion Skin Peel Machine Skin
Whitening HOT

**$119.99**
or Best Offer
**Free shipping**

110 sold





NEW Diamond
Microdermabrasion...

**$119.99**
Buy It Now or Best offer
Free shipping

### Browse related



**Diamond
Microdermabrasion
Facial Machine**

### Collections

**Microdermabr...**
By: taliultra2012







10 items

**skin care**
By: krhamstine





24 items

**Bliss Spa**
By: izzy-lara



Less Money, More Love! DHgate is in California Giving Away Free Gifts!  



Welcome! **Join Free** or Sign in                                                                     Buyer Protection    VIP Club    He

**DH** .com
Buy Smart. Buy Direct.

I'm shopping for ..

All Categories ▾

Hi, Sign in
**My DHgate** ▾

You might be interested in


Water Peeling dermabrasion
Aqua Facial Peel Skin Care
**US $218.75 - 248.87**
Piece
Sold 3


Monopolar RF Cavitation
Vacuum slimming Weight
**US $1570.69 - 1727.75**
Piece
100 % Positive feedback


infrared spa capsule,infrared
heat spa capsule,far infrared
**US $5654.46** / Piece
100 % Positive feedback


Multifunction ultrasonic
cavitation slimming reshape
**US $1308.91 - 1465.97** /
Piece
100 % Positive feedback


SPA Hydro dermabrasion
&skin care beauty equipment
**US $2115.19** / Piece
100 % Positive feedback


new 40k Cavitation
Liposuction RF R
**US $1591.63** /
100 % Positive feed

← Go Back    Home >    Health & Beauty    >    Beauty Equipment    >    Microdermabrasion    >    **Product detail**



 **Free Shipping**

**2015 New 4 in 1 Microdermabrasion Hydro Facial PDT LED Skin Care Water
Dermabrasion RF Cavitation Cacuum Fat Reduction Photon Machine**

| | | |
|---|---|---|
| Price: | **US $3350.79** / Piece | Reference Currency ▾ |
| Wholesale Price ( Piece ): | 1 + US $3350.79 | |
| Quantity: | 1      Piece | |
| Shipping Cost: | Free Shipping to United States Via DHL ▾ Ships within 5 days, estimated delivery time: Sat Dec 19 and Thu Dec 24   ? | |
| Total Cost: | **US $3350.79** | |



⊕ See larger image

‹   ›

**Buy It Now**        **Add to Cart**

Add to Favorite Items

Share on 🅵 🅿 🆃 🅱 🅶+ ✉

12/11/2015                             Envy Medical, Inc Unveils SilkPeel3® | SilkPeel



*Love your skin again*

**Home**   **Why SilkPeel? »**   **SilkPeelTV »**   **Results »**   **Skincare Professionals »**   **About Us »**

Home   ›   Announcements   ›   Envy Medical, Inc. Unveils SilkPeel3®   ›

## Envy Medical, Inc. Unveils SilkPeel3®
## By Media on Apr 8, 2015 in Announcements |

WESTLAKE VILLAGE, Calif., March 18, 2015 /PRNewswire/ — Envy Medical, Inc. launches
SilkPeel3, the next generation of its world class patented Advanced Dermalinfusion Technology.
Unveiled originally in 2005, SilkPeel is celebrating its 10th birthday in style with fresh features,
enhanced functionality and a sleek new design.



In the past decade, SilkPeel has expanded to over 40 countries, with 3,000 systems in use
worldwide. It has also developed a solid celebrity fan base thanks to the gentle, non-irritating
technology and immediate "wow" factor. A longtime favorite of A-listers, SilkPeel is one of the most
coveted treatments at destination spas like The Spa at Four Seasons Hotel Los Angeles at Beverly
Hills with a following that includes Katie Couric and the Olsen twins.

As the first and only true Dermalinfusion system, SilkPeel combines non-invasive exfoliation with the
delivery of condition-specific solutions under pressure. These solutions are targeted toward the
individual skin needs of the client and can address acne, dryness, dull skin, aging, sun damage and
pigmentation.

"Our R&D team has been listening to doctors and skincare professionals as they have expanded their
use of Dermalinfusion, treating new areas of the body and skin textural issues," says Curtis Cluff,
CEO of Envy Medical, Inc. "Based on their feedback, we upgraded the SilkPeel design, improved the
features and enhanced the functions to exceed the expanding needs of our clients."

SilkPeel3 is an exponential advancement in ease-of-use, functionality, and efficacy. It is sleeker,
more compact and has an innovative "IndiviDUAL Infusion" dual-port design that loads two serum
solutions at once, allowing for more tailored treatments that address multiple skin concerns. SilkPeel3
can now treat blemishes, dry skin, dark spots and a host of other common skin concerns in one quick
and simple session.

