**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No: 1:14-cv-24517-KMM

EDGE SYSTEMS LLC, a California
limited liability company, and AXIA
MEDSCIENCES, LLC, a Delaware limited
liability company,

       Plaintiffs,

v.

RAFAEL NEWTON AGUILA, a/k/a
RALPH AGUILA, an individual, d/b/a/
HYDRADERMABRASION SYSTEMS,

       Defendant.

_____/

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

THIS CAUSE came before the Court upon Plaintiffs' Motion for Summary Judgment (ECF No. 176) and related responses and replies. The motion is now ripe for review. For the reasons that follow, Plaintiffs' Motion for Summary Judgment is GRANTED.

## I.      BACKGROUND[1]

Bootleg. Clone. Copycat. Imitation. Knock-off. Palm-Off. However one labels a peddled product that conspicuously capitalizes on another's intellectual property rights, this case presents the quintessential example.

---

[1]  The facts of this case have been previously set out in a number of the Court's prior orders. *See* (ECF Nos. 15, 89, 110, 158). For brevity's sake, the Court will only reiterate the facts most pertinent to the instant motion. The facts presented here are undisputed and supported by the record before the Court.

Plaintiffs Edge Systems LLC ("Edge") and Axia Medsciences, LLC ("Axia")[2] brought this action against Defendant Rafael Newton Aguila ("Aguila") seeking damages and injunctive relief for, *inter alia*, patent, trademark, and trade dress infringement.  *See generally* Compl. (ECF No. 1).

Roger Ignon and William Cohen founded Edge—a California corporation—in 1997. Edge designs and sells skin health devices, including spa and skin treatment products and hydradermabrasion systems.  Edge's premier and bestselling product is its HydraFacial MD® hydradermabrasion system (the "Edge Machine") pictured below.



The Edge Machine utilizes a "wet system" that exfoliates a patient's facial skin tissue by using an abrasive tip in combination with the application of serums, followed by a vacuum source to extract dead skin cells from the patient.

---

[2]  For ease of reference, the Court will collectively refer to Plaintiffs as Edge throughout the remainder of this order as Plaintiff Axia's interest in this matter is confined to its claim of patent infringement (as the patent owner), whereas Plaintiff Edge has claims of both patent and trademark infringement (as the exclusive licensee of Axia's patents).

The average sales price for the Edge Machine is $24,000.  Sales of the Edge Machine account for over half of Edge's total sales and revenue from sales of the Edge Machine has totaled over $48 million in the past five years.  The machine is well-known in the aesthetic industry and has been recognized with numerous awards.  Edge extensively advertises the Edge Machine and related products in consumer and trade magazines, at trade shows, seminars, and on the Internet.  In the past five years, Edge has spent over $5.6 million in advertisement of its products.  In addition to Edge's advertising, several national media outlets have featured profiles of Edge and its various products.

### A.      Plaintiffs' Intellectual Property

Edge's machine incorporates technology—for exfoliating and moisturizing skin—that is claimed in six U.S. patents[3], owned by Plaintiff Axia and exclusively licensed to Edge.  On December 30, 1999, the application for the '620 Patent was filed with the United States Patent and Trademark Office ("USPTO").  On October 9, 2001, the '620 Patent, entitled "Instruments and Techniques for Inducing Neocollagenesis in Skin Treatments," was issued by the USPTO.  Claim 1 of the '620 Patent reads as follows:

> A system for treating surface layers of a patient's skin, comprising: an instrument body with a distal working end for engaging a skin surface; a skin interface portion of the working end comprising an abrasive fragment composition secured thereto; at least one inflow aperture in said skin interface in fluid communication with a fluid reservoir; and at least one outflow aperture in said skin interface in communication with a negative pressurization source.

ECF No. 1-4.

---

[3]  The patents at issue are: (1) U.S. Patent No. 6,299,620 ("the '620 Patent"); (2) U.S. Patent No. 6,641,591 ("the '591 Patent"); (3) U.S. Patent No. 7,678,120 ("the '120 Patent"); (4) U.S. Patent No. 7,789,886 ("the '886 Patent"); (5) U.S. Patent No. 8,066,716 ("the '716 Patent"); and (6) U.S. Patent No. 8,337,513 ("the '513 Patent").  As Edge only moved for summary judgment of infringement and no invalidity of the '620 Patent and the '591 Patent, the remainder of the Court's analysis will focus solely on those two patents.

The '591 Patent, entitled "Instruments and Techniques for Controlled Removal of Epidermal Layers," was issued on November 4, 2003.  Claim 1 of the '591 Patent reads:

> A system for treating the skin surface of a patient, comprising: an instrument body with a distal working end that defines a skin interface portion for contacting the skin; a first aperture arrangement in said skin interface consisting of at least one port in communication with a treatment media source; a second aperture arrange in said skin interface consisting of at least one port in communication with a vacuum source for removing treatment media and removed tissue from the skin interface; and wherein the skin interface comprises an abrading structure with substantially sharp edges for abrading tissue.

ECF No. 1-5.

As early as 2005, Edge began to use the names ACTIV-4, ANTIOX-6 and BETA-HD to identify serums used with the Edge Machine.  In 2010, Edge began to offer serums under the names DERMABUILDER and GLYSAL, and has continuously used all of the serum marks in interstate commerce since their initial use in connection with the advertisement and sale of Edge's products.  Edge expanded its selection of serums by offering VORTEX-FUSION®, a mark it registered with the USPTO on March 20, 2012.[4]  In 2014, Edge first offered a serum named ANTIOX+ and has since continuously used this mark in interstate commerce to advertise and sell that product.

In addition to the Edge Machine and related serums, Edge offers a skin resurfacing product named HYDROPEEL®.  Edge registered the HYDROPEEL® mark with the USPTO in September 2008, and has continuously used this mark in interstate commerce to advertise and sell that product as well.  The HYDROPEEL® mark is associated with goods described as

---

[4]  The Court takes judicial notice of U.S. Trademark Registration No. 4,114,466 for the mark VORTEX-FUSION ("the '466 Registration").  *See* Fed. R. Evid. 201.  Additionally, the Court will refer to the serum marks collectively as the Edge Serum Marks unless an individual distinction is necessary.

"medical apparatus and instruments for resurfacing and nourishing tissue" and has attained "incontestable" status.[5]

Additionally, Edge owns the registered trademark The EDGE SYSTEM®, which was registered in September 2005, and has also attained "incontestable" status. According to the registration, the mark is associated with "medical apparatus, namely, systems comprised primarily of a vacuum source and hand piece used for medical body treatments, microdermabrasion and massage therapy."

Since its founding in 1997, Edge has continuously operated under the trade name "Edge Systems," and used the common law mark Edge Systems in connection with the sale and promotion of its products. Since 1999, Edge has used variations of its Chevron "E" logo formed by three triangles as shown below:


1999–2011


2011–PRESENT

### B.    Aguila's Allegedly Infringing Conduct

In October 2014, Edge was surprised to learn that one of its main competitors, Lumenis, was apparently offering a copycat version of the Edge Machine (the "Accused Product") on the website www.hydradermabrasion.com ("Aguila's Lumenis Website"). When Edge contacted Lumenis, Edge learned that Lumenis was equally surprised at the presence of Aguila's Lumenis Website. After further evaluation, Edge and Lumenis discovered that the website was registered to Aguila, who was using the site, Lumenis' trade name, and Lumenis' trademarks to advertise a

---

[5]  As will be discussed *supra*, a mark gains "incontestable" status when it has been registered on the Principal Registry for more than five (5) years and is the subject of certain filings with the USPTO as required under the Section 15 of the Lanham Act. *See* 15 U.S.C. § 1065.

knock-off version of the Edge Machine for his business Hydradermabrasion Systems.   The

Accused Product was advertised, interchangeably, as the HydraDerm, the HydraDermMD, the

Hydradermabrasion, and the Hydradermabrasion MD.

          

EDGE HYDRAFACIAL® PRODUCT          DEFENDANT'S ACCUSED PRODUCT

On October 27, 2014, Edge sent Aguila a cease and desist letter and asked that he stop

infringing on Edge's asserted patents.[6]   *See* (ECF Nos. 13-04 ¶ 20, 13-06).   Lumenis also

separately asked Aguila to cease using its trade name and trademarks.   *See* (ECF No. 13-04, ¶

21).   On October 29, 2014—just two days after Edge's letter—Aguila filed for a Fictitious

Business Name with the Florida Department of State for the name EDGE SYSTEMS.   *See* (ECF

Nos. 13-15, 13-27).   Soon thereafter, Aguila transformed his Lumenis website into one that was

designed to blatantly pass his company off as Edge.