"The dual-port design will make combination treatments catering directly to individual needs a reality,"
says Felipe Jimenez, Ph.D., Envy's Chief Scientific Officer. "For a patient with combination skin, we
can use an infusion of ClarityMD across the oily T-zone and then switch to a hydrating solution for
drier areas, ensuring optimal results for all skin types." Continues Dr. Jimenez, "For our providers,
SilkPeel3 gives a wider variety of treatment offerings and protocols."

Additional improvements include the ergonomically improved "Plexus" hand piece with the option of
new disposable medical-grade stainless steel treatment tips that make the treatment more
comfortable and effective by eliminating incomplete passes and delivering more powerful and precise
pneumatic vacuum results. Clients will be able to see impurities being removed from their skin in real
time, so they can actually visualize their skin getting cleaner.

The new SilkPeel3 offers an even wider treatment range, expanding the system's efficacy to multiple

### Skincare News

SilkPeel Featured in October
2015 NewBeauty Magazine

Envy Medical, Inc. Unveils
SilkPeel3®

Envy Medical Appoints New
CMO

Envy Medical Secures
Investment For Growth

JDD: SilkPeel's Effectiveness
Shown In Skin Of Color

### Search SilkPeel

Search for:
[_____]  [ Search ]

### Like Us On Facebook!



SilkPeel - ENVY...
27,231 likes

[ 🗓 Like Page ]   [ ➤ Share ]

Be the first of your friends to like this

body applications as well. When treating the body, SilkPeel3's higher vacuum power settings improve
the appearance of cellulite and restore skin elasticity, while the lower settings help address stretch
marks, truncal acne and rough patches.

SilkPeel3 will launch at AAD – March 20-24 in San Francisco. Visit the Envy Medical booth (#312) to
be among the first to experience the system.

A SilkPeel3 Facial will cost approximately $125 – 150, and will be available at select spas, medspas
and dermatologist offices nationwide. Find SilkPeel near you.

See the SilkPeel3 difference here: http://silkpeel.com/SP3/

SILKPEEL®
The SilkPeel Advanced Dermalinfusion Treatment System is a breakthrough skin rejuvenation and
precision exfoliation treatment from Envy Medical, the creators of The LUMIXYL® System.
@SilkPeelMD

ABOUT ENVY MEDICAL
Envy Medical develops, markets and sells highly effective non-invasive skin rejuvenation therapies for
patients suffering from either dermatologic or aesthetic conditions. The Company's lead products
include SilkPeel®, a breakthrough device combining exfoliation with Advanced Dermalinfusion
Technology for deeper tissue delivery of active ingredients and better patient outcomes
(www.silkpeel.com). Envy is also the developer of the patent pending ClarityMD Acne Solution brand
of acne treatment products (www.claritymdacne.com) and is the exclusive worldwide licensor of skin
brightening peptides, including the Lumixyl® peptide, developed at Stanford University
(www.lumixyl.com). More information can be found at www.envymedical.com. @Envymedical
@LUMIXYL @ClarityMDAcne.



Share this:

Email    Facebook    LinkedIn    Pinterest    Twitter    Google    More

Like this:

Like

One blogger likes this.





envymedical.com/index.php?view=article&catid=25%3Aproducts&id=88%3Asilkpee-what-it-is&tmpl=comp

silkpeel: what it is

how it works | what it is | treatment | how long does it take?



Skin Hydrating Pro-Infusion

12/11/2015

WhatsDermalinfusion.jpg (2558×1440)

# What is Dermalinfusion Technology?

The *simultaneous action* of skin exfoliation and Infusion of condition-specific serums



**Diamond Exfoliation:**
Patented diamond tips exfoliate dead, damaged skin at a uniform, controlled depth

**Volumizing Hydration:**
All skin treated with SilkPeel has 70% more volume – meaning skin is plumped and wrinkles smoothed

**Targeted Treatment Delivery:**
Specialized Pro-infusion serums are delivered to the base of pores to address dark spots, acne, fine lines & wrinkles, stretch marks, and dry skin

**Deep Pore Cleansing:**
Vacuum pressure flushes pores with condition-specific serums, and removes dirt and debris

DIAMOND EXFOLIATION

DEEP PORE CLEANSING

VOLUMIZED HYDRATION

TARGETED DELIVERY SYSTEM

http://silkpeel.com/wp-content/uploads/2013/07/WhatisDermalinfusion.jpg

1/1



*Love your skin again*



Home   **Why SilkPeel? »**   SilkPeelTV »   Results »   Skincare Professionals »   About Us »

**Why SilkPeel?**



**Congratulations!** You have found **SilkPeelMD**, the only medical grade in-office procedure with patented Dermalinfusion technology to treat a wide variety of visible skin conditions, on the face and body.