---

[6]   This was not the first time Edge dealt with Aguila's infringing activity.   On two prior
occasions—October 2006 and January 2010—Edge became aware that Aguila, through a
company he operated named DiamondSkin Systems, Inc. was selling a potentially infringing
device.   After determining that the 2006 device did not infringe Edge's patents, Edge took no
further action.   However, in January 2010, Edge sent Aguila a cease and desist letter demanding
that DiamondSkin Systems stop using the marks GLYSAL, ACTIV-4, DERMABUILDER and
ANTIOX-6 in connection with treatment topicals, because Edge possessed common law rights in
these marks.   Aguila did not respond to the letter, but less than two months later, he filed Articles
of Dissolution with the Florida Secretary of State dissolving DiamondSkin.   Aware of the
company's dissolution, Edge believed Aguila's company ceased selling the infringing products
and considered the matter closed.

Aguila went to great lengths to assume Edge's identity, including filing his own trademark applications for the Edge Systems trade name and Edge's Chevron "E" logo by submitting a false declaration claiming a first use of the marks in commerce that predates Edge's founding.   Aguila also started using the website www.edge-systems.com to advertise the Accused Product and had his receptionist greet callers as having called "Edge Systems."  At least one of Aguila's "Regional Sales Managers" passed himself off as being affiliated with Edge and even included "Edge Systems" in his e-mail signature line.  When a potential customer asked if there was a difference between the Edge Machine and the Accused Product, Aguila's "Regional Sales Manager" represented that the product was Edge's newest upgrade of the Edge Machine.

Aguila's charade as Edge continued as he lured customers into thinking that the Accused Product was an authentic version of Edge's Machine.  For example, Dr. Elliott Duboys—a plastic surgeon who purchased the Accused Product from Aguila for $7,650—thought the machine he purchased was actually the Edge Machine.  Upon receiving the machine from Aguila, Dr. Duboys contacted Aguila's company to question why the machine was labeled HydraDerm MD instead of HydraFacial MD.  Aguila's sales representative assured Dr. Duboys that the HydraDerm MD was the newest version of Edge's medical-grade machine and that it was being sold throughout Europe.  After noticing several deficiencies with his purchased product, Dr. Duboys attempted to lodge a complaint through Aguila's website and listed phone number but neither were operational.  Dr. Duboys ultimately reached Edge and learned that the product he purchased was not Edge's Machine.

Another customer, Lealani Irby—a day spa owner—purchased a product she believed was Edge's Machine from Aguila for $6,000 through eBay.  Irby stated that the overall appearance of the machine that she purchased made her believe that it was an Edge Hydrafacial

MD® hydradermabrasion system.  After receiving the machine, Irby received an e-mail from Aguila listing a phone number for Hydradermabrasion Systems in case she had any questions regarding installation of the product.  Irby encountered difficulty during installation, but was unable to obtain any assistance at the number Aguila provided.  Shortly after purchasing the Accused Product, Irby attended a convention held by the International Congress of Esthetics where she met with representatives from Edge.  Ms. Irby approached Edge seeking training and certification for her recently purchased machine, but was informed by Edge that it was not an authentic product.

After returning home, Irby mailed the Accused Product to Edge to assist with their investigation into Aguila's activities.  At this point, Edge learned that Aguila was selling a hydradermabrasion machine that looked nearly identical to the Edge Machine.  The only apparent difference was the names Aguila gave those machines—which were displayed on a translucent blue door cover and monitor screen next to an "E" logo and the words "Edge Systems."  On October 27, 2014, Edge sent Aguila another cease and desist letter demanding that he stop marketing and selling the Accused Product because it infringed on Edge's intellectual property rights.  Aguila responded to the letter by accusing Edge of engaging in fraud and unfair competition, but otherwise did not dispute Edge's infringement allegations.

### C.    Procedural History

On November 25, 2014, Edge initiated the instant action against Aguila.  *See* Compl. (ECF No. 1).  Shortly thereafter, Edge filed an emergency motion for an ex parte temporary restraining order ("TRO") and for an order to show cause why a preliminary injunction should not issue against Aguila.  *See* (ECF No. 13).  On December 2, 2014, the Court granted the

motion for a TRO and referred the remainder of the application for a preliminary injunction to the Honorable Chris M. McAliley, United States Magistrate Judge.  *See* (ECF Nos. 15, 16).

Judge McAliley held an evidentiary hearing on the preliminary injunction on December 19, 2014.  *See* (ECF No. 44).  At the hearing, Aguila conceded that he uses the same or nearly identical trademarks and trade dress as Edge, and that his machine incorporates technology covered by Edge's patents.  However, Aguila argued that Edge's motion should be denied because he is the first to use the trademarks and trade dress and any patents that Edge has are invalid.

To support his prior use claim, Aguila testified that in 1996 he informally created a company named "Edge Systems" and designed the Chevron "E" logo at that point.  Aguila further testified that he used the Edge Serum Marks in 2004, well before Edge did so.  Weeks after the hearing, Aguila filed a Supplemental Declaration (ECF No. 63) and attached to it two invoices—ostensibly dated 1996 and 2004—which he claimed were proof of his prior use of the various disputed marks.  Aguila asserts that he did not submit the invoices at the preliminary injunction hearing because he was unclear about certain evidentiary rules.  Judge McAliley was unconvinced of the credibility of Aguila's claims and issued a report and recommendation (ECF No. 81) recommending that Edge's request for a preliminary injunction be granted.  The Court— after conducting a de novo review of the record—adopted the report and recommendation and entered a preliminary injunction against Aguila.  *See* (ECF Nos. 89, 90).

Aguila filed an interlocutory appeal of both of the Court's orders.  *See* Notice of Appeal (ECF No. 97).  The Federal Circuit issued a mandate affirming the Court's orders on the grounds that the Court did not abuse its discretion in granting the preliminary injunction.  *See Edge Sys. LLC v. Aguila*, No. 2015-1507, 2015 WL 9267529, (Fed. Cir. Dec. 21, 2015) (per curiam).  In

the interim, the Court denied Aguila's motion to dismiss (ECF No. 110) and Aguila's proposed

Second Amended Answer and Counterclaims[7] ("SAAC") (ECF No. 154).  On October 26, 2015,

the Court granted Edge's motion to dismiss Aguila's counterclaims and strike his affirmative

defenses.  *See* Order (ECF No. 158).  Most pertinent to the instant motion, the Court applied the

following reasoning in striking Aguila's affirmative defense of prior use:

> The Court is unconvinced that the exhibits Defendant offers in support of the
> Ninth affirmative defense are authentic.  Prior testimony by the Defendant and the
> Report and Recommendation issued by Judge McAliley only highlight the Court's
> grave concerns over Defendant's willingness to manufacture evidence and abuse
> the judicial process.  Clear and convincing evidence has been presented that
> Defendant knowingly advanced a document of questionable authenticity and
> relied upon it in Defendant's pleadings.  Such repeated submissions of fraudulent
> documents and testimony form a sufficient basis for the Court to strike the Ninth
> affirmative defense.  *See Vargas*, 901 F. Supp. at 1582 ("Litigants must know that
> the courts are not open to persons who would seek justice by fraudulent means.")
> (citation omitted).

*Id.* at 13−14.

On December 4, 2015, both Aguila and Edge moved for summary judgment.[8]  *See* (ECF

Nos. 176, 179).  The Court now turns to Edge's motion for summary judgment.

## II.   LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine issue as to any material fact

[such] that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*,

---

[7]   The Court noted that Aguila's "proposed amendment not only exhibits bad faith, but also
appears to demonstrate a continuous disregard for the judicial process which threatens the
integrity of the judicial system."  *See* (ECF No. 154).  The Court further cautioned Aguila that
"further dilatory tactics and bad faith filings before this Court could lead to sanctions for abusive
practices."  *Id.*

[8]   On April 25, 2016, the Court denied Aguila's summary judgment motion on the grounds
that—without a supporting statement of material facts—the Court had no basis to entertain
Aguila's motion.  *See* (ECF No. 224).  The Court also determined that Aguila's motion was "full
of nothing but conclusory assertions" which the Court found "wholly lacking in probative value"
at the summary judgment stage.  *Id.*

477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56.  An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case.  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).  An issue of fact is "genuine" if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party.  *Id.*  Additionally, speculation or conjecture cannot create a genuine issue of material fact.  *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

The moving party has the initial burden of showing the absence of a genuine issue as to any material fact.  *Id.* (citation omitted).  In assessing whether the moving party has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the non-moving party.  *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001).  Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment.  *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); *see also* Fed. R. Civ. P. 56(e).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment."  *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992).  But if the record, taken as a whole, cannot lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment is proper.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.   DISCUSSION

In the interests of clarity, the Court will take a multi-pronged approach to resolve the issues presented in Edge's motion for summary judgment and request for permanent injunctive relief.  First, the Court will address Edge's arguments that there is no genuine issue of material fact that Edge has protectable interests in both its common law and registered trademarks.  Next, the Court will determine whether summary judgment is appropriate on the issue of infringement and the validity of the '620 and '591 patents.  The Court will then turn to resolving Edge's state law claims.  Lastly, the Court will analyze whether Edge is entitled to permanent injunctive relief against Aguila's allegedly infringing activities.  The Court now turns to the merits of the motion.