According to the American Society of Aesthetic Plastic Surgeons, microdermabrasion has been one of the top 5 non-surgery procedures performed for the last several years.  At the same time, patients are turning to their dermatologist or cosmetic surgeon for medical grade skin care in increasing numbers.

Now there is the **SilkPeel MD**, combining the highest quality, diamond assisted microdermabrasion with a simultaneous delivery of potent topical serums deep into the surface of the skin and down to the base of the pores.

## What is Dermalinfusion Technology?



The SilkPeel diamond treatment head handpiece removes the top-most portion of the epidermis called the stratum corneum.

SilkPeel Pro-Infusion solutions are simultaneously infused into the viable epidermis under pneumatic pressure.  This is Dermalinfusion.  No other device uses true Dermalinfusion technology.  It's an exclusive SilkPeel patent!

**Skincare News**

SilkPeel Featured in October 2015 NewBeauty Magazine

Envy Medical, Inc. Unveils SilkPeel3®

Envy Medical Appoints New CMO

Envy Medical Secures Investment For Growth

JDD: SilkPeel's Effectiveness Shown In Skin Of Color

**Search SilkPeel**

Search for:                    [Search]

**Like Us On Facebook!**



Improve your skin function, tone and texture.

  

# EXHIBIT K



# U.S. Food and Drug Administration
Protecting and Promoting *Your* Health

FDA Home[3] Medical Devices[4] Databases[5]

## MAUDE Adverse Event Report: EDGE SYSTEMS LLC HYDRAFACIAL GFE, HYDRADERMABRASION

| | 510(k)[7] | DeNovo[8] | Registration & Listing[9] | Adverse Events[10] | Recalls[11] | PMA[12] | HDE[13] | Classification[14] | Standards[15] |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [6] | CFR Title 21[16] | Radiation-Emitting Products[17] | | X-Ray Assembler[18] | Medsun Reports[19] | | CLIA[20] | TPLC[21] | Inspections[22] |

### EDGE SYSTEMS LLC HYDRAFACIAL GFE, HYDRADERMABRASION

Back to Search Results

**Model Number** HYDRAFACIAL WAVE
**Event Date** 07/27/2010
**Event Type** Injury
**Event Description**

Patient received a facial acid peel (cosmetic treatment) performed by the health professional during the above dates. The suspect products used were cosmetic products containing glycolic acid and salicylic acid; the products were used in conjunction with the hydrafacial wave device. The operator failed to follow instructions for use and precaution to properly cover and protect patient's eyes during facial treatment, causing the acidic fluids to get into patient's eyes and surrounding areas, resulting in reported patient injuries. Those reports include excessive tearing of both eyes; itchiness, swelling, and burning sensation of the eyes and surrounding areas; rash an irritated skin; mild contact dermatitis; lacrimal tear duct stenosis; mild sinusitis with nasal obstruction; mild periorbital cellulitis; etc. Patient also complained about blurry vision, sensitive to light, etc. Patient was caused to use eye drops, facial ointments, warm compresses, medications, and underwent a bilateral lower eyelid punctoplasty. Patient was not hospitalized or confined to bed, but was confined to her home for approximately 30 days intermittently.

**Manufacturer Narrative**

The incident occurred in 2010, but was not brought to edge systems' (manufacturer) attention until recently by the lawsuit between the consumer and the health professional. The attorney provided medical records and details on (b)(6) 2013, so edge systems was able to file a report. The incident was caused by operator neglecting to follow the instructions for use (ifu). It was operator error; no device malfunction or product defects. The suspect cosmetic product(s) used in conjunction with the device contain glycolic acid and salicylic acid at low concentration that are safe to use on human skin surface to remove stratum corneum if the recommend instructions for use are followed properly. The suspect product(s) are not intended to be used on or around the eyes. The ifu provided by edge systems, including use manuals, training dvds, and labels, provide adequate and proper instructions and recommend the use of eye protection for patient during treatment. The ifu also state that if the fluids get into the eyes, rinse with water immediately, and seek medical care if irritation occurs/persists. Edge systems also provided training to the health professional at time of device purchase, educating operators the proper treatment protocols and procedures. In addition, all the lots of suspect product(s) that could possibly be use around the date of event all showed compliance to specifications and no microbial growth or defects were found.