### A.   The Edge Marks

1.   There is no Genuine Issue of Material Fact That Edge Has Valid Common Law Rights in Its Marks.

Under common law, trademark ownership rights "are appropriated only through actual [and continuous] prior use in commerce."  *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1022 (11th Cir. 1989).  To acquire common law rights in a mark, a party must show that (1) it is the prior user of the unregistered mark and (2) it acquired a protectable interest in the mark because the mark is either inherently distinctive or has acquired distinctiveness through a secondary meaning.  *Investacorp, Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d 1519, 1522 (11th Cir. 1991); *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992).

Here, Edge has acquired common law trademark rights to the EDGE SYSTEMS trade name and the Chevron "E" logo since Edge is the prior user of the marks and the marks are inherently distinctive.  First, there is no genuine dispute of material fact that Edge's use of the aforementioned marks predates Aguila's use of the marks and subsequent attempts to gain a

protected interest over the EDGE SYSTEMS word mark.[9]   Edge has continuously operated

under the trade name EDGE SYSTEMS since 1997 while Aguila's first recorded use of the mark

was in 2014.[10]   Similarly, Edge has used variations of its Chevron "E" logo in connection with

the sale and promotion of its products since 1999 while Aguila's first record use of the logo was

2014.

Second, the EDGE SYSTEMS mark and the Chevron "E" logo are inherently

distinctive.[11]   Courts within this Circuit generally recognize four categories of mark

distinctiveness, listed in ascending order of strength:

---

[9]   On November 1, 2014, Aguila submitted a trademark application for the word mark "Edge Systems."   *See* (ECF No. 50-30).   Around that same time, Aguila applied for a Fictitious Business Name with the Florida Department of State for the name Edge Systems.   Aguila also acquired the domain name, www.edge-systems.com, where he established a website which displays the "E" logo and states "Welcome to Edge Systems' new website."   *See* (ECF No. 50-32).

[10]   As previously noted, Aguila only offered documents of an unquestionably fraudulent nature in support of his stricken defense of prior use dating back to 1996.   *See Edge Sys. LLC v. Aguila*, No. 1:14-CV-24517-KMM, 2015 WL 6447502, at *1 (S.D. Fla. Oct. 26, 2015).   "While courts should afford a litigant proceeding pro se leeway in pleadings, even pro se litigants must satisfy essential burdens."   *Blanco GmbH Co. KG v. Vlanco Industries, LLC*, 992 F. Supp. 2d 1225, 1254 (S.D. Fla. 2014) (citation omitted); *see also Patterson v. Aiken*, 841 F.2d 386, 387 (11th Cir. 1988) ("[P]ro se filings do not serve as an 'impenetrable shield, for one acting pro se has no license to harass others, clog the judicial machinery with meritless litigation, and abuse already overloaded court dockets.'") (quoting *Farguson v. MBank Houston, N.A.*, 808 F.2d 358, 359 (5th Cir. 1986)).   Submitting a fraudulent document to the Court is an explicit violation of Rule 11 of the Federal Rules of Civil Procedure.   *See* Fed. R. Civ. P. 11(b).   "Federal courts have the inherent power and a constitutional obligation to protect their jurisdiction from conduct that interferes with their functions."   *Procup v. Strickland*, 792 F.2d 1069, 1073 (11th Cir.1986) (en banc).   Rule 11 sanctions work "to deter baseless filings in district court and thus streamline the administration and procedure of federal courts."   *Peer v. Lewis*, 606 F.3d 1306, 1311 (11th Cir. 2010).   For example, "where no evidence or only patently frivolous evidence is offered to support factual contentions, sanctions can be imposed."   *Lawson v. Sec'y Dep't of Corr.,* 563 F. App'x 678, 680 (11th Cir. 2014).   Aguila's continued reliance on fraudulent documents clearly runs afoul of Rule 11 and sanctions—including the award of attorney's fees to Edge—are appropriate for Aguila's bad faith conduct.

(1) generic—marks that suggest the basic nature of the product or service; (2) descriptive—marks that identify the characteristic or quality of a product or service; (3) suggestive—marks that suggest characteristics of the product or service and require an effort of the imagination by the consumer in order to be understood as descriptive; and (4) arbitrary or fanciful—marks that bear no relationship to the product or service, and the strongest category of trademarks.

*Tana v. Dantanna's*, 611 F.3d 767, 774 (11th Cir. 2010). The latter two categories, suggestive and arbitrary or fanciful, "are deemed to be inherently distinctive," *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1317 (11th Cir. 2012), because "their intrinsic nature serves to identify a particular source of a product" and are generally entitled to trademark protection. *Two Pesos*, 505 U.S. at 768; *see also Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, 703 F. Supp. 2d 1307, 1312 (S.D. Fla. 2010) ("Distinctiveness measures the relationship of the mark to the good or service it describes."). Neither the EDGE SYSTEMS mark nor the Chevron "E" logo mark bears any relationship to the sale of microdermabrasion systems and are thus inherently distinctive as a matter of law.

The outcome is the same for the Edge Serum Marks[12] as the undisputed record evidence is clear that Edge is the prior and continuous user of each of those marks. Additionally, each of the Edge Serum Marks are inherently distinctive. For example, DERMABUILDER is best classified as a suggestive mark—which by definition is inherently distinctive—as it "suggests some characteristic of the product or service to which it is applied, but requires the consumer to use his imagination to determine the nature or the product or service." *Popular Bank of Florida v. Banco Popular de Puerto Rico*, 9 F. Supp. 2d 1347, 1356 (S.D. Fla. 1998). Likewise, the remaining Edge Serum Marks are also suggestive and thus inherently distinctive.

---

[12] Edge has been continuously using the trademarks ACTIV-4, ANTIOX-6, and BETA-HD since 2005, DERMABUILDER since 2009, GLYSAL since 2010, and ANTIOX+ since 2014. *See* Pls.' Statement of Material Facts (ECF No. 177) ¶¶ 13–16. Although Aguila asserts that he has been using four of these marks since June 2003, his mendacious claim is belied by the record.

Further buttressing this conclusion is the fact that Aguila applied for—and successfully obtained[13]—federal registration of the following four marks:  ANTIOX-6, ACTIV-4, BETA-HD, and DERMABUILDER.  *See* Pls.' Statement of Material Facts (ECF No. 177) ¶¶ 26–29. Moreover, the USPTO's decision to register a mark, without requiring evidence of secondary meaning, is powerful evidence that the registered mark is inherently distinctive.  *See Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1357 n.3 (11th Cir. 2007).  Lastly, there is no evidence that Aguila even disputes that the Edge Serum Marks are inherently distinctive.

Accordingly, viewing the facts in the light most favorable to Aguila as the non-moving party, the Court finds that Edge is entitled to summary judgment on the issue of whether Edge has valid common law rights in the EDGE SYSTEMS mark, the Chevron "E" logo, and the Edge Serum Marks.

2.  There is no Genuine Issue of Material Fact that Edge's Registered Trademarks are Not Invalid.

Edge also moves for summary judgment on the issue that Edge's Registered Marks are not invalid.  The only registered mark that Aguila challenges on the basis of invalidity is The EDGE SYSTEM®.  In opposing summary judgment, Aguila appears to argue that Edge has abandoned the trademark The EDGE SYSTEM® by failing to use the trademark on its products.

Registration of a trademark on the principal register of the USPTO is prima facie evidence of validity and establishes a presumption that the mark is protectable or distinct.  15 U.S.C. § 1057(b); *see also Forman*, 509 F.3d at 1357 n.3; *AR2, LLC v. Rudnick*, No. 14-80809-CIV, 2014 WL 3887907, at *4 (S.D. Fla. Aug. 7, 2014) ("Registration of a trademark establishes

---

[13]   Whether Aguila committed fraud on the USPTO in applying for and obtaining trademark registration for these four serum marks is an issue that is not currently before the Court as the operative complaint was filed on November 26, 2014 and Aguila's trademark applications were filed on December 1, 2014. *See* (ECF Nos. 137-27, 137-28, 137-29, 137-30).

a rebuttable presumption that it is distinctive.").  When the USPTO registers a mark without requiring proof of secondary meaning, the mark is presumed to be inherently distinctive.  *See Forman*, 509 F.3d at 1357 n.3; *see also Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 537 n.1 (5th Cir. 2015) ("[T]here is no evidence in the record that the PTO examined evidence of secondary meaning.  We therefore presume inherent distinctiveness."); 2 *McCarthy on Trademarks and Unfair Competition* § 11:43 (4th ed. 2015).