### Search Alerts/Recalls[23]

New Search | Submit an Adverse Event Report[24]

**Brand Name** HYDRAFACIAL
**Type of Device** GFE, HYDRADERMABRASION
**Manufacturer** *(Section D)* EDGE SYSTEMS LLC
Signal Hill CA
**Manufacturer Contact** Gary Mocnik
49 Coastal Oak
Aliso Viejo , CA 92656

12/11/2015      MAUDE Adverse Event Report: EDGE SYSTEMS LLC HYDRAFACIAL GFE, HYDRADERMABRASION

**MDR Report Key** 3108813
**Report Number** 2031227-2013-00001
**Device Sequence Number** 1
**Product Code** GFE 25
**Report Source** Manufacturer
**Source Type** Unknown
**Reporter Occupation** NOT APPLICABLE
**Type of Report** Initial
**Report Date** 05/06/2013
**1 Device Was Involved in the Event**
**1 Patient Was Involved in the Event**
**Date FDA Received** 05/06/2013
**Is This An Adverse Event Report?** Yes
**Is This A Product Problem Report?** No
**Device Operator** Health Professional
**Device MODEL Number** HYDRAFACIAL WAVE
**Device Catalogue Number** 70159-03
**Was Device Available For Evaluation?** Yes
**Is The Reporter A Health Professional?** No
**Date Manufacturer Received** 04/05/2013
**Was Device Evaluated By Manufacturer?** Device Not Returned To Manufacturer
**Date Device Manufactured** 05/01/2010
**Is The Device Single Use?** No
**Is this a Reprocessed and Reused Single-Use Device?** No
**Type of Device Usage** Invalid Data


**Patient TREATMENT DATA**
**Date Received: 05/06/2013 Patient Sequence Number: 1**
**Treatment**
GLYSAL PEEL
1.5% SALICYLIC ACID
GLYSAL PREP, 7.5%
15% GLYCOLIC ACID
SLICYLIC ACID
GLYCOLIC ACID AND 2%

**Links on this page:**

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain

2. http://www.addthis.com/bookmark.php

3. http://www.fda.gov/default.htm

4. http://www.fda.gov/MedicalDevices/default.htm

5. http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Databases/default.htm

. /scripts/cdrh/devicesatfda/index.cfm

7. /scripts/cdrh/cfdocs/cfPMN/pmn.cfm

8. /scripts/cdrh/cfdocs/cfpmn/denovo.cfm

9. /scripts/cdrh/cfdocs/cfRL/rl.cfm

10. /scripts/cdrh/cfdocs/cfMAUDE/TextSearch.cfm

11. /scripts/cdrh/cfdocs/cfRES/res.cfm

12. /scripts/cdrh/cfdocs/cfPMA/pma.cfm

13. /scripts/cdrh/cfdocs/cfHDE/hde.cfm

# EXHIBIT L

12/11/2015                          www.sunbiz.org - Department of State



# FLORIDA DEPARTMENT OF STATE
# DIVISION OF CORPORATIONS

| Home | Contact Us | E-Filing Services | Document Searches | Forms | Help |

Previous on List     Next on List     Return to List

Fictitious Name Search

Submit

**No Filing History**

## Fictitious Name Detail

### Fictitious Name

DIAMONDSKIN SYSTEMS

### Filing Information

| | |
|---|---|
| Registration Number | G10000027051 |
| Status | ACTIVE |
| Filed Date | 03/24/2010 |
| Expiration Date | 12/31/2015 |
| Current Owners | 1 |
| County | MIAMI-DADE |
| Total Pages | 1 |
| Events Filed | NONE |
| FEI/EIN Number | NONE |

### Mailing Address

1172 SOUTH DIXIE HIGWAY
SUITE 485
CORAL GABLES, FL 33146

### Owner Information

AGUILA, RAFAEL
1172 SOUTH DIXIE HIGHWAY, SUITE 485
CORAL GABLES, FL 33146
FEI/EIN Number: NONE
Document Number: NONE

### Document Images

03/24/2010 – Fictitious Name Filing     View image in PDF format

Previous on List     Next on List     Return to List

Fictitious Name Search

Submit

**No Filing History**

# EXHIBIT M

# INVOICE

**HYDRADERMABRASION SYSTEMS**

1172 S. Dixie Highway
Suite 485
Coral Gables, FL 33146
1-866-766-0639
www.hydradermabrasion.com

INVOICE # 2344
DATE: MAY 13, 2010

| | |
|---|---|
| SHIP TO | Cosmetic Laser & Vein Centre<br>1504 15 AVE SW<br>Calgary, Alberta<br>T3C 0X9<br>403-229-2747 |

| SALESPERSON | JOB | SHIPPING METHOD | SHIPPING TERMS | DELIVERY DATE | PAYMENT TERMS | DUE DATE |
|---|---|---|---|---|---|---|
| Ralph Aguila | | FedEx | | | | |

| QTY | ITEM # | DESCRIPTION | UNIT PRICE | SHIPPING | LINE TOTAL |
|---|---|---|---|---|---|
| 1 | Hydradermabrasion system | 3-month supply of dermal-infusion products. 30-day moneyback guarantee. | $4,000 | $0 | $4,000 |
| | | | | **TOTAL** | $4,000 |

**THANK YOU FOR YOUR BUSINESS!**

MANUAL

HydraDerm handpiece



MANUAL

Diamond-Tip handpiece