After five years of continuous use, the owner of a registered trademark may file an affidavit and have the mark declared "incontestable."  *Wilhelm Pudenz, GmbH v. Littlefuse, Inc.*, 177 F.3d 1204, 1208 (11th Cir. 1999) (citing 15 U.S.C. § 1065)).  Incontestability is "conclusive evidence of the registrant's right to use the trademark, subject to certain enumerated defenses" including fraud and abandonment.[14]  *Id.* (citing 15 U.S.C. § 1115(b)); *see also AFFCO New Zealand, Ltd. v. Am. Fine Foods Corp.*, 913 F. Supp. 2d 1331, 1340 (S.D. Fla. 2012).

In challenging Edge's Registered Marks, Aguila offers the Court little more than conclusory allegations of invalidity.[15]  At best, Aguila argues that Edge has abandoned the incontestable mark The EDGE SYSTEM® by failing to use the mark on its products.  *See* Def.'s Opp'n (ECF No. 199) at 9–10.  Under the Lanham Act, a trademark is deemed abandoned

---

[14]  The enumerated defenses of 15 U.S.C. § 1115(b) only "rebut the conclusive presumption of validity that comes with incontestability."  *Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Florida Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, The Ecumenical Order*, 809 F.3d 1171, 1191 (11th Cir. 2015).  A defendant seeking to rely upon any of these statutory defenses "must still identify some additional reason why the plaintiff's marks are invalid."  *Id.*  Aguila has not done so here.

[15]  Specifically, Aguila alleges that Edge's trademarks were wrongfully issued by the USPTO.  *See* (ECF No. 128) at 14.  Yet, he offers no evidence to support this assertion; without factual support Aguila's claims are insufficient to preclude summary judgment.  *See Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000).  After all, "one who resists summary judgment must meet the movant's affidavits with opposing affidavits setting forth specific facts to show why there is an issue for trial."  *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978).

"[w]hen its use has been discontinued with intent not to resume such use."  15 U.S.C. § 1127; *see also Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1173 (11th Cir. 2002) ("[A] defendant who successfully shows that a trademark plaintiff has abandoned a mark is free to use the mark without liability to the plaintiff."); *Tally–Ho, Inc*., 889 F.2d at 1022–23 ("Trademark ownership is always appurtenant to commercial activity.   Thus, actual and continuous use is required to acquire and retain a protectable [sic] interest in a mark."). Defendants asserting an abandonment defense bear a strict burden of proving abandonment by a preponderance of the evidence.  *Cumulus Media*, 304 F.3d at 1175 ("Because a finding of abandonment works an involuntary forfeiture of rights, federal courts uniformly agree that defendants asserting an abandonment defense face a 'stringent,' 'heavy,' or 'strict burden of proof.'").

Aguila offers no evidence that Edge has stopped using the registered mark The EDGE SYSTEM® or that Edge has formed the subjective intent not to resume use of the mark. Lacking any supporting evidence on each of these essential elements, Aguila cannot meet the strict burden of proving abandonment of Edge's mark.  At bottom, Aguila's abandonment claim is a conclusory assertion that is wholly unsupported by the record and such "conclusory allegations without specific supporting facts have no probative value" and are insufficient to avoid summary judgment.  *Evers v. Gen. Motors Corp*., 770 F.2d 984, 986 (11th Cir. 1985); *see also State Farm Mut. Auto. Ins. Co. v. B&A Diagnostic, Inc*., No. 14-CV-24387-KMM, 2015 WL 7272738, at *1 (S.D. Fla. Nov. 16, 2015) (holding that "conclusory and self-serving declarations" are insufficient to create a genuine issue of material fact).

Because there is no conflicting record evidence creating a factual dispute over the validity of Edge's Registered Marks, Edge is entitled to summary judgment on this claim.

3.      Aguila has Infringed Edge's Registered Trademarks and Common Law Marks
and Falsely Designated the Origin of His Goods.

Edge also moves for summary judgment on its trademark infringement claims under the

Lanham Act.  To prevail on a claim of trademark infringement under Section 32 of the Lanham

Act, a plaintiff must demonstrate (1) that the plaintiff owns a valid and enforceable trademark,

(2) that the defendant used the trademark in commerce without consent, and (3) "'that the

unauthorized use was likely to deceive, cause confusion, or result in mistake.'"[16]  *Davidoff &*

*CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1301 (11th Cir. 2001) (quoting *McDonald's Corp.*

*v. Robertson*, 147 F.3d 1301, 1307 (11th Cir. 1998)); *see also* 15 U.S.C. § 1114(1)(a).

The same set of facts that permit a plaintiff to recover under § 1114(1)(a) will also result

in recovery for false designation of origin and unfair competition under § 1125.[17]  *See Babbit*

*Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1181 (11th Cir. 1994) (citation omitted).  As with

trademark infringement claims, the determining factor for false designation of origin under §

1125 is "whether the public is likely to be deceived or confused by the similarity of the marks at

issue."  *Under Armour, Inc. v. 51nfljersey.com*, No. 13-62809-CIV, 2014 WL 1652044, at *5

(S.D. Fla. Apr. 23, 2014) (citing *Two Pesos*, 505 U.S. at 780)); *see also Original Appalachian*

*Artworks, Inc. v. Toy Loft, Inc*., 684 F.2d 821, 831 (11th Cir. 1982) (noting that the "essential

element of an action under [§ 1125] is proof . . . that the alleged infringement . . . creates a

likelihood of confusion on the part of consumers as to the source of the goods").

---

[16]   Because the Court finds that Edge's Marks are valid, and that Aguila used them without
Edge's consent, the Court must next determine whether Aguila's use of the disputed trademarks
creates a likelihood of confusion to resolve Edge's trademark infringement and false designation
of origin claims.

[17]   "This is because Section 1125(a) is broader than Section 1114 in that it covers false
advertising or description whether or not it involves trademark infringement."  *Babbit*, 38 F.3d at
1181.

Courts in the Eleventh Circuit apply the following multi-factor test when determining whether a likelihood of confusion exists:

> (1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

*Tana*, 611 F.3d at 774–75.  Additionally, because the test for likelihood of confusion is pliant, the relevant importance of each factor is determined on a case-by-case basis.  *See Jellibeans, Inc. v. Skating Clubs of Georgia, Inc*., 716 F.2d 833, 840 n.17 (11th Cir. 1983); *see also Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc*., 508 F.3d 641, 649 (11th Cir. 2007) (recognizing that application of the multi-factor test "entails more than the mechanistic summation of the number of factors on each side; it involves an evaluation of the 'overall balance'").

Of all the factors in the likelihood of confusion analysis, actual confusion is "the most weighty consideration."  *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 936 (11th Cir. 2010).  Although likelihood of confusion is generally a question of fact, the issue may be resolved on summary judgment where the undisputed record evidence would lead a reasonable juror to only one conclusion.  *Tana*, 611 F.3d at 775 n.7; *All. Metals, Inc., of Atlanta v. Hinely Indus., Inc*., 222 F.3d 895, 907 (11th Cir. 2000) ("Although likelihood of confusion generally is a question of fact, it may be decided as a matter of law.").

As an initial matter, Aguila does not dispute whether there is a likelihood of confusion between Edge's marks and his use of identical and similar marks.[18]  *See* (ECF No. 177) ¶¶ 4, 25. In fact, during the preliminary injunction hearing held before Judge McAliley, Aguila conceded

---

[18]   Instead, Aguila rests his claim of noninfringement upon the previously stricken affirmative defense of prior use that the Court has already discussed at great length.

that his use of some of Edge's marks was likely to cause confusion; a position Aguila has maintained throughout the course of these proceedings.

Turning to the multi-factor test used to determine whether a likelihood of confusion exists, it is evident that there are no genuine issues of material fact regarding the likelihood of confusion between Edge's marks and those Aguila uses to market the Accused Product. Given Aguila's palpable efforts to "palm-off" his products as genuine Edge merchandise, an in-depth analysis of this fact-bound inquiry is unwarranted here.

Regarding the first factor, the Court has already determined that the marks at issue are entitled to the "widest ambit of protection" under trademark law as each of Edge's marks are inherently distinctive. *See Univ. of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1540 (11th Cir. 1985). Edge's longtime use, significant advertising expenditures, and large volume of sales reinforce the strength of the marks.

The second factor—the similarity of marks—is determined by considering "the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." *Frehling Enterps., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1337 (11th Cir. 1999). "The likelihood of confusion is greater when an infringer uses the exact trademark." *Turner Greenberg Assocs., Inc. v. C & C Imports, Inc.*, 320 F. Supp. 2d 1317, 1332 (S.D. Fla. 2004). This is a case where a picture is truly worth a thousand words, as the similarity of the marks can best be seen by comparing the images below.

The defining characteristics of Edge's Chevron "E" logo are the three white triangles that form an "E" on a blue square and the word EDGE in the bottom right corner. Aguila's mark is essentially identical.





CHEVRON "E" logo                    AGUILA'S INFRINGING MARK

Likewise, as shown in the table below, Aguila is using numerous word marks that are identical to the Edge Marks, with a few marks that are nearly identical to the Edge Marks.

| EDGE'S MARKS | DEFENDANT'S INFRINGING MARKS |
|---|---|
| THE EDGE SYSTEM® / EDGE SYSTEMS | EDGE SYSTEMS |
| HYDROPEEL® | HYDRAPEEL |
| ACTIV-4 | ACTIV-4 |
| ANTIOX+ | ANTIOX-PLUS |
| ANTIOX-6 | ANTIOX-6 |
| BETA-HD | BETA-HD |
| DERMABUILDER | DERMABUILDER |
| GLYSAL | GLYSAL |
| VORTEX-FUSION® | CYCLONIC FUSION |

Judge McAliley previously noted how Aguila's prescient power to name products exactly the same as Edge borders on the phantasmal.  *See* (ECF No. 81) ("On this record, that [Aguila] stumbled upon the same unusual names and logo for the same or highly similar products just before [Edge] did cannot be believed.").  Because Aguila's marks are identical, if not nearly identical[19], this factor weighs heavily in favor of Edge.

Next in the analysis comes the similarity of: (1) the products offered; (2) the sales method and customer base; and (3) the advertising methods.  Aguila's advertised product is an identical—albeit cut-rate— version of Edge's products.  Like Edge, Aguila sells the same serums

---

[19]  "The similarity of the marks is determined by focusing on the marks in their entireties as to appearance, sound, connotation, and commercial impression."  *Stone Lion Capital Partners, L.P. v. Lion Capital LLP*, 746 F.3d 1317, 1321 (Fed. Cir. 2014) (internal citation and marks omitted).  Aguila uses the word marks "HYDRAPEEL" and "CYCLONIC-FUSION" which are nearly identical to Edge's marks "HYDROPEEL®" and "VORTEX-FUSION®."  Each of Aguila's marks look and sound substantially the same as Edge's marks and leaves the consumer with the same overall commercial impression.

and solutions for use with his infringing machine.  Because the products offered by Edge and Aguila are exactly the same, this factor weighs heavily in Edge's favor.

A high degree of similarity between sales methods and use of the same advertising media also increases the likelihood of confusion.  *See Suzuki Motor Corp. v. Jiujiang Hison Motor Boat Mfg. Co*., No. 1:12-CV-20626, 2012 WL 640700, at *3 (S.D. Fla. Feb. 27, 2012).   Here, there is no question that similarities abound between Edge's and Aguila's sales methods, customer base, and advertising methods.  Both Aguila and Edge use a sales force and the Internet to market their respective products.   Aguila's website includes nearly identical information and graphics to Edge's website, along with the blatant use of Edge's marks.  In short, Aguila's entire operation is actively masquerading as an Edge affiliate in order to piggy-back off of Edge's extensive advertising and marketing efforts.  This factor also weighs heavily in Edge's favor.

The next factor—intent—requires the court to determine whether Aguila "adopted [Edge's] mark with the intention of deriving a benefit from [Edge's] business reputation." *Frehling*, 192 F.3d at 1340; *see also Caliber Auto.*, 605 F.3d at 940.  Aguila uses Edge's name and logo, welcomes callers with "Welcome to Edge," identifies his sales force as affiliated with "Edge Systems," all to sell a direct copy of the Edge Machine.   The only conclusion one can reach is that Aguila's conspicuous acts of chicanery were done with the intent to derive a benefit from Edge's reputation and goodwill.

Lastly, the Court revisits the issue of whether there is evidence of actual confusion.[20]  As previously discussed, evidence of actual confusion—though not necessary to a finding of a likelihood of confusion—is the best evidence of the likelihood of confusion, and "the quantum of

---

[20]  The Court previously determined there was evidence of actual confusion when adopting Judge McAliley's report and recommendation.  *See* (ECF No. 89).  As Judge McAliley noted, "[t]o state the obvious, the use of the same names and trade dress on what is essentially the same product is without doubt confusing." *See* (ECF No. 81) at 14.

evidence needed to show actual confusion is relatively small." *Caliber Auto.*, 605 F.3d at 937 (internal quotation omitted). Unquestionably, Aguila's directly deceitful acts have tricked several customers—including Dr. Duboys and Ms. Irby—into purchasing his knock-off product.

There is therefore no genuine issue of fact sufficient to require a trial on the likelihood of confusion engendered by Aguila's use of Edge's marks. Accordingly, Edge's motion for summary judgment on its Lanham Act claims, comprising Counts II and III of its complaint, is granted.

### B.     '620 and '591 Patents are Infringed and Not Invalid

Edge also moves for summary judgment on its claims that Aguila infringes on both the '620 and '591[21] patents and that neither patent is invalid. In response, Aguila appears to argue that his products are distinct enough as to not infringe on the '620 Patent. Related to the '591 Patent, Aguila argues that his handpieces do not meet one of the limitations of Claim 1 of that patent. Further, Aguila claims that both the '620 and '591 patents are invalid due to anticipation, obviousness, and indefiniteness. As set forth more fully below, Aguila's conclusory assertions are once again belied by the record and Aguila's invalidity arguments fail as a matter of law.

---

[21]   Edge filed a cross-motion for summary judgment on its claims for infringement and no invalidity of the '591 patent in response to Aguila's motion for summary judgment. *See* (ECF No. 194). Aguila contends that in doing so, Edge not only violated Local Rule 7.1(c)(2)'s prohibition on multiple motions for partial summary judgment, but also failed to comply with the Court's scheduling order requiring summary judgment motions to be filed no later than eighty (80) days prior to the trial date. *See* Def.'s Reply (ECF No. 206). However, Edge's claims for infringement and no invalidity of the '591 patent originated from a handpiece (the "Late-Produced Handpiece") that Aguila disclosed well after the discovery window closed and the parties' summary judgment motions had been filed. Aguila's failure to disclose this evidence before the discovery deadline indicates a complete misunderstanding of the discovery process and rings of bad faith. Additionally, Aguila's untimeliness argument is without merit as the cross-motion was filed in conjunction with Edge's response to Aguila's summary judgment motion by the relevant deadline established by the Court. In sum, Aguila's behavior during discovery reeks of rotten intentions and only further demonstrates his fruitless efforts to delay the inevitable.

Accordingly, Edge is entitled to summary judgment on its claims for patent infringement of both the '620 patent and '591 patents and that neither patent is invalid.

      1.     <u>Patent Infringement Legal Framework</u>

     A patent is infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent."  35 U.S.C. § 271(a).  Determining whether an accused device infringes a patent requires a two-step inquiry.  *See Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004).  First, a court must determine the scope and meaning of "any disputed terms and limiting expressions in the [patent] claims" as a matter of law.  *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (noting it is a "'bedrock principle' of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude") (citation omitted).  "[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy."  *Vivid*, 200 F.3d at 803 (citing *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim construction is for "resolution of disputed meanings")).  Under this analysis, "[w]ords of a claim are generally given their ordinary and customary meaning, which is the meaning a term would have to a person of ordinary skill in the art after reviewing the intrinsic record at the time of the invention."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (noting that there is a "'heavy presumption' that a claim term carries its ordinary and customary meaning").

     Second, the fact finder compares "the properly construed claims to the allegedly infringing device."  *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1273 (Fed.

Cir. 2004).  Under this step, an accused device can infringe the asserted claims of a patent either literally or under the doctrine of equivalents.[22]  *Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330, 1340 (Fed. Cir. 2013).  Although there is no "per se rule that expert testimony is required to prove infringement when the art is complex," *Centricut, LLC v. Esab Grp., Inc.*, 390 F.3d 1361, 1370 (Fed. Cir. 2004), courts regularly approve of the use of expert testimony to establish infringement.  *See Ultradent Products, Inc. v. Life-Like Cosmetics, Inc.*, 127 F.3d 1065, 1070 (Fed. Cir. 1997); *see also AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1329 (Fed. Cir. 2007) ("Even where literal infringement is involved, expert infringement testimony is generally required in cases involving complex technology.").

It is the patentee's burden to prove infringement by a preponderance of the evidence. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991).  "If the patentee fails to meet that burden, the patentee loses regardless of whether the accused comes forward with any evidence to the contrary."  *Creative Compounds, LLC v. Starmark Labs*., 651 F.3d 1303, 1314 (Fed. Cir. 2011).  Moreover, the Federal Circuit teaches that "[s]ummary judgment on the issue of infringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under

---

[22]  "Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device."  *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1477 (Fed. Cir. 1998).  "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law."  *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).  Infringement is established under the doctrine of equivalents "if an element of the accused device performs substantially the same function in substantially the same way to obtain the same result as the claim limitation."  *EMD Millipore Corp. v. AllPure Techs., Inc.*, 768 F.3d 1196, 1202 (Fed. Cir. 2014).  Thus, the doctrine of equivalents "prevents an accused infringer from avoiding infringement by changing only minor or insubstantial details of a claimed invention while retaining their essential functionality."  *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1424 (Fed. Cir. 1997).

the doctrine of equivalents." *PC Connector Sols. LLC v. SmartDisk Corp.,* 406 F.3d 1359, 1364

(Fed. Cir. 2005) (citing *Bai v. L & L Wings, Inc*., 160 F.3d 1350, 1353–54 (Fed. Cir. 1998)).

> 2. '620 Patent is Infringed

Aguila does not dispute the scope and meaning of Claim 1 of Edge's '620 Patent.

Accordingly, and consistent with the ordinary and customary meanings of the terms used, the

Court construes Claim 1 to mean:

> A system for treating surface layers of a patient's skin, comprising: an instrument
> body with a distal working end for engaging a skin surface; a skin interface
> portion of the working end comprising an abrasive fragment composition secured
> thereto; at least one inflow aperture in said skin interface in fluid communication
> with a fluid reservoir; and at least one outflow aperture in said skin interface in
> communication with a negative pressurization source.

ECF No. 1-4.

Edge contends that the Accused Product meets every limitation of Claim 1 of the '620

Patent, and therefore, the Accused Product literally infringes Claim 1.  In opposition, Aguila

argues that the Accused Product does not infringe because Aguila's diamond-encrusted

handpiece is not connected to his device's vacuum source.  *See* Def's Resp. (ECF No. 199) at 10.

Additionally, Aguila argues that the plastic tips he sells for use with the Accused Product do not

include the "abrasive fragment composition" required by Claim 1 of the '620 Patent.  *Id.* at 11.

Aguila's arguments in support of noninfringement of the '620 Patent are contrary to the

record evidence before the Court.  As noted in Edge's infringement expert's report, the Accused

Product is a system for treating the skin surface layers of a patient—which is a limitation

contained in the preamble[23] of Claim 1 of the '620 patent.  *See* Expert Report of Gary L. Loomis

("Loomis Expert Report") (ECF No. 176-11) at 17.

_____

[23]  Generally, courts do not treat preamble language "as limiting the scope of the claim."  *Bicon, Inc. v. Straumann Co*., 441 F.3d 945, 952 (Fed. Cir. 2006).  Over the years the Federal Circuit

The Accused Product also has "an instrument body with a distal working end for engaging a skin surface" as limited in element 1 of the claim. *Id.* at 18. Dr. Loomis also reports that the distal working end of the Accused Product includes "a skin interface portion of the working end that has an abrading fragment secured to it" as limited in element 2 of the claim. *Id.* Both these limitations were found to be present in the Duboys Handpiece (pictured below) and the Irby Handpiece. *Id.*



This abrading structure, which is present on both the Irby Handpiece and the Duboys Handpiece, is used to abrade and exfoliate the patient's skin. *Id.* at 19.

---

has struggled to determine when a preamble should be treated as limiting. *See Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995) ("Much ink has, of course, been consumed in debates regarding when and to what extent claim preambles limit the scope of the claims in which they appear."); *see also Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) ("No litmus test defines when a preamble limits claim scope."). On some occasions, "[w]hen limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention." *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003). Here the preamble is not merely a statement describing the invention's intended use. Instead, the preamble is "intimately meshed with the ensuing language in the claim." *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1306 (Fed. Cir. 1999).



The third element of Claim 1 of the '620 Patent is also met by the Accused Product as it has "at least one inflow aperture in said skin interface in fluid communication with a fluid reservoir." *Id.* at 24. The Duboys Handpiece pictured below clearly meets this limitation.



According to Dr. Loomis, the Duboys Handpiece "has an aperture in the distal working end, which is communication with the single-use vial" containing a serum. *Id.* The serum vial is a fluid reservoir that is inserted into the back of the handpiece. *Id.* "When the distal end of the handpiece is positioned against the skin of the patient, the vacuum creates negative pressure that pulls solution out from the [serum vial] through the needle in the handpiece." The solution is then pulled through the needle and out through the aperture, located on the distal working end of the handpiece. This structure is also present on the Irby Handpiece.

Lastly, the Irby and Duboys Handpieces both have "at least one outflow aperture in said skin interface in communication with a negative pressurization source" as required by the fourth element of Claim 1 of the '620 Patent.



Based on the essentially uncontradicted testimony of Dr. Loomis, the Court finds that Edge has proved that Aguila's infringing products meet all of the limitations of Claim 1 of the '620 Patent.  No reasonable jury could find that each limitation of Claim 1 of the '620 Patent is not literally present in Aguila's accused products.  Summary judgment of literal infringement of the '620 Patent is thus appropriate.

3.      '591 Patent is Infringed

Aguila's claim of noninfringement of Claim 1 of the '591 Patent fares no better.  Aguila once again makes an unsupported assertion that the Accused Product does not infringe Claim 1 of the '591 Patent because the "handpieces with vacuum do not have a feature or method" that meets the fourth element of Claim 1 which requires that "the skin interface comprised an abrading structure with substantially sharp edges for abrading tissue."  *See* Def.'s Motion (ECF No. 179) at 7.  Additionally, Aguila claims that his handpieces with vacuum do not have anything in common with any of the other elements of Claim 1 of the '591 Patent.  *Id.*  However, the record evidence establishes unequivocally that the Late-Produced Handpiece infringes every element of Claim 1 of the '591 Patent.

The first element of Claim 1 is "an instrument body with a distal working end that defines a skin interface portion for contacting the skin."  As explained in Loomis' Supplemental Expert

Report, the Late-Produced Handpiece pictured below includes these features.  *See* Loomis Supp.

Expert Report (ECF No. 194-4) at 4.



The second and third elements of Claim 1 of the '591 Patent are also present in the Late-

Produced Handpiece.  *Id.* at 5–6.  The second element of Claim 1 is "a first aperture arrangement

in said skin interface consisting of at least one port in communication with a treatment media

source."   The third element requires a "second aperture arrangement in said skin interface

consisting of at least one port in communication with a vacuum source for removing treatment

media and removed tissue from the skin interface."  This "second aperture" is the relatively small

hole pictured below in the Late-Produced Handpiece, immediately above the "first aperture"

previously mentioned.



Lastly, the fourth element of Claim 1 requires that "the skin interface comprises an

abrading structure with substantially sharp edges for abrading tissue."  As shown in the picture

below—and explained by Dr. Loomis—this tip includes four sets of five substantially sharp edges that abrade and exfoliate the skin of a patient. *Id.* at 7–8.



Accordingly, summary judgment of literal infringement of the '591 patent in favor of Edge is also appropriate.

### 4.    '591 and '620 Patents are Not Invalid

All issued patents are entitled to a presumption of validity.  35 U.S.C. § 282; *see also Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd*., 719 F.3d 1346, 1352 (Fed. Cir. 2013) (noting that "[i]t is black-letter law that a patent is presumed valid").  To overcome this presumption, a party challenging the validity of a patent bears the burden of proving its case with clear and convincing evidence.  *Impax Labs., Inc. v. Aventis Pharm., Inc*., 545 F.3d 1312, 1314 (Fed. Cir. 2008); *see also Sciele Pharma Inc. v. Lupin Ltd*., 684 F.3d 1253, 1260 (Fed. Cir. 2012) (noting that this high burden of proof stems from the fact that the party challenging a patent "bear[s] the added burden of overcoming the deference that is due to a qualified government agency presumed to have done its job") (citation omitted).

This standard requires that "a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise."  *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).  Or, as the case is here, the "party seeking to have a patent held not invalid at summary

judgment must show that the nonmoving party, who bears the burden of proof at trial, failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent." *Id.* A party may assert invalidity on several grounds, including anticipation by prior art, obviousness, and indefiniteness. *See* 35 U.S.C. §§ 102, 103, 112.

Under 35 U.S.C. § 102 a claim will be "invalid for anticipation when the same device or method, having all of the elements contained in the claim limitations, is described in a single prior art reference." *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002); *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) ("[I]nvalidity by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation."). "A reference patent anticipates an invention . . . only if the reference patent's effective filing date is before the date of the invention." *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1356 (Fed. Cir. 2010). While "anticipation is a question of fact, it may be decided on summary judgment if the record reveals no genuine dispute of material fact." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1327 (Fed. Cir. 2001).

A patent is invalid for obviousness "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." *Harmonic Inc. v. Avid Tech., Inc.*, No. 2015-1072, 2016 WL 798192, at *3 (Fed. Cir. Mar. 1, 2016) (quoting 35 U.S.C. § 103)). Obviousness is a question of law based on underlying factual findings. *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013).

The Federal Circuit notes that "testimony concerning anticipation must be testimony from one skilled in the art and must identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference." *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002).

Turning to Aguila's arguments of invalidity, there is substantial evidence to support a finding that Aguila did not present clear and convincing evidence that either Claim 1 of the '591 Patent or Claim 1 of the '620 Patent are anticipated or obvious due to the alleged prior art of U.S. Patent No. 6,241,739 (the "'739 Patent").[24]   Quite frankly, Aguila's claims were baseless and factually unsupported from the beginning of this case.  First, the priority date of the '591 Patent precedes the filing date of the '739 Patent and thus the '739 Patent cannot be considered prior art.  *See* (ECF No. 195) ¶ 20.  Moreover, Aguila's conclusory averments that the '739 patent is prior art to the patents at issue does not stray from the script he has followed throughout the progression of this action.   And once again, these conclusory statements are inadequate to support Aguila's claims of patent invalidity as the non-movant.  *See TechSearch, L.L.C. v. Intel Corp.,* 286 F.3d 1360, 1372 (Fed. Cir. 2002) ("Mere denials or conclusory statements are insufficient.").

---

[24]   Nor does Aguila present clear and convincing evidence that Claim 1 of the '591 and '620 patents are indefinite in violation of 35 U.S.C. § 112.   The statute requires that a patent specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  *UltimatePointer, L.L.C. v. Nintendo Co*., No. 2015-1297, 2016 WL 798354, at *8 (Fed. Cir. Mar. 1, 2016) (quoting 35 U.S.C. § 112)).  The Supreme Court has read this provision to require that "a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus v. Biosig Instruments, Inc.,* 134 S. Ct. 2120, 2129 (2014).  There is no doubt that Claim 1 of both patents clears this bar and that Aguila has offered no evidence to the contrary.

As both the '591 Patent and the '620 Patent are presumed to be valid, Aguila must offer something more than conclusory statements to show clear and convincing evidence of anticipation or obviousness.  Aguila has failed to meet that high burden, and the Court cannot find either patent invalid on the current record.  Rather, the opposite conclusion is warranted.  Accordingly, Edge is entitled to summary judgment on its claims that both the '591 Patent and the '620 Patent are not invalid.

### C.  Edge is Entitled to Summary Judgment on State Law Claims

Edge also moves for summary judgment on Counts IV (Florida Common Law Unfair Competition) and VI (Florida Deceptive and Unfair Trade Practices Act).  The legal standards for Florida statutory and common law claims of trademark infringement and unfair competition "are the same as those for federal claims of trademark infringement and unfair competition." *Rain Bird Corp. v. Taylor*, 665 F. Supp. 2d 1258, 1267 (N.D. Fla. 2009) (citing *Gift of Learning Found., Inc. v. TGC, Inc*., 329 F.3d 792, 802 (11th Cir. 2003)).  For example, it is widely accepted that "[a] successful [Lanham Act] infringement claim supports a claim for violation of FDUTPA."  *Coach, Inc. v. Swap Shop, Inc*., 916 F. Supp. 2d 1271, 1283 (S.D. Fla. 2012); *see also TracFone Wireless, Inc. v. GSM Grp., Inc*., 555 F. Supp. 2d 1331, 1338 (S.D. Fla. 2008) ("Engaging in trademark infringement is an unfair and deceptive trade practice that constitutes a violation of the [Florida Deceptive and Unfair Trade Practices] Act.").  Similarly, under Florida common law, trademark infringement can serve as the foundation for an unfair competition claim.  *Tobinick v. Novella*, No. 9:14-CV-80781, 2015 WL 6777458, at *5 (S.D. Fla. Oct. 2, 2015).

Because the Court has already determined Edge is entitled to summary judgment on the Lanham Act claims, summary judgment is equally appropriate on the Florida statutory and

common law claims.  Accordingly, Edge's motion for summary judgment as to Counts IV and VI is GRANTED.

> ### D.   Edge is Entitled to a Permanent Injunction

Edge now seeks permanent injunctive relief for Aguila's infringement of the '620 Patent as well as for Aguila's trademark infringement.  Aguila's argument against a permanent injunction seems to be one primarily based on the doctrine of laches.[25]  Aguila also challenges Edge's claims of irreparable harm based on Edge's alleged poor reputation in the marketplace. For the reasons set forth below, Edge is entitled to permanent injunctive relief against Aguila for both patent and trademark infringement.

> ### 1.   Legal Framework for Determining Appropriateness of a Permanent Injunction

Under the Lanham Act, a district court is authorized to issue an injunction "according to the principles of equity and upon such terms as the court may deem reasonable" to prevent a defendant's continuing trademark infringement.  *See* 15 U.S.C. § 1116(a).  In fact, "[i]njunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1509–10 (S.D. Fla. 1995) (citing *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1180 (9th Cir. 1988)).  Equitable relief is also available in patent infringement suits.  *See* 35 U.S.C. § 283; *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006) (finding that a prevailing plaintiff in a patent infringement suit is entitled to permanent injunctive relief).

---

[25]   Aguila's laches argument has been previously rejected by this Court as well as the Federal Circuit.  *See Edge Sys. LLC v. Aguila*, No. 2015-1507, 2015 WL 9267529, at *8 (Fed. Cir. Dec. 21, 2015) (finding district court did not abuse discretion where Aguila's laches argument was merely "*ipse dixit*" and "fail[ed] to provide any reasoned analysis of the applicable law to the facts of this case").

Relief in the form of a permanent injunction does not automatically follow a determination that an infringement of intellectual property rights has occurred.[26]  *Microsoft Corp. v. Tech. Enters., LLC*, 805 F. Supp. 2d 1330, 1333 (S.D. Fla. 2011) (citing *eBay Inc.*, 547 U.S. at 392).   Instead, "[e]quity dictates a four-factor test that a district court uses when removing a trespasser from infringed intellectual property."  *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1338 (Fed. Cir. 2013).   To obtain a permanent injunction, a plaintiff must demonstrate that "(1) it has suffered irreparable injury; (2) there is no adequate remedy at law; (3) the balance of hardship favors an equitable remedy; and (4) an issuance of an injunction is in the public's interest."  *Under Armour*, 2014 WL 1652044, at *6 (citing *eBay Inc.*, 547 U.S. at 392–93)).

2.     Permanent Injunctive Relief Against Aguila's Infringement of the '620 Patent is Appropriate

To demonstrate irreparable harm in a patent infringement suit, a patentee must establish: "1) that absent an injunction, it will suffer irreparable harm, and 2) that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement."  *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012) ("Apple II"); *see also* A*pple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1363 (Fed. Cir. 2013) ("Without a showing of causal nexus, there is no relevant irreparable harm.") ("Apple III").   Courts recognize that irreparable harm frequently manifests itself in a variety of consequences that are often difficult to quantify.  *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013) ("Irreparable injury encompasses different types of losses . . . including lost sales and erosion in reputation and brand

---

[26]   Nor does the fact that Edge has already obtained preliminary relief in this matter necessitate the issuance of a permanent injunction.  *See In re Dixie Broad., Inc.*, 871 F.2d 1023, 1029 (11th Cir. 1989) ("The fact that preliminary relief is obtained does not mean that permanent relief also must be forthcoming.").

distinction."); *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.").

Both requirements are met in this case. Aguila's infringement of the '620 patent has already damaged Edge's market exclusivity and goodwill. For example, Edge has repeatedly received complaints stemming from potential customers' purchases of the Accused Product, which they believed to be Edge's product. Additionally, by selling the Accused Product at one-fourth the price of the Edge Machine, Aguila threatens to irreversibly erode the price the market will bear for Edge's products. The fact that Aguila is in direct competition with Edge only reinforces the irreparable harm Edge now faces. *See Douglas Dynamics*, 717 F.3d at 1345 ("Where two companies are in competition against one another, the patentee suffers the harm— often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions.") The Court finds that Edge has demonstrated that it will suffer irreparable harm from Aguila's infringement in the form of lost sales, price erosion, market exclusivity, and having to compete directly with an infringing competitor.

Because the harm to be avoided is the sale of infringing products, patent owners—like Edge—must show that consumers purchase the infringing products for their patented features. The purpose of the causal nexus requirement is to distinguish between "irreparable harm caused by patent infringement and irreparable harm caused by otherwise lawful competition." *Apple III*, 735 F.3d at 1361. The patent owner is not "necessarily required to show that a patented feature is the sole reason" for consumers' purchases, but rather must "show that the infringing feature drives consumer demand for the accused product." *Id.* at 1364 (citations omitted). "[T]he relevant inquiry focuses on the objective reasons as to why the patentee lost sales," *Apple, Inc. v.*

*Samsung Elecs. Co.*, 678 F.3d 1314, 1328 (Fed. Cir. 2012) ("Apple I"), and "should focus on the importance of the claimed invention in the context of the accused product, and not just the importance, in general, of features of the same type as the claimed invention." *Apple III*, 735 F.3d at 1364.

Here, there is ample evidence of a causal nexus between the harm to Edge and Aguila's infringement of the '620 Patent.  Consumer demand for Aguila's product is driven by the same patented features that drive consumer demand for Edge's products.  As Aguila's products are a blatant knock-off of Edge's Machine, Aguila could not faithfully argue—nor does the evidence show—that the infringing products might include other popular features that contribute to their demand.  The Court finds that Edge has shown irreparable harm that is causally related to Aguila's infringement of the '620 patent, which weighs in favor of a permanent injunction.  The Court now turns to the remaining factors.

The balance of hardships clearly favors Edge.  As explained throughout the course of this Order, Edge has invested significant time, capital and other resources to promote and sell its patented products.  Absent an injunction, Aguila can continue to ride Edge's coattails, while simultaneously undermining Edge's efforts at quality control and product marketing.  Aguila's only potential harm is that he will not be able to sell his already dwindling stock of infringing machines and the loss of income from those potential sales.  However, "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Windsurfing Int'l, Inc. v. AMF, Inc*., 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986); *see also Robert Bosch LLC v. Pylon Mfg. Corp*., 659 F.3d 1142, 1156 (Fed. Cir. 2011) ("A party cannot escape an injunction simply because it is smaller than the patentee or because its primary product is an infringing one.").  In such

circumstances, the loss to the business of the income derived from the infringing products is irrelevant.  *See i4i Ltd*., 598 F.3d at 863 (noting that a defendant "is not entitled to continue infringing simply because it successfully exploited its infringement").

"[T]he touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects."  *Id.* (citation omitted).  The Federal Circuit has "long acknowledged the importance of the patent system in encouraging innovation."  *Sanofi-Synthelabo v. Apotex, Inc*., 470 F.3d 1368, 1383 (Fed. Cir. 2006).  For cases involving imitation versions of a patented product, a recent Federal Circuit opinion sheds insight onto a court's analysis of the public interest factor:

> While the general public certainly enjoys lower prices, cheap copies of patented inventions have the effect of inhibiting innovation and incentive.  This detrimental effect, coupled with the public's general interest in the judicial protection of property rights in inventive technology, outweighs any interest the public has in purchasing cheaper infringing products.  In sum, the public has a greater interest in acquiring new technology through the protections provided by the Patent Act than it has in buying "cheaper knock-offs."

*Douglas Dynamics*, 717 F.3d at 1346.

Having reviewed the four factors necessary to obtain permanent injunctive relief, the Court finds that all the factors weigh in favor of a permanent injunction to prevent Aguila from further infringement of Edge's '620 patent through the sale of his Accused Product.

### 3.    Permanent Injunctive Relief Against Aguila's use of Edge's Marks is Appropriate

Edge also seeks permanent injunctive relief from Aguila's further infringement of the Edge Marks.  As Edge has carried its burden on each of the four factors, permanent injunctive relief is appropriate.

First, in cases involving trademark infringement, "a sufficiently strong showing of likelihood of confusion . . . may by itself constitute a showing of a substantial threat of irreparable harm." *Under Armour*, 2014 WL 1652044, at *6 (citing *McDonald's Corp.*, 147 F.3d at 1306). In the wake of the Supreme Court's decision in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006), courts within the Eleventh Circuit vary widely in determining whether to presume irreparable injury upon finding a likelihood of confusion in a trademark case. *See Sylvan Learning Inc. v. Learning Sols., Inc*., 795 F. Supp. 2d 1284, 1297 (S.D. Ala. 2011) (collecting cases). However, even absent such a presumption of injury, the very nature of Aguila's infringement of Edge's marks warrants a finding of irreparable harm. *See Uber Promotions, Inc. v. Uber Techs., Inc*., No. 1:15CV206-MW/GRJ, 2016 WL 617450, at *3 (N.D. Fla. Feb. 16, 2016) ("So while a court must, in each trademark infringement case, make a finding of irreparable harm before an injunction may issue, that finding will often be made due to the nature of the harm."). Aguila's insidious acts of infringement of Edge's marks have exacerbated consumer confusion in the relevant marketplace. This type of harm is certainly hard to quantify and thus is irreparable. *See Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc*., 735 F.3d 735, 741 (7th Cir. 2013) ("[I]rreparable harm is especially likely in a trademark case because of the difficulty of quantifying the likely effect on a brand of a nontrivial period of consumer confusion.").

Edge has no adequate remedy at law so long as Aguila is able to continue his use of Edge's marks in commerce because such activity necessarily constrains Edge's ability to "control the quality of what appears to be its products in the marketplace." *Under Armour,* 2014 WL 1652044, at *6; *see also Adidas AG v. 2013jeremyscottadidas.com*, No. 13-61867-CIV, 2014 WL 799132, at *8 (S.D. Fla. Feb. 28, 2014) ("An award of monetary damages alone will

not cure the injury to Plaintiffs' reputation and goodwill that will result if Defendants' infringing and counterfeiting actions are allowed to continue.")

The balance of hardships also unequivocally tips in Edge's favor. *See e.g.*, *Tiramisu Int'l LLC v. Clever Imports LLC,* 741 F. Supp. 2d 1279, 1288 (S.D. Fla. 2010) (reasoning that enjoining a defendant from using a protected mark "cannot cause a hardship for [Defendant] that could outweigh the harm suffered by [Plaintiff] through the illegal use of its mark"); *TracFone Wireless*, 98 F. Supp. 3d 1256 (finding that "balance of hardships weighs strongly" in plaintiff's favor when defendant "has absolutely no interest whatsoever in continuing his conduct"). Edge runs the risk of loss of sales, goodwill, and damage to its reputation in the marketplace if Aguila is allowed to continue his use of the marks at issue, whereas Aguila faces no cognizable hardship, as he has no legal or equitable right to use the marks.

Lastly, the public interest supports the issuance of a permanent injunction in order to prevent consumers from being misled by Aguila's products in the marketplace. *Angel Flight of Georgia, Inc. v. Angel Flight Am., Inc*., 522 F.3d 1200, 1209 (11th Cir. 2008) ("The reason is simple: the public deserves not to be led astray by the use of inevitably confusing marks."). Quite simply, "[t]he public has an interest in not being misled as to the origin, source, or sponsorship of trademarked products." *Chanel, Inc. v. chanel255.org*, No. 12-21762-CIV, 2012 WL 1941598, at *6 (S.D. Fla. May 29, 2012).

Accordingly, all four factors favor the grant of a permanent injunction against Aguila's use of the Edge Marks in violation of the Lanham Act.

IV.     **CONCLUSION**

Yogi Berra famously quipped, "it ain't over 'til it's over."  Although various issues remain before the Court in this matter[27], we have come to the end of the inning as far as Aguila's infringing activities—that were brought to the plate by Plaintiffs' motion—are concerned.

For the foregoing reasons, it is hereby ORDERED AND ADJUDGED that Plaintiffs' Motion for Summary Judgment (ECF No. 176) is GRANTED.

It is further ORDERED AND ADJUDGED that:

1.     Aguila's Motion in Limine (ECF No. 181), Motion to Strike Expert Report (ECF No. 182), and Motion for Sanctions (ECF No. 184) are DENIED.[28]

2.     Edge's Third Request to Continue Pretrial Conference and Trial Dates (ECF No. 223) is DENIED.  Should Edge determine that a further continuance is necessary after reviewing this Order, the Court will re-entertain that issue upon a timely filed motion.

3.     Defendant Rafael Newton Aguila a/k/a Ralph Aguila, d/b/a Hydradermabrasion Systems, his/its officers, directors, servants, employees, agents, subsidiaries, affiliates and all persons in active concert or participation with him/it having actual notice of this Order are hereby permanently enjoined from:

> a.  Using, copying, simulating, or in any way infringing the trademarks EDGE SYSTEMS, THE EDGE SYSTEM®, HYDROPEEL®, VORTEX-FUSION®, ACTIV-4, ANTIOX-6, BETA-HD, DERMABUILDER, GLYSAL, ANTIOX+ and the chevron-styled "E" logo formed by three triangles (the "Edge Marks"); and
>
> b.  Making, using, offering for sale, selling within the United States, or importing

---

[27]  A review of the Complaint shows that Count I is partially resolved as four utility patents—the '120 patent, the '886 patent, the '716 patent, and the '513 patent—remain at issue.  Nor has Edge sought relief on its claim for Fraud on the USPTO for the '086 Trademark Application (Count V).

[28]  After reviewing the motions and their respective responses and replies, the Court finds that Aguila's Motions (ECF Nos. 181, 182, 184) are without merit.

into the United States, any product that infringes on U.S. Patent No. 6,299,620 (the "'620 Patent"), including but not limited to the "HydraDerm MD" or "Hydradermabrasion MD" product.

4.      Defendant Rafael Newton Aguila is hereby ORDERED to pay Plaintiffs costs and attorney's fees incurred after January 7, 2015, the date which Aguila submitted fraudulent documents to the Court in opposition to Plaintiffs' motion for preliminary injunction.  This amount should include the costs and fees Plaintiffs incurred to draft and file their motion for summary judgment, as well as the costs incurred responding to Aguila's various motions since that date.  Within two weeks of this order, Plaintiffs shall provide Aguila with an accounting of these costs and fees.

DONE AND ORDERED in Chambers at Miami, Florida, this 9th day of May, 2016.


_____
K. MICHAEL MOORE
CHIEF UNITED STATES DISTRICT JUDGE


c:      All counsel of record